**SONNENSCHEIN NATH & ROSENTHAL LLP**
Scott Stein (AZ Bar No. 022709)
Shaun Klein (AZ Bar No. 018443)
2398 East Camelback Road,  Suite 1060
Phoenix, AZ  85016-9009
Facsimile (602) 508-3914
Telephone (602) 508-3900

Christian S. Genetski (*Pro Hac Vice*)
Shane M. McGee (*Pro Hac Vice*)
1301 K Street, NW, Suite 600-East Tower
Washington, DC  20005
Facsimile (202) 408-6399
Telephone (202) 408-6400

Attorneys for Defendants Vivendi Games, Inc.
and Blizzard Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| MDY INDUSTRIES, LLC, | **Case No.:**  CV06-02555-PHX-DGC |
| Plaintiff and Counter-Claim Defendant | **BLIZZARD ENTERTAINMENT, INC. AND VIVENDI GAMES, INC. MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| vs. | |
| BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC. | |
| Defendants and Counter-Claim Plaintiffs. | The Honorable David G. Campbell |
| BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC. | |
| Third-Party Plaintiffs, | |
| vs. | |
| MICHAEL DONNELLY, | |
| Third-Party Defendant. | |

Blizzard Entertainment, Inc. and Vivendi Games, Inc. (collectively, "Blizzard") hereby move, pursuant to Fed. R. Civ. P. Rule 56, for a grant of summary judgment, in the form of injunctive relief, monetary damages, and attorneys' fees, against MDY Industries, LLC and Michael Donnelly (collectively, "MDY") on their

claims for secondary copyright infringement, DMCA trafficking, and tortious interference with contractual relationships, and present the following memorandum of points and authorities, statement of facts and exhibits in support.

## I.      Introduction

Blizzard is the creator and operator of World of Warcraft ("WoW"), the world's most popular massively multiplayer online role playing game in which over 10 million players join together online to create characters, socialize and explore a rich virtual universe.  (Statement of Facts ("SOF") ¶ 9, 25).[1]  One of the foundations of Blizzard's success is its unsurpassed recognition of and response to the desires of its players.  (SOF ¶ 10, 30).  Blizzard has invested significant resources to create and maintain a massive online world whose rules and rewards are carefully calibrated to ensure the optimum playing experience for all players.  (SOF ¶ 10, 30).  To play the game, users must purchase a license to use the copyrighted WoW software client - the software that resides on the user's computer - and pay monthly subscription fees for access to the WoW game servers.  (SOF ¶ 16-18).  Blizzard enforces its rights in and to the game through both the World of Warcraft End User License Agreement ("EULA") and Terms of Use ("TOU"), as well as technological measures designed to prevent users from accessing the copyrighted game content in an unauthorized manner.  (SOF ¶ 84, 105-119).

MDY has maliciously encouraged WoW players to exceed the scope of their licenses under the EULA and TOU by developing, promoting and supporting Glider, a "bot" program designed specifically to exploit WoW and "play" characters, increase their "level" in the game to access more advanced game content, and acquire valuable in-game currency, all without actual human participation.  (SOF ¶ 8, 53-54, 56, 114, 171-74).  While legitimate players eat, sleep, and attend school or work, MDY's customers use Glider to shortcut the advancement of their in-game

---

[1]  For a more detailed description of WoW, *see* SOF ¶ 9-48.

characters and loot scarce game assets.  As shown herein, Glider use severely harms the WoW gaming experience for other players by altering the balance of play, disrupting the social and immersive aspects of the game, and undermining the in-game economy.  (SOF. ¶ 58-63, 156-70).

Perhaps most significantly, MDY invests great effort to prevent Blizzard from enforcing its rights against Glider users by enabling them to circumvent Blizzard's technological access controls and conceal their infringements from Blizzard and other players determined to report them.  MDY has willfully persisted in this endeavor despite knowing that the overwhelming majority of WoW players despise the presence of Glider bots in WoW, and that Blizzard is being forced to divert significant human and financial resources from game development and support to efforts to stop Glider.  (SOF ¶ 238-42).  Indeed, MDY's stated goal is to drive up Blizzard's cost of combating Glider to the point it ultimately abandons efforts to block it, an option that Blizzard's rule-abiding customers, who have filed *over 465,000 formal complaints* and voiced their continued displeasure with Glider on Blizzard's forums, have made clear is unacceptable.  (SOF ¶ 83, 159-70, 242-43).

The threat that Glider poses to WoW is real.  The dismay among legitimate WoW gamers over the effects of economic exploitation of WoW on the game experience has spawned an unprecedented player class action lawsuit against a prominent internet virtual property exchange, a site where professional "botters" sell, for real money, the virtual goods that Glider enables them to collect in their sleep. (SOF ¶ 79).  Absent intervention by this Court, MDY and the opportunistic cheaters it enables will remain free to devalue the gaming experience of Blizzard's loyal and rule-abiding customers and undermine the integrity of the online gaming industry's premier franchise.  MDY's brazen unlawful conduct must be enjoined, and its illicit profits disgorged.

1

**II.      The Standard of Review on Summary Judgment**

2

Summary judgment is appropriate if the evidence, viewed in the light most

3

favorable to the nonmoving party, '"show[s] that there is no genuine issue as to any

4

material fact and that the moving party is entitled to judgment as a matter of law."'

5

*Lemon v. Harlem Globetrotters Int'l., Inc.*, 437 F. Supp. 2d 1089, 1093 (D. Ariz.

6

2006) (Campbell, J.) (alteration in original) (<u>citation</u> <u>omitted</u>). '"only disputes over

7

facts that might affect the outcome of the suit . . . will properly preclude the entry of

8

summary judgment."' *Id*.  The "court need not, [however,] draw all possible

9

inferences in [the non-movant's] favor, but only all reasonable ones." *Villiarimo v.*

10

*Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

11

**III.     MDY's Sale and Support of Glider, a Program Designed Specifically**

12

**to Enable Users to Infringe Blizzard's Copyrighted WoW Software, Renders MDY Contributorily and Vicariously Liable for the**

13

**Infringements of Glider Users.**

MDY knowingly promotes and supports using Glider to make unauthorized

14

copies of WoW in contravention of the EULA and the Copyright Act §501.  Under

15

well settled Ninth Circuit law and the undisputed facts of record, MDY's actions

16

constitute willful contributory and vicarious copyright infringement warranting entry

17

of summary judgment for Blizzard.

18

**A.     Glider Users Directly Infringe Blizzard's Copyrights by**

19

**Copying the WoW Software into Random Access Memory Beyond the Scope of the EULA.**

20

**1.     The Ninth Circuit Direct Infringement Standard.**

21

In order to establish a claim of direct copyright infringement, a plaintiff must

22

prove: 1) ownership of a copyright; and 2) a " 'copying' of protectable expression. . .

23

beyond the scope of [a] license." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085

24

(9th Cir.1989) (citation omitted); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d

25

1004, 1019 (9th Cir. 2001).  In this case, Blizzard has secured copyright registrations

26

in both the WoW server and WoW game client software code.  (SOF ¶ 49).  These

27

certificates of registration raise a presumption of the validity of Blizzard's copyrights

28

in its software, and there is no evidence of record to dispute that validity. 17 U.S.C. § 410(c).

In this Circuit, the "copying" element may be proved in software cases by showing an unauthorized reproduction of a copyrighted software program in the computer user's Random Access Memory ("RAM").  The Ninth Circuit has recognized that "the loading of software into the RAM creates a copy under the Copyright Act."  *MAI Sys. v. Peak Computer, Inc.*, 991 F.2d 511, 519 (9th Cir. 1993), <u>cert.</u> <u>dismissed</u> 510 U.S. 1033 (1994); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1334 (9th Cir. 1995); *see also Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 621 (S.D.N.Y. 2007) (agreeing with the "numerous courts [that] have held that the transmission of information through a computer's random access memory or RAM . . . creates a 'copy' for purposes of the Copyright Act," and citing cases.)  When such a copy is made in excess of a license, the copier is liable for copyright infringement.  *Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) ("'When a licensee exceeds the scope of the license granted by the copyright holder, the licensee is liable for infringement.'" (citation omitted)).

### 2.    Glider Users Make Copies of WoW by Loading the WoW Software into RAM.

There is no dispute that to run Glider with WoW, users must load WoW from their hard drive into their computers' RAM, at which point WoW is able to be both perceived and communicated, including interaction with Glider itself.  (SOF ¶¶ 50-52).  When a user first launches WoW, the executable of the program is loaded into RAM, and as they move through the game, additional copyrighted game content is loaded from the hard drive into RAM as the player reaches points in the game with which that content is associated.  (SOF ¶ 51).  In order to avoid easy detection and blocking of Glider by Blizzard's anti-cheat technology, Glider users rely on Glider's "launch pad" to initiate the start up and loading of WoW into RAM.  (SOF ¶ 135).

Thus, Glider users are running Glider in conjunction with WoW from the initial copying of WoW into RAM.[2]  Clearly, Glider users' loading of WoW into RAM creates a copy for purposes of the Copyright Act.  *Mai Systems*, 991 F.2d at 519 ("since we find that the copy created in the RAM can be 'perceived, reproduced, or otherwise communicated,' we hold that the loading of software into the RAM creates a copy under the Copyright Act." (citation omitted)).

### 3.    Copying WoW in Conjunction with Glider Exceeds the Scope of Authorized Use Under the EULA.

WoW players' authority to use the WoW client is governed by the terms of the WoW EULA.  In order to play WoW, users must read and assent to the terms of both the EULA and the Terms of Use ("TOU").  (SOF ¶ 84-88).  The EULA clearly conditions users' ability to copy WoW on their doing so within the scope of the license.  (SOF ¶ 89-95).  Copying WoW into RAM in  conjunction with Glider plainly exceeds the scope of the EULA and TOU, which conditions authorized copying as follows:

- Section 4.B(iv) of the EULA prohibits users from "facilitat[ing], creat[ing] or maintain[ing] any unauthorized connection to the Game or the Service. . . All connections to the Game and/or the Service, whether created by the Game Client or by other tools and utilities, may only be made through methods and means expressly approved by Blizzard.  (SOF ¶ 98)
- Section 4.B(ii) of the EULA prohibits "exploit[ing] the Game or any of its parts, including without limitation the Game Client, for any commercial purpose . . . "  (SOF ¶ 101)
- Section 4.B (ii) of the TOU provides that users agree not to "create or use cheats, bots, 'mods,' and/or hacks, or any other third-party software designed to modify the World of Warcraft experience;"  (SOF ¶ 101)
- Section 4.B (iii) of the TOU requires users to refrain from any "use [of] any third-party software that intercepts, 'mines,' or otherwise collects information

---

[2]  Even if a Glider user chooses to launch WoW first, without using the Glider launch pad, and then subsequently launches Glider to run with WoW, that user still loads copyrighted WoW content into RAM in conjunction with Glider.  In this scenario, the initial WoW executable will have loaded into RAM absent Glider, but WoW continues to load expressive game content from the user's hard drive into RAM as a player progresses through the game, and the copying of that content would be in conjunction with running Glider.  (SOF ¶ 51).

from or through the Program or the Service;"  (SOF ¶ 101)

- Section 5.B.(6) prohibits "us[ing] bots or other automated techniques to collect information from the Program . . . ;"  (SOF ¶ 102)
- Section 5.B.(8) prohibits "cheat[ing] or utiliz[ing] 'exploits' while playing the Program in any way . . . ."  (SOF ¶ 102)

The following undisputed facts leave no doubt that running Glider with WoW exceeds the scope of authorized copying under the EULA and TOU.  Specifically, the evidence shows:

- Both Blizzard and MDY agree that Blizzard has not granted MDY, Michael Donnelly, or any third party authorization to use Glider in conjunction with WoW and MDY's FAQ on the Glider website acknowledged, and informed Glider users, that Glider violated the WoW TOU.  (SOF ¶ 177-78, 182)
- MDY concedes that Glider is a "bot" and a "cheat" program designed to automate tasks in the WoW game environment, to garner game assets without actually playing the game, to mine information from WoW and to create an unauthorized connection to WoW.  (SOF ¶ 132-36, 171-73)
- Glider users relied on the program to exploit WoW for commercial purposes, namely the "farming' of in-game assets for the purpose of selling the assets in real money transactions outside the game.  (SOF ¶ 125, 188-97).

The Glider users' copying of WoW in circumstances exceeding their license is copyright infringement.  *LGS Architects, Inc. v. Concordia Homes of Nev.,* 434 F. 3d 1150, 1156 (9th Cir. 2006).  For example, in *Ticketmaster*, the court held that using a bot program to access and download copies of copyrighted web pages into RAM in order to purchase large quantities of tickets ─ where the use of bots for this purpose was prohibited by the website's terms of use ─ infringed Ticketmaster's copyrights.  *Id*. at 1102-03, 1109-10.  Here, WoW players similarly have agreed not to use third-party applications to launch WoW, not to run bot programs in conjunction with WoW, not to exploit WoW for commercial use, nor to mine information from WoW gaming environment.  Thus, when users copy WoW with Glider, they exceed the scope of their license, and infringe Blizzard's copyrights.

1

2     **B.**     **MDY is Secondarily Liable for its Contributory and Vicarious Infringement of WoW.**

3          **1.**     **MDY is contributorily liable for Glider users' infringements.**

4          Under the traditional test for contributory copyright infringement, a party is

5     liable where it had "knowledge of the infringing activity and induce[d], cause[d], or

6     materially contribute[d] to the [activity]."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 487

7     F.3d 701, 727 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,

8     1019 (9th Cir. 2001).  In *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, the

9     Supreme Court held that a software distributor also induces infringement where its

10    product is used to infringe copyrights "if the product is not capable of 'substantial' or

11    'commercially significant' noninfringing uses." 545 U.S. 913, 942 (2005) (citation

12    omitted).  Under either of these formulations, MDY plainly is liable for Glider users'

13    repeated infringements.

14         First, MDY's awareness of the EULA and TOU terms and ongoing support of

15    Glider infringements evidences knowledge of the infringing conduct.  (SOF ¶ 174-

16    83).  Second, MDY's contribution to the infringement is not merely material, it is

17    essential.  But for MDY, Glider users would be unable to run the bot and exceed the

18    EULA.  MDY wrote the Glider bot, created the launch pad component to enable

19    Glider to load WoW into RAM, input settings to aid commercially exploitive gold

20    farming and in-game property transfers, and provides ongoing support to Glider

21    users to enable repeated infringements.  (SOF ¶ 8, 120-21, 124-25, 135-37).  Finally,

22    even absent MDY's ongoing contributions, under the alternate *Grokster* test Glider is

23    incapable of commercially significant noninfringing uses.  (*See infra* Sec. IV.B.).

24    Accordingly, MDY's enabling of and aid to Glider users' infringements clearly

25    confer contributory liability.  *Grokster, Ltd.*, 545 U.S. at 915 ("active steps taken to

26    encourage direct infringement, such as advertising an infringing use or instructing

27    how to engage in an infringing use, show an affirmative intent that the product be

28    used to infringe"); *Napster*, 239 F.3d at 1022 (""[w]ithout the support services

- 8 -

defendant provides, Napster users could not find and download the music they want with the ease of which defendant boasts"' (alteration in original) (citation omitted)).

### 2. MDY is vicariously liable for Glider users' infringements.

A party is vicariously liable for the infringement of another if it has a right and ability to control the infringing activity and derives a direct financial benefit from that activity. *Grokster*, 545 U.S. at 931 n.9; *Napster*, 239 F.3d at 1023. Here, MDY concedes that it maintains control over all existing Glider programs, even after they are sold, and has the right and ability to control the infringement by disabling the "key" that enables Glider to function at MDY's discretion. (SOF ¶155); *Napster*, 239 F.3d at 1023 ("Napster's ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise"). MDY likewise concedes that it receives a direct financial benefit from the infringements, as Glider's enablement of infringement is its only draw, and MDY has profited generously from sales of the program. (SOF ¶ 155); *Napster*, 239 F.3d at 1023 (financial benefit exists where ability to infringe increases draw of service).

### C. Blizzard is Entitled to Injunctive Relief and Recovery of MDY's Profits for MDY's Secondary Infringements.

A victorious copyright owner is entitled to injunctive relief and recovery of its actual damages plus any profits of the infringer attributable to the infringement and not taken into account in actual damages. 17 U.S.C. §§ 502(a), 504(b). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. 504(b). MDY's gross revenues from Glider sales are $2.8 million. (SOF ¶ 233). Thus, in addition to its own damages discussed at p. 21-22 *infra*, , Blizzard is entitled to a judgment of $2.8 million, minus any deductible

expenses MDY can prove.[3]  And, to stop Glider users continued infringements, MDY's further distribution of Glider and enabling of existing Glider programs should be enjoined.

**IV.     MDY's Marketing and Distribution of Glider, a Program Designed to Enable WoW Players to Circumvent Blizzard's Technological Measures that Control Access to and Protect Blizzard's Copyrighted Software, Violates Sections 1201(a)(2) and 1201(b)(1) of the DMCA.**

MDY's distribution of Glider violates the DMCA's bans on trafficking in technology that circumvents: 1) *access controls* to copyrighted works; and 2) *technological measures that protect the rights* of a copyright owner.  17 U.S.C. §§ 1201(a)(2), (b)(1).  Section 1201(a)(2) reads:

> No person shall . . . offer to the public, provide, or otherwise traffic in any technology, product . . . that (A) is primarily designed or produced for the purpose of circumventing a technological measure that *effectively controls access to a work protected under this title*; (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively *controls access to a work protected under this title*; or (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that *effectively controls access to a work protected under this title*.

17 U.S.C. § 1201(a)(2)-(a)(2)(c)(emphasis added).  Section 1201(b)(1)(A) applies this same ban on products aimed at circumventing "protection afforded by a technological measure that *effectively protects a right of a copyright owner under this title in a work or a portion thereof*."

---

[3]  Blizzard also seeks attorneys' fees and costs, which a court may award, particularly where the infringement is willful.  17 U.S.C. § 505.  Here, given MDY's confessed knowledge from the near inception of its business that Blizzard objected to and attempted to prohibit use of Glider MDY's conduct is clearly willful.  *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 880 (S.D. Ohio 2007) (defendant willfully infringed where plaintiff sent letters explaining that the activities were unlawful and defendant continued to distribute the infringing software).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.    Blizzard's Anti-Cheat Technology Effectively Controls Access to and Protects Blizzard's Rights in WoW.

Blizzard's anti-cheat technology is designed to prohibit WoW users running "cheats," "bots," and other unauthorized programs in conjunction with WoW from accessing Blizzard's copyrighted WoW content.  This anti-cheat technology – sometimes referred to collectively as "Warden" – is composed of two different software components.  (SOF ¶ 108-19).  One component of Warden – "scan.dll" – scans for unauthorized programs *before* a user logs into the game and denies that user access to the game content, and prevents the user from copying WoW into RAM, if such a program is detected.  (SOF ¶ 108-14). The second, resident component of Warden runs periodically while a user plays WoW, patrolling the computer memory for signatures – telltale fingerprints – associated with known cheats, and revokes access to the game, and protects additional copyrighted portions from being copied into RAM, upon detection.  (SOF ¶ 115-19).

Both components of Warden effectively control access to WoW.  The DMCA states that "a technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C.A. § 1201(a)(3)(B).  Here, the scan.dll component loads immediately upon launching the game, scans the user computer's RAM to ensure the copy of WoW applies only the authorized information ─ a clean copy of WoW free of unauthorized cheats ─ and denies a user access to the game if it detects a cheat.  (SOF ¶ 108-114).  If the user removes the cheat from memory, launches the game again and supplies the correct information to pass the check, scan.dll will then permit the user to log in and access the copyrighted content.  With the notable exception of Glider, against which scan.dll has enjoined only periodic and fleeting periods of detection, scan.dll has been extremely successful in blocking

access to users running unauthorized programs in conjunction with WoW.[4]  (SOF ¶ 114).

Blizzard's technological measures also protect Blizzard's right to prevent unauthorized copying of WoW.  When scan.dll prohibits a user from accessing the game, Blizzard prevents any copyrighted game assets from being loaded into the user's RAM.  (SOF ¶ 111).  Similarly, when the resident component detects a cheat, it prevents additional copyrighted portions of WoW from being copied into RAM without authorization.  (SOF ¶ 116).  Because loading a program into RAM constitutes copying for purposes of copyright law, loading WoW in excess of Blizzard's authorization under the WoW EULA violates Blizzard's exclusive right to make copies of WoW.  *See Mai Systems*, 991 F.2d at 518-19.

The court in *Ticketmaster* recognized that a computer program called a CAPTCHA, which required inputting a series of randomly generated characters to prevent users from running bots to access Ticketmaster's otherwise publicly available website (and copy the content into their computers' RAM in a manner that violated its Terms of Use), "both *control[led] access* to a protected work [under § 1201(a)(2)] because a user cannot proceed to copyright protected webpages without solving CAPTCHA, and *protect[ed] rights* of a copyright owner [under § 1201(b)(1)] because, by preventing automated access to the ticket purchase webpage, CAPTCHA prevents users from copying those pages."  507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007).  Here, Warden performs the near identical function to protect users from accessing WoW in a similarly unauthorized manner.  Thus, Blizzard's

---

[4]  The resident component of Warden provides a secondary access control after scan.dll permits access to the game, either because no cheat was running at the time or the cheat successfully circumvented scan.dll.  The resident component continuously scans the computer's RAM while the user is connected to Blizzard's game server, and it can automatically revoke a user's access to the game upon detection. (SOF ¶ 115-19).  The resident component of Warden has located cheats and revoked user access tens of thousands of times (including periodic success with Glider), proving it to be an effective measure against virtually every cheat Blizzard has encountered, save Glider. (SOF ¶ 114).

technological measures likewise effectively protect both access under Section

12(a)(2) and its exclusive rights – in this case the right to make copies – under

section 1201(b)(1).

> **B.    MDY Traffics in Software, Glider, that is Primarily Designed and Marketed as a Circumvention Device, and has only an Otherwise Limited Commercially Significant Purpose.**

From its website, MDY has sold and distributed over 100,000 copies of

Glider.  (SOF ¶ 232).  Making a program available for download from a website

constitutes trafficking for purposes of the DMCA.  *Davidson & Assocs. v. Jung*, 422

F.3d 630, 637 (8th Cir. 2005).  MDY does not dispute that Glider is *designed* to

circumvent both components of Warden.  (SOF ¶ 126).  In fact, MDY constantly

updates Glider to ensure its continued success in cracking Warden's evolving

detection and access control technologies.  (SOF ¶ 146).  Glider is also *marketed* as a

tool to circumvent Blizzard's anti-cheat technology.  (SOF ¶ 246-47).  The MDY

website's FAQ boasts that "Glider provides a number of features to help lower the

risk of detection," and that the "current version of Glider…is not known to be

detected by these methods."  (SOF ¶ 182).  The site also offers a forum for users,

including Donnelly, to share information on avoiding detection by Blizzard. (SOF ¶

125).  Finally, Glider has only a limited commercially significant purpose other than

to circumvent Warden.  Glider's viability arises nearly entirely from its ability to

evade detection, as MDY acknowledged in deciding not to charge extra fees for

advanced circumvention functionality.  (SOF ¶ 145-48).  Blizzard is entitled to

summary on its DMCA trafficking claims.[5]  *Ticketmaster*, 507 F.Supp.2d at 111-12

---

[5]  "At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just."  17 U.S.C. § 1203(c)(3)(A).  Here, for recovery on its DMCA claim, Blizzard seeks an award of statutory damages based on MDY's sale of 100,000 Glider programs, which provides a minimum award of $20,000,000.

(bot software marketed for ability to spoof IP address and circumvent CAPTCHA violated trafficking provision of DMCA).

**V.      MDY Tortiously Interfered With Blizzard's Contracts With WoW Players By Intentionally Promoting And Enabling Their Use Of Software That Violates The WoW TOU And Helping Them Conceal The Breaches From Blizzard.**

Arizona follows the Restatement (Second) of Torts, under which the elements of a claim for tortious interference with contract are: (i) a valid contractual relationship, (ii) knowledge of the relationship by the interfering party, (iii) intentional interference with the relationship, (iv) improper motive or means with regard to the interference, and (v) harm resulting from the breach.  *Wagenseller v. Scottsdale Mem. Hosp.*, 710 P.2d 1025, 1041 (Ariz. 1985); Restatement (Second) Torts § 766 (2007).

**A.      There Is A Valid Contractual Relationship Between Blizzard and World of Warcraft Players of Which MDY Had Knowledge.**

All WoW players, without exception, enter into a valid and enforceable contractual relationship with Blizzard by agreeing to Blizzard's EULA and TOU. To play WoW, users must view and demonstrate acceptance of the EULA and TOU at numerous times. (SOF ¶ 84-88).  Such  "click-wrap agreements" are readily recognized as enforceable contracts.  *Altera Corp. v. Clear Logic, Inc.,* 424 F.3d 1079, 1092 (9th Cir. 2005) (software license agreements are valid contracts for purposes of a tortious interference claim); *Davidson & Assocs. v. Jung*, 422 F.3d at 639 (enforcing Blizzard's clickwrap terms for its online gaming offerings).  MDY was aware of these contracts, as Michael Donnelly personally assented to them in the creation of his own WoW accounts, concedes that he understood that all WoW users must agree to the EULA and TOU, and evidenced MDY's knowledge of the terms repeatedly in information it posted on the Glider website.  (SOF ¶179-81).

1

2    **B.    MDY Intentionally Induced Breaches of Blizzard's Contracts.**

3         MDY's intent to interfere with the contracts between Blizzard and World of

4    Warcraft users is plainly evident.  "[I]ntent is shown by proving that the interferor

5    either intended or knew that '[a particular] result was substantially certain to be

6    produced by its conduct.'"  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement

7    Masons Local No. 395 Pension Trust*, 38 P.3d 12, 32 (Ariz. 2002), (citation omitted).

8    Here, MDY offers no products or services other than Glider, which he concedes has

9    no viable use other than with WoW.  (SOF ¶ 123).  As described previously herein,

10   use of Glider in conjunction with WoW violates multiple provisions of both the

11   EULA and the TOU.  *See* Section III.A.3, s*upra*.  Indeed, MDY admits that from at

12   least September 2005, it knew Blizzard considered Glider use a breach, and MDY

13   agreed it was proper for Glider users to be banned upon detection of their breach.

14   (SOF ¶ 177, 183, 187).   MDY conveyed this understanding to Glider customers in

15   his FAQ, but aggressively promoted Glider use nonetheless.  (SOF ¶ 182).

16        **C.    MDY's Interference Was Improper.**

17        Arizona employs the Restatement test, which cites seven factors to consider in

18   determining whether conduct is improper:[6]  "(a) the nature of [MDY's] conduct; (b)

19   [MDY's] motive; (c) the interests of [Blizzard and users of WoW] with which

20   [MDY's] conduct interferes; (d) the interests sought to be advanced by [MDY]; (e)

21   the social interests in protecting the freedom of [MDY] and the contractual interests

22   of [Blizzard and its users]; (f) the proximity or remoteness of [MDY's] conduct to

23   the interference; and (g) the relations between the parties."  *Wagenseller*, 710 P.2d at

24   1042; Restatement (Second) of Torts § 767 (2007).  Arizona courts "give the greatest

---

25   [6]  Notably, if the Court determines that MDY's distribution of Glider violates the
     Copyright Act or the DMCA, that finding alone, is sufficient to establish that his

26   conduct was improper.  "Conduct specifically in violation of statutory provisions or
     contrary to public policy may for that reason make an interference improper."  *Wells

27   Fargo Bank*, 38 P.3d at 32-33 (holding that bank's false financial statements,
     potentially in violation of federal banking rules, could render the bank's interference

28   with a third-party contract improper).

1  weight to the first two factors, the nature of the defendant's conduct and the

2  defendant's motive." *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1027 (Ariz.

3  2005).  The undisputed facts of record clearly establish that MDY's interference was

4  improper.

5          First, the nature of MDY's conduct plainly demonstrates impropriety.

6  MDY's business has no utility.  It offers no independent good.  Rather, its sole aim is

7  to encourage and enable a group of opportunistic cheaters to exploit the WoW game,

8  to the dismay and frustration of not only Blizzard, but the rule-abiding players whose

9  experience is sullied.  (SOF ¶ 159-70).  Moreover, MDY's actions show it knows the

10  market for Glider is driven by those seeking to exploit WoW for their own profit, as

11  MDY's marketing efforts, affiliates and moderators are all closely tied to such

12  endeavors.  (SOF ¶ 188-97, 244-47).  MDY has also committed numerous additional

13  breaches of the WoW EULA and TOU, including reverse engineering WoW and

14  sharing WoW accounts to test Glider surreptitiously, in the conduct of its affairs.

15  (SOF ¶ 234, 245).

16          MDY's own words and deeds likewise betray its ill motive.  Donnelly's email

17  communications reveal that "[MDY] want[s] to make it bad business" for Blizzard to

18  detect Glider, by making such detection as difficult and time-consuming as possible.

19  (SOF ¶ 242).  MDY has acknowledged that botting has a negative effect on

20  Blizzard's goodwill with its users — "if the botting population becomes too big, other

21  players become more aware of them and think badly about the game" — yet

22  continued to push sales.  (SOF ¶ 241).  MDY has also encouraged using Glider for

23  gold farming and related activities that threaten the integrity of WoW to the point

24  that rule-abiding players have filed a class action seeking to enjoin them.  (SOF ¶ 79,

25  192-97).  Perhaps most tellingly, Donnelly concedes not only defeating Blizzard's

26  software detection,[7] but also designing features and providing instruction to assist

27

28  ───────────────

[7]  MDY's determination to frustrate Blizzard's enforcement efforts is evidenced by
MDY's $18,000 payment to a third-party for the know how to update Glider in

- 16 -

Glider users in avoiding being spotted by *other WoW players*. The reason -- Donnelly takes it as given that most WoW players detest Gliders and would report them to Blizzard. (SOF ¶ 208-09, 238-41). In sum, despite knowing that Glider use is disliked by WoW players and Blizzard, MDY has nevertheless worked diligently to ensure Glider users can conceal their breaches from Blizzard and other players who might report them, thereby preventing Blizzard from enforcing its contracts and ridding its game of this destructive menace.

The remaining factors also weigh heavily toward a finding of impropriety. In weighing the third and fourth factors, the interests of Blizzard and, in particular, legitimate and innocent users of WoW, far outstrip those sought to be advanced by MDY. Given Blizzard's rule-abiding players' strong objections to Glider, Blizzard must divert resources to stop activity that is clearly prohibited under the terms of its user agreements. (SOF ¶ 200). By contrast, MDY's only interest is to encourage users to cheat and boost MDY's revenues while driving up Blizzard's costs. (SOF ¶ 242).

The fifth factor, social interests, also favors Blizzard as here the pertinent society is the WoW gaming universe, and there is no question MDY is intentionally disrupting the bargained-for mores of that society. (SOF ¶ 226, 241-43). The proximity of MDY's conduct to the breach -- its marketing and sale of Glider is the direct and but-for cause -- renders the sixth factor particularly important: "One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. *The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper.*" Restatement (Second) Torts § 767 cmt. h (emphasis added). Finally, the relation of the parties also favors a

---

November of 2006 when it could not solve a particularly effective Blizzard detection. (SOF ¶ 148).

finding of improper conduct, as each and every case of interference and breach occurs where Blizzard had a pre-existing contractual relationship with the user, and MDY interfered with that relationship.  *See id.* cmt. i, j (interferor's conduct more likely to be improper where actual, rather than prospective, contractual relationship is in place).

In a case applying the Restatement test, a federal district court in Utah recognized that conduct closely analogous to MDY's in nature — encouraging breaches by the parties' mutual customers and instructing them how to conceal those breaches so that the plaintiff continued to perform — constituted improper interference.  In *Am. Airlines, Inc. v. Platinum Worlds Travel*, an airline whose contractual agreement with its frequent flyers provided that award tickets could not be sold or exchanged for consideration, sued a broker service that purchased and resold such tickets from the flyers.  769 F. Supp. 1203, 1204 (D. Utah 1990), *affd sub nom. Am. Airlines v. Christensen*, 967, F. 2d 410 (10th Cir. 1992).  Knowing that such purchase and resale violated the terms of the frequent flyers' contracts, and that if the airline learned of the transfer it could cancel the award tickets, the broker employed deception in the reservation process to conceal its activities from the airline.  *Id.* at 1206.

In applying the seven Restatement factors, the court made the following analysis, particularly applicable here:

> "Unfortunately, none of these factors address precisely the unusual circumstances in the present case. The type of interference before the court does not involve a classic interference with performance of contract problem. This is not a case in which the defendants are competing with the plaintiff. The defendants' interference is not a by product of the defendants' attempts to lure away the plaintiff's customers so that the defendants may provide air transportation for the customers. This case is unusual because the defendants do not want the plaintiff's customers to breach their contracts under circumstances in which the plaintiff also refuses to perform. Rather, *the defendants' business depends upon their ability to induce the plaintiff's customers to breach their contractual obligations while the plaintiff continues to perform*. In order to accomplish this the defendants

have developed an elaborate system of deception enlisting the aid of the plaintiff's customers and the purchasers of the brokered tickets."

*Id.* (emphasis added).  The court concluded that, under these facts, "it [was] difficult to see how the defendants' interference in this case can be characterized as anything but improper."  *Id.* at 1207.

Similarly, in the case at hand, MDY's entire business depends upon its ability to induce WoW users to breach the EULA and TOU *while Blizzard continues to allow those users to play*.  If Blizzard revokes the Gliders' right to play WoW, their ability to exploit the game using Glider ceases.  Indeed, Donnelly concedes Blizzard's right to ban users for running Glider, yet sets out to frustrate that right by making detection of Glider exceedingly difficult.  (SOF ¶ 240-43).  Just like the broker in *American Airlines*, MDY has "developed an elaborate system of deception," with repeated implementation and revision of anti-detection software, and instruction to users about steps to conceal their activity from Blizzard.  As such, MDY's brazen and deceptive interference cannot be fairly characterized "as anything but improper."

**D.     The Breaches of the EULA and TOU Harmed Blizzard.**

Arizona law has recognized that harm, for purposes of tortious interference, may take a variety of forms.  *See Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142, 1151 (D. Ariz. 2005) (damage to reputation a compensable harm under the Restatement); *Campbell v. Westdahl*, 715 p. 2d 288, 294 (Ariz. 1986) (plaintiff that loses profits as a result of breach is harmed); Restatement (Second) Torts § 774A(1)(b) (consequential costs associated with interference represent compensable harm).  Here, there can be no genuine dispute that MDY's tortious interference has caused and continues to cause substantial reputational and economic harm to Blizzard.

1

### 1.    Loss of customer goodwill

Blizzard has built an unparalleled reputation among gamers by striving to provide a gaming experience responsive to player demands, including their frustration with the presence of bots. These bots, left unchecked, sully the game experience in multiple ways, including destabilization of the in-game economy because Gliders devalue in-game items by accumulating them faster than game designers intended, and frustration of WoW's immersive, interactive role-playing aspects by replacing human players with bots that do not converse or work with other players. (SOF ¶ 58-68). When WoW players encounter these effects, Blizzard's hard earned goodwill among its customers is undermined.

This harm is not speculative. On the contrary, WoW players have voiced their opinion on Glider loud and clear. Blizzard has received over 465,000 in-game petition reports from users citing bots in their complaints.[8] (SOF ¶ 204). The extreme frustration Glider use causes WoW Players, and the negative impact on Blizzard's reputation, are evident from the tenor of the complaints, as the following examples demonstrate:

- A player indicated s/he could not complete an in-game quest due to the presence of two bots and demanded "DO SOMETHING ABOUT WOWGLIDER !!!!!!!!!!!" (SOF ¶ 160).
- A user noted four "auto-farmers clearly using Glider" making it impossible for the user to play, and suggested s/he would quit the game if Blizzard could not stop players from using Glider. (SOF ¶ 163).
- Another user notified Blizzard s/he had cancelled his/her account out of frustration with players using Glider to "clear[ ] a quest area 3 DAYS NON-STOP," making it impossible to complete in-game quests. (SOF ¶ 164).
- A WoW forum user commented on Glider's destructive impact on group play, noting that "Everyone keeps asking for BG's [Battle Grounds] to suck less. There's a very simple solution: track down and delete Gliders." The user concluded his post by saying "Seriously. Crack down on the botters. They ruin the BG's. If I want to play with bots I'll load up something like Battlefielld

---

[8]   While not all complaints specifically reference Glider, several thousand do, reflecting Glider's status as the most well-known bot in the WoW universe. (SOF ¶ 226).

1942 and play a bot match.  Instead AV has turned into the 6 humans + 34 Gliders vs the same on other team . . . ."  (SOF ¶ 170).

Moreover, the number of disenchanted users is surely far higher, as only those exhibiting the strongest displeasure will discontinue their play to take the time and effort to file a written complaint.  (SOF ¶ 205-07).  Indeed, many players take the easier route of posting complaints on Blizzard's own WoW forums.[9]  (SOF ¶ 168-70, 210).  Additionally, many users complaining about the secondary effects (scarcity of goods, inflation) may not specifically tie those to the root cause -- bots.  (SOF ¶ 205).

## 2.    Economic Harm

Blizzard has also suffered, and continues to suffer substantial economic harm from the distribution and use of Glider in multiple forms.[10]  First, the undisputed evidence of record establishes that Blizzard has suffered $970,000 in loss per year as the result of the direct costs of bot enforcement and responding to user complaints about bots, and $2,425,000 in the two and a half years since MDY began selling Glider.  (SOF 198-99, 248-52).  Blizzard has also suffered approximately $10.5 million in lost subscription revenues resulting directly from Glider use.  (SOF ¶ 260).

### a)    Direct costs

The proliferation of Glider has resulted in substantial direct costs for Blizzard to combat its destructive effects on WoW and its legitimate users.  First, Blizzard must employ its Game Masters, who act as in-game moderators to answer customer questions and ensure a fair gaming experience, in the remedial task of attempting to

---

[9]   For example, on WoW's European internet forum, users flocked to a customer complaint thread regarding botting, making the thread the longest in the forum's for example, history and fingering Glider as the primary culprit.  (SOF ¶ 219).

[10]   Blizzard's economic expert submitted a report containing additional models for measuring the consequential damages of unchecked Glider use in WoW, which are detailed in Blizzard's Statement of Facts.  (SOF ¶ 254-64).  Should the Court seek additional briefing on alternate damage calculations after entering judgment on liability, Blizzard can provide supplemental briefing to the Court.

manually detect Glider Use.  (SOF ¶ 202).  This additional, unplanned responsibility requires Blizzard to increase the quantity of Game Masters, or else face diminished capability of those Game Masters to perform their ordinary job functions.  (SOF ¶ 200, 251).  Game Masters also must review and respond to the ever-increasing numbers of user complaints relating to cheating.  (SOF ¶ 203).

Second, Blizzard must devote programming resources to automatic detection of Glider use, a cost that has increased each time MDY has revised the Glider code to combat these measures.  (SOF ¶ 221-24).  Donnelly admits to playing a game of cat and mouse with Blizzard programmers, writing that "[t]he trick here is that Blizzard has a finite amount of development and test resources, so we want to make it bad business to spend that much time altering their detection code to find Glider." (SOF ¶ 242).  Third, as a result of MDY's strategy, and Glider's sophisticated circumvention measures, Glider consumes more Blizzard resources than any other third-party cheats.  (SOF ¶ 221).  In fact, Blizzard has, by necessity, diverted resources from game development specifically to combat Glider.  (SOF ¶ 223). Blizzard has submitted a detailed calculation of these significant, direct losses attributable to Glider (SOF ¶ 250).

### b)      Lost Subscription Revenue

WoW players pay Blizzard around a $15 monthly subscription fee.  (SOF ¶ 254).  As detailed in Blizzard's expert report, by automating their characters' progress through the WoW "leveling" process, Glider users compress the time period required to reach the higher levels of WoW.  (SOF ¶ 255-56).  A study of WoW play estimated that an average user needs approximately 480 hours of play to reach the maximum character level.  Whereas a typical human player averaging two hours a day would thus need eight months to reach the highest level, a Glider user can run the bot and achieve the same level in less than one month.  (SOF ¶ 257-59).  Thus, Glider users can "skip ahead" to the advanced levels without having to pay the additional seven months of subscription fees required of a legitimate human player,

and thereby avoid paying up to $105 in subscription revenue Blizzard would otherwise receive.  Multiplying this $105 savings times the 100,000 Glider programs sold alone demonstrates lost revenue to Blizzard of $10.5 million.  (SOF ¶ 260). Clearly, Glider use causes significant revenue loss to Blizzard.

**VI.    Conclusion**

As demonstrated herein, MDY's creation, promotion, and support of Glider encourages and enables a significant community of cheaters to infringe Blizzard's copyrights, breach their contracts, and conceal their harmful acts from Blizzard, all to the detriment of rule-abiding players and Blizzard's premier product and good name.  For the reasons stated herein, Blizzard respectfully requests this Court enter summary judgment on Blizzard's copyright, DMCA and tort claims.


Dated:  March 21, 2008                              Respectfully submitted,


Shaun Klein                                    /s/ Christian S. Genetski
SONNENSCHEIN NATH &                Christian S. Genetski
ROSENTHAL LLP                          Shane M. McGee
2398 East Camelback Road, Ste 1060    1301 K Street, NW, Ste 600E
Phoenix, AZ  85106-9009                 Washington, DC  20005
Telephone:  (602) 508-3900              Facsimile (202) 408-6399
Facsimile:  (602) 508-3914              Telephone (202) 408-6400

Attorneys for Defendants Blizzard Entertainment, Inc. and Vivendi Games, Inc.

1

2
## CERTIFICATE OF SERVICE

3

4  ☒  I hereby certify that on March 21, 2008, I electronically transmitted the attached

5  document to the Clerk's Office using the CM/ECF System for filing and
   transmittal of a Notice of Electronic Filing to the following CM/ECF

6  registrants:

7

| Name | Email Address |
|------|---------------|
| Lance C. Venable | docketing@vclmlaw.com |
| Joseph Richard Meaney | docketing@vclmlaw.com<br>jmeaney@vclmlaw.com |

8

9

10

11

12

13

14                    /s/  Christian S. Genetski

15

16

17

18

19

20

21

22

23

24

25

26

27

28