**SONNENSCHEIN NATH & ROSENTHAL LLP**
Scott Stein (AZ Bar No. 022709)
Shaun Klein (AZ Bar No. 018443)
2398 East Camelback Road, Suite 1060
Phoenix, AZ 85016-9009
Facsimile (602) 508-3914
Telephone (602) 508-3900

Christian S. Genetski (*Pro Hac Vice*)
Shane M. McGee (*Pro Hac Vice*)
1301 K Street, NW, Suite 600-East Tower
Washington, DC 20005
Facsimile (202) 408-6399
Telephone (202) 408-6400

Attorneys for Defendants Vivendi Games, Inc. and Blizzard Entertainment, Inc.

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| MDY INDUSTRIES, LLC,<br><br>    Plaintiff and Counter-Claim Defendant<br><br>    vs.<br><br>BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC.<br><br>    Defendants and<br>    Counter-Claim Plaintiffs.<br><br>BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC.<br><br>    Third-Party Plaintiffs,<br><br>    vs.<br><br>MICHAEL DONNELLY,<br><br>    Third-Party Defendant. | **Case No.:** CV06-02555-PHX-DGC<br><br>**BLIZZARD ENTERTAINMENT, INC. AND VIVENDI GAMES, INC. RESPONSE TO THE BRIEF OF *AMICUS CURIAE* PUBLIC KNOWLEDGE**<br><br><br>The Honorable David G. Campbell |

*Amicus Curiae* ("*Amicus*") intervenes in this commercial dispute and asks this Court to reach a legal conclusion that would, in effect, reject binding Ninth Circuit precedent, create an unalienable right to copy software into RAM, and undermine established licensing practices for most consumer software sold in the United States. Nothing in the record of this case indicates that such a sweeping change in Ninth Circuit law is warranted, nor that the broader issues *Amicus* raises are even in controversy in this case. Tellingly, MDY Industries, LLC ("MDY") did not make a similar argument in any filing prior to receiving *Amicus'* brief. The reason is simple: *Amicus* asks this court to

amalgamate a number of disparate cases—none supportive of the broad holding it advocates—to alter long-standing precedent.

In seeking to validate its request for a sea change in Ninth Circuit law, *Amicus* mischaracterizes Blizzard as attempting to "eviscerate the traditional relationship between copyright and contract" and transform End User License Agreement ("EULA") violations unrelated to an author's rights under 17 U.S.C. § 106 into copyright violations. (Am. Br. at 4, 10.)  To the contrary, Blizzard's EULA and Terms of Use ("TOU") form a valid license, and World of Warcraft® ("WoW") users are licensees of the WoW Client software who may not copy the software into RAM, except as allowed under those agreements.

## ARGUMENT

### I.  The Ninth Circuit Recognizes That a Copyright Owner May Trump § 117(a) by Placing License Restrictions on the Right to Make Copies in RAM

Much of *Amicus'* argument boils down to a fundamental disagreement with binding Ninth Circuit precedent establishing that copying code into RAM is copying under the Copyright Act.  As *Amicus* states, "it is clear that a EULA violation unrelated to an author's rights under Section 106 is not a copyright violation." (Am. Br. at 10 (emphasis added).)  In *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993), however, the Ninth Circuit expressly held that Section 106 protects loading software into RAM: "loading of copyrighted software into RAM creates a 'copy' of that software in violation of the Copyright Act."  *Id*. at 518.[1]  The Copyright Act allows copying into RAM if "the owner of a copy of a computer program" makes a copy in RAM that is "an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner," *id*. §117(a)(1).  Software developers now routinely condition the sale of software under a license included in the

---

[1] *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 717 (9th Cir. 2007) (citing *MAI* with approval); *Practiceworks, Inc. v. Prof'l Software Solutions of Ill., Inc.*, Nos. Civ. JFM-02-1205, Civ. JFM-02-1206, 2004 WL 1429955, at * 5-6 (D. Md. June 23, 2004) (addition of Section 117(c) does not overrule *MAI*).

- 2 -

software box or presented to the user upon installation. Courts have routinely enforced these agreements against users.[2] In *MAI*, the Court interpreted § 117 to mean that if a developer "license[s] its software, the [purchasers] do not qualify as 'owners' of the software and are not eligible for protection under § 117." 991 F.2d at 519 n.5.

In direct contradiction to *MAI*, *Amicus* argues that § 117(a) provides an inalienable right. *Amicus* argues that Blizzard "cannot license what it does not own," and thus "the license agreement cannot govern users' right to make RAM copies, because that right is already reserved to users under 17 U.S.C. § 117." (Am. Br. at 4.) The *MAI* court, however, specifically addressed § 117(a) and held that it did not preclude a developer from selling software pursuant to a license that prevents users from copying a program into RAM. *See MAI*, 991 F.2d at 517-20.[3] The Ninth Circuit subsequently reaffirmed that copyright owners may trump §117(a) rights by license.[4] As *MAI* and its progeny make clear, Blizzard owns the right to make RAM copies of its software—and its license restrictions on users' rights to make such RAM copies are not only allowable, but combined with the other restrictions in the EULA discussed below, are clear evidence of an intent to form a license agreement rather than effect an outright sale of a copy.

In seeking to distinguish *MAI*, *Amicus* attempts to cobble together a number of disparate cases into a coherent "test" to substitute for *MAI*, but none of the cases *Amicus* cites suggest that the purchase of consumer software pursuant to a licensing agreement confers "ownership." In fact, several of the cases *Amicus* cites involve no applicable

---

[2] *See CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996) (clickwrap agreement held enforceable); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) (shrinkwrap license on outside of software box held enforceable); *Davidson & Assocs. v. Jung*, 422 F.3d 630 (8th Cir. 2005) (court found both the EULA and the TOU in a clickwrap agreement enforceable and not preempted); *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997) (license contained inside computer box was enforceable).

[3] In fact, one case *Amicus* cites held that an express restriction of § 117 rights—a right otherwise granted to the owner of a copy—is evidence that the parties intended to transfer a license rather than effect an outright sale. *DSC Commc'ns Corp. v. Pulse Commc'ns, Inc.*, 170 F.3d 1354 (Fed. Cir. 1999).

[4] *Wall Data Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 785 (9th Cir. 2006); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1333 (9th Cir. 1995).

license agreement.[5] Thus, contrary to *Amicus'* analysis, *MAI* and its progeny accept at face value that where software is subject to a license, the right to copy that software is licensed, not owned, and software developers may restrict the right to copy their software into RAM the same way they may restrict the right to copy in any other manner.

Like the copyright owner in *MAI*, Blizzard has restricted a user's right to copy its software into RAM. Blizzard requires that all purchasers of a copy of its WoW client software affirmatively agree to the EULA, and upon joining Blizzard's on-line service, the TOU.[6] The EULA states that "[a]ll title, ownership rights and intellectual property rights … are owned or licensed by Blizzard." (Ex. 21 to Blizzard Entertainment, Inc. and Vivendi Games, Inc. Statement of Facts in Support of their Motion for Summary Judgment ("Blizzard SOF") ¶ 3A (emphasis added).) Under the EULA, "[s]ubject to [a user's] agreement to and continuing compliance with this License Agreement," a user may "install the Game Client" and "use the Game Client in conjunction with the [WoW massively multi-player on-line role-playing game] service." (Ex. 21 to Blizzard SOF ¶ 1.) The EULA, states that "[s]ubject to the license granted hereunder, you may not, in whole or in part, copy, photocopy, reproduce, translate, reverse engineer, derive source code from, modify, disassemble, decompile, or create derivative works based on the

---

[5] *Krause v. Titleserv, Inc.*, 402 F.3d 119, 124 (2d Cir. 2005) (oral representations at issue did not constitute a license because "when read in context" they "relate to the ownership and/or right to use of the *copyright*, and not to ownership of the copies") (emphasis added); *SoftMan Prods. Co., LLC v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1087 (C.D. Cal. 2001) (distributor "is not bound by the EULA because there was no assent to its terms"). Other cases cited involve the creation of custom software designed specifically for a particular user *and* without a license agreement stating that the user did not own the software. *Krause*, 402 F. 3d at 124 (employer owned a copy because it "paid . . . substantial consideration to develop the programs for" his employer's sole benefit, and the programs were "customized … to serve [the employer's] operations"); *Stuart Weitzman, LLC v. MicroComputer Res., Inc.*, 510 F. Supp. 2d 1098, 1101 (S.D. Fla. 2007) (involved the development of custom-made, proprietary software for a business where there was *no license agreement* for the first twelve years of the parties' relationship). A final case addresses only whether the software is intellectual property or a *good* subject to the Uniform Commercial Code. *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670 (3d Cir. 1991).

[6] Blizzard takes the extraordinary step of requiring its users to scroll through the entire text of both the EULA and TOU before the Game Client will permit them to click on the "I ACCEPT" button.

- 4 -

Game, or remove any priorietary notices or labels on the Game." (Ex. 21 to Blizzard's SOF ¶ 4A.) "Failure to comply with the [terms of the EULA] shall result in the immediate, automatic termination of the license granted hereunder and may subject you to civil and/or criminal liability." (Ex. 21 to Blizzard SOF ¶ 4A.) Accordingly, the EULA and ToU make clear that Blizzard only intends to transfer a license to use WoW software, and under *MAI*, WoW users may not copy software into RAM except as permitted by the EULA and TOU.

### II. The Provisions of the WoW EULA Make Clear, Even Under the Test Formulated by *Amicus*, That WoW Purchasers are Licensees, not Owners.

Even setting *MAI* and its progeny aside and adopting the "test" advocated by *Amicus*, those cases addressing valid, written license agreements with language similar to that contained in WoW's EULA and TOU clearly support a finding that WoW Game Client purchasers are licensees, not owners. Indeed, as shown below, each of the key license provisions discussed in the cases upon which *Amicus* relies weighs in favor of a conclusion that WoW purchasers are licensees.

**1. WoW users do not obtain rights through a single payment.** *Amicus* relies on *SoftMan Products*, for the proposition that where "'the possessor's rights were obtained through a single payment, [that fact] is certainly relevant to whether the possessor is an owner,'" (Am. Br. at 15), and argues that WoW users purchase their software with a single payment (*id*. at 14-15, 17-18). *Amicus* ignores the fact that WoW is an on-line game, and purchase of the WoW client alone will not permit the graphical display of WoW's interactive, immersive multimedia experience—the very expression copyright law protects—without a working connection to one of Blizzard's game servers. (Blizzard SOF ¶¶ 9, 18.) In order to access Blizzard's servers, users must pay a monthly fee. The EULA expressly precludes a user from using the client software to "facilitate, create or maintain any unauthorized connection to the Game or the Service, including without any limitation any connection to any unauthorized server that emulates, or attempts to emulate, the Service," and requires that "[a]ll connections to the Game and/or

the service … may only be made through methods and means expressly approved by Blizzard." (Ex. 21 to Blizzard SOF ¶ 4B(iv).)  The Game Client's lack of independent functionality coupled with the restrictions on playing WoW independent of Blizzard's servers have the effect of requiring a recurring monthly payment to access and use the copyrighted elements of the software.  Functionally, then, users do not obtain the rights to use the copyrighted material through a single payment, but instead through a series of ongoing payments.  If the payments cease, the Game Client becomes useless.  These recurring payments support a finding that Blizzard has licensed, not sold, the WoW Game Client.

**2. The EULA places restrictions on transfer.**  In another case *Amicus* cites, *Adobe Systems Inc. v. One Stop Micro, Inc.*, 84 F. Supp. 2d 1086 (N.D. Cal. 2000), the court found that restrictive language in a EULA that allowed resale only within the country where the reseller's principal place of business was located, subject to the EULA, through the reseller's direct sales force, and "solely in the form obtained from Adobe" were sufficient restrictions to constitute a license, not a sale. *Id.* at 1091; *see also Adobe Sys. Inc. v. Stargate Software Inc.*, 216 F. Supp. 2d 1051, 1056 (N.D. Cal. 2002) (holding that the same agreement constituted a license).

Like the EULAs in *One Stop* and *Stargate*, the WoW Game Client EULA also contains a number of restrictions inconsistent with a transfer of ownership.  For instance, a user may only transfer the program "by physically transferring the original media (e.g. the CD-ROM or DVD you purchased), all original packaging, and all Manuals or other documentation distributed with the Game." (Ex. 21 to Blizzard SOF ¶ 3B.)  As in *One Stop*, resale may therefore only be accomplished "solely in the form" the game was "obtained from" Blizzard (or a reseller).  84 F. Supp. 2d at 1093.   The EULA also restricts the form of the transfer—requiring transferees to be subject to the EULA and precluding a user from "rent[ing], leas[ing] or licens[ing] the Game to others."  (Ex. 21 to Blizzard SOF ¶ 4B(i).)

**3. Contrary to *Amicus'* statements, users do not have an unlimited**

**right to possession, because Blizzard may require users to destroy their copies of the Game Client at any time and for any reason.** *Amicus* states that "unlimited, permanent possession is underscored by the fact that Blizzard does not repossess copies of the game after a termination of the license agreement." (Am. Br. at 18.) While Blizzard does not repossess the physical CD-ROM or packaging—material that is so inexpensive it is barely worth the cost of postage to return—the EULA grants Blizzard the right to "repossess" the software upon termination of the license agreement by requiring users to destroy their copies. The EULA states that "Blizzard may terminate this Agreement at any time for any reason or no reason. In such event, you *must immediately and permanently destroy all copies of the Game in your possession and control and remove the Game Client from your hard drive*. Upon termination of this Agreement for any reason, all licenses granted herein shall immediately terminate." (Ex. 21 to Blizzard SOF ¶ 6 (emphasis added).) Thus, Blizzard *does* repossess the licensed material on termination, and the right to require destruction of the copyrighted material at any time for any reason is clearly contrary to ownership by the end user.[7]

**4. The EULA grants Blizzard other rights inconsistent with ownership by the end user.** A possessor is not an owner "if the possessor's right to use the software is heavily encumbered by other restrictions that are inconsistent with the status of owner." *DSC Commc'ns Corp.*, 170 F.3d at 1362. Generally, "[a]n author has the exclusive right to control *copying,* but once a given copy has been sold its owner may do with it as he pleases (provided that he does not create another copy or a derivative

---

[7] *United States v. Wise*, 550 F.2d 1180 (9th Cir. 1977), which the District Court for the District of Washington relied on in *Vernor v. Autodesk, Inc.*, --- F.Supp.2d ---, No. C07-1189RAJ, 2008 WL 2199682 (W.D. Wash. May 20, 2008) does not alter this analysis. In *Wise*, the court held that requiring the return of film stock at the end of a specified term rendered a transaction a license rather than a sale. *Wise*, 550 F.2d at 1191. *Autodesk*'s statement that "a requirement that the print be salvaged or destroyed, was insufficient" misstates *Wise*. *Autodesk*, 2008 WL 2199682, at *6. In *Wise*, the Court analyzed destruction where the copyright owners sold the film to a salvage company *for destruction*—not an instance where the license allowed the studio to order a licensee to destroy film at will. 550 F.2d at 1193. Further, to the extent *Autodesk* seeks to distinguish *MAI* and its progeny, it does so in the altogether different context of the first-sale doctrine, and not in a case (like *MAI* its progeny, and the present case) evaluating the right to restrict copying.

- 7 -

work)." *Vincent v. City Colleges of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007) (emphasis in original). The EULA provides Blizzard the right to modify the game client "remotely, including without limitation, the Game Client residing on the user's machine, without the knowledge or consent of the user, and … grant[s] to Blizzard … consent to deploy and apply such patches, updates and modifications." (Ex. 21 to Blizzard SOF ¶ 8.) Similarly, in the TOU, "Blizzard reserves the right" to alter "the availability of any feature of the Program, hours of availability, content, data, software, or equipment needed to access the Program, effective with or without prior notice …. Blizzard may change, modify, suspend or discontinue any aspect of the Program at any time. Blizzard may also impose limits on certain features or restrict your access to parts of all of the Program without notice or liability." (Ex. 18 to Blizzard SOF ¶ 9.) While restrictions in the TOU generally concern the online component of the game, because the Game Client will not function without a connection to Blizzard's server, terms in the TOU have the effect of restricting a user's access to copyrighted content available on the CD-ROMs they purchase. The reservation of a right to restrict use and alter the game after the user purchases a license in such a way thus conflicts with the rights of owners to do as they please with their copies, is not consistent with a sale, and demonstrates that users only receive a license to the software.

Accordingly, Blizzard's WoW EULA clearly constitutes a license rather than a sale even under the "test" formulated by *Amicus*. In this way it is also similar to the sort of license agreements that are part of almost every piece of software sold in the United States. *See supra* note 2. *Amicus*' attempt to cobble together dissimilar cases to overturn this long standing and long enforced practice of licensing consumer software should be rejected and should not preclude this Court from entering summary judgment in Blizzard's favor on its copyright claims.

## CONCLUSION

For the reasons stated herein, Blizzard respectfully requests that this Court reject *Amicus*' contention that WoW users are owners, rather than licensees, of the WoW software.

Dated: June 20, 2008                                         Respectfully submitted,

Shaun Klein
SONNENSCHEIN NATH &
ROSENTHAL LLP
2398 East Camelback Road, Ste 1060
Phoenix, AZ  85106-9009
Telephone:  (602) 508-3900
Facsimile:  (602) 508-3914

/s/ Christian S. Genetski
Christian S. Genetski
Shane M. McGee
1301 K Street, NW, Ste 600E
Washington, DC  20005
Facsimile (202) 408-6399
Telephone (202) 408-6400

Attorneys for Defendants Blizzard Entertainment, Inc. and Vivendi Games, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2008, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| Name | Email Address |
|---|---|
| Lance C. Venable | docketing@vclmlaw.com |
| Joseph Richard Meaney | docketing@vclmlaw.com<br>jmeaney@vclmlaw.com |
| Public Knowledge<br>Connie Jo Mableson | connie@azlawyers.com |

/s/  Christian S. Genetski