1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9

10   MDY Industries, LLC,                    )    No. CV-06-2555-PHX-DGC
                                             )
11               Plaintiff/Counterdefendant, )    **ORDER**
                                             )
12   vs.                                     )
                                             )
13   Blizzard Entertainment, Inc.; and       )
     Vivendi Games, Inc.,                    )
14                                           )
                 Defendants/Counterclaimants.)
15                                           )
                                             )
16   _____)
                                             )
17   Blizzard Entertainment, Inc.; and       )
     Vivendi Games, Inc.,                    )
18                                           )
                 Third-Party Plaintiffs,     )
19                                           )
     vs.                                     )
20                                           )
     Michael Donnelly,                       )
21                                           )
                 Third-Party Defendant.      )
22                                           )
                                             )
23   _____)

24

25         Blizzard Entertainment, Inc. and Vivendi Games, Inc. (collectively, "Blizzard") are

26   the creators and operators of a multiplayer online role-playing game known as World of

27   Warcraft ("WoW").  WoW was released in November of 2004.  WoW players control

28   characters within a virtual universe, exploring the landscape, fighting monsters, performing

quests, building skills, and interacting with other players and computer-generated characters. As players succeed, they acquire in-game assets, experience, and power.  Players can advance from level 1 to level 60 with the basic game, and through level 70 with an expansion module.

Blizzard owns the copyright for WoW software.  The software consists of two components: the "game client" software and the "game server" software.  A user can obtain the game client software by purchasing a copy at a retail store or downloading a copy from the WoW website.  The user plays WoW by loading the game client software on his personal computer and accessing the game server software through an online account for which he pays a monthly fee.

Use of WoW is governed by an End User License Agreement ("EULA") and  Terms of Use Agreement ("TOU").  These agreements are displayed on a player's computer screen when the game client software is loaded and the player seeks online access to the game servers.  Players are required to agree to the terms of the EULA and TOU before proceeding to play the game.[1]

WoW has been enormously successful.  Blizzard asserts, and MDY does not dispute, that WoW is the largest and most successful multiplayer online game in the world.  WoW currently has some 10,000,000 active players and generates more than $1.5 billion in revenue annually.

Michael Donnelly is the founder of MDY Industries, LLC ("MDY").  Donnelly created, and MDY owns, a software program known as WowGlider ("Glider").  Glider is a computer program known as a "bot" – a word derived from "robot."  Glider plays WoW for its owner while the owner is away from his or her computer.  Glider thereby enables the owner to advance more quickly within WoW than would otherwise be possible. MDY began selling Glider to WoW users in June of 2005.  To date, it has sold some 100,000 copies.

---

[1] The record contains several different versions of the EULA and TOU.  The parties agreed at oral argument that the most recent versions – the February 2, 2007 EULA and the October 16, 2006 TOU – are the operative agreements for purposes of the summary judgment motions.  *See* Dkt. #41-8, 42.  The Court therefore will not address the earlier versions.

1    Blizzard contends that Glider diminishes the value of WoW and causes Blizzard to

2    lose customers and revenue.  Blizzard asserts that WoW is a carefully balanced competitive

3    environment where players compete against each other and the game to advance through the

4    game's various levels and to acquire game assets.  Blizzard claims that Glider upsets this

5    balance by enabling some payers to advance more quickly and unfairly, diminishing the

6    game experience for other players.  Blizzard also contends that Glider enables its users to

7    acquire an inordinate number of game assets – sometimes referred to as "mining" or

8    "farming" the game – with some users even selling those assets for real money in online

9    auction sites, an activity expressly prohibited by the TOU.  Dkt. #41. Ex. 8, ¶ 8.

10   MDY, by contrast, claims that Glider enhances the game playing experience of its

11   users and even enables some disabled users to play WoW.  MDY contends that Glider users

12   constitute a small fraction of WoW players and that the effect of Glider on WoW is minimal.

13   MDY characterizes itself as an innovator and entrepreneur, and claims that Blizzard seeks

14   improperly to use the copyright laws to squelch competition and stifle innovation.

15   On the morning of October 25, 2006, representatives of Blizzard appeared at

16   Donnelly's home and informed him that the sale and use of Glider violated Blizzard's rights

17   in WoW.  The representatives stated that they would file a lawsuit against Donnelly and

18   MDY the next day in California federal court if MDY did not agree to stop selling Glider.

19   Donnelly declined, and later that day filed this action in Arizona.  *See* Dkt. #1.

20   MDY's amended complaint seeks a declaratory judgment that Glider does not infringe

21   rights owned by Blizzard.  Dkt. #5.  Blizzard filed a counterclaim and third-party complaint

22   asserting seven claims:   tortious interference with contract, contributory copyright

23   infringement, vicarious copyright infringement, violation of the Digital Millennium

24   Copyright Act ("DMCA"), trademark infringement, unfair competition, and unjust

25   enrichment.  Dkt. #10.

26   The parties have now filed motions for summary judgment.  Blizzard seeks summary

27   judgment on the claims for contributory and vicarious copyright infringement, violation of

28   the DMCA, and tortious interference with contract (Counts I-IV).  Dkt. #39.  MDY seeks

1  summary judgment on all claims except trademark infringement (Count V).  Dkt. #45.  The

2  parties have fully briefed the issues (Dkt. ##39, 45, 54, 57, 69-70) and the Court heard oral

3  argument on June 26, 2008 (Dkt. #78).  For reasons stated below, the Court will grant the

4  motions in part and deny them in part.[2]

5  **I.    Summary Judgment Standard.**

6          Summary judgment may be granted if "there is no genuine issue as to any material

7  fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

8  A party seeking summary judgment "always bears the initial responsibility of informing the

9  district court of the basis for its motion, and identifying those portions of [the record] which

10  it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.*

11  *Catrett*, 477 U.S. 317, 322 (1986).  Only disputes over facts that might affect the outcome

12  of the suit will preclude the entry of summary judgment, and the disputed evidence must be

13  "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

14  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

15  **II.   Blizzard's Copyright Infringement Claims (Counts II and III).**

16          Section 106 of the Copyright Act grants the owner of a copyright the exclusive right

17  to "copy" the copyrighted work; that is, to make a copy of the work, to prepare derivative

18  works based on the work, or to distribute copies of the work to the public.  17 U.S.C.

19  § 106(1)-(3); *see S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989)

20  ("copying" is shorthand for the copyright owner's exclusive rights).  Section 501 of the Act

21  provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as

22  provided by section[] 106 . . . is an infringer of the copyright[.]"  17 U.S.C. § 501(a).

23  Copyright plaintiffs must therefore satisfy two requirements to establish direct infringement:

24  (1) they must show that they own the allegedly infringed copyright, and (2) they must show

25  that the alleged infringer has violated at least one of the exclusive rights granted under

26  section 106.  *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

27

28          [2] The Court will grant summary judgment on  Blizzard's unfair competition claim (Count VI).  Blizzard does not oppose MDY's motion on that claim.  Dkt. #54 at 2 n.1.

1    A person commits contributory copyright infringement "by intentionally inducing or

2    encouraging direct infringement." *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930

3    (2005).  A person commits vicarious infringement "by profiting from direct infringement

4    while declining to exercise a right to stop or limit it[.]"  *Id.*  Blizzard alleges that users of

5    WoW are licensees who are permitted to copy the copyrighted game client software only in

6    conformance with the EULA and TOU, and that when users launch WoW using Glider, they

7    exceed the license in the EULA and TOU and create infringing copies of the game client

8    software. Dkt. #10 ¶¶ 80-83, 91-92. MDY is liable for contributory copyright infringement,

9    Blizzard claims, because it materially contributes to this direct infringement by Glider users.

10   MDY allegedly does so  by developing and selling Glider with the knowledge that Glider

11   users will create infringing copies.  *Id.* ¶¶ 85-87.  MDY is liable for vicarious copyright

12   infringement, Blizzard asserts, because it has the ability to stop the Glider-caused infringing

13   activity and derives a financial benefit from that activity.  *Id.* ¶¶ 93-95.

14   MDY does not dispute that it promotes the use of Glider in connection with WoW,

15   that it controls Glider, or that it profits from Glider.  MDY instead contends that it is not

16   liable for contributory or vicarious copyright infringement because Glider users do not

17   infringe Blizzard's copyright. Dkt. #45 at 7-12.  If Glider users violate terms of the EULA

18   and TOU, MDY argues, they are merely breaching a contract, not infringing a copyright.  *Id.*

19   MDY also asserts a copyright misuse defense and an ownership defense under 17 U.S.C.

20   § 117.  Dkt. ##57, 69.[3]

21

22

23

---

24   [3] The Court permitted the public interest group Public Knowledge to file an amicus
     brief in this case (Dkt. ##74-75), and required Blizzard to respond to its arguments

25   (Dkt. ##76-77).  Public Knowledge and the other parties have provided many helpful legal
     arguments. They also make various policy arguments. Although the Court appreciates these

26   policy arguments and has benefitted from their excellent presentation, the Court is not a
     policy-making body.  The Court's obligation is to apply the law, particularly the law of the

27   Ninth Circuit.  As will be seen below, many of the issues in this case are governed by
     established Ninth Circuit law.  No matter how persuasive arguments might be for positions

28   contrary to Ninth Circuit law, this Court is not free to depart from that law.

**A.     Do Users of Glider Infringe Blizzard's Copyright?**

MDY does not dispute that Blizzard owns a valid copyright in the WoW game client and game server software.  Nor does MDY dispute that the game client software, which typically is located on the hard drive of a player's personal computer, is copied from the hard drive to the computer's random access memory ("RAM") when WoW is played.

Ninth Circuit law holds that the copying of software to RAM constitutes "copying" for purposes of section 106 of the Copyright Act.  *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518-19 (9th Cir. 1993).  Thus, if a person is not authorized by the copyright holder (through a license) or by law (through section117, which will be discussed below) to copy the software to RAM, the person is guilty of copyright infringement because the person has exercised a right (copying) that belongs exclusively to the copyright holder.

MDY contends that users of Glider do not infringe Blizzard's copyright because they are licensed to copy the game client software to RAM.  MDY claims that WoW players acquire this license when they purchase the game client software and load it on the hard drives of their personal computers.  MDY claims that contrary provisions of the EULA and TOU, such as express prohibitions on the use of bots, are mere terms of contract, not limitations on the scope of the license granted by Blizzard.  Thus, although Blizzard may assert a claim against Glider users for breach of contract, MDY argues, it cannot assert the more powerful claim of copyright infringement.[4]

"Generally, a copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement and can sue only for breach of contract."  *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) ("*Sun I*") (citations omitted).  "If, however, a license is limited in scope

---

[4] Breach of contract damages generally are limited to the value of the actual loss caused by the breach. *See* 24 Richard A. Lord, *Williston on Contracts* § 65:1 (4th ed. 2007). Copyright damages, by contrast, include the copyright owner's actual damages and any additional profits of the infringer, or statutory damages as high as $150,000 per infringed work.  17 U.S.C. § 504; *see Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 512 n.5 (9th Cir. 1985).  Courts may also impose injunctive relief, seize infringing articles, and award costs and attorneys' fees.  17 U.S.C. §§ 502, 503, 505.

1   and the licensee acts outside the scope, the licensor can bring an action for copyright

2   infringement." *Id.* To prevail on a copyright infringement claim, therefore, a plaintiff who

3   has granted a license must establish that the license terms are "limitations on the scope of the

4   license rather than independent contractual covenants," and that the defendant's actions

5   exceed the scope of the license. *Id.* at 1122.

6                   **1.      Is the EULA Limited in Scope?**

7           The use of WoW is governed by two agreements – the EULA and the TOU.  Players

8   must affirmatively consent to these agreements before playing WoW.  The first paragraph

9   of the EULA states:  "IF YOU DO NOT AGREE TO THE TERMS OF THIS

10  AGREEMENT, YOU ARE NOT PERMITTED TO INSTALL, COPY, OR USE THE

11  GAME." Dkt. #42 at 2 (capitalization in original).  The next paragraph provides that "[a]ny

12  and all uses of the [game client software] are governed by the terms" of the EULA, that the

13  game client software is "distributed solely for use by authorized end users according to the

14  terms" of the EULA, and that "[a]ny use, reproduction, modification or distribution of the

15  [game client software] not expressly authorized by the terms of the [EULA] is expressly

16  prohibited." *Id.*

17          Section 1 of the EULA specifically addresses the license granted by Blizzard.  With

18  emphasis on particular provisions, the section reads as follows:

19          *Grant of Limited Use License*.  If you agree to this License Agreement,
            computer software (hereafter referred to as the "Game Client") will be
20          installed on your hardware.  If your hardware meets the minimum
            requirements, the installation of the Game Client will enable you to play the
21          Game by accessing your account with the Service (your "Account").
            *Subject to your agreement to and continuing compliance with this License
22          Agreement, Blizzard hereby grants, and you hereby accept, a limited, non-
            exclusive license* to (a) install the Game Client on one or more computers
23          owned by you or under your legitimate control, and (b) use the Game Client
            in conjunction with the Service for your non-commercial entertainment
24          purposes only.  *All use of the Game Client is subject to this License
            Agreement and to the [TOU]*, both of which you must accept before you can
25          use your Account to play the Game.

26  *Id*. at 3 (emphasis added).

27          Several parts of this section are worth noting.  The title – "Grant of Limited Use

28  License" – makes clear that the license is limited, as does the later reference to a "limited,

                                            - 7 -

non-exclusive license."  The grant of the limited license is expressly made "[s]ubject to your agreement to and continuing compliance with this License Agreement."  The section further provides that "[a]ll use of the Game Client is subject to" the EULA and the TOU.  Thus, the very portion of the contract that grants a license to use the game client software also makes clear that the license is limited.

**2.     Are Key Provisions of the EULA and TOU Limitations on the Scope of the License or Separate Contractual Covenants?**

Having determined that the Blizzard license is limited, the Court must construe the EULA and TOU to determine whether the provisions violated by the use of Glider are themselves "limitations on the scope of the license, which would mean that [the users] had infringed the copyright by acting outside the scope of the license; or whether the terms [are] merely separate contractual covenants, which would make this a contract dispute[.]"  *Sun I*, 188 F.3d at 1119.  Blizzard argues that Glider users violate portions of section 4 of the TOU (subsections 4(B)(ii) and 4(B)(iii)) and portions of section 5 (subsections 5(B)(6) and 5(B)(8)).  Dkt. #39 at 6-7.  The Court will address these sections.[5]

As an initial matter, the Court concludes that limitations on the license granted by Blizzard may be found in both the EULA and the TOU.  Section 1 of the EULA, which grants the limited license, expressly states that users are subject to both the EULA and the TOU.  Dkt. #42 at 3.  These contracts must therefore be read together.  As already noted, both agreements must be accepted before a user can play WoW.

The EULA and TOU contain no provision that explicitly lays out the scope of the Blizzard limited license.  The Court concludes, however, that the limitations on scope are

---

[5] Blizzard also argues, although with less force, that Glider users violate sections 4(B)(ii) and 4(B)(iv) of the EULA.  Section 4(B)(ii) prohibits exploiting the game client software for any commercial purpose, and section 4(B)(iv) prohibits unauthorized connections to the game.  Dkt. #42 at 4.  Section 4(A) provides that failure to comply with the terms of section 4 results in the immediate and automatic termination of the EULA.  *Id*.  The Court will not grant summary judgment based on section 4 of the EULA because the language of the section is ambiguous and Blizzard has presented no legal authority in support of license provisions that "self-destruct" when users commit certain violations.

- 8 -

found in section 4 of the TOU.  The provisions of section 4 generally are designed to preserve and protect Blizzard's proprietary interests in its software and game, including its copyright interests.  Dkt. #41 at 4.  Subsection A of section 4 prohibits users from intercepting, emulating, or redirecting the proprietary components of the game, activities that would include the exclusive copying and distribution rights possessed by Blizzard under section 106 of the Copyright Act.  Subsection B prohibits users from modifying files that are part of the game, an activity akin to the creation of derivative works – another right possessed exclusively by Blizzard as copyright holder.  Subsection C prohibits users from disrupting the game or others players' use of the game.  Subsection D reserves Blizzard's exclusive right under section 106 of the Act to create derivative works.  *Id.*

The provisions of section 4 thus make clear that although users are licensed to play WoW and to use the game client software while playing, they are not licensed to exercise other rights belonging exclusively to Blizzard as the copyright holder – copying, distributing, or modifying the work.  The provisions are limits on the scope of the license granted by Blizzard.[6]

Section 5 of the TOU is different.  It is titled "Rules of Conduct."  *Id.* at 4.  The subsections of section 5 are titled "Rules Related to Usernames and Guild Designations" (§ 5(A)), "Rules Related to 'Chat' and Interaction With Other Users" (§ 5(B)), and "Rules Related to Game Play" (§ 5(C)).  Section 5 thus sets rules for the game, whereas section 4 establishes limits more clearly designed to preserve Blizzard's copyright interests.  The section 5 rules also regulate relatively minor matters such as the use of celebrity names (§ 5(A)(4)) or offensive language (§ 5(A)(2)) for WoW characters.  Section 5 establishes game rules by contract.

---

[6] Section 4 is titled "Limitations on Your Use of the Service."  *Id*.  The title thus reflects an intent to create limitations on use.  Although the title refers to "the Service," a term that is defined to mean the online portion of the WoW game (Dkt. #41 at 2), the Service cannot be accessed or used without the game client software and the EULA expressly makes the license of the game client software subject to the terms of the TOU.  Dkt. #42 at 2.  The Court thus views the title of section 4 as consistent with the interpretation of that section as a limitation on the license granted by Blizzard.

1    When the EULA and TOU are considered in their entirety, the Court concludes that

2    section 4 of the TOU establishes limitations on the scope of the license and section 5 sets

3    rules of the game as independent contract terms.  A single contract clearly can contain both

4    types of provisions.  *See Netbula, LLC v Storage Tech. Corp.*, No. C06-07391 MJJ, 2008 WL

5    228036, at *5 (N.D. Cal. Jan. 18, 2008) (concluding that one clause of an agreement was a

6    contractual covenant while another clause was a limitation on the scope of the license).

### 3.    Do Users of Glider Act Outside the Scope of The License?

8    Users of Glider clearly violate the prohibition in section 4(B)(ii) of the TOU against

9    the use of "bots" or any "third-party software designed to modify the [WoW] experience[.]"

10   Dkt. #41-8 at 4.  Players who use Glider to mine WoW for game assets also violate section

11   4(B)(iii).  When WoW users employ Glider, therefore, they act outside the scope of the

12   license delineated in section 4 of the TOU.  Copying the game client software to RAM while

13   engaged in this unauthorized activity constitutes copyright infringement.  *See MAI*, 991 F.2d

14   at 518-19 (copying software to RAM constitutes "copying" for purposes of section 106 of

15   the Copyright Act); *Ticketmaster LLC v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1108

16   (C.D. Cal. 2007) (use of bot violated TOU and gave rise to copyright infringement).

17   MDY relies on the Federal Circuit's decision in *Storage Technology Corp. v. Custom*

18   *Hardware Engineering & Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005), to argue that

19   "uses" which violate a license constitute copyright infringement only when the uses

20   themselves infringe one of the exclusive rights granted by the Copyright Act.  Dkt. #57 at

21   6-7.  The Court is not convinced that *Storage Technology* should be read so narrowly.  It is

22   obvious that a person cannot be liable for copyright infringement without committing an act

23   of infringement.  Thus, where a license is at issue, the person must not only act outside the

24   scope of the license, but must also engage in an act that infringes upon the exclusive rights

25   granted the copyright holder by section 106 of the Act.  This much is clear from both Ninth

26   Circuit law and *Storage Technology*.  But to the extent MDY suggests that the act that causes

27   the person to fall outside the scope of the license and the act that constitutes copyright

28   infringement must be one and the same, MDY has cited no Ninth Circuit authority.  Nor does

1    this proposition make logical sense.  If A grants a software license to B on the express

2    condition that the license will remain in effect only so long as B makes monthly payments

3    to A, and B then stops making payments to A, any subsequent copying of the software to

4    RAM by B would constitute copyright infringement – a conclusion with which MDY's

5    counsel agreed during oral argument.  This would be true even though the act that took B

6    outside the scope of the license – nonpayment – is different from the act that constitutes

7    infringement – subsequent copying of the software.  The Court cannot accept MDY's

8    assertion, at least as a matter of Ninth Circuit law, that the act that takes one outside the

9    scope of the license and the act that constitutes infringement must be one and the same.

10    Even if MDY's proposition were true, however, it would not change the result in this

11    case.  The act that violates the EULA and TOU and takes Glider users outside the scope of

12    Blizzard's limited license is the use of Glider to play WoW, and the use of Glider to play

13    WoW necessarily includes copying the game client software to RAM.  Thus, the act that

14    exceeds the scope of the license and the act that violates Blizzard's copyright are the same.

15    **4.    MDY's Other Arguments.**

16    MDY does not dispute that the requirements for contributory and vicarious copyright

17    infringement are met if the use of Glider constitutes infringement.  MDY does contend,

18    however, that certain factual disputes preclude summary judgment in favor of Blizzard on

19    the contributory and vicarious infringement claims.  Dkt. #57 at 11.

20    MDY first contends that there is a dispute as to whether Blizzard has ever terminated

21    a license pursuant to the terms of the EULA.  *Id.*  But MDY has presented no argument or

22    legal authority to suggest that Glider users infringe Blizzard's copyright only if Blizzard

23    affirmatively terminates the limited license.  Users may infringe if they engage in an act of

24    copying that is outside the scope of the limited license granted by Blizzard.  Whether

25    Blizzard has ever terminated a license is therefore immaterial.

26    MDY next contends that there is a factual issue as to whether "the EULA or TOU

27    precluded 'bots.'"  *Id.*  There is no such issue.  As MDY itself acknowledges, the operative

28    version of the TOU expressly prohibits bots.  Dkt. #58 ¶ 67; *see* Dkt. #41-8 at 4 (§ 4(B)(ii)).

1    MDY also asserts a factual dispute as to whether the violations of the TOU were

2    "within the reasonable expectations of MDY or its customers as required under Arizona

3    law." Dkt. #57 at 11.  This purported dispute is immaterial because both the EULA and TOU

4    are governed by Delaware law.  *See* Dkt. #42 at 8-9 (EULA § 14(f)); Dkt. #41-8 at 14 (TOU

5    § 16(F)).  Moreover, any person reading the TOU clearly would understand that a licensee

6    is not authorized to play WoW using Glider.

7    Finally, MDY claims that a dispute exists as to whether the RAM copying Blizzard

8    alleges here is the same as the RAM copying in *MAI*.  But whether the loading of software

9    into RAM constitutes "copying" for purposes of copyright law is a legal, not a factual,

10   question, and has been answered by *MAI*: "[T]he loading of software into RAM creates a

11   copy under the Copyright Act."  991 F.2d at 519.  MDY cites no case to the contrary.

12   **B.    Has MDY Established the Copyright "Misuse" Defense?**

13   The defense of copyright misuse "prevents copyright holders from leveraging their

14   limited monopoly to allow them control of areas outside the monopoly." *A&M Records, Inc.*

15   *v. Napster, Inc.*, 239 F.3d 1004 1026 (9th Cir. 2001) (citing *Lasercomb Am., Inc. v. Reynolds*,

16   911 F.2d 970, 979 (4th Cir. 1990)).   MDY contends that Blizzard's prohibition of bots

17   constitutes copyright misuse because Blizzard is controlling its "licensees' use of

18   independently created and noninfringing third party software." Dkt. #57 at 14.  As explained

19   above, however, the use of Glider does infringe Blizzard's copyright.  Moreover, while

20   Blizzard has limited the license of its WoW software, there is no evidence that Blizzard has

21   sought to bar third parties from developing competing games.  *See A&M*, 239 F.3d at 1027

22   (rejecting misuse defense where there was no evidence plaintiffs sought to control areas

23   outside the grant of copyright); *Triad Sys. Corp. v. S.E. Express Co.*, 64 F.3d 1330, 1337 (9th

24   Cir. 1995) (rejecting misuse defense because unlike *Lasercomb*, "Triad did not attempt to

25   prohibit [the defendant] from developing its own service software to compete with Triad").

26   MDY has not established the copyright misuse defense.

27   **C.    Does 17 U.S.C. § 117 Require a Finding of Non-infringement?**

28   Section 117 permits the "owner" of a copy of a computer program to copy the

1   program to RAM if the copy is created as an essential step in using the program. Section 117

2   provides, in relevant part:

3       Notwithstanding the provisions of section 106, it is not infringement for the
        owner of a copy of a computer program to make or authorize the making of

4       another copy or adaption of that computer program provided[] that such a new
        copy or adaption is created as an essential step in the utilization of the

5       computer program[.]

6   17 U.S.C. § 117(a)(1).

7       Public Knowledge's amicus brief contends that WoW users are "owners" of copies

8   of the game client software within the meaning of section 117, that copying the software to

9   RAM is an essential step in using the game client software, and that the act of copying to

10  RAM is, therefore, not an infringement, even when done in connection with Glider.

11  Dkt. #65. MDY adopts this argument in its reply memorandum. Dkt. #69 at 2, 5, & n.7.

12      The resolution of this issue is controlled by Ninth Circuit law. At least three cases –

13  *MAI*, *Triad*, and *Wall Data Inc. v. Los Angeles County Sheriff's Department*, 447 F.3d 769

14  (9th Cir. 2006) – hold that licensees of a computer program do not "own" their copy of the

15  program and therefore are not entitled to a section 117 defense. *See MAI*, 991 F.2d at 518

16  n.5; *Triad* 64 F.3d at 1333; *Wall Data*, 447 F.3d at 784-85. *Wall Data* provides a two-part

17  test for determining whether the purchaser of a copy of a software program is a licensee or

18  an owner: if the copyright holder (1) makes clear that it is granting a license to the copy of

19  the software, and (2) imposes significant restrictions on the use or transfer of the copy, then

20  the transaction is a license, not a sale, and the purchaser of the copy is a licensee, not an

21  "owner" within the meaning of section 117. *Wall Data*, 447 F.3d at 785.

22      In *Wall Data*, the Los Angeles County Sheriff's Department purchased nearly 4,000

23  licenses to Wall Data's computer software, but installed the software on more than 6,000

24  computers. *Id.* at 773. The license granted a right to use the software on a "stand alone

25  workstation" or a "networked station which [did] not permit the [s]oftware to be shared with

26  other networked stations." *Id.* at 775 n.5. The license also limited the transfer of the

27  software to "not more than once every 30 days." *Id.* The Ninth Circuit concluded that

28  "[t]hese restrictions were sufficient to classify the transaction as a grant of a license to Wall

1    Data's software, and not a sale of Wall Data's software." *Id.* at 785. The court therefore

2    concluded that "the Sheriff's Department [was] not the 'owner' of copies of Wall Data's

3    software for purposes of § 117." *Id.*

4          Under the two-part test for ownership in *Wall Data*, the transactions between Blizzard

5    and persons who acquire copies of its game client software are licenses, not sales.

6          First, Blizzard makes clear that it is granting a license. The EULA expressly states

7    in section 1 that Blizzard is granting a "limited license." Dkt. #42 at 2. Section 3 goes

8    further and states that "[a]ll title, ownership rights, and intellectual property rights in and to

9    the Game *and all copies thereof* . . . are owned or licensed by Blizzard." Dkt. #42 at 3

10   (emphasis added). The first paragraph of the EULA likewise states that "[t]his software

11   program and any files that are delivered to you by Blizzard . . . *and any and all copies and*

12   *derivative works of such software program* . . . is the copyrighted work of Blizzard[.]"

13   Dkt. #42 at 1 (emphasis added). The EULA thus makes clear that Blizzard is granting to its

14   users a license, not ownership, of the copies of the game client software.

15         Second, Blizzard imposes restrictions on the transfer and use of the game client

16   software. The user may transfer his "rights and obligations" under the EULA only by

17   transferring the original media containing the game client software along with all original

18   packaging and all manuals or other documentation distributed with the software; the user

19   must delete all copies and installations of the software from his computer; and the recipient

20   of the software must agree to the terms of the EULA. Dkt. #42 at 2 (EULA § 3(B)). As

21   discussed above, the TOU places additional restrictions on the use of the software. *See* Dkt.

22   #41-8 at 4 (TOU § 4). These restrictions are at least as severe as the restrictions in *Wall*

23   *Data*. The Court concludes, therefore, that users of WoW, including those who use Glider,

24   are licensees of the copies of the game client software and are not entitled to the section 117

25   defense.

26         During oral argument, counsel for MDY asserted that a person who purchases a copy

27   of the WoW game client software from a commercial retailer and walks out of the store with

28   the copy in hand certainly would not view himself as a mere licensee of what he just

purchased.  The person could dispose of the software copy as he chose, throwing it in the trash, giving it to a friend, or installing it on his computer – all consistent with ownership. Counsel for Blizzard responded by noting that the license is clear from notices on the box purchased at the retailer and from a paper copy of the EULA contained in the box, as well as from the online notices that appear when the game client software is installed on a personal computer.  One wonders what more could be done to make clear that the purchaser is a licensee, not an owner, of the software.  The Court also notes that a complete prohibition on transfer of the software is not an essential requirement of a license under the Ninth Circuit's holding in *Wall Data*.  The license at issue in *Wall Data* did not prohibit transfer of the software.  *See Wall Data*, 447 F.3d at 775 n. 5; *see also Vernor v. Autodesk, Inc.*, — F. Supp. 2d —, No. C07-1189RAJ, 2008 WL 2199682, at *7 (W.D. Wash. May 20, 2008) (the license in *Wall Data* "imposed no limits on resale of the software").

MDY's counsel also asserted at oral argument that *Wall Data* is distinguishable from this case because *Wall Data* involved a negotiated license between the software vendor and the software purchaser, not a standard form license like that contained in the WoW game. MDY is mistaken.  The software used in *Wall Data* was purchased through an approved vendor and was governed by "volume license booklets."  447 F.3d at 774.  The transaction included a "shrink-wrap license, click-through license, and volume license booklets."  *Id.* at 775.  The specific license at issue was the "standard" click-through license.  *Id.* at 775 n.5. The Blizzard license in this case is also a standard click-through license.

Finally, MDY urges the Court to follow the approach recently taken by the United States District Court for the Western District of Washington in *Vernor*, 2008 WL 2199682. The *Vernor* court declined to follow *MAI*, *Triad*, and *Wall Data*, and instead applied an earlier Ninth Circuit case, *United States v. Wise*, 550 F.2d 1180 (9th Cir. 1977).  *Wise* involved the application of the "first sale" doctrine under 17 U.S.C. § 109 to various transfer contracts between movie studios and recipients of movie prints.  *Vernor* concluded that the critical factor in *Wise* for determining whether a transaction was a sale or a license was "whether the transferee kept the copy acquired from the copyright holder."  2008 WL

2199682, at *6.  MDY urges the Court to follow *Vernor* and *Wise* and hold that the users of the WoW game client software are owners of the software because they are entitled to keep the copy of the software they acquire from Blizzard.  The Court declines this invitation. Whatever freedom the court in *Vernor* may have had to disregard *Wall Data* when applying a different statutory provision – section 109 – this Court does not have the same freedom. This case concerns section 117, the very provision addressed by the Ninth Circuit in *Wall Data*.  The Court is not free to disregard Ninth Circuit precedent directly on point.[7]

### D.   Copyright Summary.

The Court reaches the following conclusions on the basis of undisputed facts, construction of the EULA and TOU, and controlling Ninth Circuit law:  Blizzard owns a valid copyright in the game client software, Blizzard has granted a limited license for WoW players to use the software, use of the software with Glider falls outside the scope of the license established in section 4 of the TOU, use of Glider includes copying to RAM within the meaning of section 106 of the Copyright Act, users of WoW and Glider are not entitled to a section 117 defense, and Glider users therefore infringe Blizzard's copyright.  MDY does not dispute that the other requirements for contributory and vicarious copyright infringement are met, nor has MDY established a misuse defense.  The Court accordingly will grant summary judgment in favor of Blizzard with respect to liability on the contributory and vicarious copyright infringement claims in Counts II and III.

---

[7] The Court recognizes that *Vernor* found the meaning of "owner" to be the same in sections 109 and 117 and therefore found *Wise* and *Wall Data* to be incompatible.  *Id* at *7. The *Vernor* court elected to follow the older precedent of *Wise*.  *Id.*  This Court, however, is confronted with recent Ninth Circuit authority not only interpreting section 117, but also explicitly declining to reconsider the rule established in *MAI* and *Triad*.  *Wall Data*, 447 F.3d 785 n.9.  If the Circuit's interpretation of section 117 is to be reconsidered, it must be done by the Circuit, not this Court.  Moreover, it is not at all clear that the result in this case would be different even if the Court were to follow *Wise*.  Under *Wise*, a transaction is a license where the recipient is required to the return the copy to the copyright owner *or the copyright owner retains title to the copy*.  550 F.2d at 1190-92.  As noted above, section 3 of the EULA provides that Blizzard explicitly retains title to "all copies" of the game client software. Dkt. #42 at 3.

1    **III.    Blizzard's Digital Millennium Copyright Act Claim (Count IV).**

2    Blizzard alleges that MDY has violated the DMCA. Specifically, Blizzard claims that

3    MDY traffics in technological products, services, devices, or components designed to

4    circumvent technological measures Blizzard has put in place to control access to its

5    copyrighted work and to protect its rights as the copyright owner of WoW. Blizzard moves

6    for summary judgment on all of its DMCA claims. MDY moves for summary judgment on

7    Blizzard's claim under 17 U.S.C. § 1201(a)(2). The Court will grant MDY's motion insofar

8    as it applies to Blizzard's game client software code, but deny the motions in all other

9    respects.[8]

10    **A.    Section 1201(a)(2).**

11    This section of the DMCA provides that "[n]o person shall manufacture, import, offer

12    to the public, provide, or otherwise traffic in any technology, product, service, device,

13    component, or part thereof" that "is primarily designed or produced for the purpose of

14    circumventing a technological measure that effectively controls access to a work protected

15    under this title[.]" 17 U.S.C. § 1201(a)(2)(A). Even if the product is not "primarily designed

16    or produced" for this purpose, this section of the DMCA may be violated if the product has

17    only limited commercially significant purposes other than to circumvent the technological

18    measure, or if the product is sold with the knowledge that it will be used in circumventing

19    the technological measure. *Id.* § 1201(a)(2)(B)-(C). "[A] technological measure 'effectively

20    controls access to a work' if the measure, in the ordinary course of its operation, requires the

21    application of information, or a process or a treatment, with the authority of the copyright

22    owner, to gain access to the work." *Id.* § 1201(a)(3)(B).

23    Blizzard alleges that MDY has violated this provision by enabling Glider to evade

24    Blizzard technologies designed to detect and prevent the use of bots by WoW players.

25    Blizzards' protections, referred to in the briefing as "Warden," include two different software

26    _____

27    [8] The headings in MDY's motion suggest that MDY also seeks summary judgment
on Blizzard's counterclaim under 17 U.S.C. § 1201(b)(1) (Dkt. #45 at 12), but MDY's

28    motion contains no discussion of this statutory provision (*id.* at 13-16) and its reply brief only
addresses the section in one sentence (Dkt. #69 at 6-7).

1  components.   One component, known as "scan.dll," scans the user's computer for

2  unauthorized programs such as Glider before the user logs onto the WoW servers to play the

3  game. If Glider or similar programs are detected, scan.dll denies the user access to the game

4  servers.  The second component, referred to as the "resident" component of Warden, runs

5  periodically while a user plays WoW.  If the resident software detects the use of Glider or

6  a similar program, Blizzard revokes access to the game.

7        Blizzard argues that scan.dll and its resident software control access to its copyrighted

8  software, as required by section 1201(a)(2), in two different but related respects.  First, when

9  scan.dll prevents a user from playing WoW, or when the resident software terminates a user's

10 playing of WoW, they prevent additional code in the game client software from being written

11 to RAM.   Second, scan.dll and the resident software bar access to WoW's "non-literal

12 elements,  which  are  the  products  that  are  generated  by  the  code's  interaction  with  the

13 computer  hardware  and  operating  programs."   Dkt. #70 at 7 (citations in parentheses

14 omitted).   Blizzard  explains  that  these  non-literal  elements  include  "the  multi-media

15 presentation of the WoW universe and character interactions."  *Id*.  Because scan.dll and the

16 resident software prevent a user from further writing of the software code to RAM, and from

17 further accessing these non-literal elements, Blizzard contends that Warden constitutes an

18 effective access control device within the meaning of § 1201(a)(2).

19       MDY asserts that a holder of Blizzard's game client software has full and complete

20 access to the software code.  This access is available on the CD that contains the game client

21 software or on the user's hard drive once the game client software is loaded on the user's

22 computer.  The user thereafter can view or copy the game client software code, regardless

23 of whether the user actually plays WoW or encounters Warden.  MDY likewise argues that

24 the user has full access to the non-literal aspects of the WoW software through the game

25 client software, and that these non-literal aspects can be viewed on the user's computer.

26       With respect to the code contained in the game client software, the Court agrees with

27 MDY.  The Court has found no Ninth Circuit law that addresses this issue, but the following

28 explanation from the Sixth Circuit is highly relevant:

1           It is not Lexmark's authentication sequence that "controls access" to
    the Printer Engine Program.  See 17 U.S.C. § 1201(a)(2).  It is the purchase
2        of a Lexmark printer that allows "access" to the program.  Anyone who buys
    a Lexmark printer may read the literal code of the Printer Engine Program
3        directly from the printer memory, with or without the benefit of the
    authentication sequence, and the data from the program may be transferrable
4        into readable source code after which copies may be freely distributed.  No
    security device, in other words, protects access to the Printer Engine Program
5        code and no security device accordingly must be circumvented to obtain
    access to the program code.

6

7           The authentication sequence, it is true, may well block one form of
    "access" – the "ability to . . . make use of" the Printer Engine Program by
8        preventing the printer from functioning, but it does not block another
    relevant form of "access" – the ability to [ ] obtain" a copy of the work or to
9        "make use of" the literal elements of the program (its code).  Because the
    statute refers to "control[ling] access to a work protected under this title," it
10       does not naturally apply when the "work protected under this title" is
    otherwise accessible.  Just as one would not say that a lock on the back door
11       of a house "controls access" to a house whose front door does not contain a
    lock and just as one would not say that a lock on any door of a house
12       "controls access" to the house after its purchaser receives the key to the lock,
    it does not make sense to say that this provision of the DMCA applies to
13       otherwise-readily-accessible copyrighted works.

14   *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004).

15          The same is true with respect to the code contained in Blizzard's game client software.

16   A user has full access to that code once the game client software has been placed on the user's

17   computer.  The user need not pass through Blizzard's security devices to gain access to the

18   code.  The user may view the code on the hard drive and may freely copy it to another hard

19   drive, a CD, a jump drive, or other media.  Because scan.dll and the resident software do not

20   control access to the code in Blizzard's game client software, section 1201(a)(2) does not

21   apply and MDY's marketing of Glider with capabilities of evading scan.dll and the resident

22   software does not violate the statute.  The Court therefore will grant summary judgment in

23   favor of MDY on this issue.

24          Blizzard argues for a contrary result on the basis of *Ticketmaster*.  In *Ticketmaster*,

25   however, the district court concluded that Ticketmaster's protective software, known as

26   CAPTCHA, "*controls access* to a protected work because a user cannot proceed to copyright

27   protected web pages without solving CAPTCHA[.]"  507 F. Supp. 2d at 11-12 (emphasis in

28   original).  A purchaser of Blizzard game client software, by contrast, can view and copy the

1    code within that software without passing through scan.dll or the resident software.

2        The Court cannot similarly grant summary judgment with respect to the non-literal

3    elements of Blizzard's game.  The parties' statements of fact say virtually nothing about this

4    aspect of the game, and the Court is therefore unable to determine whether MDY or Blizzard

5    is entitled to summary judgment as a matter of law.  Blizzard argued in its reply memorandum

6    that a user of WoW could not gain access to the non-literal elements of the game without

7    passing through scan.dll and the resident software, but has provided no factual support for this

8    assertion.  MDY disputed the assertion during oral argument, but has provided no factual

9    support for its position.  The Court therefore will deny the motions of both parties on this

10   issue.[9]

11       The Court has identified an additional apparent defect in Blizzard's section 1201(a)(2)

12   claim.  The statute applies only to the circumvention of a "technological measure" that, "in

13   the ordinary course of its operation, requires the application of information, or a process or

14   a treatment, with the authority of the copyright owner, to gain access to the work."  17 U.S.C.

15   § 1201(a)(3)(B).  Blizzard's scan.dll and resident software do not appear to satisfy this

16   description.  Both software programs function by searching for the presence of bots and

17   similar programs.  As Blizzard explained in its statement of facts, the scan.dll component

18   "finds" unauthorized programs, and the resident software "scans" for cheats and other

19   unauthorized programs.  Dkt. #40 ¶¶ 110-115.  These programs thus do not appear to require

20   the application of information by the game user, or the application of a process or a treatment

21   by the game user, before granting access to copyrighted information.  Because the parties did

22   not address this issue in their briefs and have not provided specific factual information

23   concerning this question, however, the Court will not rely on it to grant summary judgment

24

25       [9] The Sixth Circuit in *Lexmark* noted that "[i]n the essential setting where the DMCA

26   applies, the copyright protection operates on two planes:  in the literal code governing the
     work and in the visual or audio manifestation generated by the code's execution."  387 F.3d

27   at 548.  Blizzard's reference to the "non-literal elements" of its game appears to be the same

28   as *Lexmark*'s second plane.  Although the Sixth Circuit addressed this issue, the parties have
     provided no factual basis upon which the Court may analyze it in this case.

1   for MDY.  This will be a factual issue for trial.[10]

2           **B.**       **Section 1201(b)(1).**

3         This provision of the DMCA is similar to section 1201(a)(2), with one critical

4   difference.  Section 1201(a)(2) applies to protective measures that control access to software.

5   Section 1201(b)(1) applies to "a technological measure that effectively protects a right of a

6   copyright owner under this title in a work or a portion thereof[.]"  17 U.S.C. § 1201(b)(1)(A).

7   The protection of copyright rights, not controlling access, is key.  The statute further provides

8   that "a technological measure 'effectively protects the rights of a copyright owner under this

9   title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise

10   limits the exercise of a right of a copyright owner under this title."  17 U.S.C. § 1201(b)(2)(B).

11         Blizzard seeks summary judgment on this claim, arguing that scan.dll and the resident

12   software constitute technological measures that, in the ordinary course of their operation,

13   prevent, restrict, or otherwise limit the exercise of a right of Blizzard as the copyright owner.

14   Specifically, Blizzard asserts that scan.dll and the resident software prevent users from

15   copying software code to RAM and accessing the non-literal elements of the game once they

16   are caught using Glider.

17         MDY disputes this factual assertion.  MDY contends that code from the game client

18   software is not written to RAM after a user passes by scan.dll or the resident software.

19   Dkt. #58 at ¶¶ 35-39.  Although Blizzard contends that scan.dll and the resident software

20   prevent a user from accessing the non-literal elements of the game, as noted above, Blizzard

21   and MDY have failed to address this aspect of the case in their statements of fact.  Because

22

23   _____

24        [10] MDY also argues that scan.dll and the resident software are not "effective"
    protection devices and therefore do not fall within section 1201(a)(2).  The Court is not

25   convinced, however, that only effective measures are covered by the statute.  Although the
    statute includes that word, it is a term of art defined in section 1201(a)(3)(A).  Nothing in the

26   definition suggests that the Court must assess the success of scan.dll and the resident
    software in determining whether they enjoy the protection of the statute.  And as other courts

27   have noted, affording protection only to effective measures – measures that cannot be
    circumvented – would render the statute a nullity.  *See Lexmark*, 387 F.2d at 549; *Universal*

28   *City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000).

there appears to be a factual dispute with respect to the extent to which Blizzard's protective software protects against the copying of software code to RAM, and because the parties have not submitted sufficient facts from which the Court can decide whether these protective measures protect Blizzard's rights in the non-literal elements of the game, summary judgment on this claim will be denied.

## IV.   Blizzard's Tortious Interference with Contract Claim (Count I).

Blizzard alleges that MDY is liable for tortious interference with contract because MDY intentionally induces WoW users to purchase and use Glider in breach of the terms of the EULA and TOU.  Dkt. #10 ¶¶ 64-78.  To establish tortious interference, Blizzard must show that (1) a valid contractual relationship exists between Blizzard and its customers, (2) MDY knows of the relationship, (3) MDY has intentionally and improperly interfered in the relationship and caused a breach or termination of the relationship, and (4) Blizzard has been damaged as a result.  *See Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bur. of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981); *Wagonseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1043 (Ariz. 1985), *superseded in other respects by* A.R.S. § 23-1501.

MDY does not dispute several elements of this tort:  that there is a valid contract between Blizzard and its customers (the EULA and TOU), that MDY knows of the contract, and that the use of Glider breaches the contract.  No additional proof is required on these elements.

Nor is there a genuine dispute that MDY has intentionally interfered with the contract.  MDY actively promotes the use of Glider even though it knows that using Glider breaches the TOU.  MDY has admitted as much.  Donnelly testified that he learned in September of 2005 that Blizzard had banned Glider users from playing WoW.  Dkt. #40-6 at 13, 17.  He responded by modifying Glider so that it could not be detected by Blizzard.  *Id.*  Donnelly expressly acknowledged in a November 2005 email that the use of Glider by his customers was a breach of their contracts with Blizzard:  "[s]ince Blizzard does not want bots running at all, it's a violation to use them."  Dkt. #43-10 at 3.  And MDY's website openly acknowledges that using Glider "is against the [TOU] as provided by Blizzard for [WoW]."

Dkt. #43-9 at 3.  In short, there can be no doubt that MDY knows that its promotion and sale of Glider results in the breach of Blizzard's contract with its customers.  MDY's interference clearly is intentional.

MDY contends that Blizzard has no evidence that MDY's conduct has damaged Blizzard.  Dkt. ##45 at 26-28, 57 at 28.  But MDY does not dispute that Glider consumes more Blizzard resources than any other bot because of its sophisticated anti-detection features, that Blizzard must divert resources from game development to combat Glider, and that Blizzard has received numerous complaints from WoW players regarding other players' use of Glider.  Dkt. ##40 ¶¶ 220-23, 58 ¶¶ 101-03.  Moreover, Blizzard has presented evidence that the use of Glider has caused Blizzard to lose subscription fees from WoW players. Dkt. ##40 ¶¶ 254-57, 58 ¶ 124.  MDY's contention that Blizzard can present no evidence of harm is without merit.

The sole remaining question for purposes of liability is whether MDY's actions are improper.  Arizona has adopted the seven factors enumerated in Restatement (Second) of Torts § 767 for determining when a defendant's interfering conduct is improper.  *See Wagonseller*, 710 P.2d at 1042-43.  Those factors include (1) the nature of the defendant's conduct, (2) the defendant's motive, (3) the interests of the plaintiff with which the conduct interferes, (4) the interests sought to be advanced by the defendant, (5) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff, (6) the proximity or remoteness of the defendant's conduct to the interference, and (7) the relationship between the parties.  *See id*.  Courts give the greatest weight to the first two factors.  *Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1027 (Ariz. 2005).

The first factor concerns the nature of MDY's conduct.  The following facts are not disputed:  MDY knowingly aids WoW players in breaching their contracts with Blizzard; MDY assists the players in gaining an advantage over other WoW players; MDY enables players to mine the game for their own financial benefit and in direct violation of the TOU; MDY assists players in avoiding detection by Blizzard, and does so in a way designed to place Blizzard at risk.  In MDY's own words, "[s]taying one step ahead of Blizzard is just about

1    impossible," so MDY seeks to make it "bad business" for Blizzard to spend time and money

2    trying to detect Glider.  Dkt. #43-10 at 3.  MDY seeks to make it a "bad idea" for Blizzard to

3    try to detect Glider because counter-measures Blizzard must create to detect Glider present

4    the "risk [of] banning or crashing innocent customers."  *Id.*

5          The second factor concerns MDY's motive.  That motive is clear – profit.  MDY's

6    business strategy is not to accept and honor the pre-existing contract between Blizzard and

7    its customers, but to take advantage of that relationship for MDY's financial gain.

8          The third factor considers the interests of Blizzard with which MDY interferes.  These

9    interests are both legitimate and substantial.  Blizzard has established valid and financially

10   profitable contracts with its customers, and has done so through the innovative development

11   and marketing of WoW.  Blizzard's interests are fully deserving of the protection the law

12   affords legitimate contracts.

13         The fourth factor considers the interests sought to be advanced by MDY.  MDY asserts

14   that it too is an innovator deserving of protection.  Although MDY certainly has developed

15   an innovative and successful software program in Glider, and has done so on the strength of

16   Mr. Donnelly's creative abilities and considerable computer skills, the success of MDY's

17   endeavor depends on inducing Blizzard customers to breach their contracts.  Glider affects

18   the operation of WoW, empowering its users to play WoW in a way not contemplated or

19   approved by the game's creator and copyright holder.  Glider is successful because WoW is

20   successful, and MDY seeks to exploit WoW's success for its own financial benefit.  Thus,

21   even though MDY's creative abilities cannot be denied, the fourth factor favors a finding of

22   impropriety.

23         The fifth factor concerns the social interests in protecting MDY's freedom of action

24   and the contractual interests of Blizzard.  MDY argues that liability should not be imposed

25   on "'one who honestly persuades another to alter a contractual relationship.'"  Dkt. #69 at 11.

26   But this language, quoted from the *Wagonseller* case, refers to competitors in a marketplace.

27   *Wagonseller* recognizes that businesses should be permitted to compete fairly for customers.

28   One barbershop may try to attract the clients of another shop, or one car dealership may

1   legitimately seek to lure away the customers of another dealership.  MDY, however, is not a

2   competitor of Blizzard.  MDY does not offer a competing computer game.  Rather, MDY

3   persuades Blizzard customers to violate their contract with Blizzard for MDY's financial

4   advantage.  Thus, although social interests favor full and honest competition, MDY ultimately

5   is an exploiter, not a competitor, and this fifth factor therefore favors a finding of impropriety.

6   *See Am. Airlines, Inc. v. Platinum Worlds Travel*, 769 F. Supp. 1203, 1206-07 (D. Utah 1990)

7   (finding the defendants' conduct improper where their businesses depended on their ability

8   to induce the plaintiff's customers to breach their contractual obligations while the plaintiff

9   continued to perform without knowledge of the breaches).[11]

10          The sixth factor concerns the proximity of MDY's conduct to the contract breaches.

11   Here, the link is direct.  The development, marketing, and sale of Glider is the but-for cause

12   of the breaches of contract.  "One who induces a third person not to perform his contract with

13   another interferes directly with the other's contractual relation.  The interference is an

14   immediate consequence of the conduct[.]"  Restatement § 767 cmt. h.

15          The seventh factor – the relationship between the parties – also weighs in favor of a

16   finding of impropriety.  Blizzard and MDY are not competitors.  Blizzard had pre-existing

17   contractual relationships with WoW users and MDY seeks to exploit that relationship to its

18   own commercial advantage.  *See id.* cmts. i, j.[12]

19          All seven of the factors enumerated in Restatement section 767, including the most

20

---

21          [11] The Court rejects MDY's argument under Restatement § 774 that the EULA and
   TOU are against public policy because they are anti-competitive and restrain trade.  *See*
22   Dkt. #57 at 21-23.  Neither agreement prohibits MDY from developing and selling a
23   competing game.

24          [12] Citing *Bar J Bar Cattle Co. v. Pace*, 763 P.2d 545 (Ariz. Ct. App. 1988), MDY
25   contends that "*[m]alice must be the sole motivator* for the actor to interfere *tortiously*."
   Dkt. ##45 at 22, 57 at 26 (emphasis in original).  The Court disagrees.  *Bar J Bar* simply
26   recognizes that the impropriety of a defendant's conduct requires a multi-pronged inquiry.
   Malice is one "facet[] of the element of impropriety that the plaintiff *may* show in a particular
27   case."  *Wagonseller*, 710 P.2d at 1043 (emphasis added).  Malice need not be shown if the
28   other elements of improper conduct exist, and it certainly need not be the sole motivation.

1   important first and second factors, favor a finding of improper conduct on the part of MDY.

2   The Court concludes that a reasonable jury applying these factors could not conclude that

3   MDY has acted properly.  *Anderson*, 477 U.S. at 248.  Because the other requirements for

4   tortious interference have been satisfied, the Court will grant summary judgment in favor of

5   Blizzard with respect to MDY's liability on this claim.

6   **V.    Blizzard's Unjust Enrichment Claim (Count VII).**

7           MDY seeks summary judgment on Blizzard's unjust enrichment claim.  Dkt. #45 at

8   28. The essential elements of the claim are an enrichment of MDY, an impoverishment of

9   Blizzard, a connection between the enrichment and the impoverishment, the absence of

10  justification for the enrichment and the impoverishment, and the absence of a legal remedy.

11  *See Cmty. Guardian Bank v. Hamlin*, 898 P.2d 1005, 1008 (Ariz. Ct. App. 1995).  MDY does

12  not address these elements, but merely asserts that nothing MDY has done rises to the level

13  of unjust enrichment.  Dkt. #45 at 28.

14          As the party seeking summary judgment, MDY has the initial burden of informing the

15  Court of the basis for its motion and identifying those portions of the record that demonstrate

16  the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 322.  MDY has not

17  met this burden.  Moreover, MDY's reply does not address the evidence and arguments

18  presented by Blizzard in support of this claim.  *See* Dkt. #54 at 24-25; Dkt. #69.  The Court

19  accordingly will deny MDY's request for summary judgment.

20          **IT IS ORDERED:**

21          1.      The parties' motions for summary judgment (Dkt. ##39, 45) are granted in part

22  and denied in part.  The Court grants summary judgment in favor of Blizzard with respect to

23  MDY's liability for tortious interference (Count I) and contributory and vicarious copyright

24  infringement (Counts II-III); grants summary judgment in favor of MDY on the portion of the

25  DMCA claim (Count IV) that is based on 17 U.S.C. § 1201(a)(2) and applies to Blizzard's

26  game client software code; grants summary judgment in favor of MDY on the unfair

27  competition claim (Count VI); and denies summary judgment on the unjust enrichment claim

28  (Count VII).

1    2.    The Court will set a final pretrial conference by separate order.  Trial will

2  concern the claims that remain unresolved – portions of the DMCA claim, the trademark

3  claim, and the unjust enrichment claim – and damages or other remedies on Counts I, II, and

4  III.

5    DATED this 14th day of July, 2008.

6

7

8    _____

9    David G. Campbell
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28