**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

MDY Industries, LLC,

        Plaintiff/Counterdefendant,

vs.

Blizzard Entertainment, Inc.; and
Vivendi Games, Inc.,

        Defendants/Counterclaimants.

_____

Blizzard Entertainment, Inc.; and
Vivendi Games, Inc.,

        Third-Party Plaintiffs,

vs.

Michael Donnelly,

        Third-Party Defendant.

_____

No. CV-06-2555-PHX-DGC

**ORDER**

This case concerns the hugely popular World of Warcraft computer game ("WoW") and a software program known as Glider that plays WoW for its owners while those owners are away from their computer keyboards.   The Court previously held Plaintiff/ Counterdefendant MDY Industries, Inc. ("MDY") – the owner and distributor of Glider – liable to Blizzard Entertainment, Inc. and Vivendi Games, Inc. (collectively, "Blizzard") – the owners and distributors of WoW – for tortious interference with contract, contributory

1   copyright infringement, and vicarious copyright infringement.  Dkt. #82.  The Court granted

2   summary judgment to MDY on the portion of Blizzard's claim based on 17 U.S.C.

3   § 1201(a)(2) that applied to Blizzard's game client software code.  The Court also granted

4   summary judgment in favor of MDY on Blizzard's unfair competition claim.  *Id.*

5       Following this ruling, the parties entered into a stipulation that Blizzard would recover

6   $6,000,000 in damages from MDY on the tortious interference, contributory copyright

7   infringement, and vicarious copyright infringement claims if any of those claims is affirmed

8   on appeal.  Dkt. #95.  The parties agreed that the Court should hold a bench trial to decide

9   three matters: (1) the remaining claims under the Digital Millennium Copyright Act

10  ("DMCA"), (2) whether Third-Party Defendant Michael Donnelly is personally liable to

11  Blizzard for MDY's tortious interference and copyright infringement, and (3) whether

12  Blizzard is entitled to a permanent injunction.  Dkt. ##92, 96.  Blizzard agreed to dismiss its

13  trademark infringement and unjust enrichment claims.  Dkt. #95.

14      The bench trial was held on January 8 and 9, 2009.  Dkt. ##100-02.  This order will

15  set forth the Court's findings of fact and conclusions of law.  The Court concludes that

16  Plaintiff MDY is liable under the DMCA, that Donnelly is personally liable for MDY's

17  tortious interference, copyright infringement, and DMCA violations, and that Blizzard is

18  entitled to a permanent injunction against the continued sale and distribution of Glider.  The

19  Court will require additional briefing on whether the permanent injunction should be stayed

20  pending appeal.

21  **I.    Background.[1]**

22      WoW players control their "avatar" characters within a virtual universe, exploring the

23  landscape, fighting monsters, performing quests, building skills, and interacting with other

24  players and computer-generated characters.  As players succeed, they acquire in-game assets,

25  experience, and power.  Players can advance from level 1 to level 60 with the basic game,

26

27      [1]The general facts in this background section are found by the Court on the basis of
28  evidence presented at trial and the parties' pretrial stipulations.  *See* Dkt. ##88, 97.  The
    Court will provide additional issue-specific findings later in this order.

1  and through levels 70 and 80 with expansion modules.  Blizzard is the creator and operator

2  of WoW and owns all copyrights related to the game.  WoW was released in November of

3  2004 and is now the largest and most successful multiplayer online game in the world.  WoW

4  currently has some 11,500,000 players and generates more than $1.5 billion annually.

5      The WoW software consists of two components:  the "game client" software and the

6  "game server" software.  The game server software is located on a Blizzard-owned server.

7  A user obtains the game client software by purchasing a copy at a retail store or downloading

8  a copy from the WoW website.  The user plays WoW by loading the game client software

9  on his personal computer's hard drive and accessing the game server software through an

10  online account for which he pays a monthly fee to Blizzard.

11      Glider is a computer program known as a "bot" – a word derived from "robot."  Glider

12  plays WoW for its owner while the owner is away from his or her computer keyboard.

13  Glider enables the owner to advance more quickly within WoW than would otherwise be

14  possible.

15      Donnelly incorporated MDY in 2004 in connection with his computer contracting

16  business.  Donnelly created, and MDY owns, Glider.  MDY began selling Glider to WoW

17  users in June of 2005.  To date, it has sold more than 100,000 copies and generated revenues

18  between $3.5 and $4 million.

19      WoW is a carefully balanced competitive environment where players compete against

20  each other and the game to advance through the game's various levels and acquire game

21  assets.  Glider upsets this balance by enabling some payers to advance more quickly,

22  diminishing the game experience for other players.  Glider also enables its users to acquire

23  an inordinate number of game assets – sometimes referred to as "mining" or "farming" the

24  game.  The acquisition of these assets upsets the game's economy, diminishing the value of

25  assets acquired by regular game users.

26  **II.      Blizzard's Remaining DMCA Claims.**

27      Blizzard alleges that MDY and Donnelly have violated the DMCA.  Specifically,

28  Blizzard claims that MDY and Donnelly traffic in technological products, services, devices,

1  or components designed to circumvent technological measures Blizzard has put in place to
2  control access to its copyrighted work and to protect its rights as the copyright owner of
3  WoW.  Blizzard brings claims under sections 1201(a)(2) and 1201(b)(1) of the DMCA,
4  17 U.S.C. §§ 1201(a)(2), 1201(b)(1).

5        Section 1201(a)(2) provides that "[n]o person shall manufacture, import, offer to the
6  public, provide, or otherwise traffic in any technology, product, service, device, component,
7  or part thereof" that "is primarily designed or produced for the purpose of circumventing a
8  technological measure that effectively controls access to a work protected under this title[.]"
9  17 U.S.C. § 1201(a)(2)(A).  Even if the product is not "primarily designed or produced" for
10 this purpose, this section of the DMCA may be violated if the product has only limited
11 commercially significant purposes other than to circumvent the technological measure, or if
12 the product is sold with the knowledge that it will be used in circumventing the technological
13 measure.  *Id*. § 1201(a)(2)(B)-(C).  "[T]o 'circumvent a technological measure' means to
14 descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass,
15 remove, deactivate, or impair a technological measure, without the authority of the copyright
16 owner[.]"  *Id*. § 1201(a)(3)(A).  "[A] technological measure 'effectively controls access to
17 a work' if the measure, in the ordinary course of its operation, requires the application of
18 information, or a process or a treatment, with the authority of the copyright owner, to gain
19 access to the work."  *Id*. § 1201(a)(3)(B).

20       Section 1201(b)(1) is similar to section 1201(a)(2), with one critical difference.
21 Section 1201(a)(2) applies to protective measures that control "access" to software.  Section
22 1201(b)(1) applies to "a technological measure that effectively protects a right of a copyright
23 owner under this title in a work or a portion thereof[.]"  17 U.S.C. § 1201(b)(1)(A).  The
24 protection of copyright rights, not controlling access, is key.  The statute provides that "a
25 technological measure 'effectively protects the rights of a copyright owner under this title'
26 if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits
27 the exercise of a right of a copyright owner under this title."  17 U.S.C. § 1201(b)(2)(B).

28

1      **A.     DMCA-Specific Findings of Fact.**

2          Blizzard owns the copyright for the WoW software code.  When a user launches a

3   copy of WoW from his hard drive to play the game, the user's computer copies the WoW

4   game client software from the hard drive to the computer's Random Access Memory

5   ("RAM").  This copying continues while the game is being played.  Additional copyrighted

6   software is loaded from the computer's hard drive into RAM as the player reaches points in

7   the game where additional content is needed.

8          The game client software includes both literal code and nonliteral elements.  The Sixth

9   Circuit has explained the difference: "[i]n the essential setting where the DMCA applies, the

10  copyright protection operates on two planes:  in the literal code governing the work and in

11  the visual or audio manifestation generated by the code's execution."  *Lexmark Int'l, Inc. v.*

12  *Static Control Components, Inc.*, 387 F.3d 522, 548 (6th Cir. 2004).  Blizzard's game client

13  software includes literal code, stored as WoW.exe, and nonliteral elements such as graphics,

14  sound effects, and character animations.

15         Blizzard employs a technical measure known as Warden to detect and prevent the use

16  of bots by WoW players.  Warden includes two software components.  One component,

17  known as "scan.dll," scans the user's computer for unauthorized programs before the user

18  logs onto a Blizzard game server to play the game.  Scan.dll examines certain portions of the

19  user's RAM and WoW game data files for the presence of defined code signatures.  If

20  identified code signatures match those associated with unauthorized programs such as Glider,

21  scan.dll prevents the user from logging on to a Blizzard server.

22         The second component, referred to as the "resident" component of Warden, runs

23  periodically while the user plays WoW.  The resident component sends requests asking for

24  the user's game client software to report the content of certain defined portions of WoW

25  memory to the Blizzard game server.  If the client reports information showing a "clean"

26  segment of memory, the resident component permits the user to continue playing the game.

27  If the client reports information showing the presence of defined patterns of code associated

28  with unauthorized programs, the resident component can block access to the Blizzard server.

1   As noted in this Court's previous order, the literal elements of the game client
2   software stored on the user's hard drive may be accessed and copied without connecting to
3   a Blizzard game server and without successfully bypassing scan.dll or the resident
4   component of Warden.  For this reason, the Court granted summary judgment in favor of
5   MDY and Donnelly on the section 1201(a)(2) claim related to the game client literal software
6   code. Dkt. #82. The Court concluded that Warden did not prevent users from gaining access
7   to the literal code and therefore was not a technological measure covered by section
8   1201(a)(2). *Id*. at 19.

9   The literal code, however, constitutes only a small part of the game client software.
10   The majority of the software consists of nonliteral elements – the digital multi-media content
11   such as environmental graphics (mountains, lakes, oceans, trees, castles, rain, fog, meteor
12   storms, etc.), sound effects (monsters roaring, rain falling, birds singing, battle cries, and
13   explosions, etc.), music played in different geographical areas of the game, and a large
14   variety of player avatars, each of which can wear a wide array of clothing and armor and
15   carry a wide variety of weapons and equipment.  These nonliteral elements are stored in the
16   user's hard drive and loaded into RAM after scan.dll has functioned and the user has
17   connected to Blizzard's game server.  These elements continue to be loaded into RAM as a
18   user plays the game and encounters new areas and characters of the game.

19   The nonliteral aspects of the game client software include more than 400,000 discrete
20   visual and aural components.  Although it is the combination of these components as
21   prompted by the Blizzard server that creates the dynamic WoW environment, individual
22   nonliteral components may be accessed by a user without signing on to the server.  As was
23   demonstrated during trial, an owner of the game client software may use independently
24   purchased computer programs to call up the visual images or the recorded sounds within the
25   game client software.  For example, a user may call up and listen to the roar a particular
26   monster makes within the game.  Or the user may call up a visual image of that monster.  The
27   image does not appear in the dynamic WoW game environment, but instead appears on the
28   user's screen with a blank background.  The user may cause the image to run, fight, or die

1   by accessing additional components of the game client software, but the image performs
2   these activities in a void, not in the dynamic world created by the WoW game.  Similarly, a
3   user may call up an avatar and select the clothing, armor, weapons, and other equipment with
4   which the avatar is clothed and equipped.  Or an owner may call up a particular geographical
5   area of the game and see the hills, trees, and structures in that area.

6       Although an owner of the game client software may thus view and listen to the
7   discrete nonliteral components of the game stored on his hard drive, the user cannot create
8   or experience the dynamic, changing world of the game without signing on to a Blizzard
9   server.  The user could call up discrete elements to create a landscape and place a discrete
10  character of a monster within it, and thus achieve a single visible scene on his computer
11  screen, but the scene would not be dynamic – the user could not fight the monster, travel
12  through the countryside, and encounter other players or scenes as he can while playing
13  WoW.  Thus, although the individual nonliteral illustrations and sounds created by the game
14  client software may be viewed in isolation, or even in limited combinations, they cannot be
15  viewed in the dynamic context of the WoW game, or controlled or choreographed by a
16  Blizzard server, unless the user logs on and stays connected to a Blizzard server.  To do so,
17  of course, requires the user to bypass scan.dll and the resident component of Warden.
18  Warden therefore controls access to the dynamic nonliteral elements of the WoW game
19  environment.

20      Some of the dynamic game content is provided or controlled by the Blizzard server.
21  For example, the server decides how large or small to make an image or how soft or loud to
22  make a noise.  The server choreographs the dynamic scene being viewed on the user's
23  computer screen, and provides the prompts necessary for the nonliteral elements on the user's
24  hard drive to be loaded into RAM and displayed on the screen in the appropriate locations
25  and sequences.  The server determines where each monster will spawn, what type of monster
26  will appear, the monster's capabilities, and what treasure will be recovered if the monster is
27  defeated.  The server determines the amount of damage inflicted by a blow from a monster
28  or another player, and when a character dies.  The server provides the quest scripts read by

1  users on their screens to understand the quests they are undertaking.  None of these server-
2  provided features may be accessed by the user without clearing the scan.dll investigation
3  when logging on and repeatedly passing the resident component as the game is played.

4        MDY and Donnelly have designed Glider to avoid detection by Warden.  Glider
5  software examines a user's computer configuration and makes recommendations on what can
6  be done to minimize the risk of detection.  Glider takes other specific steps to disguise its
7  presence.  Blizzard has succeeded on three occasions in developing software that detected
8  Glider.  Each time, Blizzard collected the identities of Glider users and banned them from
9  continuing to play WoW.  Each time, MDY and Donnelly modified Glider to again avoid
10  detection by Warden.  At present, Warden cannot detect the presence of Glider in WoW.
11  MDY and Donnelly have also taken steps to make it more difficult for WoW players to
12  recognize when another player is using Glider.

13        Glider's  anti-detection  features  are  essential  to  Glider's  commercial  success.
14  Donnelly reverse-engineered Warden to learn how to make Glider undetectable.

15        **B.    Section 1201(a)(2) Claim.**

16        Blizzard alleges that MDY and Donnelly violate section 1201(a)(2) by enabling
17  Glider to evade Warden.  As noted above, the Court has rejected this claim with respect to
18  the literal code contained in the game client software.  Blizzard also contends, however, that
19  Glider violates section 1201(a)(2) because Warden controls access to the nonliteral elements
20  of WoW and Glider defeats that control.  This claim clearly fails with respect to the discrete
21  nonliteral sights and sounds associated with each of the more than 400,000 individual
22  components of the game client software.  As explained above, these components can be
23  accessed on the user's hard drive without connecting to Blizzard's servers and, therefore,
24  without circumventing Warden.  Because Warden does not control access to these individual
25  nonliteral aspects of the game, section 1201(a)(2) does not apply.

26        The same cannot be said, however, with respect to the dynamic nonliteral elements
27  of the WoW game.  These dynamic components – the real-time experience of traveling
28  through different worlds, hearing their sounds, viewing their structures, encountering their

1    inhabitants and monsters, and encountering other players – cannot be accessed on a user's

2    hard drive.  They can be accessed only when the user is connected to a Blizzard server,

3    something that requires the user successfully to pass by scan.dll when he logs on and to

4    survive the periodic scrutiny of the resident component.  Warden does control access to the

5    dynamic nonliteral elements of the game and, in this respect, falls within section 1201(a)(2).

6        MDY and Donnelly argue that section 1201(a)(2) does not apply because the dynamic

7    nonliteral elements of the WoW game cannot be copyrighted, and Warden therefore does not

8    control access to a "work protected by this title" as required by the section.  *See* 17 U.S.C.

9    § 1201(a)(2)(A), (B), (C).  This argument appears to be based on the Copyright Act's

10   statement that "[c]opyright protection subsists, in accordance with this title, in original works

11   of authorship *fixed* in any tangible medium of expression, now known or later developed,

12   from which they can be perceived, reproduced, or otherwise communicated, either directly

13   or with the aid of a machine or device."  17 U.S.C. § 1012(a) (emphasis added).  MDY and

14   Donnelly also argue that the dynamic elements of the game cannot be copyrighted because

15   they are controlled by users of the game, not Blizzard.  Courts have rejected both arguments.

16   Audio-visual displays of computer games are subject to copyright protection, and a player's

17   interaction with the software of those games does not defeat this protection even though the

18   player's actions in part determine what is displayed on the computer screen.  *See Atari*

19   *Games Corp.  v. Oman*, 888 F.2d 878, 884-85 (D.C. Cir. 1989); *Midway Mfg. Co. v. Arctic*

20   *Int'l, Inc.*, 704 F.2d 1009, 1011-12 (7th Cir. 1983); *Williams Elec., Inc. v. Arctic Int'l, Inc.*,

21   685 F.2d 870, 874 (3d Cir. 1982); *Stern Elecs., Inc. v. Kaufman*, 669 F.2d 852, 855-56 (2d

22   Cir. 1982).

23       MDY and Donnelly also contend that Warden does not satisfy the definition of

24   section 1201(a)(2).  The statute applies to a "technological measure" that "effectively

25   controls access to a work[.]"  17 U.S.C. § 1201(a)(3)(B).  The statute explains that a measure

26   meets this definition "if the measure, in the ordinary course of is operation, requires the

27   application of information, or a process or a treatment, with the authority of the copyright

28   owner, to gain access to the work."  *Id.*  The resident component of Warden satisfies this

1   requirement.  As explained above, the resident component calls for the game client software

2   to examine portions of the user's computer memory and report the results back to Blizzard's

3   server.  If the report reflects software associated with Glider or other bots, Warden can block

4   the user's access to the server.  Thus, as a user plays WoW, the resident component requires

5   the user's computer to apply information (the results of the memory scan) to gain continuing

6   access to the server and the WoW game.  MDY and Donnelly argued at trial that the

7   language of section 1201(a)(3)(B) should be read to require that the computer user – not the

8   computer – apply the required information, but they cite no authority for this narrow reading

9   and courts have held that computer-applied information satisfies the definition of section

10  1201(a)(3)(B).  *See, e.g.*, *321 Studios v. MGM Studios*, 307 F. Supp. 2d 1085, 1095 (N.D.

11  Cal. 2004) (CSS technology, which required a DVD player to apply certain keys and

12  algorithms to gain access to movies and movie-related content, constituted a technological

13  measure within section 1201(a)(2)).

14          The Court concludes that MDY has violated section 1201(a)(2) with respect to the

15  dynamic nonliteral elements of WoW.  Warden constitutes a technological measure that

16  effectively controls access to such elements, and such elements are protected by copyright

17  law.  Glider circumvents Warden by avoiding and bypassing its detection features.  *See*

18  17 U.S.C. § 1201(a)(3)(A) ("to 'circumvent a technological measure' means . . . to avoid,

19  bypass, remove, deactivate, or impair [the] measure, without the authority of the copyright

20  owner").  MDY knowingly markets Glider "for use in circumventing" Warden.  17 U.S.C.

21  § 1201(a)(2)(C).  All aspects of the statute are thus satisfied.

22          Some courts have adopted a six-part test for a violation of section 1201(a)(2):

23          A plaintiff alleging a violation of § 1201(a)(2) must prove: (1)
        ownership of a valid *copyright* on a work, (2) effectively controlled by a
24      *technological measure*, which has been circumvented, (3) that third parties can
        now *access* (4) *without authorization*, in a manner that (5) infringes or
25      facilitates infringing a right *protected* by the Copyright Act, because of a
        product that (6) the defendant either (i) *designed or produced* primarily for
26      circumvention; (ii) made available despite only *limited commercial
        significance* other than circumvention; or (iii) *marketed* for use in
27      circumvention of the controlling technological measure.

28  *Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004)

1   (emphasis in original).

2       Blizzard's claim satisfies this test.  First, Blizzard has a valid copyright in the dynamic

3   nonliteral elements of WoW.  Second, access to those elements is effectively controlled by

4   Warden, a measure Glider circumvents.  Third, Glider enables third parties to access the

5   dynamic nonliteral elements of the game.  Fourth, Blizzard has not authorized this access.

6   Fifth, once players obtain access to these elements of the game, they may copy those

7   elements as they are displayed.[2]  Sixth, MDY has designed and produced Glider primarily

8   to circumvent Warden, Glider is made available despite the fact that it only has commercial

9   significance as a bot that can circumvent Warden, and MDY markets Glider for use in

10  circumventing Warden and playing WoW.

11      **C.**     **Blizzard's Section 1201(b)(1) Claim.**

12      Section 1201(b)(1) applies to a technological measure "that effectively protects a right

13  of a copyright owner under this title in a work or a portion thereof[.]"   17 U.S.C.

14  § 1201(b)(1)(A). A "technological measure 'effectively protects a right of a copyright owner

15  under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or

16  otherwise limits the exercise of a right of a copyright owner under this title."   17 U.S.C.

17  § 1201(b)(2)(B).  Warden satisfies this requirement with respect to the dynamic nonliteral

18  elements of WoW.

19      MDY and Donnelly argue that the only "right of a copyright owner" at issue in this

20  case is the right to copy.  The Court agrees.  *See* Dkt. #82.  MDY and Donnelly argue that

21  Warden does not prevent, restrict, or otherwise limit a user's ability to copy the literal code

22

23      [2] MDY and Donnelly conceded during trial that these aspects of WoW could be
    recorded while a user is playing WoW.  This could be done with software that records the
24  sights and sounds of the game as it is being played.  Indeed, a few of such copies were played
    by Blizzard during trial.  Because such copying would constitute copying within the meaning
25  of section 106 of the Copyright Act, 17 U.S.C. § 106(1)-(3), Warden prevents users from
26  exercising a right (copying) belonging to Blizzard as the copyright owner.  MDY and
    Donnelly argued that Glider does not create such a copy.  That may be true, but Warden
27  clearly constitutes a technological measure that prevents such copying, and Glider, by
28  circumventing that technological measure, facilitates such copying. Nothing more is required
    for a violation of section 1201(a)(2).

1  contained in the game client software or the individual nonliteral illustrations of that code

2  because both can be freely copied from the user's hard drive.  The Court again agrees.  The

3  same cannot be said, however, with respect to the dynamic nonliteral elements of the game.

4  As explained above, these aspects of WoW can be accessed only while playing the game on

5  Blizzard's servers.  By preventing or interrupting a Glider user's access to the servers,

6  Warden effectively prevents that user from copying – should he choose to do so – the

7  dynamic nonliteral sights and sounds of WoW as it is being played.[3]

8       The Court concludes that MDY has violated section 1201(b)(1).  Warden constitutes

9  a "technological measure" within the meaning of section 1201(b)(1) to the extent it prevents

10  a user from copying the dynamic nonliteral elements of WoW as it is being played.  Glider

11  circumvents Warden within the meaning of the statute.  *See* 17 U.S.C. § 1201(b)(2)(A).  And

12  Glider is knowingly marketed by MDY for use in circumventing Warden.  *See* 17 U.S.C.

13  § 1201(b)(1)(C).

14  **III.    The Personal Liability of Michael Donnelly.**

15       Blizzard contends that Michael Donnelly should be held personally liable for the

16  tortious interference, contributory copyright infringement, vicarious copyright infringement,

17  and DMCA violations.  The Court will set forth relevant facts and then address the law.

18       **A.    Findings of Fact.**

19       Michael Donnelly is the president of MDY and manages its day-to-day operations.

20  MDY is the entity that promotes and modifies Glider.  MDY currently has two employees.

21  These employees work under the direction of Donnelly.

22       Donnelly did not believe that the creation or distribution of Glider violated the

23  copyright laws.  Donnelly did not copy any of Blizzard's code, nor does Glider seek to

24  replicate the WoW game.  Donnelly knew that Glider users would be required to pay all

25  _____

26       [3]The Court is aware that Warden does not prevent all WoW users from copying the
dynamic nonliteral elements of the game.  Players who do not use Glider may copy that

27  content while connected to Blizzard servers.  The statute, however, requires only that the
technological measure "restricts[] or otherwise limits" unauthorized copying.  17 U.S.C. §

28  1201(b)(1)(A).

1  required WoW fees.

2       When Donnelly first introduced Glider, he read the Blizzard End User License

3  Agreement ("EULA") and Terms of Use Agreement ("TOU"). These contracts did not at the

4  time expressly prohibit bots. They did prohibit cheats and hacks, but Donnelly did not view

5  Glider as a cheat or a hack because it did not modify any WoW code. By November of 2005,

6  however, Donnelly understood that the use of Glider by his customers was a breach of their

7  contracts with Blizzard. An e-mail written by Donnelly at the time stated that "[s]ince

8  Blizzard does not want bots running at all, it's a violation to use them." Dkt. #43-10 at 3.

9  MDY's website openly acknowledges that Glider "is against the [TOU] as provided by

10  Blizzard for [WoW]." Dkt. #43-9 at 3.

11       In August of 2006, Donnelly received a cease and desist letter from Blizzard. The

12  letter addressed five files on MDY's website and claimed that they contained Blizzard

13  intellectual property. Four of the five files consisted of screen shots from WoW. Donnelly

14  removed those files from his website. The fifth file concerned the "launchpad" program that

15  Donnelly had written for Glider. Because Donnelly did not understand how this program

16  affected Blizzard's copyright, he wrote Blizzard and asked for an explanation. Blizzard did

17  not respond.

18       In October of 2006, representatives of Blizzard appeared at Donnelly's home. They

19  informed him that Glider violated Blizzard's copyrights and demanded that he immediately

20  cease selling Glider and disgorge all profits earned from Glider. The representatives

21  threatened to file a lawsuit in California the next day if Donnelly refused to comply.

22  Donnelly immediately sought legal counsel. When that counsel was unable to obtain an

23  extension of Blizzard's deadline, Donnelly brought this action in Arizona before Blizzard

24  could bring the action in California. Donnelly has continued selling Glider during the course

25  of this lawsuit, including after the Court's July 2008 ruling that the sale of Glider constituted

26  contributory and vicarious copyright infringement. Dkt. #82. Donnelly testified at trial that

27  he did not stop selling Glider after the Court's ruling because he disagrees with the ruling and

28  believes it will be overturned on appeal.

1    Blizzard has suffered damages as a result of Glider.  Mr. Ashe testified without

2 contradiction that Glider and other bots diminish the game playing experience of WoW and

3 provoked 500,000 complaints to Blizzard between December of 2004 and March of 2008.

4 Blizzard spends almost $1,000,000 per year attempting to detect and eliminate Glider and

5 other bots, money that could be devoted to more productive uses.  Blizzard also believes that

6 it has lost customers and sales as a result of Glider, but has no way of determining how

7 many.

8    **B.    Conclusions of Law.**

9       **1.    Tortious Interference.**

10    The parties agree that Arizona law applies to Blizzard's tortious interference claim.

11 Under Arizona law, corporate officers and directors "are not personally liable for torts

12 committed by the corporation or by one of its officers merely by virtue of the office

13 they hold." *Bischofshausen, Vasbinder, & Luckie v. D.W. Jaquays Mining & Equip.*

14 *Contractors Co.*, 700 P.2d 902, 908 (Ariz. Ct. App. 1985).  To be personally liable,

15 "the directors or officers must participate or have knowledge amounting to acquiescence or

16 be guilty of negligence in the management or supervision of the corporate affairs causing or

17 contributing to the injury." *Id.* at 908-09; *see Albers v. Edelson Tech. Partners L.P.*, 31 P.3d

18 821, 826 (Ariz. Ct. App. 2001) ("[W]hile corporate officers and directors are generally

19 shielded from liability for acts done in good faith on behalf of the corporation, their status

20 does not shield them from personal liability to those harmed as a result of intentionally

21 harmful or fraudulent conduct."); *Dawson v. Withycombe*, 163 P.3d 1034, 1051 (Ariz. Ct.

22 App. 2007) ("Under Arizona law, a director cannot be liable without some kind of personal

23 participation in the tort or at least acquiescence by knowledge of the tort combined with a

24 failure to act.").

25    To establish MDY's liability for tortious interference, Blizzard was required to prove

26 that (1) a valid contractual relationship existed between Blizzard and its customers, (2) MDY

27 knew of the relationship, (3) MDY intentionally and improperly interfered in the relationship

28 and caused a breach or termination of the relationship, and (4) Blizzard was damaged as a

result.  *See Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bur. of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981); *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1043 (Ariz. 1985) (en banc), *superseded in other respects by* A.R.S. § 23-1501.  The Court found that each of these elements has been satisfied.  *See* Dkt. #82 at 22-26.

For Donnelly to be personally liable for MDY's tortious interference, the Court concludes that Donnelly must have known that MDY was engaging in tortious interference. Donnelly does not dispute that a valid contractual relationship existed between Blizzard and its customers.  Donnelly clearly knew of the relationship – he read the contracts.  Since at least November 2005, Donnelly knew that MDY was intentionally interfering with that contractual relationship by inducing its customers to breach the TOU.  And, as the finding of fact set forth above demonstrate, Blizzard has been damaged by Glider.

The one remaining question is whether Donnelly knew MDY's interference with Blizzard's contracts was improper.  The Court previously found that MDY's actions were improper under the seven-factor test of Restatement (Second) of Torts § 767.  Dkt. #82 at 23-26.  The Court finds that Donnelly, from at least November of 2005, was aware of the facts that satisfy the seven-factor test and therefore knew that MDY's conduct was improper. Donnelly knew that Blizzard has established valid and financially profitable contracts with its customers.  Donnelly knew that MDY aids WoW players in breaching their contracts with Blizzard, assists the players in gaining an advantage over other WoW players, enables players to mine the game for their own financial benefit and in violation of the TOU, assists players in avoiding detection by Blizzard, and does so in a way designed to place Blizzard at risk.  Donnelly knew that MDY's motive was financial gain.  Donnelly knew that Glider was successful because WoW was successful, and that MDY sought to exploit WoW's success for its own financial benefit.[4]

---

[4] Citing *Bar J Bar Cattle Co. v. Pace*, 763 P.2d 545 (Ariz. Ct. App. 1988), MDY contended in its summary judgment briefing that "*[m]alice must be the sole motivator* for the actor to interfere *tortiously*."  Dkt. ##45 at 22, 57 at 26 (emphasis in original).  The Court disagreed.  Dkt. #82 at 25 n. 12.  *Bar J Bar* simply recognizes that the impropriety of a defendant's conduct requires a multi-pronged inquiry.  Malice is one "facet[] of the element

1    Because Donnelly knew the facts that satisfy all seven factors enumerated in

2   Restatement § 767, the Court concludes that he knew that MDY was improperly interfering

3   with Blizzard's customer contacts.  This is true whether or not he understood the details of

4   Arizona tortious interference law.  The Court therefore holds that Donnelly is personally

5   liable for MDY's tortious interference from November 2005 forward.  The parties have

6   addressed damages through stipulation and have not asked the Court to determine the dollar

7   amount of this liability.

8                    **2.      Copyright Infringement and DMCA Violations.**

9    "Courts within virtually every circuit have adopted a two-prong test to determine

10   whether a corporate officer is jointly and severally liable with the corporation for copyright

11   infringement.  The prerequisites for vicarious liability are:  (1) the officer has the right and

12   ability to supervise the infringing activity, and (2) the officer has a direct financial interest

13   in such activities." *Jobete Music Co. v. Johnson Communications, Inc.*, 285 F. Supp. 2d

14   1077, 1083 (S.D. Ohio 2003) (citing cases); *see Microsoft Corp. v. Ion Techs. Corp.*, 484 F.

15   Supp. 2d 955, 961 (D. Minn. 2007); *BMI v. Rooster's, Inc.*, No. Civ.A. 04-140-DLB, 2006

16   WL 335583, at *3 (E.D. Ky. Feb. 14, 2006); *Coogan v. Avnet, Inc.*, No. CV-04-0621-PHX-

17   SRB, 2005 WL 2789311, at *7 (D. Ariz. Oct. 24, 2005); *see also A&M Records, Inc. v.*

18   *Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (noting that vicarious liability for

19   copyright infringement "is an 'outgrowth' of respondeat superior").

20    Donnelly does not address the issue of personal liability in his proposed findings of

21   facts and conclusions of law.  *See* Dkt. #88.  At oral argument, Donnelly relied on *Murphy*

22   *Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841 (N.D. Cal. 1979),

23   for the proposition that personal liability should be limited to cases where the defendant

24   engaged in "inherently wrongful conduct."  *See id.* at 853.  *Murphy* involved the application

25   of the Sherman Antitrust Act.  Personal liability was limited because "'the behavior

26   ────────────────

27   of impropriety that the plaintiff *may* show in a particular case." *Wagenseller*, 710 P.2d at
     1043 (emphasis added).  Malice need not be shown if the other elements of improper conduct
28   exist.

                                                  - 16 -

proscribed by the Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct.'" *Id.* (citation omitted). The Court has found no case applying *Murphy* outside the context of antitrust, and Donnelly has cited no case applying it to copyright law.[5]

Generally, liability for copyright infringement does not require knowledge of wrongdoing on the part of the infringer. The Copyright Act permits an award of damages even where "the infringer was not aware and had no reason to believe that his or her acts constituted infringement of copyright[.]" 17 U.S.C. § 504(c)(2); *see also Coogan*, 2005 WL 2789311, at *4 (noting that damages may be increased for willful infringement and stating that a finding of willfulness "does not require that a defendant act with the 'specific intent' to violate the copyright protection"). Similarly, courts hold that vicarious liability – even of corporate officers – does not require knowledge that the conduct is infringing. *See MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005) (vicarious liability may be imposed "even if the defendant initially lacks knowledge of the infringement"); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262 (9th Cir. 1996) (vicarious liability may be imposed "even though the defendant was unaware of the infringement") (citation omitted); *S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985) ("[The corporate officers] all had a financial interest in the infringing activity and the right to supervise [the infringer's] activities. Liability falls on all of them even if they were ignorant of the infringement."); *Novell, Inc. v. Unicom Sales, Inc.*, No. C-03-2785 MMC, 2004 WL 1839117, at *17 (N.D. Cal. Aug. 17, 2004) (in determining the liability of corporate officers "it is immaterial whether such individuals are aware that their acts will result in infringement"); *Foreverendeavor Music, Inc. v. S.M.B., Inc.*, 701 F. Supp. 791, 793 (W.D. Wash. 1988) (corporate officer's doubts about the plaintiff's right to enforce copyright

---

[5]Donnelly's counsel at trial also cited *Wechsler v. Macke International Trade, Inc.*, 486 F.3d 1286, 1292 (Fed. Cir. 2007), and *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996), for the proposition that officers are personally liable for a corporation's patent infringement only if they act culpably. Donnelly has provided no case applying this rule to copyright law.

laws "[did] not absolve him from liability for infringing copyrights").

Donnelly's argues, with some persuasive force, that he should not be held personally liable when he could not reasonably be expected to know that the Ninth Circuit applied copyright law to the copying of software into RAM.  But copyright law is clear, as shown by the cases cited above.  Knowledge is not required.  The Supreme Court has noted that vicarious liability "allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement."  *MGM Studios*, 545 U.S. at 930 n.9.  In support of this statement, the Supreme Court cited *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 308 (2d Cir. 1963), a case which provides this helpful explanation of the strict-liability policy of copyright law:

> [T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income.  He is liable whether the bandleader is considered, as a technical matter, an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection.
>
> We believe that the principle which can be extracted from the dance hall cases is a sound one . . . .  Green licensed one facet of its variegated business enterprise, for some thirteen years, to the Jalen Amusement Company.  Green retained the ultimate right of supervision over the conduct of the record concession and its employees.  By reserving for itself a proportionate share of the gross receipts from Jalen's sales of phonograph records, Green had a most definite financial interest in the success of Jalen's concession; 10% or 12% of the sales price of every record sold by Jalen, whether "bootleg" or legitimate, found its way – both literally and figuratively – into the coffers of the Green Company.  We therefore conclude . . . that Green's relationship to its infringing licensee, as well as its strong concern for the financial success of the phonograph record concession, renders it liable for the unauthorized sales of the "bootleg" records.
>
> The imposition of liability upon the Green Company, even in the absence of an intention to infringe or knowledge of infringement, is not unusual.  As one observer has noted, "Although copyright infringements are quite generally termed piracy, only a minority of infringers fly the Jolly Roger."  While there have been some complaints concerning the harshness of the principle of strict liability in copyright law, courts have consistently refused to honor the defense of absence of knowledge or intention.  The reasons have been variously stated.  "The protection accorded literary property would be of little value if . . . insulation from payment of damages could be secured . . . by merely refraining from making inquiry."  "It is the innocent infringer who must suffer, since he, unlike the copyright owner, either has an opportunity to guard against the infringement (by diligent inquiry), or at least

the ability to guard against the infringement (by an indemnity agreement . . . and/or by insurance)."

*Shapiro*, 316 F.2d at 307-08 (citations omitted); *see Fonvisa*, 76 F.3d at 261-64 (following *Shapiro* and referring to it as the "landmark case" on vicarious liability for copyright infringement).

Donnelly clearly supervised the infringing and circumventing activities of MDY and profited personally from their success. Applying this well-established law, Donnelly is liable for MDY's vicarious copyright infringement, contributory copyright infringement, and DMCA violations.

**IV.    Permanent Injunction.**

Under 17 U.S.C. § 502(a), this Court "is empowered to grant a permanent injunction 'as it may deem reasonable to prevent or restrain infringement of a copyright.'" *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1208 (C.D. Cal. 2007). To obtain a permanent injunction under section 502(a), Blizzard must satisfy a four-part test: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are not adequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-92 (2006).

Citing *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993), Blizzard asserts that courts have routinely granted permanent injunctions when liability has been established and there is a threat of continuing violations. Dkt. #97 at 6. The Court agrees with other district courts that *MAI*'s two-part rule did not survive *eBay*. "*MAI* should only be relevant to the extent it informs the *eBay* analysis." *Grokster*, 518 F. Supp. 2d at 1209-10; *see Designer Skin, LLC v. S & L Vitamins, Inc.*, No. CV 05-3699-PHX-JAT, 2008 WL 4174882, at *3 (D. Ariz. Sept. 5, 2008).

Blizzard further asserts that courts in copyright cases traditionally have held that irreparable harm is presumed. Dkt. #97 at 6. After *eBay*, however, the presumption of

irreparable harm no longer inures to the benefit of plaintiffs. "The *eBay* Court plainly stated that [p]laintiffs 'must demonstrate' the presence of the traditional factors, and therefore have the burden of proof with regard to irreparable harm." *Grokster*, 518 F. Supp. 2d at 1211; *see Designer Skin*, 2008 WL 4174882, at *4 (citing *eBay*, 547 U.S. at 391); *Magna-RX, Inc. v. Holley*, No. CV 05-3545-PHX-EHC, 2008 WL 5068977, at *4 (D. Ariz. Nov. 25, 2008).

The Court will consider whether Blizzard has satisfied the four-part test for a permanent injunction.

### A.    Irreparable Injury.

Blizzard has established irreparable injury. Blizzard can calculate the amount of money it spends annually to detect and eliminate bots from its game, but Blizzard cannot determine the extent of damage caused by Glider to Blizzard's reputation and customer goodwill. As noted above, Blizzard received 500,000 customer complaints regarding bots in WoW between December of 2004 and March of 2008. The use of Glider gives a player an unfair advantage over other players and imbalances the in-game economy. The damage to Blizzard's reputation and customer goodwill constitutes irreparable harm. *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm."); *MySpace, Inc. v. Wallace*, 498 F.Supp.2d 1293, 1305 (C.D. Cal. 2007) ("Harm to business goodwill and reputation is unquantifiable and considered irreparable.").

### B.    Remedies at Law.

This factor is closely related to the first. Because the damage to Blizzard's goodwill and the loss of its customers caused by Glider cannot be calculated with any certainty, traditional legal remedies such as monetary damages are inadequate to redress Blizzard's harm.

### C.    Balance of Hardships.

On one hand, failure to enjoin the sale of Glider will result in a continuation of Blizzard's injuries. On the other hand, enjoining the sale of Glider will put MDY out of

business and eliminate a significant source of income for Donnelly.  MDY and Donnelly argue that their hardship would be greater and urge the Court to deny a permanent injunction.

In the preliminary injunction context, the Ninth Circuit has noted that "[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration[.]'" *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) (citation omitted).  Where, as here, the conduct has been shown to be both tortious and infringing, this principle applies with even greater force.  An injunction may force the closure of MDY's business, but that business is based on contributory and vicarious copyright infringement.  The hardship factor favors an injunction.

### D.  Public Interest.

Congress has determined that the public interest is served by protecting the creative works of those who obtain copyright protection.  Congress has concluded in the DMCA that the public interest disfavors those who circumvent technological measures designed to protect creative works.  Although the public interest also favors creativity and open competition, MDY is not a competitor of Blizzard.  MDY does not offer a competing computer game.  Rather, MDY persuades Blizzard customers to violate their contract with Blizzard for MDY's financial advantage.  The public interest may favor full and honest competition, but MDY ultimately is an exploiter, not a competitor.

### E.  Conclusion.

The Court finds that all four requirements for a permanent injunction are satisfied.  The Court will enter a permanent injunction against the continued sale, distribution, and servicing of Glider.

## V.  Stay of the Injunction.

MDY and Donnelly argue that the Court's decision may be reversed on appeal and that MDY should not be put out of business while the appeal is pending.  Donnelly testified that even twelve months of injunction would put MDY out of business forever.

The Court recognizes that MDY and Donnelly will ask the Ninth Circuit to overturn

1   the RAM-copying and ownership holdings of *MAI Systems Corp. v. Peak Computer, Inc.*,

2   991 F.2d 511 (9th Cir. 1993).  The Court also recognizes that reasonable minds can disagree

3   on whether these holdings are correct.  Because the parties have not briefed the stay of a

4   permanent injunction, the Court will require the parties to file memoranda addressing that

5   issue.  The Court will not enter the permanent injunction until it has decided whether the

6   injunction should be stayed pending appeal.

7        **IT IS ORDERED:**

8        1.     MDY is liable to Blizzard for violations of 17 U.S.C. §§ 1201(a)(2) and

9             1201(b)(1) with respect to the dynamic nonliteral elements of WoW.

10       2.     Michael Donnelly is liable to Blizzard for damages arising from MDY's

11            tortious interference with contract from November 30, 2005, to the present.

12       3.     Michael Donnelly is liable to Blizzard for damages arising from MDY's

13            contributory infringement, vicarious infringement, and DMCA violations.

14       4.     Blizzard is entitled to a permanent injunction against the continued sale,

15            distribution, and servicing of Glider.

16       5.     On or before **February 13, 2009**, the parties shall submit memoranda, not to

17            exceed seven pages in length, addressing (1) the appropriate terms of any

18            permanent injunction, (2) whether the permanent injunction should be stayed

19            pending appeal, and (3) what bond or other measures – for stay of the

20            injunction and for damages – should be imposed for Blizzard's protection

21            pending appeal.

22       DATED this 28th day of January, 2009.

23

24

25

26                          David G. Campbell
                      United States District Judge

27

28