LAW OFFICES OF
VENABLE, CAMPILLO, LOGAN & MEANEY, P.C.
1938 EAST OSBORN ROAD
PHOENIX, ARIZONA 85016
TELEPHONE (602) 631-9100
FACSIMILE (602) 631 4529
E-MAIL DOCKETING@VCLMLAW.COM
Lance C. Venable (AZ Bar No 017074)
Joseph R. Meaney (AZ Bar No. 017371)
Attorneys for Plaintiff MDY Industries, LLC
and Third-Party Defendant Michael Donnelly

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

**MDY INDUSTRIES, LLC,**

Plaintiff and Counterdefendant,

vs.

**BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC.,**

Defendants and Counterclaimants,

**Case No.: CV06-02555-PHX-DGC**

**MDY Industries, LLC and Michael Donnelly's Request for Reconsideration of the Court's March 10, 2009 Order Regarding Tortious Interference with Contractual Relations.**

**The Honorable David G. Campbell**

**Oral Argument Requested**

MDY Industries, LLC and Michael Donnelly (collectively, "MDY") ask this Court to reconsider its March 10, 2009 Order denying a stay the Permanent Injunction. In its Order, the Court concluded that MDY's appeal will not raise serious questions concerning tortious interference with contractual ("TIWC"). The Court rejected MDY's assertion that without Copyright and DMCA violations, Blizzard's TIWC claim will fail.

As set forth in the attached memorandum of points and authorities, MDY specifies that this matter may raise serious questions before the Ninth Circuit.[1] The Ninth Circuit may conclude that (1) "honest persuasion" is not limited to competition, (2) the Court's intent analysis was incomplete, (3) MDY was not "participating" in the breach by merely

[1] LRCiv7.2(g). MDY asks the Court to consider that it allowed no more than seven pages to address the issues in this case, which by their nature require a certain level of depth. *See* Docket #108 at 22.

selling and supporting software openly and honestly, (4) MDY's profit motive does not favor Blizzard, (5) MDY was privileged to avoid Warden, (6) Glider was not the "but for" cause of the breaches, (7) the relationships between the parties favors MDY, and (8) a reasonable jury could find for MDY.

Upon reconsideration, the Court should find that serious questions do exist with respect to Blizzard's TIWC claim,[2] and stay its permanent injunction for the same reasons it stayed the Copyright and TIWC injunctions.

## **Memorandum of Points and Authorities**

### I. The Court improperly rejected MDY's position, for MDY did nothing more than honestly persuade individuals to purchase its Glider program, and MDY cannot be liable for Tortious Interference With Contract.

The Court stated in its July 14, 2008 ruling that MDY's argument that it honestly persuaded individuals to purchase Glider did not apply because "… this language [governing honest persuasion], quoted from the *Wagenseller* case, refers to competitors in a marketplace."[3] MDY respectfully asserts that the Court is incorrect. *Wagenseller* never referenced the concept of honest persuasion in the context of "competitors in a marketplace."[4] In fact, it is quite the opposite.

*Wagenseller* states that an interference must be "improper" to find a defendant liable. Specifically, *Wagenseller* stated, "It is difficult to see anything defensible, in a free society, in a rule that would impose liability on one who honestly persuades another

---

[2] *See, e.g., Societe Civile Succession Richard Guino v. Beseder*, 414 F.Supp.2d 944 (D. Ariz., 2006) (Defendants' Motion for Reconsideration was granted in part with regard to the Court's award of partial summary judgment to Plaintiffs. The Court found that its summary judgment Order "involves controlling questions of law" as to which there are "substantial grounds for difference of opinion" on copyright protection and liability).

[3] Docket #82, at 24 (citing *Wagenseller v. Scottsdale Memorial Hosp*., 147 Ariz. 370, 386 (Ariz. 1985)).

[4] *See generally, Wagenseller,* 147 Ariz. at 388.

to alter a contractual relationship."[5] The *Wagenseller* court then cites to two law review articles written by Dan B. Dobbs and Harvey S. Perlman.[6] In each of their respective articles, Dobbs and Perlman critique the tort of tortious interference with contract, and specifically, the idea that a court can find a defendant liable when he neither directly commits a breach, nor does he do anything more than honestly persuade someone to commit an act that may ultimately cause a contract breach.[7]

The *Wagenseller* court recognizes Dobbs and Perlman[8] as scholars in the field and relies directly on their respective articles to support its holding that a court cannot find a defendant liable for TIWC merely for the act of honestly persuading a person to act.[9] Thus, the Court should consider that *Wagenseller's* support of Dobbs and Pearlman raises serious questions as to whether this Court should have found MDY liable under the tort.

**A. The Dobbs article rejects the notion that a court can find a defendant liable for either interference alone, or any act where the defendant does nothing more than honestly persuade an actor to commit a breach of contract.**

In his article, Dobbs criticizes the tort of TIWC. Dobbs does not limit his "honest persuasion" analysis to competitive relationships. He applies it consistently throughout his article. In formulating his critique, Dobbs references cases where "[l]iability is imposed for acts permissible in themselves – honest representations, for example – and

---

[5] *Id.*

[6] Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark. L. Rev. 335 (1980-81); Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of tort and Contract Doctrine*, 49 U. Chi. L. Rev. 61 (1982).

[7] *See generally, id.*

[8] Perlman's article specifically calls for the prerequisite to liability in a tortious interference case to hinge on a defendant committing a wholly separate tortious act that must cause the interference, and ultimately, the breach of contract.

[9] *See Wagenseller*, 147 Ariz. 370, at 388 (referencing Dobbs and Pearlman's articles on the issue of improper behavior by stating "[W]e do not find compelling a rule of law that only one state has adopted and that runs counter to the views of the scholars in the field. *See* Dobbs, supra; Perlman, supra.").

impermissible only because the defendant's purpose is thought insufficiently laudable."[10] In these cases, Dobbs questions the very basis for liability.

> Indeed, the act involved in these cases is often the act of speech, the most protected of all social acts. Although liability for such acts might be understandable in some historical framework, analytically it seems puzzling.[11]

Dobbs then remarks that courts must not find defendants liable under circumstances involving honest persuasion:

> One reason sometimes offered, and perhaps more often assumed, is that interference with a contract should produce liability because it is wrong to interfere. This is, however, very much the same as saying it is wrong because it is wrong. There are cases in which it is indeed wrong to interfere. This is clearly so when violence is done or lies are spoken as a means of interference. It would even be wrong to persuade if the person to whom persuasion is addressed is unable to think for himself and the persuasion is simply a form of manipulation. But these are not the cases in dispute. The cases of concern here are those in which honest representations are made to competent adults and there is neither threat, nor violence, nor abuse of confidence, nor undue influence, nor misuse of economic power.[12]

Dobbs further asserts that, "[T]o find a wrong in interference, we shall have to add some factor besides the act of interfering by persuasion or honest representation."[13] In the present case, this additional factor is lacking. Moreover, neither the *Wagenseller* court, nor Dobbs distinguish between competitive and non-competitive relationships. Hence, this Court is constrained from providing any legal support for its new distinction that the honest persuasion doctrine should not apply to MDY because MDY is an "exploiter, not a competitor." As this Court acknowledges, MDY offered Glider for sale through its website and actively marketed Glider to actual or potential WoW customers.

---

[10] Dobbs, *supra*, at 343.
[11] *Id.*
[12] *Id.*
[13] *Id.*

But at no time did MDY use or threaten violence, engage in abuse of confidence, undue influence, misuse economic power, or lie to its potential customers to sell Glider. In fact, MDY was open and notoriously honest about its belief that using Glider with WoW could possibly violate Blizzard's EULA or TOU.

Therefore, MDY's act of merely selling a program that Blizzard finds objectionable is nothing more than honest persuasion of a third party that ultimately may cause the breach of Blizzard's EULA or TOU. Under *Wagenseller's* ruling, and its supporting authorities in Dobbs and Perlman, the Court should not have considered MDY's acts tortious acts of interference.

**B. Imposing duties upon strangers to a contract is unsupported in a claim for TIWC**

Dobbs also rejects the notion of imposing duties on strangers to a contract except in limited cases. As he stated:

> Perhaps the most obvious reason not to impose liability upon the actor, T, for interference with a contract between A and B, is that to do so is to allow A and B, by their private arrangement, to appropriate a measure of T's freedom. At least as a general rule we must take it that A and B may not by their contract impose duties upon T or constrain him."[14]

By adding language to its TOU that excludes programs such as Glider, Blizzard did precisely that – imposed a duty upon MDY not to sell Glider and constrained MDY's freedom to contract with Blizzard's customers.

Additionally, Dobbs stated that attempts to:

> … constrain T by the terms of a contract to which he is not a party collides with some of our most fundamental notions of justice. The notion of privity… remains a technical expression of a just rule that only parties to the contract gain its benefits or suffer its burdens. The idea is not limited to the commercial forum; in the judicial forum the idea seems so important we attach it to due process and say that an action between A and B may not except in very special cases bind C as well. A and B may, by their actions, affect T's world by affecting facts on which T depends. Nothing is wrong

[14] *Id.* at 350.

> with this; it is an expression of freedom. But if A and B may by a legal action between them in court or in a contract prescribe legal rights of T, then something is very wrong with the state of the law.[15]

Dobbs' position applies directly to the present case. MDY is not a party to Blizzard's contracts with its users and therefore, should not suffer its burdens. Thus, Dobbs rejects the theory that Blizzard could impose duties upon MDY simply by adding language to its TOU. Dobbs clearly disagrees with this Court's belief that Blizzard's TOU clauses prohibiting bot programs should limit MDY's freedom to lawfully sell its Glider program; even if it has the effect of interfering with Blizzard's contracts with its customers.

Therefore, MDY asserts that when this Court's misapplied the honest persuasion doctrine, coupled with the *Wagenseller* court's support of Dobbs's arguments regarding the liability basis for TIWC claims demonstrate that MDY has raised and identified serious questions that MDY will raise on appeal and merit the Court's reconsideration of its March 10 ruling precluding a stay.

## II. The Ninth Circuit may conclude that the Court's intent analysis was incomplete and overturn the Court's "improper" finding absent independent tort

The Court found that MDY's actions resulted in a breach, allegedly satisfying the intent element.[16] But the Court's analysis stopped there. The Court never addressed the significance of its finding that MDY's motive was to sell software for a profit – and that the resulting breaches were mere consequences of MDY's intent. According to the Restatement, conduct is generally not improper if it is merely a consequence of actions taken for a purpose other than to interfere with a contract:

---

[15] *Id.*

[16] Order, Dkt. 82 at 22, line 20-23, line 3 ("In short, there can be no doubt that MDY knows that its promotion and sale of Glider results in the breach of Blizzard's contract with its customers. MDY's interference clearly is intentional.")

> [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight towards producing any determination that the interference was improper."[17]

As result, a court cannot ordinarily find a defendant liable absent criminal, fraudulent or other independently wrongful inducement when the intent is to profit, not interfere. Unlike the defendant in the *American Airline[18]s* case that the Court relied upon, MDY does not engage in any similar behavior. As the Restatement affirms:

> If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.[19]

In this case, the Court found that MDY's motive was to profit from its software sales[20] – not to interfere. Yet, the Court's analysis never accounted for this fact. The Ninth Circuit may agree that MDY intended to sell software for a profit – but conclude that the breach by MDY's customers was only a consequence of MDY's intent. Therefore, even though MDY had "intent," the Court's unaccounted for finding on motive stands absent an independent tort like violating the copyright or DMCA statutes.[21]

---

[17] Restatement (Second) of Torts § 767 comment d. *see also*, *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 244-45 (Iowa, 2006) (finding breach a certain consequence of actions (thus intentional), but not improper: "[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests.").

[18] *Am. Airlines, Inc. v. Platinum Worlds Travel*, 769 F.Supp. 1203 (D. Utah 1990).

[19] Restatement (Second) of Torts § 766 comment j.

[20] Dkt. 82 at 24 ("The second factor concerns MDY's motive. That motive is clear – profit.")

[21] This is also consistent with Dobbs and Perlman's positions regarding liability under TIWC.

In fact, the Ninth Circuit may even grant summary judgment in MDY's favor if it overturns copyright and DMCA.[22]

**III. The Ninth Circuit may disagree that MDY is "participating" in the breach by merely selling software openly and honestly**

The Court found that MDY "aids", "assists", and "enables" its customers in breaching Blizzard's contracts.[23] The Ninth Circuit, however, may not agree that MDY participated to the level of actively participating in the breach. The Ninth Circuit may view MDY's involvement as nothing more than legally selling software. It is uncontroverted that MDY's customers -- not MDY – committed the breaches.

The Ninth Circuit may agree with Professor Dobbs on this issue. Professor Dobbs would conclude that a court could not find MDY liable for selling and supporting software honestly and openly merely because some of Blizzard's customers freely decide to use MDY's Glider software:

> If B is thought of as [a human being in charge of his or her own life] and in fact has done something wrong in terminating a contract or other relationship, it is B, the decision-maker, who should be responsible, not T. Any reasonable assessment of accountability must put blame, if blame there is, on the person who makes the decision, not on one who, without fraud or duress, merely persuades.
>
> …
>
> These reasons vary in importance, but all of them suggest that neither justice, nor policy nor decent respect for humans as individuals would permit that one person, T, should be held liable for the decision of another, B.[24]

---

[22] *Neonatology Associates v. PPA,* 216 Ariz. 185, ¶ 15 (App. 2007) (summary judgment is appropriate in cases where there is no evidence of ill will or intent to injure unless the asserting party can produce admissible evidence of an independently wrongful means to induce a breach.")

[23] Order, Dkt. 82 at 23, lines 23 – 27.

[24] Dobbs, *supra,* at 358. Perhaps, even *American Airlines* would have come out differently if the defendant merely wrote a book on how to defraud AA rather than actively participating in the tort itself.

Here, MDY's participates only by writing, selling and supporting Glider. Blizzard's autonomous customers freely elect do the acting that results in the breach, not MDY. At a minimum, a serious question exists whether a court can find MDY liable for actions taken by Blizzard customers by merely selling and supporting software.

## IV. The Ninth Circuit may disagree that MDY's profit motive favors Blizzard with respect to the second factor.

The Court concluded that the second factor favors Blizzard.[25] The Court found that MDY's motive was improper (1) because its motive was profit and (2) because it "fail[ed] to honor the pre-existing contract between Blizzard and its customers."[26] The Ninth Circuit may disagree.

First, MDY's motive to seek profit from its software business is not improper. "A business-driven motive, in and of itself, is not an improper motive."[27] And the Arizona Supreme Court has expressly stated that "profit motive … cannot establish that [defendants'] actions were 'improper.'"[28]

Second, stating that the second factor favors Blizzard because MDY fails to honor a third-party contract is circular – and as Dobbs remarked, it is like saying, "it's wrong because it wrong."[29] Dobbs rejects the theory that a court could find a defendant like MDY liable for TIWC for not honoring a third-party contract while being motivated to make a profit. As Dobbs noted, unless a defendant accompanied its profit motive with threats, violence, abuse of confidence, undue influence, or misuse of economic power – none of which MDY utilized – the defendant could not be liable under a TIWC theory.

---

[25] *Id.* at 25 ("All factors favor Blizzard…").

[26] Dkt. 82 at 24 ("The second factor concerns MDY's motive. That motive is clear – profit.")

[27] *Neonatology Associates v. PPA*, 216 Ariz. 185, ¶ 15 (App. 2007).

[28] *Safeway Insurance Co., Inc. v. Guerrero*, 210 Ariz. 5 ¶23, 106 P.3d 1020 (Ariz. 2005).

[29] Dobbs, *supra*, at 343.

As a result, the Ninth Circuit may conclude that the second factor, one of the two most important factors, favors MDY.

**V. The Ninth Circuit may disagree that the MDY's interests are not protectable**

**A. MDY's pre-existing contracts**

In its Summary Judgment Order, the Court concluded that MDY was liable for TIWC because MDY's anti-detection measures were preventing Blizzard from identifying Glider users.[30] The Court overlooked one critical point - that Blizzard modified its TOU to explicitly exclude "bots" and it implemented Warden to stop Glider use with WoW after MDY had already established a contractual relationship with its Glider customers.[31] The Ninth Circuit may conclude that MDY had a privilege to sell software that Warden could not detect to protect its own contractual relationships.

Under Arizona law, "if a defendant has a present, existing interest to protect such as . . . a prior contract of his own, he is privileged to prevent the performance of a contract of another which threatens it."[32] Likewise, "[a]n interest created by a valid, existing contract indisputably falls within [the definition of a "legally protected" interest within the meaning of Restatement § 773]."[33] Thus, MDY was privileged to sell software that Blizzard's customers could use to avoid Warden given that MDY already had its own valid contracts. Professor Dobbs agrees with this view as well. [34]

This begs the question whether MDY improperly sold Glider in the beginning – i.e., before Warden and before Blizzard contractually excluded "bots." When MDY

---

[30] Order, Dkt. 82 at 23-24;

[31] Not only did Blizzard not modify its TOU until December 2006 after MDY had already established contractual relationships with its own customers, but the modification occurred over three months after the present suit was filed in an effort by Blizzard to create a post-filing breach.

[32] *Strojnik v. General Insurance Company of America*, 201 Ariz. 430, 437 (App. 2001) quoting, *Wyatt v. Ruck Const., Inc*., 117 Ariz. 186, 190, 571 P.2d 683, 687 (App. 1977)).

[33] *Strojnik*, 201 Ariz. at 437 Strojnik citing *Wyatt*.

[34] Dobbs, *supra,* at 350.

began selling Glider, Blizzard's contracts did not preclude bots,[35] Warden did not exist,[36] and MDY did not believe Blizzard would object to his software because it was not a "hack, cheat, or mod."[37] At a minimum, based on the balance of this memorandum, the Ninth Circuit faces a serious question whether Blizzard can maintain its TIWC claim for acts MDY took when MDY had a privilege to protect its own contractual interests with its customers before Blizzard ever excluded "bots" and before Blizzard created Warden.

**B. MDY's Protected Commercial Speech.**

Commercial speech represents "expression related solely to the economic interests of the speaker and its audience,"[38] and "does no more than propose a commercial transaction."[39] The Supreme Court held that speech is commercial when: (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech.[40] Obviously, commercial speech occupies a "subordinate position in the scale of First Amendment values."[41]

In *Central Hudson* the Court outlined a four part inquiry for analyzing the lawfulness of restrictions on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries

---

[35] Order, Dkt. 108 at 13("These contracts [EULA and TOU] did not at the time expressly prohibit bots. They did prohibit cheats and hacks, but Donnelly did not view Glider as a cheat or a hack because it did not modify any WoW code.")
[36] MDY's SOF, Dkt. 45a, ¶¶ 57- 63.
[37] *Id.; see also* Order, Dkt. 108 at 13.
[38] *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980)
[39] *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 752 (1976); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554-55 (2001).
[40] *Bolger*, 463 U.S. at 66-67. See also *Ass'n of Nat'l. Advertisers, Inc. v. Lundgren*, 44 F.3d 726, 728 (9th Cir. 1994) (applying the *Bolger* factors).
[41] *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456 (1978).

> yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.[42]

The "commercial speech" line of cases invariably arises in the governmental regulation context. These cases ask whether the speech concerns a "lawful activity" that a statute or ordinance does not prohibit. If so, the secondary question addresses whether the government-imposed restriction is based on a substantial "governmental" interest, whether the restriction "directly advances the governmental interest," and whether the restriction is "more extensive than necessary."[43]

The Constitution protects "commercial speech" and with equal force, protects private causes of action for damages.[44] While the Ninth Circuit has not expressly stated that the "commercial speech" defense applies to private causes of action, it has held that First Amendment rights protect not only against defamation suits, but also for tortious interference with contract.

In *Unelco Corp. v. Rooney,*[45] the plaintiff brought a number of claims against Andy Rooney, the *60 Minutes* commentator, for allegedly defamatory statements against a product produced by Unelco. Following a constitutional analysis with respect to the defamation claims and finding in Rooney's favor on First Amendment grounds, the Ninth Circuit Court of Appeals rejected Unelco's claim for interference with contractual relations:

> *Unelco* also argues that its claims for product disparagement, or "trade libel," and for tortious interference with business relationships were

---

[42] *Id* at 566.
[43] *Id.*
[44] *U.S. Healthcare, Inc. v. Blue Cross*, 898 F.2d 914 (3d Cir. 1990) (Commercial speech protection applicable to private actions for defamation and the like); *Procter & Gamble Company v. Amway Corporation*, 242 F.3d 539 (5th Cir. 2001).
[45] 912 F.2d 1049 (9th Cir. 1990).

improperly dismissed. These claims, however, are subject to the same first amendment requirements that govern actions for defamation.[46]

Here, MDY engages in constitutionally protected "commercial speech" by selling its Glider software that it drafted. Blizzard's tortious interference with contract claim cannot lie based on MDY's constitutionally protected activity.

**C. MDY's Freedom to Contract.**

Of course, the conduct at issue here involves more than mere commercial speech. MDY's conduct also includes Glider sales to WoW players. MDY offers its Glider for sale knowingly that the Glider use will interfere with existing end user agreements between Blizzard and the players. Like its speech, the law also protects MDY's contracts.

The Contracts Clause of the United States Constitution provides that "no state shall enter into any . . . Law impairing the Obligation of Contracts."[47] The Supreme Court formerly recognized an absolute right to freedom of contract under the Due Process Clause of the Fourteenth Amendment.[48] Under federal law, the question is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."[49]

In this case, it is unnecessary to inquire whether any law operates as a "substantial impairment" of MDY's right to contract with any person. In Arizona, the law considers the freedom to contract a valuable right subject to government regulation

---

[46] *Unelco,* 912 F.2d at 1057-58; accord, *Medical Laboratory Management Consultants v. American Broadcasting Companies, Inc.*, 30 F.Supp.2d 1182 (D.Ariz.1998); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3rd Cir.1985); *Ellis v. Time, Inc.*, 1997 WL 863267, *36 (D.D.C.1997); *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir.1994).
[47] U.S. Const. Art. I, § 10.
[48] *See Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).
[49] *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244, 98 S.Ct. 2716, 57 L.Ed. 2d 727 (1978).

only in very limited circumstances.[50] Quoting from *Wood Motor Co. v. Nebel*,[51] the Court stated:

> "[I]f there is one thing which more than another public policy requires it is that [people] of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of Justice. Therefore, you have this paramount public policy to consider -- that you are not lightly to interfere with this freedom of contract." (citations omitted)

Arizona courts have modified this in some limited circumstances. The government may impair a contractual relationship *only* where the enforcement of contractual terms that may be either unconscionable because the parties' unequal bargaining power.[52] The legislature has also modified the "freedom to contract" in cases not germane here.[53] Neither the Arizona judiciary nor the Arizona legislature has seen it fit to limit freedom to contract in cases where the entry of a contract between two persons may provide a stranger to the contract with a private cause of action. Thus, the Constitution protects MDY's contracts with WoW players.

## VI. The Ninth Circuit may disagree that MDY's software sales are the "but for" cause of the breaches of contract

With respect to the sixth factor, the Court concluded that Glider sales are the "but-for cause of the breaches of contract."[54] The Ninth Circuit may disagree. The Ninth Circuit may find that the "but-for" cause of the breaches is not MDY's acts of offering or

---

[50] *Consumers International Inc. v. SYSCO Corp.*, 191 Ariz. 32, 951 P.2d 897 (App.1997)
[51] 238 S.W.2d 181, 185 (Tex. 1951)
[52] *See Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984), or contravene public policy, *see also Wagenseller v. Scottsdale Memorial Hospital*, 147 Ariz. 370, 710 P.2d 1025 (1985).
[53] *See, e.g.*, A.R.S. § 44-1551 to 1562 (Petroleum Products Franchises); A.R.S. § 44-1565 to 1567 (Spiritous Liquor Franchises); A.R.S. § 28-1301 to 28-1329 (Automobile Dealers and Wreckers).
[54] *Id.* at 26.

selling Glider to a competent individual under no threat, undue influence, violence, abuse of confidence, or misuse of economic power, but rather when Blizzard's customers decide to seek out a "bot" program. The Ninth Circuit may find it persuasive that Glider purchasers originate as Blizzard's customers who have already decided that they do not wish to spend seven months "leveling up" their characters.

In fact, because the same breaches will continue without Glider, Glider cannot be the "but for" cause. Blizzard does not dispute that Glider is only one of many bots available to WoW players.[55] So, even without Glider, Blizzard's customers can purchase other bot software from places like China, or other countries, and breach Blizzard's TOU. To the contrary, without a Blizzard customer unilaterally deciding[56] to purchase a bot program, <u>MDY would not have sold a single copy of Glider</u>. Blizzard's unhappy customers, not Glider, are the but-for cause of the breaches.

## VII. The Ninth Circuit may disagree that the relationships between the parties favors Blizzard

The Court concluded that regarding the relationships between the parties, the seventh factor, favors Blizzard.[57] In its analysis, the Court focused solely on the relationship between Blizzard and MDY. The Court's seventh factor analysis added nothing new, but simply reiterated statements already made.[58] The Ninth Circuit may not agree that Blizzard and MDY's relationship is the only significant relationship.

According to the Restatement, the significant relationship is not always between plaintiff and defendant - the "significant relationship may be between any two of the three parties."[59] For example, if T is a "business advisor" to the breaching party, "it is

---

[55] Blizzard's Response SOF, Dkt. 55, ¶74.

[56] It is undisputed that MDY does not personally or directly solicit its customers. MDY SOF., Dkt. 45a, ¶¶ 49, 52; Blizzard's Response SOF, Dkt. 55, ¶¶ 49, 52.

[57] *Id.* at 25 ("All factors favor Blizzard…").

[58] Order, Dkt. 82 (restating its conclusion that Blizzard and MDY are not competitors and MDY exploits Blizzards contracts).

[59] Restatement (Second) of Torts § 767, cmt. i.

proper for him to advise [the breaching party], in good faith and within the scope of [the breaching party's] request for advice."[60] Stated another way, "A person can give honest advice or truthful information'" and may assert a legal interest of his own in good faith, even though such actions interfere with an existing contract or prospective relationship."[61] The Restatement expressly includes non-professional advice as part of its "honest advice" privilege.[62]

The Ninth Circuit may consider the relationship between MDY and MDY's clients to be the significant relationship for the seventh factor. The Ninth Circuit may place weight on the undisputed facts that Donnelly initially wrote the Glider for his own personal use and only began selling to others upon their request. Like most doctors and lawyers, MDY's clients initiated contact with MDY. MDY has never directly or personally solicited any of its clients; MDY merely advertises its software, which at worst, can do nothing more than honestly persuade someone to purchase its software. In addition, Blizzard never disputed that MDY's customers seek Glider because they want to advance their WoW character. MDY provides them the advice they seek in the form of written expression [i.e, a computer program], which is perfectly legal. MDY delivers its advice open and honestly. Like the lawyer who can never be liable in TIWC for providing honest instructions to his client on how to breach a contract, MDY does not actually breach any contract itself. At worst, MDY merely explains how to do so, which is not a tortious act.

## VIII. The Ninth Circuit may disagree that no reasonable jury could find for MDY

The Court concluded that a reasonable jury could not find for MDY on the issue of what constitutes an improper act.[63] The Ninth Circuit may disagree.

---

60 *Id.*
61 Perlman, *supra*, at 69.
62 Restatement (Second) of Torts § 772, cmt. c.
63 Order, Dkt. 82 at 26.

According to the Restatement, a court may appropriately grant summary judgment in interference cases involving recurrent fact patterns and established rules.[64] In other cases, "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question."[65]

In this case, if Professors Dobbs and Perlman comprised the jury, there is little doubt that they would not find MDY liable for tortious interference.[66] And if two legal scholars would find for MDY, certainly a reasonable jury could too. Moreover, professors Dobbs and Perlman are not just any legal scholars; they are the professors the Arizona Supreme Court selected to guide it when deciding the TIWC's future in Arizona.[67] At a minimum, a serious question exists whether Blizzard was entitled to summary judgment.

## IX. Conclusion

For all of the reasons cited above, MDY has presented serious questions whether the Ninth Circuit could reverse the Court's ruling on MDY regarding tortious interference with contract. As a result, MDY respectfully requests that the Court reconsider its March 10, 2009 ruling and stay the Court's permanent injunction for the tortious interference claim against MDY.

---

[64] Restatement (Second) of Torts § 767, cmt. l.

[65] *Id.*

[66] *See* Dobbs, *supra,* at 337 (would not impose liability "for persuasion and other non-violent and non-manipulative forms of interference"); Perlman, *supra,* at 97 (would require "independently unlawful" act before finding TIWC liability).

[67] *See Wagenseller,* 147 Ariz. at 386.

Respectfully submitted on March 24, 2009.

**Venable, Campillo, Logan & Meaney, P.C.**

By /s/Lance C. Venable

Lance C. Venable SBN 017074
Joseph R. Meaney SBN 017371
1938 East Osborn Road
Phoenix, Arizona 85016
Tel: 602-631-9100
Fax: 602-631-9796
E-Mail docketing@vclmlaw.com

*Attorneys for Plaintiff MDY Industries, LLC and Third-Party Defendant Donnelly*

**CERTIFICATE OF SERVICE**

☒ I hereby certify that on March 24, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| Name | Email Address |
|---|---|
| Christian Genetski, Esq.<br>Scott Jeremy Stein, Esq.<br>Shane McGee, Esq. | cgenetski@sonnenschein.com<br>sstein@sonnenschein.com<br>wanderson@sonnenschein.com<br>smcgee@sonnenschein.com |
| | |

☐ I hereby certify that on ___________________, I served the attached document by FIRST CLASS MAIL on the following, who are not registered participants of the CM/ECF System:

| Name | Physical or Email Address |
|---|---|
| | |

s/ Lance C. Venable