# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| MDY INDUSTRIES, LLC,, | ) |
| | ) |
| Plaintiff and | ) |
| Counter-Claim Defendant, | ) |
| | ) **CIV06-02555-PHX-DGC** |
| vs. | ) Phoenix, Arizona |
| | ) June 26, 2008 |
| BLIZZARD ENTERTAINMENT, INC., | ) 2:58 p.m. |
| and VIVENDI GAMES, INC., | ) |
| | ) |
| Defendants and | ) |
| Counter-Claim Plaintiffs | ) |
| | ) |
| BLIZZARD ENTERTAINMENT, INC., and | ) |
| VIVENDI GAMES, INC. | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| MICHAEL DONNELLY, | ) |
| | ) |
| Third-Party Defendant. | ) |

**BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                      **A P P E A R A N C E S**

3

**For the Plaintiff/Counter Defendant MDY Industries**
4   **and Third-Party Defendant Michael Donnelly:**

5              VENABLE, CAMPILLO, LOGAN & MEANEY, PC
             By:  **Joseph R. Meaney, Esq.**
6                   **Lance C. Venable, Esq.**
             1938 E. Osborn Road
7              Phoenix, AZ  885016

8   **For the Defendant/Third-Party Plaintiff Blizzard Entertainment:**

9              Sonnenschein, Nath & Rosenthal, LLP.
             By:  **Christian S. Genetski, Esq.**
10                  **Shane M. McGee, Esq.**
             1301 K St. NW
11             Suite 600 East Tower
             Washington, DC  20009

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                P R O C E E D I N G S

2          (Called to the order of court at 2:58 p.m.)

3               THE CLERK:  Civil case 06-2555.   MDY Industries, LLC

4     v. Blizzard Entertainment, Incorporated, and others.  This is

5     the time set for motion hearing.

6               Counsel, please announce your presence for the record.

7               MR. VENABLE:  Your Honor, Lance Venable for the

8     plaintiff MDY Industries, LLC and Third-Party Defendant Michael

9     Donnelly.

10               THE COURT:  All right.  Good afternoon.

11               MR. GENETSKI:  Good afternoon, Your Honor.  Christian

12     Genetski on behalf of Blizzard Entertainment, Vivendi Games,

13     and I'm joined by my colleague Shane Mc Gee, also from

14     Sonnenschein, and Rod Rigole, Senior Counsel at Blizzard.

15               THE COURT:  All right.  Good afternoon.

16               Okay.  Our purpose this afternoon is for oral argument

17     on the various motions for summary judgment that have been

18     filed.  I have read the briefs.  I have read many of the cases.

19     I have read the statutes.  I have looked at portions of the

20     record, so I understand the issues in the case and you don't

21     need to repeat basic arguments.

22               I do want to start with a couple questions before I

23     actually hear your arguments, because they may affect my

24     thinking as we go through these issues.  I want to start with

25     you, Mr. Genetski, with a question.

1          Blizzard clearly argues in this case that a copyright

2     violation occurs when game client software is copied from the

3     users' hard drive to RAM.

4          Do you also contend that a copyright violation occurs

5     because software from the server at Blizzard is copied to the

6     user's RAM?  Or is your claim limited to the software that's on

7     the game client disk?

8          MR. GENETSKI:  Yes, Your Honor.

9          Your Honor, the -- our claim is limited to the

10    software -- the copying of the software on the client with a

11    caveat, which is the software that's resident on the client,

12    the protected code on the client, is when it is connected to

13    the game servers, Blizzard's proprietary game servers, and

14    interacts with that code.  That interaction in the server

15    environment, in the online environment, displays -- enables the

16    display of the expressive elements of the copyrighted code, but

17    that code does -- is loaded into RAM from the client.  And it's

18    the code loaded into RAM from the client, in conjunction and

19    interaction with the server code, that forms the basis for our

20    copyright infringement claim.

21          THE COURT:  So you are not contending that there is

22    code on the server that is copied to RAM in violation of the

23    Copyright Act?

24          MR. GENETSKI:  Not my users of Glider.

25          THE COURT:  Okay.  You said something a moment ago

1    that you said in your brief, which is when the code on the

2    user's computer interacts with the server at Blizzard -- I

3    can't remember the word that you used -- "expressive."

4          MR. GENETSKI:  Yes, Your Honor.

5          THE COURT:  Something expressive.  What's the phrase

6    you've used?

7          MR. GENETSKI:  "Nonliteral elements" is another phrase

8    we've used that comes from the case law.  The --

9          THE COURT:  Give me an example of an expressive

10   nonliteral element.

11         MR. GENETSKI:  The display screen, the way that the

12   character -- the art, the different characters in the game is

13   displayed, the display that show user chat windows, if you are

14   communicating online with people during the game, the screen

15   that shows the amount of loot that your character has collected

16   during that session.

17         All of the graphical display, the music, the

18   multimedia, the sound, all those things can only be experienced

19   in the online environment.  You have to run the client code and

20   connect to the servers to be able to see those graphical

21   displays.

22         This might be an opportune time to mention to Your

23   Honor, we have brought today a four-minute video of -- it's

24   sort of an introduction to World of Warcraft.  It just shows

25   with no sound -- just shows what it looks like when it is

1    displayed on the screen.

2           We also have a short four-minute video, out of

3    fairness of MDY's Glider program, running in World of Warcraft

4    also that we have discussed with Mr. Venable about using as a

5    demonstrative exhibit -- and I understand he has no

6    objection -- we defer to the Court, if it would be helpful just

7    to your question:  What am I talking about --

8           THE COURT:  You didn't provide that explanation in the

9    brief, so I wasn't sure what you meant when you referred to

10   nonliteral expressive elements.

11          But I want to come back and be clear.  When -- so you

12   are saying the copyright infringement, that is, the copying in

13   violation of Section 106, is simply the copying of code from

14   the game client to RAM?

15          MR. GENETSKI:  Yes, Your Honor.

16          THE COURT:  Is there an additional copyright violation

17   you are asserting in that these expressive elements are somehow

18   misappropriated by MDY?

19          MR. GENETSKI:  They are -- those elements -- the

20   reason to draw the distinction between the code that's resident

21   on the client and that code when it is loaded into RAM in

22   connection with the server, when the user is connected to the

23   server, is that MDY has made an issue in the case of the

24   ability to cut and paste the code into Notepad or another

25   program, regular program you have, and have said in the context

1    of the DMCA claims, it doesn't prevent all copying of that

2    code.

3            And our position is that the important copying, what's

4    protected by our copyright, are the nonliteral elements, these

5    expressive graphic display elements of the code which is

6    resident on the client.  But when it interacts with the server,

7    that's the only context in which that content is displayed.

8            Our claim is limited to infringement when a user

9    without authorization in excess of his authorized right to load

10   the copy into RAM under our license loads that -- pardon me --

11   loads that content into RAM in connection with the server.

12           THE COURT:  You just said that the expressive elements

13   are resident on the client, correct?

14           MR. GENETSKI:  The code that enables them to be

15   displayed is resident on the client, but by necessity, must

16   interact with the server code to be displayed.

17           THE COURT:  So we're just talking about the code,

18   right?  That's the copyright violation is the copying of the

19   code from the game client to RAM?

20           MR. GENETSKI:  Yes, Your Honor, from the game client

21   to RAM, yes.

22           THE COURT:  Okay.  Thank you.

23           Mr. Venable, did you want to say anything on this

24   issue before we talk about other general matters?

25           MR. VENABLE:  Yes, Your Honor, just briefly.

1          I think what Mr. Genetski is confusing here is the

2    issue of the difference between the code and what can be loaded

3    into RAM and viewed with whether or not World of Warcraft is

4    active or not.

5          The code that is on the software -- the code that is

6    on the hard drive can be loaded into RAM using Notepad viewer.

7    It can be loaded using a picture viewer.  Use of these things

8    that he's referring to, these expressive elements that he is

9    referring to, can all be viewed independently of World of

10   Warcraft.  You don't need to actually log onto the server to

11   see these.

12         Admittedly, you do need to log onto the server to use

13   them in the concept of playing the game, but unfortunately

14   there is no case law to support -- I should say, fortunately

15   for us, there is no case law to support the concept of taking

16   something that's a protected element on the hard drive and

17   saying that, well, it's only -- it's only accessible because of

18   this access that they require to be able to use it within the

19   concept of the game.  That's functional.

20         And the functional elements of playing the game within

21   the ability to see these things that he's referring to is just

22   not protected under Section 106 of the Copyright Act, Your

23   Honor.

24         THE COURT:  Okay.  We will come to that on the DMCA

25   claim.

1          Let me ask you one other question, Mr. Genetski.  Are

2    there World of Warcraft players today in the world that are

3    operating under the two older versions of the EULA?  Or is

4    everybody effectively today operating under Exhibit 21, the

5    2007 version of the EULA?

6          MR. GENETSKI:  Everyone currently playing the game is

7    operating -- if they have logged on since that new EULA was

8    updated, they're playing under the new EULA.

9          THE COURT:  Then that's the only EULA at issue in this

10   case, isn't it?

11         MR. GENETSKI:  That would be our position, yes, Your

12   Honor.

13         THE COURT:  Is the same true of the TOU?  Anybody who

14   is using the game today is under the most recent version of the

15   TOU?

16         MR. GENETSKI:  Yes, Your Honor.

17         THE COURT:  Okay.  Thank you.  Mr. Venable, do you

18   disagree with that?

19         MR. VENABLE:  I'm sorry, Your Honor?

20         THE COURT:  The question that I put to him was whether

21   there are users of World of Warcraft anywhere in the world

22   today who are using it under the two older versions of EULA.

23   And his answer was no.  Everybody who is using it today is

24   using it under the current version of EULA, which would be the

25   2007 revision.

 1          And then I asked him, well, then that's the only EULA

 2     issue in this case, and he agreed with that.

 3          What's your view on that issue?

 4          MR. VENABLE:  Well, it is in terms of whether or not

 5     someone is in breach of an agreement today, but there are

 6     issues that we have raised in our briefs regarding what

 7     Mr. Donnelly understood at a certain time.

 8          THE COURT:  Right.  I understand for the tortious

 9     interference claim you're saying it wasn't intentional or

10     improper when he started because it wasn't prohibited.

11          MR. VENABLE:  Right.

12          THE COURT:  But you agree that the people who are

13     operating World of Warcraft today are under the current EULA

14     and the current TOU?

15          MR. VENABLE:  Yes.  We have no objection to that, Your

16     Honor.

17          THE COURT:  Okay.  All right.  Okay.  That answers the

18     two questions that I wanted to focus on, so Mr. Venable, why

19     don't I let you take 15 minutes or 20 minutes and address the

20     matters you think need to be addressed, and then I will let

21     Mr. Genetski respond, and then we will decide where to go from

22     there.

23          MR. VENABLE:  Thank you, Your Honor.

24          Your Honor, I understand that since you have a -- read

25     the briefs significantly, I won't try to delve too deep into

1    things that I believe are a waste of this Court's time.  But I

2    do want to start off by addressing what has not been

3    properly -- or I should say what has not been responded to from

4    us on the issue of Section 117, because technically, the

5    amicuses had the opportunity to speak.

6        We would like to raise a couple of points that I think

7    are imperative to be able to show why this case can be

8    dismissed at this point or grant our motion for summary

9    judgment and deny Blizzard's.

10       As the Court may be aware, Your Honor, Section 117 of

11   the Copyright Act grants the owner of the copy -- of the copy

12   of the code to make a copy of the code, as long as the copy in

13   question is an essential step to using the software.

14       And I believe that clearly Congress enacted this

15   exception for a reason, and that reason was to prevent the

16   copyright owner from suing the owner for copyright infringement

17   just for using the very program that he or she owns; for

18   example, as a result of a retail sale.

19       Blizzard's sole basis for its copyright infringement

20   claims against MDY are derived from this issue of whether or

21   not the copy is made from the point it is -- Blizzard's

22   software is residing on the user's hard drive and taking it

23   into RAM.  And that's it.

24       If there is no copyright infringement that is

25   occurring as a result of that action, then there can be no

1   direct infringement by the user of the World of Warcraft

2   software.  And, of course, if there is no direct infringement,

3   there can be no vicarious or contributory infringement either,

4   which means my client has no liability under the copyright

5   statutes.

6          And Blizzard cannot dispute the fact that when I walk

7   into Best Buy, for instance, and I walk into Best Buy and I

8   pick up this box off of the shelf, which I believe goes for

9   $39.99.  I go up to the cash register.  I pay for it.  I walk

10   out of the store.  I have a receipt that shows I am the owner

11   of this box that contains several disks which contain the code

12   that they claim is protected under the copyright law.  And we

13   don't dispute the fact that this code is, in fact, protected

14   under the copyright law.

15          I could take this box and as I'm walking out of the

16   Best Buy, if someone was walking into the Best Buy and said

17   that they were interested in going to buy this box to play

18   World of Warcraft at home, I could sell them my box of World of

19   Warcraft software.  I could sell them to it for whatever price

20   I choose to sell it for and there is nothing that Best Buy or

21   Blizzard or any other person can do to stop me.

22          I don't purchase that software under any restrictions

23   from Best Buy.  In fact, I don't really purchase that software

24   under any restrictions from Blizzard.

25          So the only question is whether Blizzard's customers

1    become owners of these copies despite Blizzard including a

2    license agreement that somehow restricts how long it can be

3    played after I have loaded that software onto my computer.

4            But prior to the time I have loaded that software onto

5    the computer, there's no doubt, Your Honor, that I'm an owner

6    of that package.

7            And this is, I think, really the heart of the question

8    under 117, is that when I go in and do this -- when I take --

9    when I do this transaction with, you know, a retail

10   establishment such as Best Buy, am I not an owner?

11           What am I at that point?  In fact the question is

12   really is Best Buy the owner of the software when they sold it

13   to me?

14           THE COURT:  Well, let me interrupt you on that for a

15   minute, Mr. Venable.

16           MR. VENABLE:  Yes.

17           THE COURT:  When the Sheriff's Department in the *Wall*

18   *Data* case purchased their disks and had them in hand before

19   they loaded it, they're in the same position you are in your

20   hypothetical walking out of Best Buy, right?

21           MR. VENABLE:  Well, there is a slight difference

22   there, Your Honor?  The *Wall Data* case did not involve the

23   retail sale of a single purchase of a --

24           THE COURT:  Right.

25           MR. VENABLE:  -- of a piece of software.  *Wall Data*,

there was several thousand copies that were purchased, and it

was at that time, I believe, the License Agreement that was in

place was actually negotiated between them and the *Wall Data* to

be able to get a discount, and there were all sorts of things.

So when we do this with *Wall Data*, this is not your --

this is not really classified as a typical retail sale.

Certainly, a person who walks into Best Buy expects

that they would be the owner of this software, at least the

copy of the software; not the copyright, but just the software

itself, the disks.  And so I think that's how we would

distinguish ourselves from the *Wall Data* case.

THE COURT:  Well, in *Wall Data* the Ninth Circuit said

that the two factors the courts must consider in deciding

whether you own the rights to the software when you walk out of

Best Buy is whether the copyright owner, Blizzard --

MR. VENABLE:  Yes.

THE COURT:  -- has made it clear that it's granting

only a license to you, number one; and number two, whether it

places significant restrictions on your use or transfer of it.

Isn't that the test I have to apply in deciding

whether, in fact, you are -- or a user is an owner under 117?

MR. VENABLE:  Well, actually, Your Honor, this sort of

leads me into my next point, because the Western District of

Washington just in the last couple of weeks has come out on

this issue.

 1          THE COURT:  Is this *Verner*?

 2          MR. VENABLE:  This is the *Verner* case.

 3          THE COURT:  I have read *Verner*.

 4          MR. VENABLE:  Okay.  And what *Verner* says,

 5  essentially, is that when looking at these cases, there's a

 6  trio of cases, the *MAI* case, the *Triad* case, and the *Wall Data*

 7  case, is that those cases cannot be reconciled in view of the

 8  *Wyse* case which discusses this issue about what really is the

 9  main issue when deciding whether or not there's been a -- you

10  know, a first sale.

11          And the main issue is whether or not -- I should say

12  the primary issue that the Court discussed there -- was whether

13  or not the user, the purchaser of the software, the owner --

14  the quote-unquote owner of the software -- is allowed to

15  basically keep these copies for as long as they wish.

16          And certainly, when I walk out of Best Buy, I expect I

17  can hold these disks as long as I want.  I don't even have to

18  load them onto my computer if I don't want to load them on my

19  computer.  But I certainly would be able to get these disks as

20  long as I want.  That was the critical issue.

21          THE COURT:  Well, here's -- yes, and I understand

22  that, and I read Judge Jones' opinion with interest in *Verner*.

23          Here is what I wrestle with on that, so that you can

24  address it.

25          In *Verner*, Judge Jones was interpreting the word

"owner" under Section 109 and the First Sale Doctrine.

MR. VENABLE:  Yes.

THE COURT:  And he was looking at, *Wyse*, which was a first-sale case, and asking whether the *MAI* trio under Section 117 should, in effect, overrule them.  And he said I have -- they are essentially indistinguishable.  I have to look at the older case *Wyse*.

I'm in a different position.  I'm being asked in this case to apply 117.  And the Ninth Circuit has specifically held in *MAI* and *Wall Data* that under 117, I use the *Wall Data* test.

It seems to me if I were to go Judge Jones' route, I would be doing it in direct contravention to Ninth Circuit authority, whether or not I agree that *Wall Data* is the correct test.

MR. VENABLE:  But the difference, Your Honor, is that in the *MAI* trio, *Triad*, *MAI*, *Wall Data*, none of those cases were the case where I walk -- I can walk into a retail establishment, purchase a piece of software, like I can here.  None of those cases involve that.  All of those cases involve either a negotiated license or something where the person purchased hardware that contained software within it.

In other words, what I bought with MAI or what I bought with Wall Data or what I bought with Triad was the license itself.  I'm not doing that in the case here with Blizzard's -- with Blizzard's software.  And I think that

1   what -- I think what also in the *Verner* case is very important

2   to note is that the judge said that you cannot simply look at

3   whether or not something is a sale and say that you're an owner

4   for 109, but you can't be an owner for 117.

5          You are either an owner or you're not.  There is no

6   in-between.  And I think that the risk is that if we take

7   the -- you know, we're not asking you to overturn *MAI*.  We're

8   not asking you to overturn *Wall Data*.  Those cases are easily

9   distinguishable, because they were not involving the sale.

10          I mean, I think if you take the approach that someone

11  is not an owner of software when they go into a Best Buy and

12  purchase it, I think it could have very detrimental effects on

13  what software creators can allow you to do once you purchase

14  that software.

15          But there's no doubt, Your Honor, that at the point

16  where I walk in and I buy this box that contains the code,

17  these disks, I certainly own it.  Blizzard doesn't restrict my

18  ability to own it.  So the only way that they can get to the

19  issue of whether or not I'm no longer an owner is to say that

20  well, when you turn this computer on and install the

21  software -- which by the way under their License Agreement they

22  give you the right to do -- in fact, the two things that

23  Blizzard grants you under their End-User License Agreement are

24  only two things.

25          They grant you the right to install it on as many

1    copies as you own of -- I'm sorry, as many computers as you own

2    in your possession so that you can play World of Warcraft on

3    three or four different computers in your house if you so

4    choose.  And the other thing is the right to use the software.

5           So even within their own license, they grant you the

6    right to be able to put it on the computer and at a minimum be

7    able to load it into RAM to be able to access this license that

8    comes up and then says to you, Now you must agree to all these

9    terms.

10          But what you are really agreeing to is not the

11   issue -- is not a question of ownership.  They're asking you to

12   agree to these terms so that you can then access their server

13   and then play the game and then load the code from the hard

14   disk into RAM.

15          So then what they are essentially doing is they're

16   reaching back and they're saying, Well now you were an owner of

17   this software, but now you are no longer an owner because you

18   are agreeing to these new terms.  But that's not the way that

19   117 works.  117 says that you are an owner at that point.

20   Congress has given you this exception to the normal rule of

21   whether or not something is a copy or not.

22          And I believe that the intended purpose of this is for

23   this very reason.  You can't just simply say that you're an

24   owner for one reason and then you're not under certain

25   circumstances.

1            And that by allowing you to be able to purchase the

2     software and then say, Now I'm no longer an owner -- and by the

3     way, there's nothing in their License Agreement that says that

4     here is an explicit waiver of Section 117(A) that maybe you

5     were an owner, now you're no longer an owner; or now you no

6     longer have the right to load this program into RAM unless you

7     do certain things, play the game a certain way.

8            But the issue of whether or not you can play the game

9     a certain way, Your Honor, those are all rights that are

10    granted under contract law.  They are not granted under the

11    copyright laws.

12           Copyright law is a minimalistic statute.  It grants

13    five specific rights; copying, derivative works, public

14    display, all those things.  But the copy that the -- the

15    copyright law grants you under 106, doesn't count under 117

16    when it's this loading into RAM if it's an essential step and

17    you're an owner.

18           THE COURT:  Mr. Venable, what if, instead of going to

19    Best Buy and buying the box, you buy it online directly from

20    Blizzard and download it to your computer?

21           MR. VENABLE:  It still would not matter, Your Honor,

22    because I'm still getting the same software.  I still own -- I

23    would still be in full possession of the software.  I would

24    have it -- and the fact that I think even *Wyse* addressed this

25    issue directly, that just because you don't have to pay for it,

1    that, you know, you pay value for it, doesn't mean that you are

2    still not an owner of it.

3           THE COURT:  What if Blizzard said before you pushed

4    "yes" to download it, you're agreeing that you're only getting

5    a license?

6           MR. VENABLE:  Well, it still doesn't matter, Your

7    Honor, because the license that they are giving you is a right

8    to play the game under certain circumstances.  It's not the

9    right to make copies into RAM.  They have implicitly granted

10   you that right even within their license.

11          THE COURT:  So what you are arguing is that retail

12   marketers of software are always under 117?  There is no --

13          MR. VENABLE:  At a minimal.

14          THE COURT:  -- there's no way of getting around it?

15          MR. VENABLE:  I don't see any way that you could

16   possibly do it that when you go to buy a single copy, if you

17   are purchasing that software with no restrictions, I don't see

18   how you could not be.  And the other thing is we don't

19   necessarily have to say this is specifically tailored to

20   retail.

21          I'm sure you probably read the *Krause* case.  And the

22   *Krause* case, although it's a Second Circuit of New York --

23   Second Circuit Court of Appeals case, it is one of the leading

24   cases that addresses this very issue about what factors in this

25   License Agreement itself constitute granting the right of

1    ownership.

2            And, you know, when you look at all the five factors

3    in the *Krause* case, every single one of them, when you look at

4    the Blizzard license, all of them -- and this was discussed

5    very extensively in the amicus brief -- but every single one of

6    those factors align in favor of MDY to show that what they

7    really are doing is just, in fact, giving you the software.

8    They don't ask you to return it, which is key.  That's a very

9    key fact.

10           They even say that you can -- you know, it says here

11   are the five factors.

12           You can purchase a single copy for a single price.

13   That's a factor in favor of ownership.

14           Does the purchase of that copy limit the right to

15   possess the copy for an unlimited time?  Well, yes.  You

16   don't -- you can hold onto your software for an unlimited

17   sometime.

18           Does the user have the right to discard or destroy the

19   copies as you wish?  Well, yes, I can take these disks when I

20   walk out of Best Buy and break them if I want.  I can throw

21   them away.  I can cut them in half.  There is nothing that

22   Blizzard or anyone else can do to stop me from doing that.  And

23   those are the disks that contain code.

24           Is the program stored on the users hardware?  Yes, it

25   is.  That favors ownership.

1          And are there severe restrictions on resale or other

2     use?  Blizzard themself, even in their License Agreement, says

3     I can take the software I bought or download it, by the way,

4     and I can transfer the rights to the new person that I want to

5     give it to, as long as I destroy all the copies that I had

6     before.

7          But that's no different, Your Honor than if you went

8     to the store and bought Microsoft Word.  You put Microsoft Word

9     on your computer.  I certainly could not, nor are we advocating

10    that we could, take Blizzard's software and make copies on

11    computers that I don't own so that my friends could use it.

12    Although I don't really think they would mind that because you

13    can download these programs for free.

14         But if I had Microsoft Word, if I took Microsoft Word

15    and made a second copy without destroying the copy on my hard

16    drive, then now I have made an unauthorized copy under 106.

17    That's not allowable.  But all five of these factors are

18    discussed in the *Krause* case and they go directly at, okay, so

19    you give me a license, but the question is --

20         THE COURT:  I understand that.

21         MR. VENABLE:  -- but you have to look to the license.

22         THE COURT:  All right.

23         MR. VENABLE:  Okay.  Your Honor, even if the Court

24    doesn't find that Section 117 applies to this case, Blizzard

25    still can't create a cause of action for copyright infringement

1    merely by having its customers breach a term in its agreement

2    that has no relevance to copyright law, because this is a key

3    factor.   There are no -- there are no disputed facts in this

4    case that the reason why Blizzard says that they can sue

5    Mr. Donnelly and his company for copyright infringement is

6    because they say that this license is sort of a big condition

7    precedent.   And if you don't agree to it when you load this

8    program into RAM, you are making a copy that's not authorized.

9            Well, if under 117 that doesn't apply, the question

10   still is what term of the agreement did I actually breach?   If

11   I breached the agreement saying that I agreed to not use

12   third-party programs, but then I use this third-party program

13   that Blizzard doesn't like, well I have breached their

14   contract, yes, but I have not breached any act or any right

15   under 106.

16           THE COURT:  Let me give you a hypothetical,

17   Mr. Venable.

18           MR. VENABLE:  Sure.

19           THE COURT:  Let's assume I sell you some software with

20   the agreement that you're going to pay me $10 a month for the

21   license to use it.

22           MR. VENABLE:  Yes.

23           THE COURT:  You pay me this month in July and August

24   and then you stop paying.

25           MR. VENABLE:  Yes.

1          THE COURT:  You don't pay me anymore and you don't do

2     anything with the software until next March.  Next March you

3     load it on the computer and copy it to RAM.

4          Copyright violation?

5          MR. VENABLE:  Yes, it is, Your Honor.

6          THE COURT:  But in that hypothetical, the act that

7     constituted the breach, which was nonpayment, is different from

8     the act that constitutes the copyright violation, which is

9     copying to RAM.  And it seems to me you're arguing they can't

10    be different.  They have to be one in the same.

11         MR. VENABLE:  No.  But there are several cases out

12    there that address the issue of whether or not you stop making

13    payments for something, because then you are then outside the

14    scope of the license.

15         THE COURT:  Exactly.  So what they are arguing is if

16    you breach the contract --

17         MR. VENABLE:  Yes.

18         THE COURT:  -- by using a third-party product such as

19    Glider, you've breached the contract just like you do when you

20    don't pay.  You are now outside the scope of the license.  And

21    when you load it to RAM, you make a copy in violation of

22    Section 106.

23         MR. VENABLE:  But the case law is different on the

24    issue of payment versus the issue of what they are talking

25    about.  The *Storage Tech* case is a classic case that discusses

1    this, Your Honor.  There is a quote in *Storage Tech*.

2              THE COURT:  And I have read *Storage Tech*.

3              MR. VENABLE:  Okay.

4              THE COURT:  And again, the reason I'm sort of pushing

5    you on this is because *Storage Tech* to me is unremarkable.

6    What *Storage Tech* says is if you do something to get outside

7    the license, you're not liable for copyright infringement

8    unless you infringe, unless you engage in an action that's

9    infringing.

10             But I don't see *Storage Tech* saying that the act of

11   infringement has to be the same act that gets you outside the

12   scope of the license, which is really what you are arguing.

13             MR. VENABLE:  Well, in this case, Your Honor, I think

14   we can distinguish it for one very important fact.  What we pay

15   for -- with Blizzard's -- with Blizzard's -- to play Blizzard's

16   game, you pay a $15-a-month fee to be able to play the game.

17             Okay ?  What Blizzard says in its contract is they are

18   giving you the right to use the game.  If you are loading the

19   software into RAM, you are technically not using -- you're not

20   playing the game yet.  Okay?

21             So when I stop paying my $15, I'm sure what happens on

22   Blizzard's end is somebody in their Accounting Department says,

23   Well, this person is no longer authorized to play this game.

24   And if I tried to log in, I couldn't play the game.  So

25   technically, I would only be violating Blizzard's agreement, if

in fact, I was playing the game, despite the fact that I was

not paying $15 a month.

I think Blizzard has already addressed this very issue

in the case that they dealt with a couple of years ago, the *B*

*Net D Davidson* case in the Eighth Circuit where somebody was

taking a copy of Blizzard's software and actually playing the

game on a server that was not connected to Blizzard.  And

they -- that's exactly what they were doing, which was clearly

a copyright infringement.

This was something that was not only outside the scope

of the agreement, but it was clearly an infringement, because

they were not allowed to do that.  Not paying the $15 according

to Blizzard's license doesn't say that I'm an infringer, even

if I load the program into RAM.  What we are paying $15 for is

the right to be able to play the game.  In fact, I think

Mr. Genetski even said that earlier.

THE COURT:  Well, I understand that, but they're not

claiming that the $15 is -- or the failure to pay the $15 is

what gets you outside the scope of the license.  They're saying

it's when you use Glider, you are now using this program in a

way they haven't authorized.  It's outside the scope of the

license.  And once you're outside the scope of the license, as

soon as you copy to RAM, you are copying in violation of

Section 106, because you're not licensed to do it.

MR. VENABLE:  But what the license also says, Your

1    Honor, is that they have granted us the right to install it and

2    the right to use it.  The right to copy it is subject to the

3    right to use.  That's right in their agreement.  I can point

4    that out to you.  I believe it's section IVA of their End User

5    License Agreement.  So this whole question of whether or not

6    when I load it into RAM I'm making a copy, well, that's not

7    really a violation of what I'm licensed to do.  That's a breach

8    of the agreement.  I'm not making a copy under the copyright

9    law that would infringe the copyright law.

10           At worst, I have just breached their agreement.  I am

11   still licensed to use the software.  In fact, I'm still

12   licensed to use the software until they terminate the software.

13           THE COURT:  Without Glider.

14           I mean, their point would be if you're using it

15   without Glider, you're certainly authorized to make copies.

16   They've given you a license.

17           But once you start using Glider, you step outside the

18   area they've authorized the use for.  And when you make a copy

19   outside of that area, it's not authorized.  And under *MAI*, it's

20   a copy and, therefore, an infringement.

21           Isn't that their argument?

22           MR. VENABLE:  Well, yeah, that's exactly it.  And I

23   think if you look at the other things, virtually anything that

24   you do within this Agreement, because that's their

25   interpretation of their agreement, is that if you do anything,

1   anything whatsoever, that violates one term of their agreement,

2   you want to call your character Michael Vick, well, you are not

3   Michael Vick.  That's a violation of the agreement, now you're

4   a copyright infringer.

5           You want to do -- and then they also use terms like

6   "doing anything that Blizzard considers contrary to the essence

7   of the game."

8           Well, I wouldn't even know what that is, quite

9   frankly.  I don't know what Blizzard considers contrary to the

10  essence of the game unless I sat down and talked with them

11  about it.  If I provided a false address to them, I'm now

12  violating the contract and I'm a copyright infringer.

13          There are ways that you have to do to control your --

14  what they are trying to do essentially, Your Honor, is they are

15  trying to extend the rights under copyright law through their

16  contract.  They are trying to say that, Well, we really can't

17  control what Mr. Donnelly is doing, so here is the way we will

18  do it.

19          We will just simply say that if he does this, well,

20  it's a violation of the contract.  Now everybody who uses this

21  software is a copyright infringer.  Image for a second, Your

22  Honor, that if Ford Motor Company was selling automobiles.

23  And, of course, they have software embedded within their

24  ignition system, let's say.  And they put a contract on the

25  front of the car saying:

1          If you buy this automobile and you want to drive it

2     around, that's fine.  However, you cannot replace any of the

3     parts on this car with NAPA auto parts.

4          If you do, you are now outside the scope of your

5     license to be able to drive this car.  And  when you load that

6     ignition software into RAM, oh, my goodness, you are a

7     copyright infringer.  You have loaded something and now you

8     don't have the right to load that software into RAM.  So they

9     can --

10         If you give Blizzard the ability to do this, any

11    company in the world can put in a, you know, a piece of

12    software on their machine, put in some artful contract language

13    and say, here, you know what, if you don't like what we're

14    doing we can sue you for copyright infringement.

15         That's not what Congress intended, Your Honor.  What

16    Congress intended was to grant the author of his work a limited

17    right to be able to protect it from being copied, from making

18    derivative works, so that it can't be exploited.

19         What Blizzard is trying to do is trying to use this

20    copyright as sort of a punitive measure to be able to try to

21    take out anybody who plays the game in a manner that they don't

22    want it to be played, in a manner that they find is

23    unacceptable.  And, you know what, they have every right to

24    control how they want to play their game, they just can't use

25    copyright to do it.

```
 1              THE COURT:  All right.  I understand that argument,

 2    Mr. Venable.  You have used a little over 20 minutes.  Were

 3    there any other matters you wanted to touch upon?

 4              MR. VENABLE:  Your Honor, the only other -- well,

 5    yeah, there were a couple of other matters I wanted to -- I

 6    haven't even gotten to my DMCA or my tortious interference

 7    arguments.

 8              You know, I would just like to say that with regard to

 9    the copyright issue, one last matter is that even if you can

10    find that 117 doesn't apply and that there is a copyright

11    infringement under this scheme that Blizzard feels that it can

12    sue you for copyright infringement for, the fact remains is,

13    Your Honor, that under the Laser Cone case, this is still

14    copyright misuse.

15              Again, Congress cannot allow or does not allow people

16    to use copyrights to try to enforce -- to try to prevent some

17    third party from being able to use its software with what

18    Blizzard is doing.

19              You know, this is -- this goes far beyond what someone

20    can do with their copyrights.  They cannot tell a third party

21    that they cannot use something and say that it's all under the

22    guise of copyright law.  It's Draconian in terms of its ability

23    to deter what may be a very valid attempt to try to write

24    software and use it for third parties.

25              My client has expressed in his briefs that his
```

 1   software -- what started out to be used for Blizzard's World of

 2   Warcraft can be used now for many different things.  That's --

 3   I think that's basically what I wanted to say in terms of

 4   copyright.

 5        There's no set of facts, Your Honor, under the

 6   copyright law that you could find for Blizzard on this.  There

 7   has clearly not been a copyright infringement either under

 8   117 -- people that buy this software are clearly owners -- and

 9   there is certainly misuse of copyright if you believe that what

10   they can do is -- or what my client does is infringing.

11        With regard to the DMCA, Your Honor, very quickly, we

12   have briefed the *Chamberlain* case very extensively.  We have

13   basically said that no matter what -- no matter what Blizzard

14   is able to say in terms of their version of the facts, that the

15   Scan.dll and this Warden program, they are just simply not

16   effective measures at being able to control access to what

17   Mr. Genetski said earlier this afternoon that what is really

18   protected is the code.

19        Warden and Scan.dll are machine -- or software schemes

20   to be able to detect third-party software like Mr. Donnelly's

21   program.  They are not designed to protect the actual loading

22   of the copyrighted code into RAM.  It's not disputed by the

23   people that we have deposed at Blizzard that despite the fact

24   that Warden runs or despite the fact that Scan.dll immediately

25   detects there is an unauthorized third-party software program,

you are still able to load that software from the hard drive

into RAM using Notepad, using any number of code viewers.

　　　　And if you can load it into RAM, Your Honor, it's a

copy.  Just because it's not a copy when it's being played,

which is functional and not protected under the copyright law,

it is still loaded into RAM.

　　　　Therefore, despite the fact that Blizzard says that

they have some protected right to this code, these -- these

so-called access control measures are not only not effective,

they don't do what -- they're not even intended to do what they

say they do, which is to protect the code from being loaded

into RAM.

　　　　*Chamberlain* spells this out explicitly.  The DMCA,

Your Honor, and I think *Chamberlain* goes through this

explicitly too -- the history of the DMCA was there to protect

massive distribution of digitized works.

　　　　When I go to the store and I buy a DVD, Your Honor,

that DVD is encrypted.  I could not make a copy of it on my

computer.  I could not load it in and say, Here, I want to copy

this from the DVD to my hard drive because it's encrypted.

It's there because you don't want people to be able to get on

the Internet, put this DVD code on there, and then distribute

it massively through the Internet.

　　　　THE COURT:  Let me ask you a question on that,

Mr. Venable.

1        If I conclude that copying code from the game client

2   to RAM is copying for purposes of Section 106, isn't it true

3   that Warden stops a player from performing additional copies to

4   RAM after they're intercepted?

5        MR. VENABLE:  No, it does not.  All it can do is --

6   what Warden does is it detects the presence of, say, Glider.

7   It will notify Blizzard back at its servers, at its

8   headquarters, that there is an unauthorized third-party program

9   that has been found.

10        And then once that happens, either somebody from

11   Blizzard can notify the Accounting Department and say you can

12   no longer allow this person to play the game.  This has

13   happened many, many times, in fact, by the people at Blizzard.

14   It's been well-known, well-documented, and we don't deny the

15   fact that they have detected my client's software on many

16   occasions.

17        THE COURT:  Well, let me ask you this question.

18   Looking at 1201(b)(1)(A), in order for this portion of the Act

19   to apply, Warden must be a technological matter that

20   effectively protects a right of a copyright owner under this

21   title.

22        MR. VENABLE:  Yes.

23        THE COURT:  Where does it say that Warden itself has

24   to shut out the user as opposed to notifying Blizzard so they

25   can shut out the user?

1          MR. VENABLE:  No, Your Honor, but that's not what it

2   does.  What it does is it says that you can't play the game

3   anymore.  It will effectively lock you out of their server so

4   that you can't load the program into RAM to be able to play it.

5          It does not prevent you from being able to load the

6   actual code itself into RAM.

7          THE COURT:  I understand that.  But let's say it

8   catches you at level 19 and it prevents you from going to level

9   20.  Had you gone to level 20, additional code would have been

10  written to RAM, right?

11         MR. VENABLE:  No.  That's not my understanding of how

12  it works.  Everything that you have to be able to play the game

13  is already on your hard drive.

14         THE COURT:  On the hard drive.

15         But Blizzard has asserted that as you progress through

16  the game, additional code is written to RAM.  And my point is,

17  if Warden stops you in mid-game, then it prevents you from any

18  of that additional writing to RAM.

19         MR. VENABLE:  I don't believe that that's what

20  happens.

21         THE COURT:  All right.  Well, I will hear from

22  Mr. Genetski on that.  That has been their assertion.

23         MR. VENABLE:  Okay.  Well, my understanding is that is

24  not the case.

25         THE COURT:  So is it your view that everything in the

1   game client is written to RAM when you turn on the game?   There

2   is no additional call to the hard drive to write anything

3   further to RAM?

4           MR. VENABLE:   No.   My understanding is that what it

5   does is it goes out on the server and actually gets information

6   about your character, but it doesn't actually put any

7   additional software onto your computer.

8           Mr. Genetski has even said that earlier.   It's all on

9   your hard drive when you load it up.   What it does is that it

10  shuts out your access to the server and that's a key

11  distinction.

12          THE COURT:   I understand that distinction.   I just

13  understood Blizzard to say that when that happens, it prevents

14  further writing to RAM that would have occurred had you not

15  been shut out.   And it sounds like you disagree with that as a

16  factual matter.

17          MR. VENABLE:   I don't believe that is the case.

18          THE COURT:   Okay.   We're going to run out of time for

19  the arguments, so why don't you wrap up your points and then I

20  will hear from Mr. Genetski.

21          MR. VENABLE:   Okay.   Really quickly, Your Honor, we

22  have already discussed the DMCA.   I think the last major issue

23  I just wanted to hit really quickly was the issue of the

24  tortious interference, Your Honor.

25          And briefly, all of the facts that -- and I'm sure you

1    will hear a ton of things about -- from Mr. Genetski or

2    Mr. McGee about our client being the devil -- he's a horrific

3    guy.  He is interfering with Blizzard's ability to play the

4    game.  He is circumventing their detection schemes so that

5    makes him malicious in his attempt to try to, you know,

6    interfere with their contracts.

7         Your Honor, what is very clear here is that the State

8    of Arizona has adopted the Restatement.  The Restatement is

9    followed explicitly by the *Wagenseller* case.  And in the

10   *Wagenseller* case, your Honor, *Wagenseller* made it very clear,

11   and I would just like to read the quote really quick from

12   Wagenseller:

13        It is difficult to see anything defensible in a free

14   society in a rule that would impose liability on one who

15   honestly persuades another to alter a contractual relationship.

16        The question here is not whether there is any

17   alteration of the contractual relationship, Your Honor, because

18   that's not really the issue that we contest.

19        The issue here is that all the facts that they have

20   alleged deal with the bad behavior by the end-user regarding

21   the breach itself.

22        What *Wagenseller* says is that there is no tortious

23   interference when one honestly persuades somebody to breach a

24   contract.  And there is no set of facts that Blizzard can raise

25   that would show that what my client is doing, Your Honor, isn't

1    simply honestly persuading people to purchase his software.

2          He puts it up on the Internet passively.  He may

3    advertise through his affiliates.  He may use keyword searches

4    that draw people to him by using the word "cheat" or "bot" or

5    whatever.  And he even knows full well that maybe Blizzard

6    doesn't like what he is doing.

7          But what he has done, Your Honor, is that he has

8    notified on his Frequently Asked Questions sections that if you

9    buy his software, that Blizzard probably believes that it is a

10   violation of its term -- of the Terms Of Use of its agreement

11   and that you use this at your own risk.  And, in fact, you

12   might even be suspended over it.

13         He is just simply telling you, use it at your own

14   risk.  That is honest persuasion.  He is doing no more

15   advertising than I am through my firm's web site to draw people

16   to get me -- to use my services.

17         THE COURT:  I understand that point, Mr. Venable.

18         MR. VENABLE:  Okay.

19         THE COURT:  You had made that point in your brief as

20   well.

21         MR. VENABLE:  Okay.  And other than that, Your Honor,

22   again, we just don't believe there are any facts that they can

23   raise that would allow the summary judgment by Blizzard to be

24   granted, and I think ours should be granted.  No copyright

25   infringement.  No DMCA violation.  And certainly, no tortious

1    interference with contract.

2         THE COURT:  All right.  Thank you.  Mr. Genetski.

3         MR. GENETSKI:  Your Honor, I think -- again, the Court

4    is obviously very familiar with the briefs.  I would try to

5    jump in to the key points and for the sake of time like to

6    start with copyright and try not to cover ground that's already

7    been covered, but just to say that I think Your Honor in some

8    of the questions to Mr. Venable accurately captured our

9    position, that there's a two-part test here.  We're talking

10   only about the direct infringement of the Glider users.

11        I think that the law of the Ninth Circuit is clear

12   that there -- a copy into RAM from a hard drive into RAM of

13   software is a copy under Section 106.  The Ninth Circuit does

14   not distinguish -- and somehow much of MDY's briefing seems to

15   suggest -- make that somehow a lesser right or not entitled to

16   the same sorts of protections.  Copying into RAM is copying.

17        So when Blizzard License Agreement, you'll learn it's

18   TOU, expressly limit and condition a user's right to copy,

19   reproduce.  That right includes the right to copy into RAM.

20   We're granting a limited conditional license.  It says that the

21   "subject to" language that Mr. Venable pointed out we agree.

22        Subject to the conditions in this license, you may

23   make that copy into RAM.  If you exceed the scope of those

24   restrictions, you have forfeited your right to make that copy

25   into RAM.

1          And I think the case that's most on point for our set

2     of facts is the *Ticketmaster* case which is currently on appeal

3     to the Ninth Circuit.

4          And the reason I believe that that's very instructive

5     and were the Ninth Circuit to affirm that case, I believe it

6     would be close to a controlling authority on this set of facts,

7     because in *Ticketmaster* what you have is a web site that allows

8     you to download content.

9          If you go as a human being and enter and try to get

10    the best tickets and solve the caption yourself, you're

11    authorized to get the same exact content loaded into your RAM.

12         If, however, you use a bot which gives you the

13    advantage -- and the reason Ticketmaster doesn't want bots is

14    it gives you an advantage to move up in the queue and get the

15    best tickets.  So if you use a bot, you forfeited your

16    authorized access to make that copy in RAM.

17         And we feel that our case is very much the same for

18    many of the same reasons.  That Glider users running bots are

19    gaining advantages over other users to the detriment of those

20    users, to their frustration, and ultimately, to the detriment

21    of my client.

22         THE COURT:  Mr. Genetski, if I purchase a copy of

23    World of Warcraft and I sign on and use the name Michael Vick,

24    copyright violation?

25         MR. GENETSKI:  I do not think that would be a

1    copyright violation, Your Honor.

2         THE COURT:  Why?

3         MR. GENETSKI:  I do believe there are -- the limits go

4    to how you use the game client.  I believe that under the Ninth

5    Circuit -- *Nebula* is a district court case, but under the *LGS*

6    case and other cases -- there is a line here between a

7    condition and a covenant.

8         And we do believe that our -- all the provisions of

9    our EULA and TOU are enforceable.  But the provisions in

10   Sections 4 of the EULA and 4 of the TOU which speak to the

11   limitations on use -- and Mr. Venable has made a big

12   distinction between "use" and "copy" -- in this context and

13   part of my initial comments to you were to make the point that

14   that copying into RAM in connection with the server while you

15   are connected is the use.

16        The Ninth Circuit cases and *Nebula* speak of

17   limitations on how the work may be used, as opposed to

18   secondary restrictions that don't deal with use of the word.

19        THE COURT:  So you would say, if I understand you

20   correctly, that the EULA grants the license and says you can't

21   violate TOU or you're outside of the scope of what the license

22   really means.  You can't violate Section IV of the TOU or

23   you're outside of the license.

24        It doesn't mean if you violate Section V, you're

25   outside?

1          MR. GENETSKI:  In this case, the provisions that are

2     at issue are Section IV of the EULA and Section IV of the TOU.

3          THE COURT:  You do a lot of citing of Section V, too.

4          MR. GENETSKI:  I agree, Your Honor.  And obviously,

5     the primary provision in the TOU is the prohibition against

6     bots or cheats which there is no dispute of fact that summary

7     judgment that Mr -- that MDY's program is -- falls under that

8     provision.

9          We believe that any time you are running a program at

10    the same time that you are also loading WoW into RAM, at the

11    same time that you're making that copy, that that action is a

12    direct condition on how you may make that copy.

13         THE COURT:  How do I --

14         MR. GENETSKI:  I think it is clear in this case the

15    provisions that are issue are conditions.

16         THE COURT:  As I read these two contracts together,

17    how do I distinguish between the provisions that are a

18    limitation on the license and those that are merely affirmative

19    contract obligations?

20         MR. GENETSKI:  Your Honor, I think you have to again

21    look to these tests.  And I think *Nebula* is instructive in

22    saying that where -- it looked at two provisions; one the

23    number of users that could use the software, and the second,

24    what operating systems the software was authorized to be used

25    in conjunction with.

1          And I think applying that and defining the latter, the

2     operating system to be a condition, and therefore, grounds for

3     infringement and the former to be just a contract provision, I

4     believe that one line that can be drawn are activities that

5     take place "in game" versus activities that take place "out of

6     game."

7          So we, for instance, the Terms Of Use, say that you

8     cannot sell in the real world the -- an account or the

9     characters or goal that you have acquired in the game.

10         However, we know that there are, much to my client's

11    dismay, third-party web sites out there that allow people to do

12    this.  That would be a violation of the Terms Of Use, but it

13    would not be made in conjunction with loading a copy of our

14    game into RAM, as opposed to running a bot or a cheat, which is

15    done simultaneously with the loading into RAM.

16         And Your Honor is correct.  I just want to make sure

17    that I address the point that you raised about content,

18    continuing to load into RAM as you're connected to the servers.

19    New copyrighted content is moved from the hard drive into RAM

20    and I believe that's an undisputed fact in the Statement of

21    Facts.

22         THE COURT:  But it doesn't sound like it from the

23    hearing it today.

24         MR. GENETSKI:  I believe in the record it is

25    undisputed.  They might have had a change of heart.  But I

1    believe that the running of bot, which is happening

2    simultaneously and in conjunction, Glider is also running in

3    RAM.  It is interacting with the code of World of Warcraft

4    simultaneously.

5            And we would submit that that is not a close case;

6    that that falls clearly on the side of a condition that exceeds

7    the scope of the license.

8            THE COURT:  Let me ask you this question just to test

9    your line drawing.

10            Let's say you've got two boys on the block who are

11    avid World of Warcraft users.  Boy number A doesn't like the

12    progress that boy number B is making and so he, at an opportune

13    time, steals into that boy's bedroom and disables his computer.

14            When boy A goes back home and fires up World of

15    Warcraft, is he infringing the copyright?

16            Section IV of the TOU says you can't disrupt any other

17    player's use of the game.  He's just done it with respect to

18    boy B.  Is he now outside the scope of the license and guilty

19    of copyright violations?

20            MR. GENETSKI:  I would say no in that case, your

21    Honor.  He is not infringing because he's not committing a

22    violation in conjunction with his loading of the -- his copy

23    into RAM when he is playing.  He is playing consistent with the

24    license at that point.

25            He may have taken a -- engaged in mischief a half-hour

1     earlier at his friend's house which his friend may then report

2     him to an in-game GM, which may engender some penalty, but I

3     would not put that on the infringement side of the line.

4          THE COURT:  So he has to do the disrupting while he is

5     using the World of Warcraft software?

6          MR. GENETSKI:  I believe that's a fair interpretation

7     of *Nebula* and the Ninth Circuit's standard about provisions

8     that affect the manner of use, part and parcel of the license

9     itself.

10         Your Honor, I would like to close out copyright, make

11    sure I answer any questions the Court has on the amicus

12    argument under Section 117.

13         I would just note that the box that Mr. Venable

14    presented does have language on the side, I believe, that

15    indicates that use of the game is subject to a EULA and a Terms

16    Of Use.

17         It has a paper license in the box that indicates that

18    it's licensed software.  Certainly, it's undisputed fact that

19    the first time you loaded it up, you would be presented with

20    the EULA and Terms Of Use which could not be much more clear in

21    our view that Blizzard considers itself retaining ownership of

22    the software and expressly reserving all of its rights,

23    including the right to copy, which is the right to copy into

24    RAM, subject to the terms of the License Agreement.

25         I think Mr. Venable also fairly pointed out that you

1   can reject those terms and get a refund if you don't want to

2   ascribe to the license.

3          We agree with the statement the Court made that the

4   *MIA* and the *Wall Data* cases are controlling in the 117 context.

5   They fairly plainly state that 117 can be trumped by a License

6   Agreement and those cases post-dated Section 117.

7          THE COURT:  Do you agree that they're all negotiated

8   licenses as opposed to off-the-shelf licenses?

9          MR. GENETSKI:  I do agree that that would be the

10  distinction in those cases.  But I think the clear distinction

11  between them -- those cases -- that line of cases on the one

12  hand and the *Wyse* case and the *Verner* which, you know,

13  interprets *Wyse* as sort of being a free choice between *Wyse* and

14  *MAI* -- is that I understand *Verner's* argument that the

15  statutory language is similar.

16         But the rights of a first-sale doctrine versus the

17  right to copy are somewhat different.  And in this case, in our

18  EULA we've actually preserved the right, as Mr. Venable notes.

19  It incorporated the right of first-sale doctrine explicitly

20  into the license, which we have not done.  We have not

21  acknowledged that a user retains their 117 right in the

22  license.  In fact, we have said you may not copy this, except

23  as consistent with the license, and again, "copying" includes

24  copying into RAM.

25         I also believe that if you look at the factors that

1    *Verner* looks at, even if you were to set aside *MAI* and say we

2    take a free, fresh look, Your Honor is right that the test

3    would be whether the owner of the copyright has made clear that

4    it's subject to a license.

5              And again, there is language.  Bold.  All caps.

6    Repeatedly on the front page of the license which is in paper

7    and when you sign on saying it's a license and we're the owner.

8              But I also believe the key restrictions that the

9    courts have looked for when they have looked at these cases are

10   present in the Blizzard EULA and TOU.

11             First of all, I don't think it's a fair

12   characterization to say it's a one-time purchase and you get

13   the software.  To be able to use the software, you have to use

14   it for the way it was intended.  You have to be able to connect

15   the Blizzard server and you have to pay ongoing monthly

16   subscriptions.

17             Blizzard also expressly reserves the right to send out

18   updates to your software, periodically whenever they need to,

19   and you give them the right to make changes to your software

20   pursuant to the license.

21             And I also believe that Blizzard reserves the right to

22   at least constructively repossess the software when they say if

23   you want to forfeit your license, Blizzard can require you to

24   destroy all your copies, delete all your copies off your hard

25   drive.

1          They don't require you to return the box and the

2     CD-ROMs, but the value of the software they do require it to be

3     destroyed.  So I think that even if we are to treat it as an

4     open playing field, I think that the Blizzard license is much

5     more -- has much more of the terminology and the kind of terms

6     the courts look for to establish a license and is more in line

7     with some of the Adobe cases which are consumer software.

8     They're in the first-sale context, not the 117 context, but

9     they are consumer software cases.

10         And I think that it is fair to say that it's an

11    industry standard -- I know Mr. Venable said 117 should apply

12    in all cases of consumer software -- I think that would be big

13    news in the consumer software industry.

14         I think that the notion of shrink-wrap licenses and

15    click-through licenses, creating enforceable rights under

16    copyright is a well-accepted industry norm.

17         THE COURT:  Well, I don't think he was arguing,

18    Mr. Genetski, that they are unenforceable.  I think he was

19    saying that the shrink-wrap and click-through licenses can't,

20    in effect, undo what Congress did in Section 117.

21         MR. GENETSKI:  I understand that.  I believe there

22    would be some understanding in the industry that the copyright

23    rights would still attach through those EULAs.  That was my

24    point.

25         If I could, I'll move on quickly to the DMCA and I --

 1          THE COURT:  Before you do, I want to bring you back to

 2  the general copyright issue for a minute to make sure I

 3  understand your argument.

 4          It seems to me in the briefs you really argue about

 5  two different theories as to why the license doesn't authorize

 6  the copying to RAM when you are using Glider.

 7          One theory would be that if you use Glider, you are

 8  outside the terms of the granted license because you've only

 9  been granted a license to use it without a third-party

10  software.  And since you're outside and you make a copy, you

11  are guilty of copyright infringement.

12          A second argument is what I sort of think of as a

13  self-destructing license argument, which is if you use the

14  software with Glider, your license is immediately eliminated as

15  it says in Section IV of EULA.  And once that license

16  self-destructs, any copying you do is unlicensed, and

17  therefore, a copyright infringement.

18          Which of those two theories are you asserting in this

19  case in your argument that the copying is outside the scope of

20  the license?

21          MR. GENETSKI:  Well, I think, Your Honor, that we are

22  asserting both the theories.  I think the first one you

23  articulated is our primary theory, and we think that that is --

24  that that theory is sufficient.

25          I would agree, however, that someone that uses Glider

1  does -- it is at that point forfeiting their license.  Our

2  problem obviously as a practical matter is our ability to

3  detect Glider, which is part of the DMCA and the -- you know,

4  when we have been able to successfully detect Glider, we have

5  terminated those licenses.

6          THE COURT:  Well, you have terminated them.  But under

7  my second theory, you don't have to do that.  They

8  self-destruct.  You suggested when you referred to Section IV

9  that the license automatically disappears if somebody uses

10 Glider.  And that's what I'm asking.

11         Are you making that assertion in this case?

12         MR. GENETSKI:  I don't think I fully appreciated your

13 question.  And if I do now, I think my answer is:  If someone

14 forfeits their license right but we can't detect it, how do we

15 know?

16         If you're saying that once they've used Glider, we're

17 unaware they're using Glider, it's a self -- their license

18 ends --

19         THE COURT:  Well, let me --

20         MR. GENETSKI:  Yes.  It ends and they are then

21 infringing if they continue.

22         THE COURT:  The sentence is Section IV.A of your EULA.

23 There's a sentence in there that says:

24         Failure to comply with the restrictions and

25 limitations contained in this Section IV shall result in the

immediate, automatic termination of the license granted

hereunder.

Are you standing on that sentence in this case?  Are

you saying that that's what happens is when they use Glider,

there's an immediate, automatic termination of license, and

therefore, the copying is unlicensed?

MR. GENETSKI:  I believe -- yes.  I believe they've

forfeited their authorization to continue copying under the

license when they have used Glider.  We may not be able to

effectively act on that termination of the license because it's

been concealed from us, but --

THE COURT:  Well, okay.  If you're standing on the

provision -- then that gets to my next question, which is, it

has to be a violation of Section IV of the EULA for this

self-destruct provision, as I call it, to exist.

MR. GENETSKI:  That's right.

THE COURT:  What provision of Section IV is violated

by the use of Glider?

MR. GENETSKI:  Of the EULA as opposed to --

THE COURT:  Of the EULA.

MR. GENETSKI:  As opposed to the TOU?

THE COURT:  Yes.

MR. GENETSKI:  May I get my copy?

THE COURT:  Yes.

MR. GENETSKI:  Sorry, Your Honor.

```
 1              I wanted to grab the briefs so I have the language.   I

 2     would say Section IV.B-- and this is out of our original

 3     brief -- but Section IV.B, Roman IV, which prohibits making

 4     unauthorized connections to the game or the service or

 5     connections that are not authorized by Blizzard.

 6              Glider at different points in its iteration has been

 7     responsible for actually -- you could load WoW with Glider and

 8     initiate the connection.  Glider made the connection for you.

 9     Also independent of that, Glider obviously connects and sends

10     and receives commands with the Blizzard servers.

11              I would also say Section IV.B.2of the EULA that is

12     exploitation of the game, there's --

13              THE COURT:  But that's only if somebody is selling

14     their gold on eBay, right?

15              MR. GENETSKI:  Or if their -- we would say using a bot

16     to farm the gold in the game is exploiting the game.  Running

17     the bot is also exploiting the game.

18              THE COURT:  Well, it has to be for a commercial

19     purpose.

20              MR. GENETSKI:  For a commercial purpose.  And I

21     believe there's extensive evidence in the record of -- that

22     that is one of the substantial, if not primary uses, of the

23     Glider program, whether MDY disavows that that's how it wishes

24     it would be used or not.

25              THE COURT:  Well, 4(b)(2) would be limited to those
```

1    Glider users who are really farming, correct, and selling?

2    Correct?  Farming and selling what they farmed on some

3    commercial --

4           MR. GENETSKI:  Or leveling up an account to sell it,

5    but yes, Your Honor, it would be included with the commercial

6    license.

7           THE COURT:  And you are arguing that 4(b)(4), even

8    though it talks about connecting to an unauthorized server,

9    which sounded like a different -- it sounded like the *Davidson*

10   case that Blizzard brought -- you're saying that you think

11   Glider is an unauthorized connection within 4 (b)(4)?

12          MR. GENETSKI:  To the game or the service because it

13   is connecting -- it is connecting and receiving commands with

14   the service.

15          But if I could step back for a moment, Your Honor,

16   I -- if we're splitting this apart, I do want to say I'm not

17   superseding the Section IV automatic termination to the first

18   point you made.

19          THE COURT:  I understand.  I just wanted to make sure

20   I understand if you were making a self-destruct argument, what

21   it was based on.

22          Okay.  You were going to go on to the DMCA and I think

23   you've got about five minutes left to where you will be where

24   Mr. Venable was.

25          MR. GENETSKI:  Okay.  Thank you, Your Honor.

UNITED STATES DISTRICT COURT

1          THE COURT:  Actually, seven minutes.

2          MR. GENETSKI:  So let me try to skip to what I believe

3     is the crux of the dispute on the DMCA, which is that MDY is

4     relying largely on *Sky Link* and *LexMark*.  And the argument he

5     presented today, which is sort of the argument he zeroed in on

6     on the latter rounds of briefing, is that Warden and Scan.dll

7     cannot be accurate -- cannot be effective TPMs, Technology

8     Protection Measures -- because even if they stop you from

9     accessing further copyrighted content as it's loaded into RAM

10    when you are connected to the servers, they don't stop you from

11    doing the copy and paste into Notepad or copying -- excuse me,

12    the static object code in some other form.

13          But that's -- the DMCA does not say that you must have

14    a copy protection scheme that protects any and all rights that

15    a copyright owner might reserve to themselves.  You are allowed

16    to grant different apportioned rights.

17          And, in fact, the *LexMark* case itself says this, that

18    copy protection measures do not have to protect all forms of

19    copying.  They just have to protect some form of protected

20    content.

21          One example of that would be the *Real Player v. Stream*

22    *Box* case out of the Western District of Washington in 2000,

23    which is cited, I believe, in *LexMark*.

24          Where in Real Networks, they allowed by license,

25    someone using Real Player to stream music files, audio files,

but they had a switch that prevented only certain licensees

from being able to also copy those files.

So depending on the type of license you had, you

either had streaming rights, which they had the right to

restrict but didn't, or copying rights which they had the right

to restrict but didn't.

And Stream Box, the defendant, found a way to

circumvent the switch to turn someone who had this subservient

license to get the other license rights.  And the court said

that that's okay.  You don't have to prohibit all copying.

And here Warden and Scan.dll may allow some of this

static object code that's resident on the client to be copied.

But my point in perhaps inarticulately in the brief describing

what these nonliteral elements are, but the graphical

presentation, the way the characters look like, the way they

move, as you get to different levels in the game, more content

is loaded.  It's not loaded until you reach that next level

that presents new scenarios in the game, new content in the

game.

THE COURT:  Is loaded to RAM?

MR. GENETSKI:  Loaded into RAM, yes, Your Honor.

THE COURT:  So that's what you're saying is the

Copyright Violation Act that Warden prevents in effect?

MR. GENETSKI:  Two parts.  You don't have access.  You

won't ever be able to see what the different monsters look like

1    and what these different presentations look like if you have --

2    if Warden has detected that you're running probably another

3    cheat, not Glider, since it has difficulty detecting Glider at

4    present, but if it detects a cheat and you are revoked, you

5    will not get access to that next content that was coming in the

6    game, nor will you be able to load it into RAM in connection

7    with the server.

8         THE COURT:  Let me ask you this question about the

9    DMCA claim, Mr. Genetski.

10         Under 1201 (a)(2)(A) the technological measure has to

11    be one that effectively controls access to the work.

12         "The work," for purposes of what we're talking about,

13    is the software in the game client, plus --

14         MR. GENETSKI:  As displayed in the online gaming

15    environment.

16         THE COURT:  It's what we talked about in the

17    beginning.  It's not code on the server at Blizzard?

18         MR. GENETSKI:  It's not.  But it's also not just code

19    on the client.

20         THE COURT:  All right.  In order for a measure to

21    effectively control access to a work, 1201 (a)(3)(B) says that

22    it must in the ordinary course of operation require the

23    application of information or a process or a treatment with

24    authority of the copyright owner to gain access to the work.

25         To the extent "the work" is the code on the game

 1   client, you don't need to get past Warden to get access to it.

 2   You've got it.  It's on your hard drive, right?

 3        MR. GENETSKI:  On your hard drive.  You don't get

 4   access to it in RAM in the game environment where you can

 5   actually view the expressive elements.

 6        THE COURT:  All right.  I understand the expressive

 7   elements.

 8        MR. GENETSKI:  Okay.

 9        THE COURT:  But looking just at the software code, you

10   don't have to get past Warden to gain access to "the work,"

11   which is the code on the game client; do you agree?

12        MR. GENETSKI:  I would -- I believe I agree with the

13   caveat that "work protected under the title" is the finish to

14   the sentence and we believe that the work that's protected

15   under the title is the work as it's displayed, the audio visual

16   representation of that code in the online environment.

17        So with that caveat --

18        THE COURT:  Well, if that's true, then it's only that

19   display that's a DMCA violation under 1201(a)(2)(A), correct?

20        MR. GENETSKI:  It's the access to that code in RAM.

21   Once that code -- on the hard drive you cannot see that code

22   displayed that way.  When it's loaded into RAM in connection

23   with the server, then you can see again the expressive --

24        THE COURT:  Well, but without loading it on the

25   server, without getting past Warden, you can still get full

1    access to the code on the game client, right?

2        MR. GENETSKI:  Yes.  The ones and zeros, the object

3    code sitting on the client, yes, you can move it around.

4        The analogy, if I may, the analogy I would use is, you

5    know, if an iTunes music file which are protected by rights

6    protection, you can copy and move those files from one hard

7    drive to another, but your ability to hear the music is

8    dependent upon playing it in a manner that is consistent with

9    your license rights to listen to the song.

10       And I think that's the analogy I would use here for

11   the ability to move the static code of the client from one hard

12   drive to another or to cut-and-paste it into Notepad, does not,

13   in effect, give you real access to the protected work.

14       THE COURT:  All right.  I understand your position.

15       MR. GENETSKI:  I think I will use whatever remaining

16   time I have, if I may, to move ahead to tortious interference.

17       THE COURT:  Okay.  You'll have to it quickly, because

18   you don't have much time.

19       MR. GENETSKI:  I promise not to do any name calling,

20   but I think that the crux of this issue clearly comes down to

21   two of the elements of the tortious interference claim.  The

22   briefs are pretty clear, with the primary one being that the

23   improper purpose element, and the second one being the harm

24   element.

25       And I think the key distinction to make on the

1    improper purpose -- and we both agree on the seven-part

2    Restatement test, but I think posited the *American Airlines*

3    case, which we rely heavily on in our brief, because we feel

4    like it is in our exhaustive research, and I assume MDY's, by

5    far the most relevant case we could find to this fact pattern,

6    versus *Bar J Bar*, which is one of the primary Arizona tortious

7    interference cases under the same Restatement tests that MDY

8    relies upon, I think you see the difference.

9          All the cases that MDY is relying on are the sort of

10   traditional tortious interference cases where you have two

11   competitors.  And in the *Bar J Bar* case you have a third party

12   who owns land and leases it to the plaintiff.  The defendant

13   comes in and convinces the third party to sell the defendant

14   the land.  Plaintiff then has its rights to use that land

15   terminated and sues the person who convinced the third party to

16   sell.

17         And the court there said, Look, the plaintiff could

18   have negotiated in his contract a right of first refusal to buy

19   that property, if that was important to him.  And the court was

20   loath, absent some indication of fraud or inequity on the part

21   of the defendant, to interfere with the third party's right to

22   make a choice that was a valid choice under the contract.

23         That's not this case.  This case is not a case of two

24   competitors or of MDY honestly persuading users of World of

25   Warcraft of a better game for them to play or even a better way

1    to play our game.

2          What he is focusing on is like the ticket broker in

3    *American Airlines*, what he is inducing, what he is selling is,

4    I am -- I've got a way to let you cheat and get ahead of

5    everyone else in the game and the key selling point for me is

6    I'm better at helping you conceal those breaches so you can

7    cheat for as long as you want to your full game without

8    Blizzard detecting you, with no consequence.

9          That's the essence of his offer to those users, which

10   is akin, I believe, to the ticket broker.  Again, ticket broker

11   seems to be our closest analogy here.  The ticket broker in

12   *American Airlines* saying, Let me help you get the free seat on

13   American Airlines in violation of their contract.

14         If you follow my steps, I will support you through

15   this.  I have come up with a system that works.  We believe

16   that that's effectively what MDY is doing here and that

17   *American Airlines* case said, you know, does it fit that neatly

18   into the seven-factor test?

19         But that is as clear a type of inequitable and

20   improper purpose as you can have to conduct -- to basically

21   engage in an agreement with your users to help assist them in

22   concealing breaches and eliminate Blizzard's right to enforce.

23         Blizzard -- it would be as if the third party --

24   Blizzard is the third party in the tortious interference cases.

25   They did bargain for the right to be able to handle this

1    problem on their own by contract.  They have spent a million

2    dollars a year on research and enforcement costs trying to

3    eliminate this problem.

4            They're going to the wall with their contracts and

5    with their technological measures to try to combat the problem.

6    They are just not winning.  And to say that it's honest

7    persuasion and the ability to knowingly encourage these

8    breaches on a record where he stated candidly -- and candidly

9    has not disputed -- on the record in this case that his goal is

10   to drive up Blizzard's costs to the point where they give up.

11           And he has candidly stated that he knows people don't

12   like bots in the game.  He knows that bots are bad for the game

13   and will -- could eventually ruin the game for everyone, but

14   yet he persists, and we think that is clearly a case of

15   tortious interference.

16           THE COURT:  Okay.  I understand that point.

17           Thank you, Mr. Genetski.

18           MR. GENETSKI:  Thank you, Your Honor.

19           MR. VENABLE:  Your Honor, may I have five minutes in

20   rebuttal?

21           THE COURT:  No.  I don't have time to give you five

22   minutes.  I will give you two.  I have some other things I need

23   to attend to, but why don't you --

24           And I do have a question for you on another matter,

25   Mr. Venable, but why don't you take two minutes to address the

1    things you think I need to hear.

2            MR. VENABLE:  Yes, Your Honor, very quickly.

3            When Mr. Genetski was talking about the copyright

4    issues and you were trying to find this distinction between

5    whether a violation of one section and another -- or another

6    section would be an infringement, it says right in the opening

7    part of their -- the end-user License Agreement, Your Honor.

8            "If you do not agree to the terms of this agreement,

9    you are not permitted to install, copy, or use the game.  If

10   you reject the terms of this agreement within 30 days after

11   purchasing the game, you may request a full refund."

12           It does not specify which terms you have to choose to

13   enforce or which terms you don't.  A person who reads this

14   agreement, I believe -- and at least I think that is what they

15   will try to, you know, argue this is the interpretation -- is

16   that it's any term.  They don't get specific about which terms

17   would be a violation of the copyright law.  And it's really

18   about what would a person who reads this adhesion contract

19   expect under the copyright laws?

20           So if you call your character Michael Vick, it seems

21   to me that a person who follows their logic, I wouldn't know

22   that that would not be a copyright infringement if I did

23   Michael Vick, but I decided to use Glider instead.

24           Let's see.  Oh.  They mentioned this part about that

25   what they do is they reserve the right to return the disk.

Well, it's interesting to note, Your Honor, is that when you buy the software from Best Buy, they tell you that if you would like to request a full refund, you can get the refund, but they never ask you for the disk back.  That's right in the agreement, Your Honor.

So then if they give me the money back for my disks, they never say I have to take the disks back to Best Buy and give it back to them.  That's a clear indication, Your Honor, that the person who buys that software is an owner, because they don't even ask for it when they give you the refund.

The other thing, Your Honor, when he refers to this "subject to" language, and this is supposed to be the whole basis for why they can say that there is a copyright infringement, Your Honor, that's not what it says in the *Sun* case and that's Ninth Circuit law.

Ninth Circuit in *Sun* said the enforcement of a copyright license raises issues that lie at the intersection of copyright and contract law, an area of law that is not yet well developed.  We must decide an issue of first impression, whether there are two sophisticated parties have negotiated a license agreement and dispute its scope.  The copyright holder who has demonstrated likely success on the merits is entitled to a presumption of irreparable harm.  However, we hold that it is only, but only after the copyright holder has established that the disputed terms are limitations on the scope of the

1   license rather than independent contractual covenants.  In

2   other words, before Sun can gain the benefits of copyright

3   enforcement -- which is what Blizzard is trying to do -- it

4   must definitively establish that the rights it claims were

5   violated were copyright and not contractual.

6          They have not done that, Your Honor.  There is

7   absolutely nothing in either of these two agreements that say

8   when you use his software, when you use Glider, that that is

9   somehow a copyright infringement.

10         And this was -- this case involved the negotiation of

11  two very sophisticated parties.  Certainly, you're not going to

12  expect that when a person signs up online to sign -- to click

13  on an adhesion contract that they probably don't even read in

14  the first place.

15         THE COURT:  Well, it seems to me, Mr. Venable, that's

16  the issue I have to decide.  I have to construe this contract

17  and I have to decide if the terms that they are saying are

18  limitations on scope are, in fact, limitations on scope, or

19  whether they are mere affirmative contract limitations.

20         MR. VENABLE:  And also -- I'm sorry -- and also, Your

21  Honor, whether or not somebody who reads it would understand it

22  to mean that.

23         THE COURT:  Well, that's what I wanted to ask you

24  about.  You argue in your brief the reasonable expectation

25  doctrine, which is a doctrine of Arizona law.

1          Don't these agreements choose Delaware law as the

2     governing law?

3          MR. VENABLE:  I don't know, Your Honor.  I think --

4     well, maybe they do.

5          THE COURT:  Section 14 of the EULA, 14(F), I think it

6     is, chooses Delaware law.

7          If so, should I be looking at Arizona's reasonable

8     expectation law when interpreting this contract?

9          MR. VENABLE:  You know, Your Honor, I honestly don't

10    know the answer to that question.  But I believe that at least

11    in interpreting, I think the reasonable expectations of any

12    party should be to be able to read an agreement and understand

13    what it means; and certainly, if it's an adhesion contract.

14          And finally, Your Honor, this argument that

15    Mr. Genetski makes about the -- or I should say, second to the

16    last thing I wanted to make real quickly, the loading into RAM

17    is what is protected under the DMCA.  And that when you -- when

18    this Warden or Scan.dll protects it, that it's preventing you

19    from being able to see these pictures and the animation, Your

20    Honor, that's actually not true.

21          You can use a program called ModelViewer.  It's

22    readily available online.  You can use this program and you can

23    load all the code that's on your hard drive and actually see

24    the game being played without it actually -- you don't even

25    need an account to do this, Your Honor.

1          There is nothing that Warden or Scan.dll prevents you

2     from being able to do that.  It's just simply not effective

3     software to stop you.  And more importantly, Your Honor, it's

4     not designed to prevent someone from being able to get access

5     to the code.  It's designed specifically to try to detect

6     third-party software.

7          Lastly, Your Honor, they make reference to this

8     *American Airlines* case for the tortious interference.  And with

9     regard to that, Your Honor, that is a completely different

10    case.  First and foremost, it is a Utah case.

11         The Arizona state law adopts the Restatement and

12    everybody in Arizona uses the *Wagenseller* case to be able to

13    determine.  Factually, maybe these cases are slightly

14    different, but the issue of whether or not someone tortiously

15    interferes is explicit in Arizona law that you have to be using

16    more than just honest persuasion.

17         And in the *American Airlines* case, the guy that was

18    doing all of the bad behavior was not doing the same behavior

19    that my client was.  This guy was actively involved in inducing

20    and scheming and lying to American Airlines to try to get them

21    to do --

22         THE COURT:  Right.  I understand.

23         MR. VENABLE:  -- to do certain things.

24         THE COURT:  I understand that.  You made that point in

25    your brief and I understand it's a Utah case.

1          MR. VENABLE:  Okay.  Thank you very much, Your Honor.

2          THE COURT:  Thank you, Mr. Venable.

3          All right, counsel.  I will take this matter under

4     advisement and I will get you an order.  Thank you very much.

5          MR. VENABLE:  Thank you.

6          MR. GENETSKI:  Thank you, Your Honor.

7        (Proceedings adjourned at 4:24 p.m.)

8                              * * *

C E R T I F I C A T E

I, ELIZABETH A. LEMKE, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 20th day of April, 2009.


                              s/Elizabeth A. Lemke
                              ELIZABETH A. LEMKE, RDR, CRR, CPE