1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF ARIZONA

3                    _____

4    MDY INDUSTRIES, LLC,                    )
                                             )
5                         Plaintiff,         )   CV 06-02555-PHX-DGC
                                             )
6              vs                            )   Phoenix, Arizona
                                             )   January 9, 2009
7    BLIZZARD ENTERTAINMENT, INC., et al.,   )
                                             )
8                         Defendants.        )
     _____)

9

10

11

12

13          BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

14              REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                    BENCH TRIAL - DAY 2

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RPR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

3    For the Plaintiff:

4            Venable Campillo Logan & Meaney PC
             By: **JOSEPH R. MEANEY,** ESQ.
5            By: **LANCE C. VENABL**E, ESQ.
             1938 E. Osborn Rd.
6            Phoenix, AZ  85016

7

8    For the Defendant:

9            Sonnenschein Nath & Rosenthal, LLP
             By: **CHRISTIAN S. GENETSKI,** ESQ.
10           By: **SHANE M. McGEE,** ESQ.
             1301 K St. NW, Ste 600 E Twr
11           Washington, DC  20009

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **I N D E X**

3                          <u>**EXAMINATION**</u>

4                                   .

5       **MICHAEL DONNELLY**

6               Cross-Examination By Mr. Genetski        6

7               Redirect Examination By Mr. Venable     14

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

THE COURT:  Thank you.  Please be seated.

Good morning.

10:03:17   MR. VENABLE:  Good morning, Your Honor.

THE COURT:  All right.  We're going to continue with where with left off yesterday.  I do have a question for counsel before I forget it.

Have you all provided me, our chambers, with copies

10:03:32  of the proposed findings and conclusions in either Word or Word Perfect format?

MR. VENABLE:  I believe I have, Your Honor.  I would have been the one that would have sent that to you and -- I can verify that.  I don't know if I --

10:03:48   THE COURT:  Let me -- if you're not sure, I'll have -- I haven't asked my judicial assistant to check.  I'll have her check.  But it would help me a lot to have those to work with so she doesn't have to retype stuff that I adopt from your findings and conclusions.  I'll have her check.  Remind me if I

10:04:05  forget about it in the next hour to ask her before you leave.

MR. VENABLE:  Okay.

THE COURT:  All right, Mr. Donnelly, you're still under oath so you can return directly to the witness stand and we'll proceed with the cross-examination.

10:04:16   1                    MICHAEL DONNELLY,

           2   recalled as a witness herein, having been previously sworn or

           3   affirmed, was further examined and testified as follows:

           4                C R O S S – E X A M I N A T I O N

10:04:45   5   BY MR. GENETSKI:

           6   Q   Good morning, Mr. Donnelly.

           7   A   Good morning.

           8   Q   Mr. Donnelly, you read the summary judgment order entered

           9   in this case, correct?

10:04:52  10   A   Yes, I have.

          11   Q   Do you now consider the selling of Glider unlawful?

          12   A   No, I don't.

          13   Q   Do you consider your sale of Glider to be infringing or

          14   tortious?

10:05:06  15   A   No, I disagree.

          16   Q   During your testimony yesterday you demonstrated how to use

          17   a model viewer program and an MPQ Editor program to render

          18   images that are embedded in the WoW -- in the code on the WoW

          19   client, correct?

10:05:25  20   A   Yes, I did.

          21   Q   But you agree that the demonstration you conducted with

          22   those model viewer programs is not the same as playing the WoW

          23   game, correct?

          24   A   It's not the same as the game experience.

10:05:39  25   Q   In fact, you can't use any of the tools that you used in

CROSS-EXAMINATION - MICHAEL DONNELLY

10:05:42  1   your presentation to generate, for example, the same Illidan

2   fight sequence that we witnessed in the video of in-game WoW

3   play during Mr. Ashe's testimony, correct?

4   A   I could choreograph that myself but it wouldn't be dynamic

10:06:00  5   like the game is.

6   Q   You haven't created any versions of Glider that work with

7   the model viewer program, have you?

8   A   No.

9   Q   You haven't created any programs to use with any of the

10:06:14 10   model viewer or MPQ Editor or similar programs, have you?

11   A   No, I've not.

12   Q   During your demonstration yesterday, you played some

13   Illidan sound effects with an MPQ Editor; isn't that correct?

14   A   Yes.

10:06:37 15   Q   When you generate those Illidan sound effects using that

16   third-party program, that sound is perceived the same way each

17   time you generate it, correct?

18   A   That's correct.

19   Q   But you'd agree that when a user is connected to the WoW

10:06:52 20   game servers, the server will determine how and when that sound

21   is played, correct?

22   A   Well, the server will determine when that sound is played.

23   Q   And wouldn't you also agree that the server will determine,

24   for example, how loud the sound is?

10:07:08 25   A   Oh, yes.  It may change the volume of the sound.

CROSS-EXAMINATION - MICHAEL DONNELLY

10:07:12   1   Q   So if that sound is generated from the WoW code in WoW game

2   play, the sound would be, for instance, louder if you're closer

3   to the character that's making that sound, correct?

4   A   Right, it might be louder or quieter.

10:07:33   5   Q   And you're aware that the model viewer you demonstrated

6   yesterday cannot generate the graphics and the models to appear

7   in exactly the same manner that they appear in the WoW game,

8   correct?

9   A   That tool cannot, right.

10:07:48  10   Q   Are there any tools that can create those models in the

11   same manner that they appear during the WoW game?

12   A   There's none on the market.  But it's open source.  It

13   would be very easy to create a tool to do that.

14   Q   But none exist?

10:08:04  15   A   None exist.

16   Q   And isn't it true that when those graphics and models are

17   viewed in the context of the WoW game they're rendered

18   differently with different lighting and shadows depending on

19   where they're viewed during the game?

10:08:18  20   A   Well, the game will make those decisions based on server

21   rules, yes.

22   Q   You testified that MDY continues to offer Glider for sale

23   through the mmoglider.com website, right?

24   A   Yes, that's correct.

10:08:48  25   Q   You manage and run that website, correct?

CROSS-EXAMINATION - MICHAEL DONNELLY

10:08:51   1   A   Well, I manage some of it.  Jay, my employee, manages some

2   of it as well.

3   Q   And Jay works for you, correct?

4   A   Yes, Jay works for MDY Industries.

10:09:00   5   Q   And the work that he performs in connection with the Glider

6   business is at your direction?

7   A   Yes, it is.

8   Q   MDY has sold tens of thousands of copies of Glider,

9   correct?

10:09:10   10   A   Yes.

11   Q   What are the total sales revenues generated from Glider

12   sales?

13   A   I don't have that in front of me.  I would approximate

14   between three and a half or four million dollars.

10:09:26   15   Q   And the sales of Glider have increased, those sales

16   increased during the months after this litigation commenced;

17   isn't that correct?

18   A   They have slowly increased over the lifespan of the

19   product.

10:09:40   20   Q   Including in the time after this litigation was filed?

21   A   Yes.  They decreased as of late, but they were going up

22   before.

23   Q   You're the author of the Glider code, correct?

24   A   Yes, I am.

10:09:59   25   Q   And you're also the author of the program Tripwire?

CROSS-EXAMINATION - MICHAEL DONNELLY

10:10:03  1   A   Well, it's a piece of Glider.  Yes, I'm the author of that

2   component of Glider.

3   Q   And the purpose of Tripwire is to detect when Blizzard

4   makes updates or changes to Warden?

10:10:22  5   A   Right.  Tripwire is in effect our Warden.

6   Q   And you wrote the Launchpad application as well, correct?

7   A   Yes, I did.

8   Q   When the need arises to make changes to Glider to continue

9   to avoid detection by Blizzard, are you the person who makes

10:10:36  10   those changes to the code?

11   A   Typically.  Although Jay may make some of them at my

12   direction.

13   Q   And when Jay makes the changes to the code, he performs

14   those tasks at your direction?

10:10:48  15   A   Yes, in his role as programmer at MDY Industries.

16   Q   You market Glider through various forms of Internet

17   advertising, correct?

18   A   Currently we only use Yahoo keywords.  We were using Google

19   before.

10:11:08  20   Q   When you used Google keywords before, did you sign up for

21   that Google program and provide the keywords that were used?

22   A   Yes, I did.

23   Q   And did you provide the keywords that are used in the

24   current Yahoo advertising program?

10:11:19  25   A   I believe Jay has not changed them, so yes.

CROSS-EXAMINATION - MICHAEL DONNELLY

10:11:24   1   Q   And you personally participate in the Glider forums and

           2   exchange information with users about how to use Glider; is

           3   that right?

           4   A   Yes, I do.

10:11:45   5   Q   I believe you testified that you became aware that Blizzard

           6   was attempting to detect and block Glider as of September 2005;

           7   is that right?

           8   A   Yeah, that's when there was software detection of Glider.

           9   Q   But prior to the time of software detection, were there

10:12:03  10   other methods used to detect Warden -- I mean detect Glider?

          11   Excuse me.

          12   A   There were other methods used to detect bots.  Not Glider.

          13   Q   I believe you testified yesterday that during times that

          14   the software detection -- you were able to evade the software

10:12:28  15   detection of Glider, that Glider users were still sometimes

          16   banned because they were reported by human users, right?

          17   A   You mean the software detection of Warden?

          18   Q   Yes.

          19   A   Okay.  Yes, that's true.

10:12:41  20   Q   So even when Glider is able to evade Warden, some Glider

          21   users are nonetheless banned from the game through detection by

          22   human players?

          23   A   Right.  They're banned because of complaint.

          24   Q   In fact, I believe you testified that you wrote code into

10:12:57  25   Glider to help assist users from being detected by other human

CROSS-EXAMINATION - MICHAEL DONNELLY

10:13:03   1   players in the game; is that right?

         2   A    Correct, there's code in Glider to avoid either being seen

         3   by other players or causing complaints.

         4   Q    And the reason you need to put that code in there is that

10:13:13   5   when other players in the WoW game see someone operating the

         6   Glider bot, they don't like it and they report it to Blizzard;

         7   is that right?

         8   A    They definitely report it to Blizzard, yes.

         9   Q    And WoW players know that when they report someone using a

10:13:30  10   bot to Blizzard, that if that's verified, that person is likely

        11   to be banned from the game, right?

        12   A    I don't know if they'd know that for sure.  I'd guess.  I'm

        13   sure some WoW players would report a bot and not have any

        14   expectation of action because they don't know.

10:13:46  15   Q    Is it your assumption that when somebody is reported using

        16   a Glider bot and Blizzard confirms it they will be banned?

        17   A    Yeah, but I'm not a typical WoW player.

        18   Q    Does MDY sell any other products besides Glider?

        19   A    No.

10:14:00  20   Q    Does Glider have any functionality with any other programs

        21   currently other than World of Warcraft?

        22   A    It can play solitaire.  Other than that, no.

        23   Q    Is that a commercial use of Glider to play solitaire?

        24   A    No, it's a demonstration of new technology.

10:14:21  25   Q    I believe you testified to this on direct, but you control

CROSS-EXAMINATION - MICHAEL DONNELLY

10:14:24  1    the operation of Glider through the issuance of individual keys

2    that enable the program to work; is that right?

3    A    Correct.  Our Web server does, yes.

4    Q    And you control and operate that Web server?

10:14:37  5    A    Yeah, we operate the Web server.

6    Q    And it's true, right, that Glider won't work for more than

7    a few minutes at a time unless that key is activated to unlock

8    the software?

9    A    Yeah.  You mean the trial version?  That's correct.

10:14:53 10    Q    So if you disable Glider's user keys, those Gliders will

11    cease to work; is that right?

12    A    For that key, correct.

13    Q    Has MDY Industries established a reserve to pay a judgment

14    rendered in this case?

10:15:13 15    A    No, we don't have $6 million.

16    Q    Have you set aside any reserve of your available funds to

17    satisfy the extent of the judgment that you can?

18    A    No, I've not.

19    Q    Have you personally set aside a reserve to pay any eventual

10:15:27 20    judgment that might attach to you personally in this case?

21    A    Well, I have not spent any money, so I've reserved what I

22    can.

23    Q    You haven't spent any of the money that's been derived from

24    Glider sales since the beginning of this litigation?

10:15:46 25    A    I've obviously paid expenses, but I haven't tried to put

CROSS-EXAMINATION - MICHAEL DONNELLY

10:15:51  1   money out of Blizzard's reach or otherwise waste it.

       2             MR. GENETSKI:  May I take one moment?

       3             I have nothing further.

       4             THE COURT:  Redirect.

11:19:09  5             R E D I R E C T   E X A M I N A T I O N

       6   BY MR. VENABLE:

       7   Q    Morning, Mr. Donnelly.  I just have a couple quick

       8   questions for you.  Mr. Genetski asked you about the certain

       9   program that you were using with the sounds, I think that was

10:16:46 10   the MPQ Editor?

      11   A    That's correct.

      12   Q    Would there be anything that would prevent you from being

      13   able to manually adjust your volume on your computer to change

      14   the volume that comes out when the sound is made?

10:16:58 15   A    Of course not.  I can set the volume to anything I want.

      16   Q    And you also said -- he asked you a question about did

      17   Glider work -- did you create Glider to work with any other

      18   program.  Correct?

      19   A    Yes.

10:17:09 20   Q    And he said -- or you responded by saying it works with

      21   solitaire but that wasn't a commercial use; is that correct?

      22   A    That's right.

      23   Q    Is it possible that you could have created Glider to work

      24   with many other pieces of software besides World of Warcraft?

10:17:26 25   A    Oh, absolutely.  The solitaire demo was our steps in that

REDIRECT EXAMINATION – MICHAEL DONNELLY
REDIRECT EXAMINATION – MICHAEL DONNELLY

10:17:30  1  direction.

2  Q   And why haven't you done that for other pieces of software?

3  A   Mostly because the market dominance in WoW makes it unwise

4  to try to work with another game, there's not enough customers,

10:17:41  5  and we have a great healthy fear of being add-on to another

6  program that doesn't like us for whatever reason.

7           MR. VENABLE:  Thank you.  No further questions.

8           THE COURT:  Okay.  Thanks.  You can step down

9  Mr. Donnelly.

10:17:54  10          Counsel, any other evidence you wish to present?

11          MR. GENETSKI:  No.  Not from us, Your Honor.

12          MR. VENABLE:  None from us, Your Honor.

13          THE COURT:  Okay.  Why don't we go ahead and hear

14  closings.  We'll start with Blizzard and then hear from MDY.

10:18:15  15          MR. VENABLE:  Before we get started, Your Honor, I

16  simply wanted to ask a question.  I wanted to know if it would

17  be possible for the closing to be split between my partner

18  Joseph Meaney and I.  He wants to able to handle the personal

19  liability aspects and I want to be able to handle the DMCA and

10:18:32  20  injunction part.

21          THE COURT:  That's fine.

22          MR. GENETSKI:  Your Honor, I believe we're well under

23  our time for the trial but I'd like to reserve a few minutes

24  for rebuttal.

10:18:39  25          THE COURT:  That's fine.

10:18:48  1          MR. GENETSKI:  Your Honor, as I stated in my opening

2     argument, this is a case about Blizzard's efforts to protect

3     the integrity of its World of Warcraft creation, of its

4     copyrighted work, and about MDY and Michael Donnelly's

10:19:02  5     determined efforts to exploit that work and evade -- both

6     breach Blizzard's contract and evade the technological measures

7     that Blizzard's implemented to try to protect the work.

8          As we discussed, there are three questions before the

9     Court.  One, whether the DMCA applies to the technological

10:19:18  10     measures that Blizzard's implemented to safeguard access to

11     and its exclusive rights to World of Warcraft.

12          Two, whether the law dictates that Michael Donnelly

13     should be held personally liable for his direct participation

14     in and direction of and benefit from the activities the Court

10:19:34  15     has deemed infringing and tortious in its summary judgment

16     order.

17          And three, whether MDY and Donnelly should be

18     permanently enjoined from the further development and sales of

19     Glider.

10:19:44  20          As I mentioned in my opening, and I believe the

21     evidence presented to you over the course of yesterday and

22     today confirmed, there are relatively few disputes of actual

23     fact about how the software works, about what the business of

24     Glider is, how Blizzard software works.  And the parties

10:20:02  25     largely disagree, I believe, about the legal import of those

facts.

I'll take each issue in turn and walk through what I believe to be the key issues that are still in dispute.

On the DMCA, as an initial matter, I believe there's no question under the evidence of record that as to both DMCA claims, the (a)(2) and (b)(1) claim, that Blizzard has established that MDY traffics in Glider, which is a technology that is designed to circumvent Blizzard's Warden protection.

The evidence is that MDY distributes the program from its site, it clearly sells and supports and markets that program, so it is clearly a trafficker.  I believe the evidence has been clear that Glider's circumvention functionality is something that Glider -- that MDY and Donnelly are well aware that its users rely upon, as evidenced by the fact that they have to quickly and speedily reinstitute that ability on the few instances where Blizzard's been able to successfully thwart it.

With these elements established, the only areas of contention are whether Warden qualifies as a technological measure that protects access under (a)(2) or prevents, restricts or limits the rights of a copyright owner under (b)(1).  And I'll discuss (b)(1) first.

We believe the evidence makes claim that Glider circumvents Warden and that Warden is a measure that protects Blizzard's right as the copyright owner in WoW.

10:21:36  1          The key language here in 1201(b)(1) is whether

2    Warden, in the course of its ordinary operation, prevents,

3    restricts, or limits the exercise of a right of a copyright

4    owner in a work or a portion thereof.

10:21:51  5          It's the law of this case that copying World of

6    Warcraft into RAM while running Glider during WoW game play

7    exceeds the scope of Blizzard's licenses and is infringing.

8    The Court in fact specifically stated that the act that

9    violates the EULA and TOU and takes Glider users outside the

10:22:19 10   scope of Blizzard's limited license is the use of Glider to

11   play WoW.  And the use of Glider to play WoW necessarily

12   includes copying the game client software to RAM.

13          As provided in Blizzard's conclusions of law, and

14   specifically the *Lexmark* case, the DMCA recognizes that a

10:22:42 15   copyright owner doesn't have to protect all of its rights in

16   copyright work.  It can protect some of those through

17   technological measures.  And here Blizzard's rights to WoW

18   include the right to prevent unauthorized or infringing copying

19   in the specific way that the Court has recognized.

10:22:59 20          Similarly, the DMCA protects Blizzard's right to the

21   copying of the nonliteral elements of WoW into RAM while

22   playing WoW with Glider.

23          The question at summary judgment was, as we discussed

24   in the opening, whether, after you bypass Warden, that code

10:23:14 25   continues to be loaded into RAM, copied into RAM, in this

10:23:21  1   infringing manner, and that question has been answered

2   unequivocally yes, as Mr. Donnelly -- excuse me, Mr. Venable

3   conceded in the opening and the witnesses here all confirmed.

4   That continued loading does take place.

10:23:35  5        The position of MDY now at trial seems to be that

6   although Warden does prevent a user from continuing that

7   infringing copying of code into RAM while they're playing the

8   game, the fact that some code can be loaded into RAM while not

9   running -- while not having a connection to the server negate's

10:23:57 10  Blizzard's rights to protect against the infringement.  And we

11  don't believe that this is correct as a matter of law.  I think

12  that that argument is significant for the (a)(2) access claim

13  because there is access to the code sitting in a client and you

14  can pull that code out of the client and make copies of it

10:24:21 15  separate and apart from the connection to the server.

16       But (b)(1) is not a lock-out mechanism in the way that

17  (a)(2) is for access.  (b)(1) protects rights, protects the

18  right against copying.  And the language of (b)(1) speaks to

19  restrictions and limitations on the rights that Blizzard holds

10:24:46 20  in a work or a portion of that work.

21       Here we are clearly restricting and limiting the right

22  to copy that portion of code that continues to load into RAM

23  when you're connected to the servers.

24       The DMCA is designed to allow copyright owners to

10:25:01 25  protect the meaningful part of their work.  And as Mr. Ashe

10:25:05  1    testified, the portion of WoW code that generates the graphics

2    and the multimedia content during the context of the game is

3    the meaningful part of Blizzard's work, and that is the right

4    that they're protecting here.

10:25:15  5         The fact that they may not protect all -- any and all

6    ability to load code into RAM in some other respect does not

7    negate the rights under the DMCA to have their technological

8    measure not be evaded for the rights that it is seeking to

9    protect.

10:25:35 10         Now I'll talk about 1201(a)(2), the access claim.

11         THE COURT:  Before you leave that, in the summary

12    judgment briefing and during this trial you have talked about

13    two aspects of Blizzard's copyrighted material, the literal

14    aspect, the code, and the nonliteral.  I understand your

10:26:08 15    argument on (b)(1).  We'll hear from MDY on that in a minute.

16    But here's the specific question I have.  I understand how you

17    can argue that after evading Warden a user then copies literal

18    code to RAM.

19         I'm having trouble understanding that argument with

10:26:31 20    respect to the nonliteral content.  The user never copies the

21    nonliteral content.  The nonliteral that we've been talking

22    about is the sound, the sight, the picture that's on the

23    screen.  They may get access to that, and I understand that's

24    a subsection (a) claim, but they don't copy that.  What gets

10:26:54 25    copied is the code getting copied into RAM.  So can you really

10:26:58  1    argue that there's a (b)(1) violation with respect to the

2    nonliteral aspects?

3                MR. GENETSKI:  I understand Your Honor's question.

4    And candidly this is something we've struggled with sorting out

10:27:09  5    ourselves on that claim.  I think as from the copying from the

6    hard drive to RAM, I would agree that that is a transfer of

7    code into the nonliteral elements.  The nonliteral elements are

8    what is displayed to the user.  In order for that to be

9    displayed to the user, the copy has to be made in RAM.  And the

10:27:39 10    nonliteral elements, the code for nonliteral elements is fixed

11    in RAM.  The copying of the nonliteral elements could be made

12    through making a video of the game, taking screen shots of the

13    game during the game.  They can be copied in that way, they can

14    be replicated.  But I would agree with Your Honor in terms of

10:27:59 15    the loading of the code into RAM, it really is the code for the

16    nonliteral elements.

17                THE COURT:  Well, are you claiming that there is a

18    (b)(1) violation with respect to nonliteral elements or are you

19    limiting the (b)(1) claim to the copying of the literal code

10:28:20 20    into RAM?

21                MR. GENETSKI:  I think -- I think we would need to

22    limit it to literal code under Your Honor's formulation, except

23    as to the fact on the moving of the code into RAM.  I would

24    state that I believe that once those nonliteral elements are

10:28:45 25    present, they are able to be copied in other ways through the

10:28:49   1   recording of game play and those sorts of things and that you

2   wouldn't be able to get to that content running Glider to be

3   able to make that copy without evading Warden.  But as for the

4   circumvention of (b)(1) from the code, then, yes, I would

10:29:08   5   agree.

6         THE COURT:  Well, let me ask the question again.  Are

7   you making the (b)(1) claim with respect to the nonliteral

8   elements?

9         MR. GENETSKI:  Yes, Your Honor.  I think we are.

10:29:21  10   We're making a (b)(1) claim as to the subsequent copying.

11        THE COURT:  Well, let me state it this way since you

12   just said yes.  Your (b)(1) claim with respect to literal

13   elements is based on the fact that Warden prevents the copying

14   of the literal elements into RAM.

10:29:39  15        MR. GENETSKI:  Yes.

16        THE COURT:  Your (b)(1) claim with respect to the

17   nonliteral elements is based on your contention that if Warden

18   is effective, then the user can't take screen shots or

19   otherwise record the nonliteral expression of the game on the

10:29:57  20   screen; is that right?

21        MR. GENETSKI:  I believe that's right, Your Honor.

22   Yes.  We clearly focused our presentation of evidence and our

23   arguments on the form or claim that Your Honor has correctly

24   seized on, the point that it is the literal code that moves and

10:30:10  25   gets copied into RAM, and it is our right to prevent that

10:30:13  1  copying that's clearly our principal argument under (b)(1).

2  THE COURT:  All right.  Before we go to section (a)

3  let me ask you another question about (b).  This applies to (a)

4  as well, but let's focus on (b).

10:32:29  5  Is it your contention that Glider is primarily

6  designed or produced for the purpose of circumventing Warden?

7  MR. GENETSKI:  Yes, Your Honor.  It's our position

8  that Glider meets all three elements -- all three elements of a

9  circumvention device.  I believe that's either (a) or (1), is

10:32:52 10  primarily designed for.

11  THE COURT:  Yeah.  It's (a).  Isn't Glider primarily

12  designed to enable automated play of World of Warcraft?

13  MR. GENETSKI:  Your Honor, I think the fair

14  description of Glider is that those are equal primary purposes.

10:33:09 15  No one is going to purchase Glider unless it can do both of

16  those things.  I realize the nature of the definition of

17  "primary" suggests that one has to be higher in the order than

18  the other, but I believe the testimony's been clear that no one

19  buys Glider unless it can bot and unless it can evade

10:33:31 20  detection.

21  THE COURT:  Okay.  Go ahead and talk about (a).

22  MR. GENETSKI:  Your Honor, I would just add briefly on

23  those points that we do think it most clearly meets the third

24  definition which is marketed with MDY's knowledge that it is

10:33:48 25  used for circumvention and also that it has limited commercial

10:33:54   1   application absent the circumvention feature.

           2          As to (a)(2), we believe the evidence has shown that

           3   Glider circumvents Warden and that Warden is a technological

           4   measure that prevents access to the protected nonliteral

10:34:07   5   elements of the copyrighted WoW game as those are uniquely

           6   generated from literal code and perceived by users when

           7   connected to the WoW servers.

           8          There are two issues that the Court asked us to

           9   address at this trial.  First, whether Warden meets the

10:34:24  10   1201(a)(3)(B) definition of a technological measure for

          11   purposes of an (a)(2) claim, and, second, whether Warden in

          12   fact blocks access to WoW's nonliteral elements.

          13          The definition under 1201(a)(3)(B) is that the

          14   measure must require the application of information or process

10:34:43  15   or treatment with the authority of the copyright owner to gain

          16   access to the work.

          17          We believe the evidence at trial has more than

          18   established that Warden meets this definition.  Understanding

          19   that the particular manner in which Warden operates is a bit

10:34:58  20   technical and that the semantics of describing its operation

          21   have been, I think, a bit clumsy, especially in our

          22   presentation of them at the summary judgment stage, it's clear

          23   that Warden performs the function that the DMCA is designed to

          24   protect.  Warden performs an initial scan, we've used the word

10:35:19  25   "scan" and I believe Mr. Ashe at different points in his

10:35:22  1   testimony used that word, of a segment of memory associated

2   with the WoW client.  There's no question that this scan is

3   part of Warden running a process and that process is an

4   interactive exchange of hash values and instructions that

10:35:35  5   designate areas of memory to -- from which to extract

6   information.

7           THE COURT:  Interactive between or among whom?

8           MR. GENETSKI:  Among the elements of Warden from the

9   server and the elements of Warden that are in the client that

10:35:49 10   run in memory.

11           THE COURT:  I --

12           MR. GENETSKI:  Resident component.

13           THE COURT:  I inferred, perhaps incorrectly, from

14   Mr. Ashe's testimony that the Warden code is on the client

10:36:01 15   software itself.

16           MR. GENETSKI:  The Warden code is on the client

17   software.  It reports back to Blizzard when it's connected to

18   the server.  The information is reported back from the client.

19           THE COURT:  Well, back by Warden?

10:36:16 20           MR. GENETSKI:  Back by the Warden portion in the

21   client.  It extracts information from the client and reports it

22   back.

23           THE COURT:  If you think he's wrong, Mr. McGee, you

24   can say something.

10:36:28 25           MR. GENETSKI:  I'm feeling staring behind me, Your

10:36:31  1    Honor.

        2          MR. McGEE:  Your Honor, it's not wrong at all.  The

        3    server both sends information to Warden and that information

        4    is -- was -- and this is what Mr. Ashe testified to yesterday,

10:36:39  5    that information is what memory to scan and what to compare

        6    that to.  And then Warden will ask the game client for that

        7    memory space.  It will then compare what it receives from the

        8    game client to known hash values of things like Glider and then

        9    report back to the server.  I think that's the process

10:37:01 10    Mr. Genetski's describing.

       11          MR. GENETSKI:  Next paragraph of my outline, actually.

       12          So I think the way Mr. Ashe formulated was this is

       13    akin to other challenge/response authentication sequences

       14    where a question is asked and some authentication sequences

10:37:23 15    that a user has to supply a password and if that password

       16    matches the stored value password on the application or server

       17    that the person is seeking to gain access to, if it's a match

       18    they're allowed to proceed.

       19          Here, instead of a password, a segment of memory

10:37:42 20    associated with a hash value is reported back.  If it's the

       21    right answer for Warden, and here that right answer is that

       22    that segment of memory is a Glider-free segment of memory,

       23    you're admitted entry.  If it's the wrong answer, akin to the

       24    wrong password, here having the wrong password is information

10:38:01 25    that shows that Glider is running in that space by the hash

10:38:04  1    value, then access is denied.

2              We believe that the text of the DMCA is designed

3    application information process -- application of information

4    or process or treatment is designed to protect this very type

10:38:22  5    of sequence where technology and software requires validation

6    that the user meets the requirements for entry and for access.

7    So we believe that that satisfies the definition of

8    1201(a)(3)(B).

9              The second point of contention is whether Warden

10:38:43 10    prohibits access to the nonliteral elements of WoW.  And we

11   believe that the evidence at trial under a proper construction

12   of the meaning of nonliteral elements -- under the meaning of

13   nonliteral elements and copyright law that it clearly does.

14             Here, the work that's being accessed is the WoW game.

10:39:05 15    Specifically the protectable nonliteral elements, which we

16   submit are the expression of the multimedia content that we

17   saw displayed in the video that is generated by the WoW code

18   when the client is connected to the server and being

19   choreographed through that interaction by the server.

10:39:22 20             The facts at trial have been pretty clear on this.

21   The combination, the combination of the graphics, the

22   character interactions, the storylines, the interfaces, the

23   sound effects and the musical arrangements are choreographed

24   by the WoW game servers when you are in game play, and you

10:39:43 25    cannot access that combination of expressive elements anywhere

10:39:47  1    other than on the WoW game servers.

2         Mr. Calandrino and Mr. Donnelly in their respective

3    demonstrations showed the Court a number of facts that we

4    don't contest.  It is true that users can access the WoW

10:40:00  5    literal code on their hard drive and that that WoW code is the

6    code that generates the nonliteral elements, that generates

7    the expressive and artistic content.  But we believe that both

8    Mr. Donnelly and Mr. Calandrino and MDY in their arguments in

9    this case are conflating the difference between the literal

10:40:26 10    code and nonliteral elements.  And what they're in effect

11    doing is asking to have the literal code double-counted,

12    rather than recognizing the two separate planes for the

13    literal code and the nonliteral elements.

14         For example, in Mr. Calandrino's demonstration he

10:40:43 15    focused on the user's ability to access the literal WoW code

16    on a user's drive from which the non-expressive element -- the

17    expressive nonliteral elements are generated.

18         Now, in the hard drive portion of his demonstration,

19    in the green box that he had on the hard drive, he had it

10:40:59 20    labeled incorrectly "nonliteral elements."  And I think he

21    candidly in his testimony on cross-examination conceded that

22    he didn't have any prior understanding of the concept of

23    nonliteral elements.  Which is understandable given that

24    that's not a term for a computer scientist, it's a term that

10:41:20 25    has meaning in the copyright law.

10:41:22  1        What that term means in the copyright law, as *Lexmark*

2    sets out pretty clearly, and there are a number of other cases

3    cited in our proposed conclusions of law that discuss this as

4    well, when you're talking about software as a copyrighted

10:41:38  5    work, there are the two planes that are equally worthy of

6    protection, the literal code, which is what Mr. Calandrino was

7    largely discussing, and the audiovisual manifestations

8    generated from that code.  So if there's a DVD, there's code

9    on the DVD, but the nonliteral elements are the movie that you

10:41:53  10   get to watch from that code.  In the case of a computer game,

11   the nonliteral elements, the expression is the game.

12        Now, Mr. Donnelly's demonstration did attempt to

13   address a user's access to these nonliteral elements outside

14   of the game context.  But we would submit that his

10:42:14  15   demonstration -- what his demonstration actually did was

16   convincingly show that a user does not have access to those

17   elements absent a connection to the WoW server.  We saw the

18   user can, using an assortment of different third-party

19   programs, extract isolated portions of that literal code from

10:42:35  20   which WoW's expressive elements are generated and generate

21   certain individual renderings:  Sounds in isolation, the

22   depiction of a character.  But by Mr. Donnelly's own admission

23   and Mr. Calandrino's admission, none of these programs, alone

24   or in combination, can replicate the audiovisual

10:42:54  25   manifestations that are generated by that same literal code

10:42:57   1    when a user is connected to the WoW servers and that code is

2    interacting with the choreography of the servers.

3            If you look at the video of WoW game play and see

4    what that literal code generates in the context of the WoW

10:43:15   5    game play, what the user gets to perceive in that game, it

6    bears -- the difference between that and what you can generate

7    with these third-party programs from that same literal code is

8    striking.  It's clear that it's not the same thing.  A point

9    that's underscored by the fact that a program like Glider is

10:43:36  10    written to work with WoW when it's being played in the game.

11    It's not written to work with a program like a model viewer

12    that can extract little individual elements.

13            Without that connection to the server, not only is

14    the user not able to access the full range of the graphics and

10:43:57  15    text and sound effects and combination, even the individual

16    graphics that Mr. Donnelly showed us are rendered differently

17    than they're rendered in the game.  They don't have the same

18    shadows and lighting because those -- the shadows and lighting

19    of those expression of those elements when you're connected to

10:44:17  20    the server depends on where you are in the game.  The

21    intensity of sound is not the same.  Changing the volume on

22    your computer doesn't -- does not approximate the fact that

23    that same code generates a louder sound because you're in the

24    game closer to the character that makes that sound.  From the

10:44:43  25    third-party MPQ Editor the sound is the same every time.  You

10:44:48  1   don't adjust the volume in your game to hear that sound

2   differently.  That's because that literal code when extracted

3   in connection with the server generates a different

4   expression.  And that expression, those are the nonliteral

10:45:00  5   elements.

6         *Lexmark*, although it is a case about printers and not

7   a case about video games or artistic works, it speaks to this

8   point.  The losing party in *Lexmark* tried to cite other cases

9   that say access is synonymous or equates to the ability to use

10:45:21 10   the work.  And the Court said no, because in *Lexmark* you are

11   only dealing with literal functional code.  You weren't

12   dealing with artistic expression that was generated by that

13   code like you are here.  And *Lexmark* recognized that in the

14   case where it is an artistic work, and the examples it used

10:45:40 15   were DVDs or video games, that there, of course what the owner

16   of the copyright wants to protect includes the nonliteral

17   works because that is where the enjoyment of the work comes

18   from.  It's the audiovisual manifestation of that work as the

19   copyright owner intended for it to be presented that is the

10:46:00 20   protected work.

21         And in that context, access under the DMCA is

22   synonymous with the right to use.

23         Mr. Ashe used the analogy of a symphony, which I

24   believe is an apt analogy, that using model viewers or MPQ

10:46:20 25   Editor may get you a few random notes in isolation from a

violinist or a basist or a cellist, but it does not create, it does not give you access to the symphonic convergence of all those elements.  And that is what we're protecting here. That's the access we're denying through Warden, but for Glider circumvention.

There are other analogies that are perhaps closer than a symphony to this actual case.  A pay-per-view movie service may permit the viewing of a couple of select scenes of a movie, but you cannot access the entire work itself.  You don't get to access the whole movie.  You can get a 30-second snippet of a song, but you don't get access to the entire song.  That's because it's the work in its entirety as the way it was -- the way it's rendered by the code, authored by the creator that matters.

And Mr. Ashe explained why Blizzard focuses it's protection on that, because the game is the work.  The way those elements are expressed Blizzard knows can only be replicated in that environment.  There are certain parts of the game, I believe he testified the text quests that only come down from the server to the game.  And that client, if you haven't connected to the servers, the game client with that content alone can never be generated through these third-party programs.

In summary, Your Honor, if the Court concludes that WoW's protectionable nonliteral elements are the unique

10:47:56  1   multimedia presentation generated by the code in the game

         2   client as controlled and choreographed during the connection

         3   with the WoW server, then MDY's trafficking of Glider which

         4   enables users to circumvent Warden and access those elements

10:48:10  5   which may only be accessed through the connection of the

         6   server violates 1201(a)(2).

         7        Unless Your Honor has questions, I'll address the

         8   other two remaining issues.

         9        THE COURT:  I do have a question.

10:48:27 10        Before I ask it, counsel, my judicial assistant has

        11   indicated that what was sent to chambers for the findings and

        12   conclusions was a .pdf file.

        13        MR. VENABLE:  I'd be happy to provide you with a Word

        14   file.

10:48:55 15        THE COURT:  If you would.  We need it in a word

        16   processing form.  If you can have your office do that later

        17   today that would be helpful.

        18        MR. VENABLE:  I'll personally take care of it.

        19        THE COURT:  Okay.  Here's the question.  1201(a)(2)(A)

10:49:14 20   talks about a work protected under this title.  Is that phrase

        21   defined in the statute?

        22        MR. GENETSKI:  A work protected under this title I

        23   believe is defined as a work protected under any of the

        24   protected works under section 101 of the copyright act, which

10:49:36 25   would include copyrighted software.

10:49:40   1         THE COURT:  Is the phrase "work" or the word "work"

  2   defined in 101?

  3         MR. GENETSKI:  I'm not sure, Your Honor.

  4         THE COURT:  Okay.  Go ahead.

10:49:54   5         MR. GENETSKI:  The one final point before we close on

  6   (a)(2) that I would direct Your Honor to is the notion that the

  7   individual elements, which are protectable in themselves if

  8   they have -- are covered by copyright registration and have

  9   their own artistic value and a fixed expression, does not mean

10:50:15 10   that the combination of all those elements is not also

  11   protected.

  12         There's case law dating back to sort of the much

  13   earlier renderings of video games, one involving Atari games

  14   where now Justice Ginsburg on the D.C. Circuit, in the old

10:50:35 15   breakout game where the ball comes down and you shoot back up

  16   to break up the brick wall, in that game even where some of

  17   the individual elements, the question was whether those were

  18   even copyrightable.  And what the Court held there was, what's

  19   clearly copyrightable are the fact that the group of images in

10:50:57 20   the context of the game is clearly an audiovisual work that is

  21   protected.  And Blizzard's copyright here protects the code

  22   and those audiovisual images that are generated by the client

  23   in WoW game play.

  24         The second issue is the individual liability of

10:51:17 25   Michael Donnelly.  And here, as I've stated, our position is

10:51:21   1   that Mr. Donnelly's personal participation in and direction of

2   all the acts that the Court has already deemed vicarious and

3   contributory copyright infringement and tortious interference

4   subject him to liability on those claims.  And similarly if

10:51:38   5   the Court were to hold that Blizzard prevailed on either its

6   (b)(1) or (a)(2) DMCA claims, that Mr. Donnelly has been

7   equally engaged in the acts that give rise to those potential

8   violations.

9        We cited what we believe to be the appropriate law in

10:51:54  10   the conclusions of law that despite acting within the scope of

11   employment or representation of a corporate entity an officer

12   or director is liable if that officer or director engages in

13   the acts that give rise to liability.

14        And there are a number of acts that the Court

10:52:16  15   specifically found as a matter of law created liability in its

16   summary judgment order:  That MDY developed and sold Glider

17   with knowledge that Glider users infringed; that it promoted

18   Glider use with World of Warcraft; that MDY controls Glider's

19   ability to work; profits from Glider sales; knows that Glider

10:52:38  20   use violates the contract between Blizzard and its users;

21   promotes Glider despite that knowledge.

22        The Court specifically found in its order that

23   Michael Donnelly's admission that he knew as of September 2005

24   that Blizzard banned Glider users.

10:52:52  25        Mr. Donnelly's subsequent modification of Glider to

10:52:54   1   evade detection by Blizzard --

          2          THE COURT REPORTER:  Counsel, I need you to slow down.

          3          MR. GENETSKI:  Oh, I'm sorry.

          4          Mr. Donnelly's admission that he knew as of September

10:53:09   5   2005 that Blizzard banned Glider users.  Mr. Donnelly's

          6   subsequent modification of Glider to evade detection by

          7   Blizzard, and his express acknowledgment that Glider use

          8   breached users' contract with Blizzard were all cited by the

          9   Court in its order as grounds for imposing liability at that

10:53:32  10   time on MDY.

         11          There are a number of findings in summary, Your

         12   Honor.  I won't go through all of them.  They're pages 5 and

         13   22 and 23 primarily of the Court's summary judgment order.

         14   That established the liability as a matter of law for tortious

10:53:51  15   interference and copyright infringement.

         16          Yesterday Mr. Donnelly's testimony on direct

         17   examination essentially was a litany of admissions that it was

         18   he, Michael Donnelly, as the sole member of MDY, who made each

         19   of these significant decisions and committed every significant

10:54:07  20   act that the Court had deemed in that order tortious and

         21   infringing.  He seem to essentially attempt to reargue all

         22   those issues in the same way they were argued on MDY's behalf

         23   at summary judgment; that his authorship and promotion of

         24   Glider and awareness of the contracts; the rationale for

10:54:24  25   producing the Glider business.

10:54:28  1          But the Court has already found those acts unlawful.

2          Donnelly seemed to argue that perhaps his state of

3     mind at the time were that these pursuits were not unlawful,

4     but there's no basis in law or fact to distinguish his acts.

10:54:45  5     And the Court has already found unlawful as a matter of law as

6     to MDY.

7          And however novel Mr. Donnelly considered and

8     apparently still considers the application of the DMCA and

9     copyright law to his conduct, that doesn't excuse the conduct.

10:55:04 10     And beyond that, Mr. Donnelly was well aware, the record's

11     entirely clear on this, that he was aware from nearly the

12     outset of this business that his actions induced breaches of

13     Blizzard's contracts.

14          There is no law offered by MDY in the proposed

10:55:27 15     conclusions of law to dispute the conclusions that Blizzard

16     offers as to what the proper standards are for imposition of

17     individual liability when the acts are engaged in by the

18     corporate officer, and there's no evidence in the record to

19     detach Michael Donnelly in any way from any of the significant

10:55:41 20     acts that gave rise to MDY.  So we would submit that the law

21     compel a finding that Mr. Donnelly is also individually

22     personally liable.

23          Finally, on injunctive relief.  Conclusions of law

24     showed both parties agree that the *eBay* test from the Supreme

10:56:03 25     Court is the applicable test here with the four *eBay* elements.

10:56:06  1        I would note that yesterday in either -- I believe it

2  was the pre-opening statement portion, that Mr. Venable cited

3  the *Napster* case as a good analogy to the present one in that

4  it raised novel copyright issues that warranted permitting

10:56:23  5  Napster to operate pending a decision from the Ninth Circuit

6  and arguing that here, for similar reasons, Glider should be

7  able to continue operation.  But *Napster* is not an apt

8  comparison that supports an argument of an entry of an

9  injunction here.

10:56:39 10        In *Napster*, the district court first was dealing in a

11  preliminary injunction context, not making a decision about a

12  permanent injunction at the close of the case.

13        Second, the district court in *Napster* did enter an

14  injunction enjoining Napster.  The injunction was stayed by

10:56:57 15  the Ninth Circuit.

16        When that case went on appeal, ultimately, of course,

17  the Ninth Circuit affirmed the core holdings of the district

18  court and the injunction was imposed again then at the close

19  of the case.

10:57:15 20        I'd also point out, Your Honor, that unlike *Napster*,

21  in this case, for this case to be overturned, it's going to

22  require an en banc revisitation of the *MAI Systems* case which

23  has been binding precedent in the Ninth Circuit for almost 15

24  years at this point.

10:57:34 25        As to the elements on irreparable harm, we cited a

10:57:38   1    number of case, granted many of them or most of them pre-*eBay*,

       2    that speak to the fact that where liability has been

       3    established at a permanent injunction stage -- at the close of

       4    the case stage, final judgment stage, and there's still a

10:57:52   5    threat of continuing violations, that that's enough standing

       6    alone for a permanent injunction.

       7        *EBay* clearly says you still have to satisfy these four

       8    factors.  But there is a case from September of this year from

       9    the District Court of Arizona, the *Designer Skin* case, and we

10:58:08  10    can provide -- it's an unpublished case but can provide it to

      11    the Court.  It is a copyright infringement case that analyzes

      12    how the *eBay* rule should be applied in a copyright infringement

      13    case and it's squared with the prior case law.  And what that

      14    court says is that -- the *eBay* court didn't address what the

10:58:29  15    necessary showing was to establish irreparable harm, just that

      16    you needed to establish it.

      17        And that what the court there says is that the burden

      18    of proof that the plaintiff must carry may be carried by

      19    showing that it satisfies this old two-part test.  It just has

10:58:51  20    a burden.  It isn't automatically entitled to an injunction it

      21    must prove it.  But the old two-part showing of establishment

      22    of liability and a threat of continued violations, particularly

      23    in copyright infringement case, could satisfy prong one, the

      24    irreparable harm prong of the *eBay* test.

10:59:11  25        Beyond that, here we heard a lot of evidence in this

10:59:14  1  case that shows that Blizzard will -- is suffering and will

        2  continue to suffer ongoing irreparable harm if MDY and Donnelly

        3  are not enjoined.  It is clear that MDY is persisting in

        4  selling and supporting Glider despite the Court's order issued

10:59:30  5  in July.

        6       It is also clear from Mr. Ashe's testimony that the

        7  continued sale and use of Glider damages Blizzard's reputation

        8  with its customers.  The complaints continue to file in about

        9  Glider use.  Blizzard continues to devote significant resources

10:59:45 10  to try to find a way to stop Glider technologically.  Those

       11  efforts have remained frustrated to date.

       12       And that's money that could be reallocated, as

       13  Mr. Ashe noted, to much more productive endeavors by Blizzard

       14  if Glider was no longer an issue.

11:00:03 15       Mr. Ashe also testified as to the inadequacy of legal

       16  remedies in this case.  While Blizzard as been able to quantify

       17  a measure of damages, a baseline measure of damages and the

       18  hard costs that they're expending to combat Glider, what they

       19  can't quantify is the overall effect on the user population

11:00:22 20  through that loss of their goodwill, how much bots are driving

       21  users from the game, soiling Blizzard's reputation in the

       22  marketplace for gamers as a company who cannot control bots and

       23  cheats in their game.  There is no available method short of an

       24  injunction that will allow Blizzard to be compensated for these

11:00:47 25  losses.

11:00:47   1        Mr. Donnelly noted in his testimony that a number of

          2   users of bots are eagerly awaiting to hear whether MDY will be

          3   enjoined in this case.  I think he noted that there was a

          4   competitor that has a bot that he testified is easily detected

11:01:01   5   by Blizzard, but is attempting -- is already trying to pursue

          6   the would-be Glider customers.

          7        But the evidence of record is that Glider is the bot

          8   that causes Blizzard's problems because that's the bot that's

          9   undetected.  If an injunction is not entered and this case were

11:01:19  10   to go to appeal, it sends a message to the Glider-user

          11   community, which will be communicated rapidly, I'm sure, that

          12   they now have another 9- to 12-month run with Glider in which

          13   they can continue to exploit the Blizzard game to the

          14   resentment of Blizzard's legitimate users.  Blizzard will be

11:01:38  15   forced to continue to incur those expenses.  And the folks

          16   using Glider know that they have a good period of time to

          17   acquire virtual property, sell it, level up, secondary

          18   characters, and beat Blizzard at its game.

          19        The third factor is balance of hardships.  The

11:01:57  20   evidence has shown that Glider has no demonstrated use beyond

          21   cheating in World of Warcraft.  And that its operation has

          22   really no utility and certainly no commercial utility beyond

          23   facilitating infringements and contractual breaches.

          24        We cited cases in the proposed conclusions of law that

11:02:19  25   make clear, even in the context of a preliminary injunction and

11:02:22  1   not a permanent injunction, that the claim by someone who's

2   found to be an infringer or a tortious actor that an injunction

3   will force them to stop that tortious activity and their

4   infringing activity and put them out of business is not a valid

11:02:38  5   claim of hardship.

6        The hardship to Blizzard is clear, as I spoke of on

7   the irreparable harm points.  It will continue suffering

8   reputational harm, its costs will continue to be suffered in

9   fighting Glider, and the devaluation of its goodwill with

11:02:59 10  customers will continue as they see and draw the conclusion

11  that Blizzard is unable, either technically and now legally, to

12  stop the flood of bots in its game.

13       Mr. Donnelly would have the Court believe that had he

14  simply received a demand letter in 2006 it would have caused

11:03:16 15  him to stop selling Glider.  But the proof on this is in the

16  pudding, Your Honor.  He didn't stop when Blizzard asserted its

17  legal claims in this case after it felt that it had exhausted

18  all technical efforts to that point to stop Glider.  Instead,

19  Mr. Donnelly redoubled those efforts.

11:03:34 20       His sales continue to grow as the litigation wore on

21  and he became more determined to continue his activity.  We

22  certainly don't begrudge MDY's or Mr. Donnelly's right to

23  contest the claims.  But they have now lost.  We've reached the

24  stages of final judgment and the judgment having been rendered

11:03:53 25  now is the time to halt Glider.  By Mr. Donnelly's own

11:03:56  1    admissions, he rejects the Court's conclusions and he's not

       2    going to stop running his Glider business unless he's expressly

       3    ordered to do so by this Court.

       4         Finally, the fourth factor, the public interest

11:04:07  5    clearly supports enjoining a product that the Court has deemed

       6    purely exploitative.  And a more relevant narrow public here,

       7    the players of World of Warcraft have made their voices heard

       8    loud and clear.  The overwhelming majority of players don't

       9    want bots in the game.

11:04:26 10         MR. VENABLE:  Objection, Your Honor, that's not in the

      11    record.  There's no evidence of that in the record.

      12         THE COURT:  I understand that objection.

      13         MR. GENETSKI:  Mr. Ashe testified that Blizzard feels

      14    compelled to spend the money it does fighting bots in the game

11:04:40 15    because it feels that's what its users demand.

      16         And that user population dwarfs the user population

      17    of Glider users who seek to exploit the game.  And the test

      18    for public interest is whether the public interest would be

      19    disserved by enjoining MDY from the sale of an infringing and

11:05:02 20    tortious product.  And it's clear that no public interest

      21    would be disserved by stopping them.

      22         So, Your Honor, we believe that Blizzard has carried

      23    its burden in this case on the DMCA claims as to

      24    Mr. Donnelly's liability and as to the propriety of the entry

11:05:25 25    of a permanent injunction.

11:05:26   1            Unless Your Honor has questions, I'll step down.

2            THE COURT:  Thanks.

3            Mr. Venable.

4            MR. VENABLE:  Good morning, Your Honor.  I'll address

11:05:54   5   the issues pertaining to the DMCA first and then when I'm done

6   I will hand this off to my partner Joe Meaney to speak about

7   the personal liability and I'll come back to speak about the

8   injunctive relief issue.

9            I would go in the same order that Mr. Genetski did on

11:06:12  10   the DMCA issue just to address those issues.  Your Honor, with

11   regard to the (b)(1) claim, I think Mr. Genetski is -- made

12   the point that we were essentially trying to conflate the

13   issue with access in the (a)(2) claim with issues involving

14   the limitations of rights in the (b)(1) claim.

11:06:40  15            I would offer to Your Honor that I don't believe that

16   is true.  I think that what Mr. Genetski was doing is he's

17   conflating the question of whether something was in violation

18   of the copyright law with whether or not something is in

19   violation of the DMCA.  And what we have presented into

11:06:57  20   evidence to establish that there's no (b)(1) liability is very

21   simple, Your Honor.

22            The issue of whether or not the literal elements that

23   are residing on the hard drive of a user who plays World of

24   Warcraft, we do not dispute that in playing World of Warcraft

11:07:18  25   those elements are indeed copied.  And certainly what the

11:07:22  1   Court has said in this case is that that in and of itself is a

2   violation of the copyright law.  But the DMCA requires more

3   than just a copy from the hard drive to RAM of a particular

4   file.  We've heard that the WoW.exe file is certainly loaded

11:07:45  5   into RAM, and it's loaded into RAM when the WoW.exe file is

6   executed.

7         And of course there are the nonliteral elements,

8   which I guess we would say the literal elements of the

9   nonliteral element files that are sitting on the hard drive

11:08:01  10   that also get loaded after that.  We don't dispute that.

11         But what we do dispute is that under the DMCA there

12   is a requirement under (b)(1) that it be protected, and that

13   those additional files must in fact be protected.  Which I

14   think raises the question here, and I think this is really at

11:08:20  15   the heart of the (b)(1) claim, is what in fact is that

16   protected right?  If the protected right is under 106, I

17   believe it is (a), 106(a)(1), that Blizzard's right to its

18   copyright in the files that are sitting on your hard drive are

19   being moved from the hard drive to the RAM, that right has

11:08:48  20   been violated under copyright law.

21         But the measures, the technological measures that

22   they use to protect those files, which would be the Warden and

23   the scan.dll program.  I'm not going to worry about addressing

24   scan.dll because we feel that we have addressed that issue in

11:09:06  25   our briefing to the Court with summary judgment, that scan.dll

11:09:10  1    is not a measure that Warden -- that Glider tries to avoid

2    because you can simply wait until after it's there.  So in

3    other words, if I load World of Warcraft first and I simply

4    decide to load my program after scan.dll, I'm not really sure

11:09:27  5    that that would under any definition of the word qualify as a

6    measure that's protecting the work that's allegedly claimed is

7    a protected right under the law.

8           But Warden itself, the resident program which resides

9    on the user's hard drive -- or in the RAM, it's working, it's

11:09:47  10   working to check to see if there are other programs that are

11   out there that are available.  Under no circumstances is

12   Warden able to protect, under any circumstances, the loading

13   of that -- those files from the hard drive to RAM.  So the

14   right to copy those files that Blizzard has is not being

11:10:09  15   protected.

16          Now, Blizzard would have you think, well, yes, they

17   are protected in the order that they are loaded into RAM

18   because there's some, as they use the word, symphony that is

19   going on here.  We have this symphony that is guiding which

11:10:24  20   files are being loaded in which order because that's the way

21   you ultimately perceive what is on the screen.  But as I asked

22   Mr. Ashe yesterday, and he certainly could not provide me the

23   answer to this, I asked him where is this symphony.  Because

24   what they're essentially trying to conflate here is the right

11:10:44  25   to their service with the right to whether actually sitting

11:10:46   1   there on the hard drive unprotected.

2           And in order to have a protected right to anything

3   under the copyright law, this is basic copyright law, it must

4   be in some form that you can actually say I have a right to

11:10:58   5   it.  In other words, where am I going to go to the copyright

6   office and say, I have a protected right on a symphony that

7   has never existed and it's at best fleeting?

8           The director who looks at a piece of sheet music and

9   is playing and is directing the instruments in the orchestra

11:11:16  10   to play the music is looking at a piece of sheet music that is

11   fixed.  But this symphony that they refer to is certainly not

12   fixed.  It is not even created.  And in fact Mr. Ashe admitted

13   on the stand that it is never the same twice.

14           So how does one define what is the protected right?

11:11:37  15   Is there a protected right in the order in which it is

16   displayed?  Well, then I say how is that -- how is that order

17   created?  We've seen that not only Mr. Ashe but Mr. Donnelly

18   and to a certain extent what Mr. Calandrino said yesterday, is

19   that that symphony is certainly not created by Blizzard.  To

11:11:59  20   the extent that the order in which those files are loaded from

21   the hard drive into RAM, it's being done by the player, the

22   player moves his character, the player hits a key, moves

23   something on the screen.  And what it does is it directs --

24   the user directs Blizzard's server to put something on the

11:12:19  25   paper so that the server, the conductor, says move this file

11:12:25   1   into RAM so that we can see what is on the screen.

2          Certainly other users are involved in this.  If there

3   are other characters that play the game, their characters, the

4   way they look, even the user who's playing, the way they look

11:12:41   5   are all determined.  The selection and arrangement of how my

6   character looks is ultimately determined by me.  Blizzard may

7   provide the underlying elements, but those elements are still

8   sitting on my hard drive.

9          And as Mr. Donnelly was readily able to do yesterday,

11:12:54  10   we can generate those.  We can generate those and create a

11   character how we want it to look.  No differently than we can

12   create it using the WorldofWarcraft.exe file, which is just a

13   tool for doing exactly what all these other programs could do.

14          So in the sense that this symphony that they refer to

11:13:13  15   is being created, it's not being created by anything that

16   Blizzard is in fact doing.

17          In fact, they argue, well, let's say that it really

18   is because they have things that they have created, things

19   that they have -- their monsters that appear in certain

11:13:30  20   locations.  But let's not forget, Your Honor, they themselves

21   even said that you cannot even see those monsters that they

22   have created until the user decides that they want to get

23   close enough so that what is on their screen is actually

24   protected.  So then I ask myself, well, are they referring to

11:13:51  25   what ultimately appears on the screen, the audiovisual works,

11:13:54  1   is that what they're saying is actually the protected right,

2   that Blizzard is somehow protected?

3          Well, there's a case that's directly on point in

4   this, Your Honor.  And I believe -- it is a Ninth Circuit

11:14:06  5   case.  It's *Lewis Galoob Toys versus Nintendo of America*.  And

6   I would just like to read one section of this because this

7   goes directly to what they're saying in this case about the

8   audiovisual works.

9          THE COURT:  Would you give me the cite, please?

11:14:19 10          MR. VENABLE:  Yes, it's 964 F.2d 965.  Ninth Circuit

11   1992.  And this case was obviously before the DMCA.  So this is

12   not a question of whether there's a circumvention of rights.

13   But it does address the question of what constitutes the

14   protected rights that they may be arguing here, because I think

11:14:42 15   that has really been the problem with what we've been trying to

16   figure out here is, what is the protected right?  It is clear

17   that under (b)(1) you have to have a protected right before you

18   can even have something to protect.

19          And under the *Galoob* case, this was a case where

11:14:57 20   Nintendo put -- Nintendo creates a game program -- a game

21   system.  And of course, if you recall, this is in the early

22   '90s, you would use cartridges to play.  You would use

23   cartridges to have to play the games and they would put

24   various images up on the screen.  Just like Mr. Genetski

11:15:17 25   referred to the break-out case.

11:15:19   1          Well, there was a gentleman that came along, a

2     company that came along, who developed something called the

3     Game Genie.  It's an add-on program much in the same way that

4     Mr. Donnelly has created -- has created Glider.  And of course

11:15:36   5     what this program did was, it didn't just act as a bot, it

6     wasn't just sort of like some thing that's running in the

7     background that's just allowing your player to bot through the

8     program.

9          This actually went above and beyond that.  It

11:15:48  10     actually gave your character more strength.  It made you much

11     stronger within the game.  Something that Glider clearly did

12     not do.  It may do a lot of things that Blizzard doesn't like,

13     but it doesn't give you any added advantage other than the

14     ability to play when you're not sitting at the computer.

11:16:06  15          Of course, Nintendo didn't want this to happen.  They

16     sued the maker of the Game Genie for the very same reason that

17     they're saying this is wrong, you can't do this, you have to

18     have our permission to do it.

19          And what Nintendo argued was that they thought that

11:16:23  20     the audiovisual works that appeared on the screen were in fact

21     their protected right.  What they said here was, in the court,

22     that Nintendo also argues that our analysis should focus

23     exclusively on the audiovisual displays --

24          THE COURT:  A little slower, please.

11:16:37  25          MR. VENABLE:  I'm sorry.

11:16:38   1          -- created by the Game Genie.  I.e., that we should

       2    compare the altered displays to Nintendo's original displays.

       3    Nintendo emphasizes that audiovisual works are works that

       4    consist of a series of related images regardless -- regardless

11:16:53   5    of the nature of the material objects in which the works are

       6    embodied.

       7          The Copyright Act's definition of audiovisual works,

       8    however, is inapposite.  The only question before us is

       9    whether the audiovisual displayed works created by the Game

11:17:08  10    Genie are derivative works.  And I think that in fact that's

      11    really what they're saying here is, is this thing that appears

      12    on the screen something that we're copying?  No, it is

      13    something that's being derived.  It is a derivative work if

      14    anything.

11:17:23  15          And the act does not provide similar to that, a work

      16    can be a derivative work regardless of the nature of the

      17    material objects in which the work is embodied.

      18          Nintendo relied heavily on a Seventh Circuit case

      19    that was called *Midway Manufacturing Company versus Arctic*,

11:17:37  20    which said, in a nutshell, that the output of what a computer

      21    video game puts up on the screen can be considered a work that

      22    is protected.  But the Ninth Circuit distinguished this.  It

      23    said that *Midway* can be distinguished.

      24          The defendant in *Midway*, Arctic International,

11:17:56  25    marketed a computer chip that could be inserted into a

11:18:01   1   Galaxian video game to speed up the rate of play.  The Seventh

         2   Circuit held that the speeded-up version of Galaxian was a

         3   derivative work and that Arctic's chip substantially copied

         4   and replaced the chip that was purchased by Midway.

11:18:16   5   Purchasers of the Arctic chip also benefited economically by

         6   offering the altered game for use by general public.

         7        The Game Genie does not physically incorporate a

         8   portion of a copyrighted work, nor does it supplant the demand

         9   for the component of the work.  The Court in *Midway*

11:18:37  10   acknowledged that the Copyright Act's definition of derivative

        11   work must be stretched to accommodate speeding up video games.

        12   Stretching that definition, and this is important, would

        13   further chill innovation and fail to protect societies'

        14   competing interest in the free flow of ideas, information and

11:18:55  15   commerce.

        16        It went on to say that it would not allow these

        17   audiovisual works to be treated as anything that's considered

        18   a protected right.  And the primary reason was because the

        19   work itself that appears on the screen is not in a permanent

11:19:09  20   or concrete form.

        21        That is important, Your Honor, because this is

        22   exactly what we're talking about when it comes to this

        23   symphony.  There is nothing that Blizzard can show, there's no

        24   evidence in the record, that what ultimately they're claiming

11:19:22  25   a right to, which is the -- it is essentially the order in

11:19:25   1   which these files get directed into the random access memory,

        2   that is the protected right here.  Because if they're just

        3   claiming it's the right to move the files from the hard drive

        4   into RAM, it's not being protected.  It may be a protected

11:19:41   5   right but it's not being protected.  And the DMCA under (b)(1)

        6   requires that much in order to be able to claim it is a

        7   violation of (b)(1).

        8        So again, to the extent that Blizzard claims that

        9   they have a protected right, we still don't even know what

11:19:56  10   that is here, other than the right to copy, which the Court

       11   has already said is illegal.  And if that's what we're talking

       12   about here, that's already been addressed by the Court.

       13        So to the extent that we have anything under (b)(1),

       14   Your Honor, we -- we strenuously dispute that.

11:20:13  15        And that also applies to the issues of the literal

       16   code and the nonliteral code, Your Honor, because it doesn't

       17   matter which one we're referring to.  Glider was designed to

       18   assist botting.  It was not designed to deal with whether

       19   there's loading of software from hard drive into RAM.  And in

11:20:37  20   fact, whether there is -- whether there's a presentation

       21   ultimately that appears nonliterally, Your Honor, it -- again,

       22   it's just not fixed.  There's no -- it's basic copyright law.

       23   It has to be -- there has to be something to say that we're

       24   violating here.  We don't copy this.  We don't take what's on

11:20:57  25   the screen or we don't take what's in RAM and make copies of

11:21:01  1    it.  Glider has nothing to do with that.

2                      Your Honor, with regard to the (a)(2) claim --

3                      THE COURT:  Let's pause for a minute.

4                      MR. VENABLE:  Sure.

11:21:13  5            THE COURT:  Yesterday Blizzard showed a video of the

6      battle and death of Illidan.

7                      MR. VENABLE:  Yes.

8                      THE COURT:  Is that copyrightable?

9                      MR. VENABLE:  Yes, it is because it's in a fixed form.

11:21:41 10            THE COURT:  If it wasn't on that video but the game

11     had the ability to reproduce the battle and death of Illidan,

12     which is probably going on now somewhere on some Blizzard

13     server with some people in the world fighting him, is that

14     copyrightable?

11:21:59 15            MR. VENABLE:  If the battle itself was in the same --

16     fixed in the same way that, say, a movie is on a DVD, because

17     then it is actually in a fixed form.  But even Mr. Ashe

18     acknowledged that that bottle is never the same battle twice.

19                     THE COURT:  So your contention is that the rendering,

11:22:21 20    the dynamic rendering of events in World of Warcraft that can

21     be perceived on computer screens all over the world is not

22     copyrighted?

23                     MR. VENABLE:  The dynamic portion of it yes, because

24     it's never the same experience.  In fact Blizzard advertises

11:22:39 25    its game on the many different reasons why people can play

11:22:44  1    World of Warcraft.  One may be they just want to walk around

2    and see different things or they participate in different

3    battles or whatever, but it's never the same.

4         THE COURT:  I understand that point, and I don't think

11:22:56  5    anybody is disputing that it's dynamic.  What you just read to

6    me from the *Lewis* case did not say that Nintendo's display,

7    visual display, of the playing of the game was not

8    copyrightable.  It said the Game Genie was not a derivative

9    work.

11:23:16  10        Is there law for the proposition that the dynamic

11    display of a video game is not copyrightable because it's not

12    fixed?

13        MR. VENABLE:  I don't believe -- I'll have to check,

14    Your Honor.  To ask me off the top of my head, I haven't really

11:23:37  15    seen anything directly.

16        THE COURT:  That's a pretty fundamental issue.

17        MR. VENABLE:  But I think the converse is also true.

18    I'm not really sure there is anything that says it is.  I

19    believe --

11:23:47  20        THE COURT:  Isn't it the nonliteral aspect of anybody

21    who's using computer code?  I mean, if I use Microsoft Word, as

22    I'm using it, it's me who's controlling what it's doing.  As

23    I'm using it to write a letter, I may be using it in a way that

24    it's never been used before.  It maybe completely different

11:24:08  25    from what you've ever used it to write.  But isn't the, not

11:24:15  1   only the code but the nonliteral representation of the code

2   copyrightable?

3        MR. VENABLE:  Using the Microsoft Word example, Your

4   Honor, let's say Microsoft Word was sitting behind a server

11:24:27  5   somewhere, okay, and I am -- I have a license to access this,

6   this code or this program, and I want to type in ABC.  If there

7   is a macro that is built within Microsoft Word that every time

8   I type ABC I see DEF, or every time I type GHI there is another

9   user who's using another Microsoft Word program on the server

11:25:01  10  that gets told to send over a HIJ and have it appear on my

11  screen, that's what's going on in the World of Warcraft, Your

12  Honor.  I would ask you, then, what appears on the screen,

13  who's the author of that?  Who directed what appears on the

14  screen?

11:25:20  15       THE COURT:  Well, I understand that argument.  What

16  I'm -- what I'm pausing on is the notion that has been argued,

17  I think, for the first time in the last day and a half that the

18  nonliteral aspects of World of Warcraft, other than the static

19  character or landscape or sound that you can look at with

11:25:44  20  something like Model Viewer is not copyrightable because it's

21  not static, it's not fixed.

22       I guess I had assumed -- I'm not expert on copyright

23  law, but I had assumed coming into this trial that the

24  nonliteral aspects of World of Warcraft included not only, you

11:26:04  25  know, the specific code on the hard drive that gets copied to

11:26:08  1   RAM, but also the game experience that somebody watches and

2   hears as they're sitting at their computer screen playing the

3   game.  And you're saying, no, that's not copyrightable.

4        MR. VENABLE:  I'm saying that it's not fixed.  If I'm

11:26:24  5   saying it's not fixed, I would say that I would cite to the

6   statute as my basis for saying it can't be considered

7   copyrightable because it's never changed.

8        THE COURT:  This has to be an issue that's been

9   decided in the case law, isn't it?  We've had computer games

11:26:39 10   now for 20 years.

11        MR. VENABLE:  But to the extent, Your Honor, that

12   these nonliteral elements are embodied in the codes that are

13   sitting on the hard drive, they're not being protected --

14        THE COURT:  I understand that.  I understand that.

11:26:50 15   We're going to get to that in a minute.  I understand your

16   point that you've got the nonliteral code which are the actual

17   script and you've got -- the literal code, and you've got the

18   nonliteral image of Illidan that you can call up on Model

19   Viewer and make him run and make him die, as we did yesterday.

11:27:09 20   And you're agreeing that that nonliteral code is copyrightable.

21   But what you're saying is the symphony isn't.  When you put

22   them all together in the game and it's dynamic and they're

23   working together with players and servers around the world,

24   that's not copyrightable because that's not fixed?  Correct?

11:27:29 25        MR. VENABLE:  Yes, I'm saying that is exactly the case

11:27:30  1    because World of Warcraft, if anything, is a very unique piece

2    of software.  There are literally infinite number of ways that

3    the, quote, unquote, symphony can be displayed.

4         THE COURT:  Well, but that's true for lots of video

11:27:42  5    games, right?  I mean, when my son plays with his brother,

6    who's out of state, Call of Duty 4 and they're fighting other

7    guys and marching around the countryside, that's a dynamic

8    game --

9         MR. VENABLE:  It is dynamic.

11:27:56  10        THE COURT:  -- just like World of Warcraft, right?

11        MR. VENABLE:  Yes, it is.  It is.  But I would also

12    say that to the extent that these nonliteral elements are

13    sitting on the hard drive, if we're simply saying the protected

14    right is to protect the right to copy those into RAM, yes, they

11:28:12  15    do have a right to protect that.  What I'm saying is they

16    don't.

17        THE COURT:  I understand that point.  Now -- but I'm

18    going to stick with this for a minute because I want to make

19    sure I understand this.  Let's jump to (a)(2) for a minute

11:28:26  20    where it talks about -- and I asked Mr. Genetski this question.

21    It talks about the work protected under this title.

22        If I understand your position, you would say -- I

23    want to ask you about three different things.  You would say,

24    number one, the literal code written in the hard drive can be

11:28:47  25    a work protected under the title.  You would say, number two,

11:28:52  1  that the nonliteral manifestation of that code to the extent

2  it's fixed, such as the image of Illidan that you can make run

3  or die, is copyrightable.  But you would say the dynamic

4  expression of the game when all of those are brought together

11:29:09  5  is not a work protected by this act.  Agreed?

6          MR. VENABLE:  Yes.  Yes.

7          THE COURT:  And it's because it's not a work protected

8  by this act that Warden doesn't protect some right of

9  Blizzard's because Blizzard doesn't have a right to protect the

11:29:28  10  dynamic expression of the game.

11          That's your contention on (b)(1).  Part of it.

12          MR. VENABLE:  Yes.  Part of it, yes.

13          THE COURT:  Okay.  All right.  I understand it.

14          I am going to be interested to hear what Blizzard

11:29:43  15  says about the state of law and I may need some additional

16  briefing on this question of whether the dynamic portions of

17  the computer game constitute a copyrightable work, but let me

18  go to the other part of (b)(1) for a minute.

19          The other part of (b)(1) I understand you to be

11:29:58  20  arguing is when it comes to the first two things, the things

21  you agree are copyrightable, the literal code and the static

22  nonliteral illustration of the code, your argument is that

23  (b)(1) isn't violated because the copying of the literal code

24  into RAM that occurs after you evade Warden -- well, let me

11:30:25  25  state it differently.  By preventing you from copying after --

11:30:29  1    let me start over.

2                   If Warden prevents from you copying to RAM as you

3        play the game forward, that doesn't really come within (b)(1)

4        because Blizzard otherwise doesn't restrict the copying.  You

11:30:43  5    can do it even after Warden shuts you out of the game.  You

6        can load up a different program and copy it to your heart's

7        content.  That's your point, right?

8                   MR. VENABLE:  That's correct.

9                   THE COURT:  Okay.  Here's the issue I want to ask you

11:30:53 10    about.  Do you have (b)(1) in front of you?

11                   MR. VENABLE:  I do, Your Honor.

12                   THE COURT:  If you look at (b) -- actually, let's look

13       at (b)(2)(B) which says, "A technological measure effectively

14       protects a right of a copyright owner under this title if the

11:31:15 15    measure in the ordinary course of its operation prevents,

16       restricts, or otherwise limits the exercise of a right."

17                   For your argument to be correct, wouldn't you have to

18       eliminate the words "restricts or otherwise limits" from the

19       statute?  So that the statute says that it's effective if it

11:31:41 20    prevents copying?

21                   MR. VENABLE:  Your Honor, if we read the right of a

22       copyright owner as you had stated before, to mean that it

23       protects the -- essentially the symphony, I don't have any

24       response to that, Your Honor.  I will concede that they are

11:32:02 25    probably -- under that definition they would win.

11:32:05  1          THE COURT:  If the symphony is protected, you're

       2  saying?

       3          MR. VENABLE:  I'm saying it is a question of what

       4  constitutes the protected right.

11:32:11  5          THE COURT:  Okay.  Let's say the right -- let's set

       6  the symphony issue aside for a minute.  I understand your point

       7  on that.  Let's say the right we're talking about is simply

       8  copying literal code into RAM.

       9          MR. VENABLE:  Yes.

11:32:25 10          THE COURT:  Now, under the Ninth Circuit law that I

      11  know you and your client disagree with, that copying to RAM is

      12  copying for purposes of the Copyright Act.  It is a right of

      13  the copyright holder.

      14          MR. VENABLE:  Yes.

11:32:37 15          THE COURT:  Warden doesn't prevent it because you can

      16  still do it.  But doesn't it limit it?

      17          MR. VENABLE:  How so?

      18          THE COURT:  It limits the player's ability to copy to

      19  RAM post Warden.  It shuts you out so you can't copy to RAM as

11:32:53 20  you go on to play the game.  And in that respect, it limits

      21  your ability to copy to RAM.

      22          MR. VENABLE:  If we're talking about that the

      23  unauthorized copy being the copy that is being loaded into RAM

      24  during game play, I think that's what you're saying, it still

11:33:12 25  goes back to me, Your Honor.  There's two other -- there's two

11:33:15  1    issues related to that.  One is there's a presumption, then,

2    that this symphony that's being used to create and move this

3    stuff that you would have access to, is somehow being authored

4    by Blizzard.  And what we contest is that that is not the case.

11:33:33  5    That the symphony, the order, it seems to me like you're saying

6    limits us from being able to move the blocks of RAM -- blocks

7    of hard drive into the RAM in the order in which Blizzard is

8    telling us to.

9              THE COURT:  No.  Forget the symphony, forget the

11:33:49  10   order.

11             MR. VENABLE:  Okay.

12             THE COURT:  Blizzard wrote the code that's on the hard

13   drive.

14             MR. VENABLE:  Yes.

11:33:52  15            THE COURT:  Blizzard has the right to control the

16   copying of that code.  If you evade Warden and some of that

17   code is copied to RAM, under the Ninth Circuit that's a copying

18   right --

19             MR. VENABLE:  Absolutely.  Absolutely.

11:34:04  20            THE COURT:  -- doesn't Blizzard limit your ability to

21   do that if it shuts you out of the game?  Because you can --

22             MR. VENABLE:  No, it --

23             THE COURT:  -- you can then no longer copy to RAM as

24   you play the game.  And maybe we're splitting hairs.  I know

11:34:17  25   you can copy elsewhere, but doesn't have to just prevent you,

11:34:20   1   all it has to do is limit you to be within (b)(1).

2           MR. VENABLE:  But is the limitation the limit to be

3   able to copy or the limit to be able to control how it is

4   copied?

11:34:31   5           THE COURT:  I guess it's the limit to copy as you go

6   on playing the game.  It says we're limiting you.  You can no

7   longer copy to RAM once Warden shuts you down.

8           MR. VENABLE:  I will concede if that is how the Court

9   interprets it, we have problems.  But I will say if there

11:34:47  10   are -- if you look at the way the statute says, it doesn't

11   say -- there is no limitation, quote, unquote, on the issue of

12   the copy.  The copy can still be loaded.  Even though you're

13   saying it can be limited, it's limited within the course of the

14   game.  But that doesn't say -- the statute doesn't say only one

11:35:13  15   particular type of copy.  It says the right of the -- the right

16   that the copyright owner has which is the right to stop the

17   copying from being -- from taking place.

18           What I say is that if I read the statute, it does not

19   limit me from being able to move the blocks of code from the

11:35:31  20   hard drive into RAM.  It doesn't.  There's no -- there's

21   nothing -- even if I stop playing the game, cut me off from

22   the server, the literal reading of what that says, even using

23   the word "limit," the block -- the block of code does not get

24   limited.

11:35:48  25           And if you look at -- if you look at let's say the

11:35:52  1    *Lexmark* case, the *Lexmark* case was a true limitation because

2    the code was actually sitting there and it literally prevented

3    you from being able to load it.  You could not load it.

4    That -- I think there is no -- there is nothing in the

11:36:08  5    definition of 1201(b)(2)(B) that says that the limit has to be

6    for a particular copy that's happening.  It does not say that.

7         I will concede, Your Honor, if you don't find it that

8    way, I'm not really sure we have a response to that.

9         THE COURT:  Well, if I understand your argument -- and

11:36:28 10    I'm going to be interested, Mr. Genetski, in your response to

11    this -- what you're saying is if Warden works and it shuts a

12    user out of the game, that user can copy code to RAM to his

13    heart's content.  Now, he may not be able to do it for purposes

14    of continuing to play the game, but he can do it to view it

11:36:51 15    through Model Viewer or MPQ or any other number of purposes.

16    He can freely copy to RAM and therefore Warden really hasn't

17    limited his exercise of the copying right.  It's simply

18    prevented him from continuing to play the game.

19         MR. VENABLE:  If the code were on the server side,

11:37:09 20    Your Honor, we would be dead in the water.  We would have no

21    response.  But the code is not.  Because Warden does not

22    protect the code.  And to the extent anything is coming down

23    from the server, it's just factual information which is not

24    copyrightable.  And there are any number of cases that we have

11:37:26 25    to support that argument, that what is coming down from the

11:37:29  1   server is not protected.

2          And so to the extent we are -- and that's also what's

3   interesting is they never actually said that what's coming

4   down from the server is what they're claiming is being

11:37:40  5   violated here under the copyright laws.  What we are talking

6   about here is what's sitting on the hard drive.

7          THE COURT:  Okay.  Let me ask you one last question on

8   (b)(1).

9          If I conclude as a matter of law that the symphony is

11:37:58 10   copyrightable, that it's part of the work, evading Warden,

11   Blizzard argues, gives user the ability to copy that work by

12   screen shots, by making videos of it, by whatever means.  Once

13   he's allowed to go on playing the game, he can copy it.

14   Whereas if Warden shuts him out, he never gets to copy that

11:38:25 15   because the symphony never gets played.  What's your response

16   to that?

17          MR. VENABLE:  I would say that that's not Glider's

18   problem.  Glider doesn't facilitate that copy.  If there was --

19          If there was a program that was sitting on your hard

11:38:39 20   drive that was taking screen shots of the software as it was

21   being played, and then --

22          THE COURT:  I'm going to interrupt you here for a

23   minute.  The focus of (b)(1) isn't on Glider, it's on Warden.

24          MR. VENABLE:  Right.

11:38:54 25          THE COURT:  The question is whether Warden is a

11:38:56  1    technological measure within the meaning of (b)(1).  Does

2    Warden effectively prevent somebody from copying the symphony

3    if it shuts them out?

4         MR. VENABLE:  From copying the symphony that appears

11:39:10  5    on the screen you mean?

6         THE COURT:  Yeah.  I mean by recording, you know, the

7    next hour of playing World of Warcraft.

8         MR. VENABLE:  I would say, no, I don't think there's

9    anything that would stop somebody from being able to take all

11:39:24 10    the screen shots they want.

11         THE COURT:  Well, they can't.  They can't play the

12    game.  Warden stops them.

13         MR. VENABLE:  That is true, but I don't believe that

14    has ever been an issue in the case, about whether or not it's

11:39:33 15    stopping you from being able to make copies of what's on the

16    screen.  Effectively, if you can get to that point, you're

17    already done back at the -- at the hard drive level, I would

18    assume.  But, like I said, if it's moving it into RAM, well,

19    you can make a copy from RAM, I suppose.  I suppose you could

11:39:50 20    make a copy from the hard drive.  I mean there's -- it's just

21    another level which you're already at, again.

22         My contention is, is that that protection has to be

23    at the beginning.  It's not -- it's not after it's already

24    happened.  The symphony, if you say that that's protected, no,

11:40:08 25    I will concede there's really nothing we can do to stop it

11:40:12  1    from making copies.  But, again, that's -- that's not to say

2    that the -- again, the underlying files, that can you see --

3    that become rendered on the screen are still not protected by

4    Warden.

11:40:29  5         THE COURT:  Okay.  We've been going an hour and 40

6    minutes, we need give Tricia a break.  I think what I'd like to

7    do, unless it creates problems, is just forge ahead, even

8    though it will take us past noon, and get the closings done.

9    Is that all right with you all?

11:40:47  10        MR. VENABLE:  It's okay as long as it's okay with

11   them.

12        MR. GENETSKI:  That's fine with us, Your Honor.

13        THE COURT:  All right.  Why don't we come back, then,

14   in 15 minutes.  Five minutes to the hour.

11:40:55  15        (Recess taken.)

16        THE COURT:  Thank you.  Please be seated.  Go ahead,

17   Mr. Venable.

18        MR. VENABLE:  Was there anything else that Your Honor

19   wanted to ask me, or should I continue speaking?

11:57:46  20        THE COURT:  Why don't we go to 1201(a).  I think I had

21   stopped you from going there.

22        MR. VENABLE:  I was just going to make one final point

23   regarding (b)(1), Your Honor.  I don't know if this will

24   clarify the position or help me in whatever way I try to

11:58:03  25   present it, but the issue of the symphony, one of the things I

11:58:07  1    was going to say was that the analogy of the symphony is really

        2    the World of Warcraft, the universe, the experience, is really

        3    more akin to something like the Second Life program.  I don't

        4    know if you're familiar with Second Life.

11:58:25  5        THE COURT:  Vaguely.  But, yeah, I know what Second

        6    Life is very generally.

        7        MR. VENABLE:  Okay.  Well, in general, as you probably

        8    know, it's a virtual world that people develop.  They create

        9    characters, they walk around, they do many different things

11:58:38  10   within it.  And, again, I'm not really sure that the authors of

        11   Second Life would ever claim they would have a copyright to the

        12   Second Life experience.

        13       The Second Life experience, because, again, it can be

        14   virtually anything, an infinite number of possible things that

11:59:00  15   ultimately appear on your screen and graphics that get loaded

        16   into your -- from your hard drive and your RAM, that because

        17   that itself cannot be fixed, it cannot be considered a right

        18   that would be protected under the copyright law.

        19       And I realize that if what you say, that really

11:59:19  20   doesn't matter ultimately if it's about preventing what

        21   ultimately appears on the screen as the protected right,

        22   that's about as, I think, as far as we can go with that.

        23       THE COURT:  Well, this may not be helpful, but let me

        24   give you a hypothetical that I was thinking about on the break.

11:59:39  25       I'm making this up.  It may be full of flaws, but I

11:59:43   1    was trying to think of an analogy.

2              Let's assume there's an artist who creates a work of

3    art and this work of art is a small art museum.  It has eight

4    rooms in it, and in each room is a different painting,

11:59:57   5    different colors, different shapes.  And when you come to the

6    museum, what the artist does is he opens it at night.  People

7    come.  As they come in the door he gives you a blue

8    flashlight, a red flashlight, an ultraviolet flashlight and

9    says have at it.  You can walk through his work of art using

12:00:17  10    any of the colors in any combinations you choose.  You might

11    go into three rooms, you might go into eight.  You can go in

12    different orders.  Is that work of art copyrightable?

13             MR. VENABLE:  The work of art where?

14             THE COURT:  Well, let me ask this way.  Let's assume

12:00:32  15    he gets every copyright right he can with respect to that work.

16             MR. VENABLE:  I'm sorry, which work are we talking

17    about here?

18             THE COURT:  The whole thing.  The experience.

19             MR. VENABLE:  The experience.

12:00:41  20             THE COURT:  Walking through it with the lights.  Let's

21    assume he says, "I've copyrighted everything here," and I show

22    up with a video camera and I say "I want to go through it but I

23    want to videotape it."  He says, "No, you can't because this is

24    a copyrighted work."  Is he right?  Can I videotape his work as

12:00:57  25    I go through the rooms in my order with my colors -- well,

12:01:01  1    choosing from among the options he's given me.

       2         MR. VENABLE:  If you're saying -- if you're saying

       3    that let's say part of the experience is seeing a painting on a

       4    wall or something and you want to be able to videotape the

12:01:17  5    painting?

       6         THE COURT:  Right.

       7         MR. VENABLE:  If he owned the right to the painting,

       8    that in and of itself would prohibit you from being able to

       9    videotape the painting because that would be an unauthorized

12:01:29 10    copy of the painting which that artist probably has a copyright

      11    to.  I'm not sure in terms of the experience itself.  I guess

      12    if you're assuming the experience is copyrightable, I would

      13    say, again, I'm not really sure how you define what the

      14    experience is.  The experience is what you make of it, I guess.

12:01:50 15         I mean, I don't really know how you classify it any

      16    other way.  If I say the experience is what you make of it,

      17    well, then, I'm not sure how Blizzard gets to own the

      18    copyright to that experience which I'm creating.  I just

      19    don't.

12:02:05 20         I mean, I don't -- I realize this is all new

      21    territory.  This is a very -- I understand this is a very

      22    difficult case, that's why there's so many hypotheticals here.

      23    We're trying to get our finger on what the real issue is here,

      24    and what I'm trying to figure out here -- and I can tell you

12:02:21 25    this conversation has taken place many times in my office over

12:02:26  1    the last couple weeks.  We're trying to figure out exactly

2    what this is.  But I don't believe -- I can tell you what I

3    certainly don't believe.

4          I certainly don't believe this is what the DMCA was

12:02:36  5    designed to protect.  I think copyright law was protect this

6    sort of thing that Blizzard is trying to say that they want to

7    stop.  And to the extent they have -- to the extent they made

8    their case to the Court and won on the issue of copyright law,

9    I think they have established that.  But I don't think the

12:02:58 10    DMCA certainly not looking at the legislative history and

11    looking at what other cases have spoken of, using a Warden

12    program to prevent what you see in a video game, if it's not

13    being protected, if that's what it really is trying to

14    protect.

12:03:15 15          And I realize I may be wrong, but -- I'm willing to

16    concede that.  But I just don't believe that what we have here

17    is a (b)(1) violation.

18          THE COURT:  Okay.

19          MR. VENABLE:  Your Honor, real briefly with regard to

12:03:29 20    (a)(2).  I think that we have made our argument, to a certain

21    extent, in our summary judgment briefing that we are well aware

22    that the code that is both literal and nonliteral elements that

23    are sitting on the hard drive are indeed not protected in the

24    form of being able to prevent access to these things.

12:03:52 25          To the extent there is anything is that accessible,

12:03:55   1   Warden doesn't protect it.  And to the extent that Warden,

           2   under the definition under (a)(3)(B) is a technological

           3   measure, I don't believe that Warden qualifies as a

           4   technological measure, and I believe that Mr. Genetski, when

12:04:11   5   he was up here arguing his points about this, he was referring

           6   to the fact that this whole process of what Blizzard's Warden

           7   program does by going and scanning the memory sitting on the

           8   hard drive -- or sitting in the client computer and checking

           9   that back with something that is on the server to see if

12:04:33  10   there's something there, it is undisputed, Your Honor, that

          11   Warden -- that Glider does not participate in that process.

          12           Glider, by making itself invisible, there's no -- we

          13   don't dispute it makes itself invisible, but it certainly

          14   doesn't provide anything to the -- to the ability of Warden's

12:04:57  15   mechanism and how it detects what is sitting on your hard

          16   drive.

          17           THE COURT:  Well, that might be true, but it seems to

          18   me again that the focus in (a)(3)(B) is not on Glider, it's on

          19   Warden.   (a)(3)(B) is a definition of the technological

12:05:15  20   measure that is evaded.  So in this case, it's Warden.

          21           And the question, then, is whether Warden is a

          22   measure that requires the application of information to gain

          23   access to the work.  And Blizzard says it does; it requires

          24   the application of the information that's in the memory and

12:05:34  25   comparing that information to these hashes to gain access to

12:05:40  1    the work.  What's wrong with that argument?

2              MR. VENABLE:  Well, I think that what's wrong with

3    that argument is for the same reason that in the case of *IMS*

4    *versus Inquiry Management Systems* -- I'm sorry.  *Inquiry*

12:05:53  5    *Management Systems versus Berkshire Information Systems,* which

6    is 307 F. Supp 2d 521, there is -- that was a case that

7    involved the use of a password protection.  A password

8    protection scheme.  That prevented you from being able to

9    access something that I believe was on a user's -- or on a

12:06:16 10    software on a server.

11             And what was happening was in order to gain

12    unauthorized access to whatever it is they were -- the -- in

13    order to gain unauthorized access to whatever it is that the

14    plaintiff was protecting, the user who was trying to

12:06:40 15    circumvent access was simply using an active password, a good

16    password.  Not a bad password.  And the -- they tried to

17    argue, well, but we've already said this is what constitutes

18    something being unauthorized.  When you use this other -- when

19    you're using this other mechanism to gain access, you use that

12:07:02 20    unauthorized access to gain that password.

21             They actually, I think, got ahold of the password

22    illegally.  But the password itself was a legitimate password.

23    And what the Court said in that case was that the application

24    of the information that was being used in that case was not a

12:07:20 25    violation of the DMCA even though they acquired the password

12:07:24  1    illegally.

2              And I think there's a similar case that can be made

3    here, is that there does have to be something that is applied.

4    These cases, I believe, deal with the DMCA, the history of the

12:07:38  5    DMCA, deals with these types of mechanisms that are -- that

6    require something more than just I'm scanning looking for

7    memory.  There has to be something more.  You know, there's

8    like in the case of the DVD encryption, that there is

9    encryption there.  You have to do something to circumvent the

12:08:00  10   encryption in order to be able to gain access to what is

11   ultimately protected, which would be, say, a movie or a song.

12             I'm not really sure that that's the case here with

13   what -- with what -- with what Warden is doing.  It doesn't

14   require -- I don't mean this process they're referring to.  I

12:08:15  15   think the Court noted that in its ruling on summary judgment,

16   that there's -- that there is a problem here.  This process is

17   just simply -- it's just scanning.  It could scan -- just by

18   scanning memory, does that make it -- does that make it?  I

19   would say no.

12:08:36  20             THE COURT:  Well, it sounds as though your

21   understanding of (a)(3)(B) could be more clearly stated if it

22   was rewritten to say -- if (a)(3)(B) was rewritten to say that

23   it is a measure in the ordinary course of operation that

24   requires user application of information or user application of

12:09:02  25   a process or a treatment with the authority of the owner to

12:09:07    1    gain access to the work.

            2            And your point is users don't have to apply to get

            3    access, they don't have to initiate a process to get access,

            4    it's all done by Warden.  Am I understanding your argument

12:09:24    5    correctly?

            6            MR. VENABLE:  Well, I think, yes, but I believe what

            7    leads me to believe that is the language in the statute that

            8    says it has to happen with the authority of the copyright

            9    owner.  I'm not really sure how that plays into this, Your

12:09:38   10    Honor, because without the authority of the copyright owner we

           11    don't do anything to stop -- they have full authority to search

           12    our memory.  They certainly do.  I don't really know exactly

           13    how we are in violation of (3)(B).

           14            It just -- the -- in the ordinary course of its

12:09:59   15    operation requires the application of information or a

           16    processor or treatment with the authority of the copyright

           17    owner.  I'm not sure how that plays in there, Your Honor.

           18            But I don't even think we have to go there because

           19    we've already argued that to the extent that they leave these

12:10:16   20    elements unprotected, freely copyable, even the nonliteral

           21    portion because they can be viewed in Model Viewer.  That's

           22    clearly shown during the testimony yesterday.  And to the

           23    extent that there's anything on the server side that's being

           24    protected, what is being protect is this dynamic database at

12:10:40   25    best.  And the dynamic database, again, contains the factual

12:10:43   1   information as to where the characters are.

2   But, again, Your Honor, facts are not protectable.

3   And we are not looking at trying to gain access to something

4   that is -- that is protected.  These elements that are sitting

12:10:59   5   on the server that get sent down are just simply factual

6   information.  It would be no different than if I was saying,

7   you know, look at these facts that are sitting on my page, I'd

8   like you to be able to look at them.  They're not protected.

9   They're simply -- facts by themselves are not protected and

12:11:17  10   can't be protected under copyright laws.

11   THE COURT:  Well, it seems to me I've already ruled in

12   your favor on the literal code because clearly I concluded

13   before at least clearly Warden doesn't control access to the

14   literal code; it's right there on the user's hard drive.

12:11:36  15   And I think that that would be correct as well if

16   we're talking about the nonliteral static illustration of

17   Illidan running or things you demonstrated yesterday.

18   But, again, it seems to me this raises the question

19   of whether the symphony is a work protected.  Because if the

12:11:54  20   symphony is protected, clearly Warden controls access to the

21   symphony.

22   MR. VENABLE:  Agreed, Your Honor.

23   THE COURT:  So it comes back to the same issue we

24   talked about before.

12:12:06  25   MR. VENABLE:  Yes.  I don't really know again -- I

12:12:08  1    wish I could stand here and, you know, provide you some magical

          2    argument that would be able to convey the issue better, but I

          3    don't believe that anything we have looked at would support the

          4    symphony is protected and can be because it's not fixed.

12:12:28  5                THE COURT:  Okay.  I understand your argument on that.

          6                MR. VENABLE:  With that, Your Honor, unless there's

          7    any other questions, I'll turn it over to my partner, Joseph

          8    Meaney.

          9                THE COURT:  Okay.

12:13:17 10                Okay, go ahead, Mr. Meaney.

         11                MR. MEANEY:  Thank you, Your Honor.  With respect to

         12    personal liability, we agree with the analysis as set forth by

         13    Blizzard to the extent they set it forth.  Our position here is

         14    very simple, is that they haven't gone far enough to show

12:13:33 15    personal liability attaches to Mike Donnelly in this particular

         16    instance.  We agree that *Transgo* is the law of the Ninth

         17    Circuit.  We agree that the statement that they have pulled out

         18    of *Transgo* --

         19                THE COURT:  I'm sorry, what's *Transgo*?

12:13:51 20                MR. MEANEY:  *Transgo* is the first case that they cite

         21    in their proposed findings of law and fact.

         22                THE COURT:  Okay.  The first one I see cited is *eBay*.

         23                MR. MEANEY:  Oh.  Under personal liability.

         24                THE COURT:  Oh, I'm sorry.  You're right.  Yeah.

12:14:05 25                MR. MEANEY:  Think that's a different section.

12:14:06  1           THE COURT:  Yeah, I'm in a different section.  Go

       2  ahead.

       3           MR. MEANEY:  Okay.  So *Transgo* -- what *Transgo* says,

       4  and this is a quote from the case *Murphy Tugboat*, what *Transgo*

12:14:17  5  says is, a corporate officer or a director is, and here's the

       6  words that we'd like focus on, in general, person liable for

       7  all torts he authorizes or directs, participates, et cetera, et

       8  cetera.  And that's where we think they failed to meet their

       9  burden to prove personal liability attaches.

12:14:35 10           What they have done is basically set forth a case

      11  that says personal liability automatically attaches when an

      12  officer or director performs the acts or ratifies the acts or

      13  participates or benefits that ultimately get constituted or

      14  determined to be a tort.

12:15:00 15           Now, *Transgo* isn't particularly helpful because

      16  *Transgo* doesn't give any more elaboration on the law than the

      17  simple quote that they have pulled out.  *Transgo* is a case

      18  that is very easy to decide as far as -- well, let me back up.

      19  While *Transgo* doesn't go into very much of analysis, the case

12:15:25 20  that *Transgo* relied upon, *Murphy Tugboat*, does.  *Murphy*

      21  *Tugboat* gives this Court the legal framework in which it can

      22  find that Michael Donnelly is not personally liable, and

      23  shouldn't have a potentially nondischargeable $6 million

      24  judgment hanging around his neck for the foreseeable future.

12:15:43 25           THE COURT:  Why do you say "nondischargeable"?

12:15:46 1         MR. MEANEY:  I think there's an issue whether you can

2  discharge in bankruptcy copyright violation.

3         THE COURT:  Okay.

4         MR. MEANEY:  I'm not sure that it's always

12:15:58 5  dischargeable or always not dischargeable, but I think some of

6  the facts that separate whether it is dischargeable or not are

7  some of the same facts that we're going to be discussing here.

8         THE COURT:  All right.

9         MR. MEANEY:  Now, *Transgo* was a pretty simple case.  I

12:16:12 10  guess -- let me back up again.  So *Murphy Tugboat* gives you the

11  analysis and the reason -- *Murphy Tugboat* was a case, it's an

12  antitrust case.  And in that case the jury found that the

13  company committed acts which constitute an antitrust violation

14  under section 2.  In addition, the jury found that the

12:16:37 15  president who was -- either participated or ratified all the

16  acts that gave -- ultimately gave rise to the liability, was

17  personally liable.  The judge entered his ruling, not

18  withstanding the jury's verdict, and said, no, you can't in

19  this case.  He --

12:16:57 20         THE COURT:  You can't hold the individual liable?

21         MR. MEANEY:  Under these set of facts.  He said what's

22  missing is inherently unlawful conduct.  That's the element

23  of -- that they're missing in their case for personal liability

24  against Mr. Donnelly, is inherently unlawful conduct.

12:17:19 25         In fact, the relevant language -- they do a nice

12:17:22  1    analysis.  They start with the general -- I'm talking about

2    *Murphy Tugboat*.  The analysis there is helpful because they

3    start with the general proposition that you're ordinarily

4    liable and then they go into the situation in this case,

12:17:35  5    antitrust, where it is not always clear whether the acts that

6    constitute a tort are inherently unlawful or not.  And it's

7    these particular instances of commercial torts where we don't

8    really want to chill activity.  If it's not inherently

9    unlawful, we shouldn't, then, impose liability personally.

12:17:58 10              THE COURT:  Do you have a cite for *Murphy Tugboat*?

11              MR. MEANEY:  Sure.  467 F. Supp 841.  It was affirmed

12    by the Ninth Circuit I believe on other grounds and then denied

13    Supreme Court, sir.

14              THE COURT:  You're saying that the Ninth Circuit's

12:18:16 15    decision in *Transgo* relies upon this District Court opinion?

16              MR. MEANEY:  Yes, Your Honor.  What it does is it --

17    the quote that's in there, that they take from -- that they --

18    the quote that Blizzard relies on from *Transgo* is a quote from

19    *Murphy Tugboat*.  I would like it if the Ninth Circuit actually

12:18:38 20    elaborated on the analysis, but the quote is taken from *Murphy*.

21    The Ninth Circuit takes the quote from *Murphy Tugboat*.  So we

22    would submit, Your Honor, that the Ninth Circuit is saying

23    *Murphy Tugboat* is the law here, but all we need in this case is

24    the general rule.  And --

12:18:57 25              THE COURT:  This may be jumping ahead in your argument

12:18:59  1     but let me ask this question while it's on my mind.  I can see

2     some sense in the law saying that if we're dealing with a

3     commercial tort where the law isn't always clear, like

4     antitrust or the copyright violations, we're not going to make

12:19:14  5     individuals liable unless they knew they were breaking the law.

6              MR. MEANEY:  Okay.

7              THE COURT:  What about tortious interference where

8     it's more of a traditional tort.  Where somebody's

9     intentionally interfering with a contract between two other

12:19:29 10     parties.  Do you think the same --

11              MR. MEANEY:  That's a good question, Your Honor.  I

12     haven't been able to find cases that address the specific issue

13     under the facts that we have here today.  But I have reviewed

14     *Fletcher's*, and *Fletcher's* has encyclopedia on this section,

12:19:46 15     and they say in general that wouldn't apply as long as the

16     actor is acting within the course and scope of his duty, which

17     raises a whole other raft of issues because I guess if you're

18     committing a tort you're outside of your duty.

19              But they conclude in general, I think one of the

12:20:02 20     cases -- there's also a similar line of reasoning in the

21     Federal Circuit.  And the Federal Circuit, of course, is where

22     all the patent cases go.  Patent cases also lend themselves to

23     this type of analysis because in the outset you may willfully

24     make a product, sell a product, and you may actually know that

12:20:21 25     there's a patent that's relevant, so you would constitute the

12:20:26  1    actual willful patent infringement, but yet wouldn't rise to

2    culpability of personal liability.

3          And so there's a whole raft -- there's two cases in

4    particular that are worth looking at.  The original case is

12:20:39  5    *Hoover.  Hoover Group versus Custom Metalcraft.*  84 F.3d 1408.

6    Where sort of the framework of the rule comes out.

7          Then there's another particularly interesting case

8    that came out in 2007.  Now, this is just at the district

9    court level -- actually, excuse me, it's the federal circuit.

12:20:58 10    It is *Wechsler versus Macke Intern.*  486 F.3d 1286.  That is a

11    very interesting case because they take the rule and flesh it

12    out a little bit more.  In that case the jury found no

13    personal liability.  They also found willful infringement by

14    the corporation.  And the corporation itself was solely a

12:21:23 15    one-man show.  You know, president, sole shareholder,

16    employee.

17          And the judge said, wait a minute, wait a minute.

18    You can't reconcile those two things.  And so he gave a

19    judgment notwithstanding the verdict, and imposed personal

12:21:39 20    liability.  When it went up on appeal to the Federal Circuit,

21    the Federal Circuit said no, it's not necessarily the case, a

22    lot of times it's going to be the case, but it's not

23    necessarily the case because the standards are different.

24          So those give some additional analysis.  They don't

12:21:52 25    use the inherently unlawful conduct rule, they use a different

12:21:56  1   rule, but to me it is the flip-side of the same thing.  They

2   go at it differently.

3        In Federal Circuit they say when a person in a

4   control position causes the corporation to commit a civil

12:22:05  5   wrong, imposition of personal liability requires consideration

6   of, one, the nature of the wrong.

7        So let's look at it.  Is this a simple easy wrong or

8   is this a -- like in *Transgo* it was an easy case, these guys

9   were tricking people into thinking that they were buying

12:22:23 10   someone else's product when they were really buying the

11   defendant's product.  You know, basically a palming-off case

12   or affirmative misrepresentation case.

13        The second prong under the Federal Circuit is the

14   culpability of the act.  So they want to look at the

12:22:38 15   culpability of the actor and see whether it rises to a certain

16   level.

17        And three, whether the person acted in his or her

18   personal interest or that of the corporation.  And the Federal

19   Circuit seems to want to find haven for a president.  If he's

12:22:52 20   acting in a way that any other president under those

21   circumstances would act.  If he's grossly negligent, reckless,

22   things like that, then you're not going to find shelter here.

23        But I think the facts of this case, you know, if you

24   heard them yesterday, it's hard to expect Mr. Donnelly to have

12:23:11 25   done anything else, to have been a clairvoyant.  We spent --

```
12:23:15   1   Mr. Genetski said just a few moments ago that -- we've always

           2   agreed on the facts.  This has always been about the law.  And

           3   perhaps after hours and hours of legal analysis and opinion,

           4   we can ultimately conclude that this was a copyright

12:23:28   5   violation.

           6        It seems to me a little bit unfair to hold

           7   Mr. Donnelly or anyone who is writing software to know these

           8   litany of steps that have to occur.  You to have go to MAI,

           9   then we have to look at the contract.  And not just look at

12:23:42  10   the contract, we have to parse the contract.  We to have

          11   cross-rough both contracts and find out whether it's going to

          12   be a condition precedent or whether it's not going to be a

          13   condition precedent.  Does 117 apply?  All these steps have to

          14   occur before we can decide whether we're going to decide

12:23:56  15   whether we have copyright violation in this instance.

          16        So the Federal Circuit also has similar law.  There's

          17   also law in the Seventh Circuit that's been there for a while

          18   that goes the same way.

          19        Now, trying to get back to your question about the

12:24:12  20   tortious.  I don't have a great answer for that.  I haven't

          21   been able to find a case on point.  I found a case out of

          22   Delaware.  In general, I know the Federal Circuit, I believe

          23   it's in the *Hoover* case, they say that, in general, tortious

          24   interference when you review -- when *Fletcher's* reviews it as

12:24:34  25   a whole, it says in general tortious interference is not
```

12:24:38  1   something that would ordinarily give rise to liability unless

2   you're acting outside the course and scope of your duty.

3          When I look at those cases, though, Your Honor, I see

4   a lot of -- I think the cases I read sort of take that general

12:24:53  5   proposition from cases where if I were the president of the

6   corporation and then I -- you know, some people try to make

7   the argument that the president should be tortiously liable

8   for sort of inducing his own company to breach a contract.

9   Which I don't think really necessarily applies to the facts

12:25:11 10   here, because the way the courts handle that they say the

11   president -- there has to be a third party there.

12          So I guess the upshot of it is, I don't have a case

13   on that, other than this case out of Delaware, which I don't

14   have the cite for right now.  But there certainly are a lot of

12:25:35 15   cases that say tortious -- you don't treat tortious

16   interference with contract any differently than you would any

17   other tort.

18          Before I, just briefly, go on to the facts of this

19   case, we certainly wouldn't dispute that there are a litany of

12:26:00 20   cases that simply state the general proposition.  And there's

21   no further analysis in all those cases.  But again, those

22   cases don't need to go to the second step of inherently

23   unlawful conduct, because like *Transgo*, they're just

24   intentionally tricking other people into thinking they're

12:26:18 25   buying that corporation, or it's a conversion case, or DVD --

12:26:21  1   or where you're just copying DVDs, or perhaps file sharing

2   after *Napster*.  But not file sharing before *Napster*.  So that

3   even though there are a lot -- we may be in a small minority

4   of cases, but it's a small legitimate minority recognized by

12:26:39  5   *Murphy Tugboat* and recognized by the Federal Circuit and the

6   Seventh Circuit.  And I'm not saying it is not recognized in

7   the other ones, but that's where I have cases, Your Honor.

8         For example, if you -- *Transgo* is the first case that

9   they cite -- excuse me, that Blizzard cites in its statement

12:27:02  10   of facts.  The next case that they cite after that is called

11   *Commission for Idaho's High Desert*.  In that case, of course,

12   said the general rule, but that case is factually

13   distinguishable.  In that case -- the defendants in that case

14   opportunistically seized the name of like an environmental

12:27:22  15   group because the environmental group let their corporation

16   lapse.  And so they jumped in and said, oh, we'll be that

17   environmental group now.  And then they went off and held

18   themselves out in public forums as that environmental group

19   even though their views were diametrically opposed to that

12:27:40  20   group.  So in other words misrepresenting.  That Court had an

21   easy time finding that the personal liability attaches to

22   those -- the officers in that case.

23         And the other cases cited, we don't disagree with the

24   propositions that they're citing there, we just disagree that

12:27:56  25   they have taken it far enough.

12:27:59  1           So at least our position is that under *Murphy Tugboat*

2      the law of the Ninth Circuit is that in order to give rise to

3      personal liability the acts would have to be inherently

4      unlawful.  And in this case they haven't met their burden.

12:28:11  5      The fact -- the facts aren't inherently unlawful.  In this

6      case Mike -- Mr. Donnelly wrote his own software, didn't copy

7      anything.  He didn't mislead anybody when he was selling

8      Glider.  In fact, he warned everybody that Blizzard doesn't

9      like it and Blizzard may ban your account.  Never tried to

12:28:31 10      trick anybody.  In addition, he didn't stick his head in the

11      sand.

12           He testified yesterday that before he went to start

13      selling the product, he reviewed the EULA.  He reviewed the

14      TOU.  He reviewed some other, I can't remember exactly what

12:28:51 15      it's called, but some sort of other server rules.  And he

16      satisfied himself that his conduct didn't apply.  And that

17      seems to me to be reasonable when they clearly know what bots

18      are.

19           But it doesn't -- at the time neither the TOU, the

12:29:07 20      EULA, or anything else expressly prohibited bots.  It

21      prohibited cheats, which is subjective.  It is arguably, maybe

22      perhaps in hindsight, that they can say it is a cheat.  In the

23      outset you couldn't necessary say it's a cheat.

24           Certainly it's not a hack.  Doesn't modify any code.

12:29:26 25      Doesn't give the user the right to do anything else that they

12:29:28  1    couldn't do.  Just gives them the right to, I guess, visit

2    with their girlfriend instead of playing the game.

3         And it's not a mod.  Nowhere in the agreement does it

4    say you're going to be liable for copyright infringement if

12:29:45  5    you sell a third-party application.  Nor does it say you're

6    going to tortiously interfere with our contract if you do.

7    Nor does it even mention the DMCA, that I'm aware of.  But it

8    certainly doesn't say if you make your own software that

9    happens to interoperate with our product you're going to be

12:29:58 10    liable for these.

11         In addition, at least from Mr. Donnelly's point of

12    view, Blizzard's acts further strengthened his belief that

13    while they might not like it and might want to stop it and

14    perhaps even they view it as a breach of a contract, by then

12:30:22 15    there's silence.  They certainly could have sent him a letter.

16    They could have done something.  They have a legal engine.  He

17    knows that they have sued people before.  They never even

18    asserted, mentioned, or otherwise told him that they had some

19    problem with this or what the basis was.

12:30:39 20         From the period of September 2005 to October, to the

21    knock and talk, never once did Blizzard say anything that his

22    acts were violated -- were copyright violations, copyright

23    infringement, or tortiously interfering or anything.  However,

24    they did send him a letter.  They sent him a letter prior to

12:30:57 25    the knock and talk saying that he had pictures on his website

12:31:01  1   that they thought were his intellectual property.  So they

      2   were aware of him.  They knew how to send a letter.  What was

      3   Mr. Donnelly's response?  He took them down.

      4       There was another issue.  Again, there was no

12:31:12  5   accusation that Glider was infringing anybody's copyrights or

      6   tortious interference.  But there was some other issue and he

      7   responded and said, hey, could you provide me some

      8   information.  So he wasn't ignoring their requests.  He was

      9   following through the way a reasonable president of a software

12:31:32 10   company would -- the way we would want somebody to follow

     11   through.

     12       Likewise, the first time he heard -- he understood

     13   that Blizzard had a problem with his trademarks, he originally

     14   I think wanted the name WoW Glider, was when there was -- the

12:31:56 15   amended counterclaims or the counterclaims were filed in this

     16   case.  Within days he changed his name.

     17       So I guess the point being, when the issues were

     18   clear, Mike Donnelly is not a guy who snubs his nose at the

     19   law.  But he's also not a guy that's going to just get bullied

12:32:16 20   if he thinks he has a legal ground to stand on.  And there's a

     21   big difference there, Your Honor.

     22       So from all positions, at all times Mike's acted the

     23   way that we would expect a reasonable person to act in his

     24   shoes.

12:32:39 25       If you ultimately conclude that his actions after all

12:32:42  1    of this legal scrutiny, and we ask the Ninth Circuit what they

        2    say constitute a commercial tort, shouldn't then -- then have

        3    him wear a $6 million judgment that is potentially

        4    nondischargeable for acts that we would expect a copyright --

12:32:59  5    the author of copyright software and president of software

        6    companies to take.

        7         For me, I wonder if anyone in this courtroom can

        8    honestly say when they took a look at these facts, did they

        9    say, "Whoa, that is copyright infringement right there.  I've

12:33:20 10    seen those before and that is copyright.  Oh, no, wait a

       11    minute, that's a DMCA violation, too"?

       12         No, this is a case that requires steps of legal

       13    analysis.  In fact, I think Mr. Genetski used the word we

       14    "struggled" to sort it out.  He was just saying that.  With

12:33:37 15    respect to DMCA, we're struggling to sort it out.  It's never

       16    been about the facts.  It's always been about the law.

       17         Just a couple points.  The Ninth Circuit's

       18    consistently said that we should be very cautious when we're

       19    dealing with facts that fall in the outer limits of copyright.

12:33:58 20    Copyright, the whole purpose of copyright is to promote

       21    additional arts.  We don't want -- we want to be very careful

       22    when we are sort of perceiving the areas that aren't

       23    well-founded because the risk is that you may chill further

       24    development of additional software.

12:34:14 25         In addition to that, Judge, it is also judicially

12:34:17  1    recognized, I think even in that *Galoob* case, that the

2    software progresses through add-on software.  This is how this

3    market -- there's other ways of progressing, but add-on

4    software is a significant way that the software industry

12:34:32  5    progresses.  I mean, you look no further than, say, Microsoft,

6    the operating system, Microsoft, pick any one.  Didn't

7    originally get shipped with a browser.  And I don't think

8    Microsoft -- anyone argued that Microsoft was on the forefront

9    of browser technology.  No.  Other entities, Netscape, they

12:34:51  10   came up with a browser technology and add-on to the operating

11   system and now that's been assimilated to all operating

12   systems.  It is just standard operating procedure.

13          The Ninth Circuit has recognized that we need to

14   protect this.  This is a legitimate commercial practice that

12:35:06  15   we should be very careful before we chill any progress in that

16   area.

17          So based on all the above, we just -- if nothing

18   else, we urge Your Honor to use extreme caution before we pin

19   it -- a judgment on Mr. Donnelly that he potentially can't

12:35:29  20   discharge and will hang around him for acts that we really

21   couldn't expect him to do anything differently.

22          THE COURT:  All right.  Thank you.

23          We have one more point on the injunction.

24          MR. VENABLE:  Your Honor, just finally with regard to

12:35:57  25   the issue of whether or not an injunction is appropriate.

12:36:07  1          Your Honor, what stood out most yesterday in

2     discussions with Mr. Ashe while he was on the stand was, while

3     he talked very extensively about what is going on in the

4     confines of Blizzard's offices with regard to how they deal

12:36:23  5     with bots and people like Mr. Donnelly in terms of how to stop

6     it, one thing that was painfully clear to me was that whatever

7     he said did not in my mind represent what would amount to the

8     legal definition of irreparable harm.

9          To me it's one of these old adage, the acts speak

12:36:49  10    louder than words sort of thing.  That if everything that

11    Mr. Ashe was saying while he was on the stand was so

12    detrimental to what was happening with Blizzard, that it

13    was -- it's killing them, doing all these horrific things to

14    them, it is undisputed that Blizzard for over a year did

12:37:16  15    nothing whatsoever to put any notification in Mr. Donnelly's

16    lap to say you need to stop this.  They didn't explain why.

17    They did certain things that even led him to believe that they

18    thought it was okay, like the Rick roll, the joke.

19         Certainly one who believes that what Mr. Donnelly was

12:37:37  20    doing was so detrimental to their business, Your Honor, would

21    not send someone a joke.  Because this isn't anything to joke

22    about.  If you're going to sue someone for copyright

23    infringement, if this was something that was so horrifically

24    bad, everyone knows the legal engine that Blizzard can

12:37:56  25    generate when it wants to.  Where was the cease and desist

12:38:00  1   letter immediately?  Where was the demand?  Where was the

2   knock and talk?  Where was all of this right away?  It never

3   happened, Your Honor.  It didn't happen until over a year

4   later.

12:38:14  5        There have been injunctions -- and I understand that

6   preliminary level is more so the case, where there have been

7   injunctions that were denied when you wait seven, eight

8   months.  Sometimes even ten weeks.  The lawsuit is filed.  Did

9   they ask the Court then, oh, we're being so irreparably harmed

12:38:31  10   that we need to have the Court stop what Mr. Donnelly is

11   doing?  No, they didn't.  And they, again, didn't ask for that

12   for several months -- actually almost two years nearly.

13        So in other words there's a three-year time period in

14   which there was no action and there was nothing that was being

12:38:53  15   done to try to stop this horrific behavior, as they put it.

16   And all the while that this is going on, Blizzard goes from

17   5 million customers to 11 and a half million customers, even

18   through today.

19        And I understand -- we don't have any evidence to

12:39:11  20   dispute that Mr. Ashe's department probably spends resources

21   to deal with Mr. Donnelly.  But they also spend, I'm sure,

22   resources to deal with a lot of things that Blizzard doesn't

23   like.  One of them certainly being bots.  And he is not the

24   only bot.  I'm sure that there was -- there was testimony or

12:39:32  25   discussions in the summary judgment motions about how there

12:39:34   1   are literally thousands of bots out there that Blizzard has to

2   deal with.  I'm not saying this makes him any better than

3   those other bots, but he shouldn't be singled out.  It's sort

4   of like the cop who drives along and picks you out for

12:39:49   5   speeding while everyone else is speeding.  I understand that.

6          But if Blizzard is allowing this to happen without

7   going on, it is a completely disingenuous argument for them to

8   make that this is something that must be stopped or they are

9   basically going to circle the drain as a company.  And I think

12:40:09  10   that's the -- in the light that they're trying to deliver that

11   argument to the Court.

12          What we are simply asking here for is that if they

13   can wait over three years to ask this Court for the first

14   time, knowing that even if they get the injunction the

12:40:29  15   behavior's not going to stop from botting, people will still

16   bot, they will still have this problem.  But what won't happen

17   is you're not going to see their sales decline as a result of

18   that decision -- or their sales increase as a result of that

19   decision.  What you're going to see is that they will still

12:40:46  20   continue to have a viable business.  They will have people

21   that will still play despite the presence of bots.

22          But yet if the injunction occurs, Mr. Donnelly is not

23   so fortunate, his company is dead in the water.  And if we go

24   up on appeal and by some chance we get this overturned, which

12:41:06  25   is very possible, not to disrespect Your Honor's ruling, but

12:41:12   1   there are, again, numerous people who have written about this

  2   case who say that this is -- this is a case of first

  3   impression, Your Honor.  We're on the frontier here.  And, you

  4   know, to the extent that Mr. Donnelly has a right to do what

12:41:25   5   he wants to do, he should at least be given the opportunity to

  6   save his business should the Ninth Circuit ultimately decide

  7   that this is not something that is a violation of the

  8   copyright law or that it's a tortious interference with

  9   contract or even a DMCA violation.  Because if that does

12:41:43 10   happen, there's going to be nothing left.

11   THE COURT:  Mr. Venable, two questions.  Irreparable

12   harm does not have to be fatal harm.

13   MR. VENABLE:  I understand that.

14   THE COURT:  Right?

12:41:56 15   MR. VENABLE:  I understand that.

16   THE COURT:  What I have to ask with respect to whether

17   they've satisfied the first prong of the *eBay* test is whether

18   they're being injured in some ways that they'll never really be

19   able to be compensated for.  Not whether it's going to cause a

12:42:11 20   decline in business or they're going to be severely damaged.

21   Do you agree with that?

22   MR. VENABLE:  Yes, I do, Your Honor.

23   THE COURT:  On the second issue, your argument that an

24   injunction will be a death knell to MDY, is that an argument

12:42:29 25   against an injunction or is that an argument in favor of

12:42:32  1    staying an injunction?

        2         MR. VENABLE:  Well, it kind of goes hand in hand, Your

        3    Honor.  The practical matter is, is that if the Court grants an

        4    injunction but also, let's say that you would issue a stay or

12:42:44  5    the Ninth Circuit would issue a stay, we still have to post a

        6    supersedeas bond.  And I'm guessing that Blizzard is not going

        7    to say that that bond is going to be a small figure.  It's

        8    going to be a rather large figure, which Mr. Donnelly is not

        9    going to be able to put up.  And it will have the same effect.

12:43:01 10    It will have -- it's going to have the same outcome no matter

       11    what.  We may not ultimately be able to stay it just from the

       12    practical purpose -- practical reasons for not being able to

       13    post the bond.

       14         THE COURT:  Well, I have a question about that in a

12:43:18 15    moment, but let me, before we leave this question of whether

       16    there should be stay at all.  If I conclude that the *eBay*

       17    elements are satisfied, and I don't know if I will, I just

       18    haven't satisfied myself yet on that issue.  If I conclude that

       19    the *eBay* elements are satisfied, and that if my ruling is

12:43:41 20    affirmed by the Ninth Circuit and the Supreme Court denies

       21    cert, then there should be an injunction in place.

       22         What's the basis for denying the permanent injunction

       23    here?  If I've denied it, I denied it.  If the Supreme -- if

       24    the Ninth Circuit affirms, there's no injunction.

12:43:58 25         It seems to me that if I conclude an injunction is

12:44:02   1   warranted if I'm right, that at a minimum I have to enter it

           2   so that when it gets affirmed it takes effect, even if I stay

           3   it in the interim.  Denying it, to me, isn't the right answer

           4   if an injunction ultimately will some day be warranted.

12:44:20   5              MR. VENABLE:  Perhaps the issue maybe is to the issue

           6   of the breadth of the injunction.  Perhaps there are other ways

           7   that we can deal with the concerns about what Blizzard's issues

           8   are, which would be -- for instance, let's say there was a

           9   mandatory royalty payment that could be significant for each of

12:44:43  10   the sales that Glider has made.  That can be used as a way to

          11   try to deal with a bond issue.  That in case it is affirmed

          12   that that money doesn't remain in the hands of Mr. Donnelly but

          13   it remains in an escrow account that would be payable to

          14   Blizzard.  What I'm concerned is, is that, you know, something

12:45:04  15   short of something like that I'm not sure how we could craft

          16   the injunction because --

          17              THE COURT:  Well, I've not thought about the bond

          18   issue until you just raised it.  But thinking off the top of my

          19   head, which is always hazardous, Blizzard has said that they're

12:45:23  20   incurring about a million dollars a year in costs, a little bit

          21   less than that, and that they quantify their other damages.

          22              If we assumed hypothetically that the Ninth Circuit

          23   was going to take a year to rule, therefore that they would

          24   incur just under another million dollars in damages, wouldn't

12:45:42  25   the bond amount have to be at a million, which would require a

12:45:45  1   ten percent payment of $100,000?  Isn't that --

2         MR. VENABLE:  I --

3         THE COURT:  -- sort of a practical reality for a bond?

4         MR. VENABLE:  I think that's how it works, Your Honor.

12:45:56  5   I don't do this a whole lot so I don't actually have any

6    experience in dealing with bond issues -- with injunction

7    issues.  That's possible.

8         What we would argue to that is to the extent there

9    really has been only Mr. Ashe's testimony, we never really had

12:46:14  10  a hearing on whether or not they're actually having a million

11   dollars in damages.  Because like I said, although Mr. Ashe

12   said, gee, if we weren't doing what he was doing -- if we

13   weren't doing something to try to stop Mr. Donnelly, we'd

14   reallocate these resources and so on and so forth.  There's

12:46:31  15  been no evidence and we've never been able to -- anything

16   other than an expert report that was written by Mr. Ed

17   Castronova that talked about this, and we adamantly disputed

18   that.  So we never really discussed that.

19        THE COURT:  Let me ask a different question.  The

12:46:48  20  stipulated judgment that I've entered in this case establishes

21   a damages number.  Does that damages number only run through

22   September of 2008?  Or would it include damages that might be

23   incurred by Blizzard while on appeal?

24        MR. VENABLE:  I think when Mr. Genetski and I spoke it

12:47:08  25  was just dealing with that it went up to the agreement and --

12:47:14  1          MR. GENETSKI:  Your Honor, through September -- I

        2   believe in September we filed.  It was through the date we

        3   filed.

        4          THE COURT:  Okay.  All right.  Go ahead.

12:47:25  5          MR. VENABLE:  In making the argument as far as the

        6   irreparable harm goes, it carries over to the issue of

        7   balancing, which I think that was the conversation we were just

        8   having here, is to be able to say that if in reality

        9   Mr. Donnelly is allowed to continue for an additional 8 to 12

12:47:40 10   months -- granted, I know Your Honor's issue about whether

       11   there can even be an injunction then if there is no injunction

       12   granted now permanently.

       13          The issue here still is that if Blizzard's gone three

       14   years and this happened, another 8 to 12 months is not going

12:48:02 15   to kill them, it's not going to hurt them to the point that it

       16   has harmed them thus far.  And I know you'll get conflicting

       17   answers from them.

       18          THE COURT:  Well, here's the problem I have with that.

       19   I understand your argument.  I fully understand why MDY

12:48:19 20   believes it's in the wrong here.  This is not an easy area of

       21   the law.  But if I'm right and the Ninth Circuit says I'm

       22   right, then that means during this year that it's been on

       23   appeal there has been an infringer and a tortious interferer

       24   allowed to continue in business.  And I think the analysis

12:48:39 25   under *eBay* is, when I balance the hardships don't I have to

12:48:42  1   look at them as an infringer and tortious interferer and ask,

2   in effect, is putting one of them out of business a greater

3   hardship than allowing the infringed party to avoid further

4   injury?  That's the way the cases talk about it.

12:49:01  5        MR. VENABLE:  I understand, Your Honor.

6        THE COURT:  So again, it seems to me if I'm asking

7   should an injunction be entered if I'm right, even if that's

8   not determined until the Ninth Circuit rules, well, if I'm

9   right, then that balance of hardships, it seems to me, weighs

12:49:14 10   in Blizzard's favor because MDY is infringing.

11        So, again, I come back to the same point, that if I'm

12   deciding today whether a permanent injunction should be in

13   effect after the Ninth Circuit affirms, it seems to me I can't

14   deny an injunction just because it will be hard on them if

12:49:38 15   they're put out of business now.

16        It may be what you're really asking me to do is to

17   say if the stay problem -- or the bond problem prevents a stay

18   is to say, I'm not going to decide the injunction today, I'm

19   going to decide the damages issue and enter an order on that

12:49:58 20   and a liability issue on DMCA.  And I'm going to certify to

21   the Ninth Circuit those issues, if I can.  So they decide

22   those.  And then I'll decide the injunction after the Ninth

23   Circuit affirms.  That's really sort of what you're asking,

24   isn't it?

12:50:13 25        MR. VENABLE:  Or a smaller bond.

12:50:16  1    THE COURT:  Well, I've never addressed the bond.

2    MR. VENABLE:  Yes.  I don't really know -- other than

3    what I've said today, those are our arguments, Your Honor.  We

4    really -- we're completely sympathetic to the dilemma here.

12:50:30  5    We're sympathetic to Blizzard's position.  I hope that after

6    hearing Mr. Donnelly, you know, on the stand for the last day

7    that he's not -- he's not -- he's not a hacker.  He's just an

8    entrepreneur.  He's trying to run a business.  He has

9    employees.  It's a tough economy.  It's hard.

12:50:51  10    I have become a good friend of his over the last

11    couple years.  And it's -- it would be hard to see him lose

12    that.  And I know this isn't about my feelings about him, but

13    it's -- it is important to understand that that is what we're

14    looking at here.  This is a guy who thinks what he's doing is

12:51:15  15    right.  Always thought what he's doing -- what he's done is

16    right.

17    And if there is going to be an injunction, all I

18    would say is, you know, it be crafted in such a way that we

19    can still maintain our ability to have our business for MDY.

12:51:34  20    And if the Ninth Circuit ultimately decides that we're wrong

21    and you're right, then he will, at my order, not do this any

22    more.  He will stop, he will do whatever it is, within reason,

23    that Blizzard asks him to do.  Which certainly would mean to

24    stop selling the software, shut his business down, whatever.

12:52:00  25    But this is really the dilemma that we're facing.

12:52:06   1          THE COURT:  All right.  I understand your position.

           2          MR. VENABLE:  Okay.

           3          THE COURT:  Thanks, Mr. Venable.

           4          Mr. Genetski.

12:52:26   5          MR. GENETSKI:  Your Honor, I might go out of the order

           6   we've been going in, as we just left the permanent injunction

           7   point, and the DMCA point may take a little longer.

           8          Respectfully, Your Honor, as to the hardships on the

           9   injunction, I had written in my notes the same thing Your

12:52:44  10   Honor brought up, which is irreparable harm is not

          11   horrifically bad or raining down on Blizzard.  It's something

          12   that can't be put right.  Our position, as testified to by

          13   Greg Ashe, is that we cannot be put right while Glider is

          14   still out there operating.

12:53:09  15          I hear the arguments, and respectfully it's been a

          16   difficult case, particularly on the IP issues, but the

          17   tortious interference issues, in Mr. Donnelly's own words from

          18   a couple years ago, he clearly understood them.  He chose to

          19   proceed.  He made that choice.  He's chosen in this case after

12:53:27  20   the entry of the summary judgment order to forgo a jury trial

          21   on damages and to enter into a stipulated damages amount.

          22          Presumably looking at the amount of damages that

          23   could potentially be awarded by a jury if he was deemed a

          24   willful infringer, attorney's fees awards and that kind of

12:53:44  25   like, and settled on a number.  He agreed to that judgment.

12:53:47  1   He testified on cross-examination to the amount of revenues

2   he's generated.  And said that while he hasn't set aside a

3   reserve to pay the judgment that he's -- I think the words he

4   used was not squandered the money and he's kept in mind the

12:54:03  5   fact that the judgment exists.

6        The law requires him, if he is enjoined and wants to

7   stay the injunction to stay in business and keep generating

8   revenue, once he's lost on final judgment to post an

9   appropriate bond.  And generally ten percent is the minimum.

12:54:17  10  We would submit, if we got to that point, that the stipulated

11  judgment is the right figure from which to determine the

12  amount of the bond.  And perhaps he has to use the money that

13  he's held back or set aside to eventually satisfy a judgment

14  to pay his portion of a bond.  That's what the law requires.

12:54:38  15       THE COURT:  Well, does the stipulated judgment say

16  anything about bonding following appeal?

17       MR. GENETSKI:  I don't believe it addresses it

18  directly, Your Honor.

19       THE COURT:  So even if I were to deny an injunction,

12:54:48  20  it will be your position that once a final judgment is entered

21  there is a $6 million judgment that needs to be bonded?

22       MR. GENETSKI:  Yes, Your Honor, and they could seek to

23  stay that.

24       THE COURT:  Okay.

12:55:04  25       MR. GENETSKI:  Your Honor, I don't have any more

12:55:05  1    argument to add on the individual liability point unless Your

        2    Honor has questions.

        3         THE COURT:  Well, I was reading as I was listening to

        4    Mr. Meaney the *Murphy Tugboat* case.  It's talking about the

12:55:24  5    Antitrust Act, but it does say that the -- I'm now reading from

        6    the opinion, it's a Judge Schwarzer opinion from San Francisco.

        7    The generality of the Antitrust Act's prohibition, the often

        8    uncertain line between proper and improper conduct, and the

        9    social interests in not deterring economically useful conduct

12:55:48 10    by the imposition of excessive risks make it appropriate to

       11    limit personal liability to cases of participation in

       12    inherently wrongful conduct.

       13         Why would that analysis not apply to the copyright

       14    and DMCA claims in this case?

12:56:10 15         MR. GENETSKI:  Well, Your Honor, going off the

       16    snippet, I haven't read the full case.  I have read a number of

       17    cases on this issue from Arizona, the Ninth Circuit and

       18    elsewhere.  My impression from those cases is that the standard

       19    that's generally been applied, in the copyright infringement

12:56:30 20    context specifically, is that if the person engages in the

       21    copyright infringement personally, then they're liable.

       22         In those cases the inherently wrongful requirement or

       23    additional element was not present.  However, our position

       24    would be that -- *MAI systems* is a case that has been out

12:56:55 25    there, it's discussed in the blogs and the commentary that

12:56:59  1    Mr. Donnelly apparently has become familiar with since the

2    onset of this case.  There is disagreement about whether or

3    not people think that *MAI* was a good case.  Mr. Calandrino had

4    testified in his deposition that as a technical matter he

12:57:18  5    didn't think that that should be copied.  But there's been no

6    dispute that that's the law of the Ninth Circuit.  I don't

7    think it is fair to hold Mr. Donnelly to the level of

8    knowledge of an IP copyright lawyer.  But there's not -- I

9    don't believe that it's an ignorance of the law protects here

12:57:36 10    to personal liability when you contribute them.  And

11    certainly -- I guess your question was limited to copyright

12    and DMCA.  I was going to address tortious interference.

13              Oh, and, Your Honor, if I could make one more point?

14              THE COURT:  Before you leave that.  I can understand

12:57:51 15    why copyright cases might come down that way for, as

16    Mr. Donnelly said, somebody who is pressing CDs in the back of

17    his truck.  Clearly knowingly violating copyrights.

18              MR. GENETSKI:  Sure.

19              THE COURT:  I think that the plaintiff makes a fair

12:58:07 20    point in saying that a software writer may well not have

21    foreseen the fact that add-on software was a copyright

22    violation when that software writer didn't use one line of

23    Blizzard's software in writing his code.  And that to me in

24    this kind of a case makes this thought from *Murphy Tugboat*

12:58:31 25    relevant.

12:58:32   1       I'm just saying that to invite any responses you have

2   to make sure I understand your position.

3           MR. GENETSKI:  Sure.  The response -- I don't -- I

4   don't dispute or disagree with that point as formulated by Your

12:58:44   5   Honor.  I think -- two thoughts.  First, as of July 17th, or I

6   forget the exact date, June 17th, the date of the summary

7   judgment order in this case, the question has been answered

8   unless and until reversed on the copyright infringement.  And

9   Mr. Donnelly has testified candidly he disagrees, he believes

12:59:11  10   that his position is still the correct one, and he doesn't

11   believe he should stop.  I realize that is part and parcel of

12   our other issue, the permanent injunctive issue.  But it's

13   pretty clear and has been pretty clear since then.

14           THE COURT:  Well, but if I were to go down that line

12:59:26  15   of thinking, then, he would only be personally liable for

16   damages after June of 1988 -- excuse me, 2008.  Right?

17           MR. GENETSKI:  Yes, Your Honor, on the copyright

18   claim.

19           And my second point, at a minimum the copyright claim

12:59:39  20   from that point forward has been -- we can't -- I don't

21   believe there's any question about the inherent unlawfulness

22   from that point forward on the copyright.  I believe that from

23   the inception of his business and the first time he looked at

24   whether or not Blizzard would object to this, and at a last

12:59:58  25   minimum, from September 2005 when Blizzard first banned

13:00:03   1    Warden, Mr. Donnelly should be charged with knowledge of his

           2    tortious interference.  He posted on his own website a FAQ

           3    making it clear.  He wants credit for that, for alerting his

           4    users that they're engaging in a risk that Blizzard objects to

13:00:19   5    that.  But as the Court found in summary judgment, it's

           6    knowledge.  It is knowledge of the TOU.  It's knowledge that

           7    this is a breach of the TOU.  And he's continued to do it.

           8            We've heard a lot of talk about the hardships that

           9    he'll suffer if his business is shut down.  And I understand

13:00:36  10    that those are real.  But he's been able to continue.  He's

          11    run this business that's now been deemed unlawful and

          12    infringing as a matter of law on tortious interference.  Not

          13    particularly a close case.

          14            He's been running that business for three years, as

13:00:54  15    Mr. Venable has suggested.  We believe that Mr. Donnelly's

          16    been well aware during that time.  And the enticement of the

          17    revenues he was generating was certainly enough of a

          18    motivation to continue.  We understand.  And as I stated in my

          19    closing, we don't dispute his right to have his day in court.

13:01:17  20            But you're not retroactively pardoned for conduct

          21    that was clear the entire time on the tortious interference in

          22    which you engaged in all the acts.  I believe in many of the

          23    tort cases, and I've got others here where -- there are ones

          24    where corporate officers who knew something was going on and

13:01:41  25    didn't stop it are held personally liable for tortious

1    activity.

2          THE COURT:  All right.  Let me ask one final question

3    on this.  I'm assuming from what you've put in your proposed

4    findings that it's your view that Mr. Donnelly's personal

5    liability on the tortious interference claim is governed by

6    Arizona law.

7          MR. GENETSKI:  Yes, Your Honor.

8          THE COURT:  Do you agree with that, Mr. Meaney,

9    Mr. Venable?

10         MR. VENABLE:  I'm sorry?

11         THE COURT:  That the question of personal liability on

12   the tortious interference claim is a matter of Arizona law.

13         MR. VENABLE:  Yes.

14         THE COURT:  Okay.  I assumed you did.  Okay.  Go

15   ahead.

16         MR. GENETSKI:  Your Honor, if I may move now back to

17   the DMCA claims.  And specifically under the 1201(a)(2) claim.

18   And I believe it was within that context you asked me the

19   question of whether work is defined in the Copyright Act.  And

20   I know Mr. Venable off the top of his head answered that

21   question.  I just want to confirm -- I think I misspoke and

22   said it was section 101(a) of the Copyright Act; it is 102(a).

23         It defines work as any one of a number of protected

24   works of authorship, and among those are literary work and

25   audiovisual work.  Which is what we're -- what are at issue

13:03:03  1  with the World of Warcraft software.

2         THE COURT:  Well, but the phrase "audiovisual work" is

3  itself defined in 101, right?

4         MR. GENETSKI:  Yes.  Right.

13:03:15  5         THE COURT:  So notwithstanding its reference in 102,

6  do you agree I have to go by the definition in 101?

7         MR. GENETSKI:  Yes, Your Honor.

8         THE COURT:  Okay.

9         MR. GENETSKI:  Listening carefully to your discussion

13:03:31 10  with Mr. Venable about his argument that -- I believe he's

11  arguing that -- I would characterize his argument that Blizzard

12  cannot have copyright protection in what *Lexmark* calls the

13  nonliteral elements.  He's saying the expressions that you see

14  on the monitor as you play the game is not protectable by

13:03:53 15  copyright --

16         THE COURT:  I think he's made a bit more of a

17  distinction.  I think he would say that Blizzard can have a

18  copyright protection for the nonliteral elements that are

19  static or fixed, that you can see, for example, through model

13:04:11 20  viewer when you call up the imagability.  But not for the

21  dynamic multi-participant presentation that occurs while the

22  game is being played.

23         MR. GENETSKI:  On that point, Your Honor, there are

24  cases in the video game context that speak to this issue.  I

13:04:33 25  mean, beginning with the definition of copyright law is that

13:04:38  1    for work to be protectable it has to be fixed in a tangible

2    medium of expression.  Which is -- and fixed is defined as able

3    to be perceived.  And we all sat in the courtroom --

4              THE COURT:  What are you referring to?

13:04:55  5              MR. GENETSKI:  Exact cite.

6              (Counsel conferring.)

7              MR. GENETSKI:  I apologize, Your Honor, I don't have

8    the Copyright Act in font of me.

9              THE COURT:  Oh, this is the statutory definition?

13:05:12 10              MR. GENETSKI:  I believe the -- I'll proceed to the

11   case cite which is --

12              THE COURT:  I think Mr. McGee may have it.

13              MR. McGEE:  It's a definition in section 102, Your

14   Honor.  It --

13:05:29 15              THE COURT:  Okay.  That's okay.

16              MR. McGEE:  -- definition of fixed, work is fixed and

17   a tangible meaning of expression -- I'm sorry, 101.

18              THE COURT:  Okay.  Where in 101?  I've got 101 in

19   front of me.

13:05:53 20              MR. McGEE:  Right below the definition of the term

21   "financial gain."

22              THE COURT:  Okay, let me get there.

23              This definition doesn't seem to help you.  This is

24   what it says in full, the paragraph.  It says:  A work is

13:06:44 25   fixed in a tangible medium of expression when its embodiment

13:06:49  1    in a copy or phonorecord by or under the authority of the

2    author is sufficiently permanent or stable to permit it to be

3    perceived, reproduced, or otherwise communicated for a period

4    of more than transitory duration.  A work consisting of

13:07:13  5    sounds, images, or both, that are being transmitted is fixed

6    for purposes of this title if a fixation of the work is being

7    made simultaneously with its transmission.

8              MR. GENETSKI:  Yes, Your Honor.

9              THE COURT:  That seems to support MDY's argument.

13:07:29 10              MR. GENETSKI:  I respectfully disagree based on the

11    way the case law has interpreted that.

12              THE COURT:  Okay.  Go ahead and tell me about the case

13    law.

14              MR. GENETSKI:  I read briefly from the *Atari Games*

13:07:38 15    case during my closing before this issue was illuminated a bit

16    more.  And that cite is 888 F.2d 878.

17              THE COURT:  888 F.2d 878?

18              MR. GENETSKI:  Yes, Your Honor.

19              THE COURT:  Okay.

13:07:58 20              MR. GENETSKI:  I believe it is 878.  I'm having

21    trouble reading my handwriting.  It's a D.C. Circuit case.

22              THE COURT:  It's a Judge Ginsburg decision?

23              MR. GENETSKI:  Yes, Your Honor.  And here the issue

24    was whether or not a copyright should have been granted by the

13:08:14 25    copyright office.  And it's in an Atari video game.  And what

13:08:22    1    Justice Ginsburg says is:  Even if -- I'll try to go slow --

            2            THE COURT:  I'm going to read the case.  You don't

            3    need to read any lengthy quotes.

            4            MR. GENETSKI:  It's short and I think it speaks

13:08:34    5    directly to the point.  "Even if initially concentrated or

            6    discrete parts ultimately should be on the audiovisual work as

            7    a whole" -- I'm sorry, let me start -- the key part of the

            8    quote is "the total sequence of images displayed as the game is

            9    played constitute the work."

13:08:57   10            So it's the sequence of images that are displayed.

           11    And the case also quotes legislative history from the

           12    Copyright Act that says the fact that some or all of the

           13    individual images in the group would also constitute separate

           14    works does not prevent the group of images from being an

13:09:12   15    audiovisual work.

           16            THE COURT:  Okay.  I'll look at *Atari*.

           17            MR. GENETSKI:  I also have an Understanding Copyright

           18    Law treatise here, Your Honor, that has a video games cases

           19    section in it which it speaks again to the interpretation of

13:09:30   20    the definition that Your Honor just read.  And curiously, this

           21    snippet speaks to two issues raised by Mr. Venable, the one

           22    we're discussing now and also the notion that the players of

           23    World of Warcraft are the authors of any expression that's

           24    generated in the game because they make the choices.  What this

13:09:49   25    says is the most recent analysis of the fixation requirement is

13:09:52  1    involved actions --

          2              THE COURT:  Slower please.

          3              MR. GENETSKI:  I'll read a truncated portion.

          4              "When the game is not being played, the images are

13:10:05  5    repetitive.  But during play they're subject to variation by

          6    human intervention.  Players playing the game.  The defendants

          7    in several cases have claimed that they were free to copy the

          8    plaintiff's games because the games were not fixed in a

          9    tangible medium of expression but were rather ephemeral

13:10:26 10    projections on a cathode ray tube.  In addition, the

         11    variations of image patterns due to the different skills of

         12    those playing the games prevented a sufficiently consistent

         13    pattern to constitute a fixation of the work."  See, it's

         14    different than the other case.  "The case law has universally

13:10:46 15    renounced this reasoning."

         16              It goes on to cite *Stern Electronic v Kaufman*, Second

         17    Circuit case.

         18              THE COURT:  What's the cite for that?

         19              MR. GENETSKI:  669 F.2d 852.  The *Atari* case is cited

13:11:04 20    here as well.  Two different *Atari* cases, actually.

         21              THE COURT:  All right.

         22              MR. GENETSKI:  So, Your Honor, our view is that

         23    copyright law has -- the copyright cases have answered this

         24    question and they said you do have protection in the nonliteral

13:11:33 25    elements.  They're able to be perceived on the screen, the fact

13:11:37  1   that they're fixed enough sufficiently to be able to be

2   perceived.

3        And we also heard from Mr. Ashe and also from

4   Mr. Calandrino that as the particular nonliteral elements that

13:11:50  5   we all watched, we all perceived in the courtroom yesterday,

6   are generated.  The code that is generating them is fixed in

7   RAM at the same time.  And that code -- the code that

8   generates those expressive elements, you can't get those

9   expressive elements without -- if you're -- without being

13:12:11 10   connected to the server and without bypassing Warden.  And the

11   fixation is also at the RAM level in the code.  The image

12   itself is fixed in the video RAM or video card, but the

13   underlying code is fixed in RAM simultaneous to the image

14   being perceived.

13:12:28 15        We believe the authorities support our position, Your

16   Honor, that we do have protection in those nonliteral

17   elements.

18        As to the -- those -- what I just read touched also a

19   bit on the users of games are not the authors, and we believe

13:12:43 20   that question was answered definitively in the early 1980s as

21   well.

22        I have a *Williams Electronics v Artic International*

23   case, 685 F.2d 870.  I won't read the quote, Your Honor.  But

24   this case and others like it stand for the proposition that

13:13:08 25   although users have some degree of selection and input into a

13:13:14  1   video game, or here a computer game, the stories are all

2   prewritten by the author.  They were in these cases and they

3   are here.  Blizzard has written all the lore, all the quests.

4   It defined which characters can be in the game and where they

13:13:31  5   can be.  The effect the user has is similar to when you get a

6   DVD.  When I pull up the menu selection from a DVD, I'm

7   allowed, in most cases these days, to jump through any number

8   of 25 different scenes on the DVD.

9          Just because a user decides to watch the climactic

13:13:53 10   scene at the end of the movie first doesn't mean the user

11   becomes the author of that work because they watched it out of

12   order.

13          One of the courts actually uses the analogy of

14   comparing it to someone changing the channels, which I think

13:14:07 15   is a similar analogy.  So we don't think there's any basis for

16   the position that the users are the authors of the work.

17          I believe that's everything I have, Your Honor.

18          THE COURT:  Okay.  All right.  Thanks.

19          MR. VENABLE:  Your Honor, may I make just one very

13:14:27 20   quick point?

21          THE COURT:  You can.  Last point.

22          MR. VENABLE:  Yes.

23          Mr. Genetski's last discussion about the issue of

24   authorship.  I think the case that he was actually referring

13:14:40 25   to about the -- the case he was referring to about the video

game cases, those are not being transmitted.  And to the

extent that they are, they're being shown simultaneously as

they've already been fixed.

In this case it's the server that is providing

information down to the hard drive.  And at the point which it

is then being copied from the hard drive into RAM, it is being

fixed.  And it is not -- so under the definition that you were

reading from in terms of what constitutes being fixed, it

would not fall under that definition and would be

distinguished from those cases that he cited to.

The last point was regarding authorship by users.

There's the explicit case that talks about -- this is a

Seventh Circuit case, the *Midway versus Artic* case.  I do have

a cite for you and I can get it for you.  But the case said

that the reason why -- this was a case involving Galaxia, the

game Galaxia, which was a '80s game where the user who played

the game was simply moving from -- had very limited movements

in what the player could do.  And the defendant in that case

was trying to argue that the -- that he had some -- that he

had some contribution that was being made to the game because

of his movements.  And the court rejected that argument

because they said his movements were very limited.  He

actually provided no creative expression in the game.  And

they said that that type of movement was not creative

expression.

13:16:13   1          But that's not the case here in the World of Warcraft

          2   game.  It is much broader.  The users have far more control.

          3   It's certainly not limited in terms of just moving from left

          4   to right.  You pick your characters -- you understand.

13:16:25   5          THE COURT:  I understand.

          6          MR. VENABLE:  Okay.  Thank you, Your Honor.

          7          THE COURT:  Okay.  Well, thank you for helpful and

          8   very excellent presentations.  I now have the hard task of

          9   trying to figure out who's right.  And I will go work on that.

13:16:42  10   I will try to get you a decision sometime next week, if I can.

         11          (The Court and the courtroom deputy confer.)

         12          THE COURT:  Okay.

         13          MR. VENABLE:  Your Honor, that citation to *Midway* is

         14   704 F.2d 1009.

13:17:13  15          THE COURT:  Okay.

         16          MR. VENABLE:  I'll send that over to you today.

         17          THE COURT:  Thanks very much.

         18          (End of transcript.)

         19                    *  *  *  *  *

         20

         21

         22

         23

         24

         25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 5th day of May, 2009.

s/ Patricia Lyons, RPR, CRR
Official Court Reporter