LAW OFFICES OF
VENABLE, CAMPILLO, LOGAN & MEANEY, P.C.
1938 EAST OSBORN ROAD
PHOENIX, ARIZONA 85016
TELEPHONE (602) 631-9100
FACSIMILE (602) 631 4529
E-MAIL DOCKETING@VCLMLAW.COM

Lance C. Venable (AZ Bar No 017074)
Joseph R. Meaney (AZ Bar No. 017371)
Attorneys for Plaintiff MDY Industries, LLC
and Third-Party Defendant Michael Donnelly

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| **MDY INDUSTRIES, LLC,**<br><br>Plaintiff and Counterdefendant,<br><br>vs.<br><br>**BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC.,**<br><br>Defendants and Counterclaimants, | **Case No.: CV06-02555-PHX-DGC**<br><br>**MDY Industries, LLC and Michael Donnelly's Response to Blizzard's Motion to Compel Compliance with the Court's March 10, 2009 Order**<br><br>**The Honorable David G. Campbell** |
| **BLIZZARD ENTERTAINMENT, INC., and VIVENDI GAMES, INC.,**<br><br>Third-Party Plaintiffs,<br><br>vs.<br><br>**MICHAEL DONNELLY, an individual**<br><br>Third-Party Defendant. | |

MDY Industries, LLC ("MDY") and Michael Donnelly ("Donnelly") for their response to Blizzard's Motion to Compel Compliance with the Court's March 10, 2009 Order, state as follows:

1

**ISSUES TO BE DECIDED**

1. Did the Court intend to put MDY out of business during the pendency of the appeal?

2. The Court's Order states that MDY and Donnelly place all profits obtained from Glider sales or other operations of MDY in an escrow account. Profits from an LLC are calculated after expenses – including salaries paid from gross revenues. Does the Court's Order require Donnelly to place assets purchased using money from his salary earned from MDY in escrow?

3. The Court's Order requires MDY to account to Blizzard on a monthly basis for its income and expenses Court. Furthermore, the Court made several references to Donnelly's testimony about profits set aside during the pendency of the case. MDY's business operations remain ongoing and, like any business, cannot operate without some level of cash reserves. Does the Court's Order require Donnelly to place MDY's remaining cash reserves in escrow?

**PRELIMINARY STATEMENT**

Because MDY and Donnelly believe that they have complied with the Court's March 10 order, MDY's Response will address Blizzard's Motion as one requesting that the Court clarify its March 10 Order. MDY and Donnelly have simply acted according to what they believe is the plain meaning of the Court's Order regarding what funds need to be placed in escrow.

MDY believes that the Court's Order does not require that Donnelly place title to every asset that he acquired with any money earned from his salary in escrow. Furthermore, MDY believes that the Court's Order did not require MDY to place its cash reserves to operate the business in escrow. If MDY and Donnelly have misinterpreted the Court's Order, they will immediately comply with whatever direction or clarification that the Court will provide regarding its Order.

**ARGUMENT**

**I.    MDY should be allowed to operate during the pendency of the appeal.**

Blizzard's Motion raises a key preliminary question—did the Court intend to

allow MDY to operate during the pendency of the appeal? Blizzard's Motion, although styled as a Motion to Compel, really seeks to shutter all business operations at MDY. The Motion seeks to deprive MDY of all of 100% its working capital and even seeks to claw back salary paid to its President. Under Blizzard's interpretation of the Order, MDY could not pay salaries and any other normal operating expenses. If the Court's intention was to allow MDY to operate as a company so long as it did not sell Glider, then Blizzard's Motion is misplaced.

MDY asked for a stay of the judgment so it could continue to operate during the pendency of the appeal. MDY is a software company and is actively developing products unrelated to World of Warcraft. Blizzard's reading of the Order is an indirect attack on the Court's decision to grant a stay on prescribed terms. Blizzard wants to put MDY out of business for good—whether it sells infringing products or not and that is the less than direct point of its Motion. Blizzard has misread both the terms and intent of the Order. First, the Court ordered MDY to account and pay over certain "profits" from the sales of Glider. Companies, like MDY, have sales or revenues first and then, after payment of expenses, profits. The Order requires MDY to pay over its profits, not all of its sales or gross revenue. MDY presumes the Court chose its words carefully and meant profits when it said profits. Blizzard ignores this distinction.

Second, MDY came to the Court asking for relief from the judgment during the pendency of the appeal in the hopes of remaining in business long enough to see the appeal through to conclusion. The Court granted this request, in part, upon certain specific terms and conditions. The plain language of the Order quite clearly allows MDY to stay in business during the appeal so long as it i) honors the injunction, ii) places the profits from selling Glider in escrow, and iii) reports "its monthly income and expenses to Blizzard during the pendency of the appeal." (Order at p.9, lines 4-5). Blizzard's interpretation is, MDY believes, inconsistent with the Order for at least two reasons.

Blizzard's interpretation and Motion ignores the language of the Order itself and the context. Blizzard believes that the Order required MDY to drain of all of its cash

3

which, in turn, will require MDY to shut its doors stopping its new product development. If that is the case, then what is the point of the requirement that MDY account to Blizzard for its income and expenses monthly? MDY's obligation to report its income and expenses makes no sense if MDY is required to turn over, as received, all of its sales receipts. MDY submits that the Court intended to allow MDY to operate pending the appeal and, therefore, Blizzard's Motion is not well taken.

**II. Donnelly does not have to place any personal assets in escrow that he acquired using money earned from his reasonable salary from MDY.**

**A. Donnelly's salary is a reasonable expense of MDY**

Merriam-Webster's Online Dictionary defines "profit" as:

**1:** a valuable return.
**2: the excess of returns over expenditure in a transaction or series of transactions;** *especially* **: the excess of the selling price of goods over their cost.**
**3: net income usually for a given period of time.**
**4:** the ratio of profit for a given year to the amount of capital invested or to the value of sales.
**5: the compensation accruing to entrepreneurs for the assumption of risk in business enterprise** *as distinguished from wages or rent.*

In particular, the definition of *profit* focuses on three primary points as highlighted above in boldface: (1) profit must be the excess of the selling price of goods over their cost, (2) profit is a measure of net income for a given period of time, and (3) profit cannot include wages as they are an expense that is deducted from gross revenues.

Blizzard first argues that the term *profit,* as used in the Court's Order, must include Donnelly's salary he received from MDY. Blizzard, however, cites no legal authority to support its position. Blizzard's sole basis for its position is that by allowing Donnelly to set his own salary, the Court would unfairly give Donnelly the opportunity to

avoid classifying MDY's income as profit. Blizzard's argument is incorrect.

In Donnelly's duties as President of MDY, and as the primary person responsible for not only creating the Glider software, but maintaining and updating the software, Donnelly spends anywhere from 40-60 hours per week doing his job.[1] Donnelly is also responsible for the accounting duties and other day-to-day responsibilities, which the owner of a small business normally carries out.[2] Certainly, all of these duties and responsibilities are included in the cost of Glider no differently than Blizzard would include one of its many software developers' time and expertise in the cost of World of Warcraft. Blizzard certainly doesn't suggest that Donnelly should simply work for free. Thus, Donnelly's salary is a necessary expense to MDY, which must be deducted from MDY's gross revenues. Donnelly's salary is undoubtedly not profit.

Regarding Blizzard's fairness argument, Blizzard argues that of the $29,350 per month that MDY pays in employee salaries, Donnelly has paid "[A] large portion" of the total salaries to Donnelly totaling $12,800 per month or $153,600 per year. Blizzard apparently believes that Donnelly's salary is unreasonable. First, Donnelly has maintained the same basic salary for the past three years while MDY earned on average $180,000 to $250,000 per month in gross revenue.[3] If, as Blizzard argues, Donnelly could have set his salary to whatever he wanted, it begs the question why did he set his salary so low? Could Donnelly have paid himself significantly more to avoid classifying his income as profit? In fact, one could argue that for Donnelly's extraordinary expertise in computer software, and for his duties as described above, his $12,800 monthly salary was far too low.[4] There is little doubt that Donnelly could be paid much more as a software developer working for another company.[5]

---

[1] Affidavit of Michael Donnelly at 1. Attached herein as Exhibit A.
[2] *Id* at 2.
[3] *Id* at 3.
[4] *Id* at 4.
[5] *Id*.

5

Furthermore, considering that MDY has two other highly-skilled software developers on its payroll, Donnelly is only receiving 43% of the total salaries paid.[6] Donnelly's salary is slightly more than 1/3 of the total, even though he is the president of MDY and the most skilled programmer of the three employees.[7] The bottom line is that not only should the Court not consider Donnelly's salary to be profit, the Court should consider that Donnelly's salary is fair and reasonable compensation for someone of his duties, responsibilities, and skill level. Therefore, any assets that Donnelly purchased from his MDY salary should not be placed in escrow.

### B. The value of Donnelly's car is not directly tied to sales of Glider.

Although it is true that Mr. Donnelly bought his present car during the time MDY was selling Glider, it is not axiomatic that the car was purchased with proceeds from the sales of Glider. Blizzard's motion ignores two key facts. First, the car was purchased towards the end of 2007, well before the trial in this matter and, therefore, was not purchased as a means of avoiding collection of the judgment in this matters. Second, Mr. Donnelly traded in his pre-Glider automobile as a down payment. If the Court is, as Blizzard urges, inclined to inquire into to source of the funds Mr. Donnelly used to purchase certain assets, then, of course, his pre-Glider equity in another car must be properly deducted. If the Court were to go down this road, then it would have to then determine, in addition, how the depreciation in the value of the car should be allocated between Blizzard and Donnelly.

Again, Donnelly asserts that this analysis is unnecessary and not required by the Order. If Donnelly is reading the Order incorrectly, then he asks that be allowed to keep his pre-Glider equity.

---

[6] *Id* at 5.
[7] *Id* at 5-6.

**III. The funds in MDY's corporate bank account should not be placed in escrow.**

The Court's Order states that MDY and Donnelly shall place "all present and future profits obtained from the sale of glider or other operations of MDY, including all monies set aside by MDY and Donnelly from the commencement of this suit, in an escrow account approved by Blizzard."[8] The Court also stated that "MDY shall report its monthly income and expenses to Blizzard during the pendency of the appeal."[9] MDY believes that the Court's Order could not be interpreted to mean MDY must deposit its cash reserves used to operate its business when the Court's Order recognizes that MDY will remain in business.

MDY believes the Court's order requires MDY to report to Blizzard its monthly income and deposit any profits earned from each month into the escrow account. MDY would have to determine the profit from gross sales of MDY's products less costs and expenses – including salaries. Certainly, in order to continue its business, MDY must have a cash reserve to cover overhead and operating expenses.[10] Currently, MDY has approximately $40,000.00 remaining in its operating account, which it is using to operate its business, for expenses still owed to third parties, and for projects as described below.[11]

Blizzard cites to a Glider forum post by Donnelly where he acknowledged he was no longer selling Glider. This is correct only as it applies to World of Warcraft. MDY is currently looking to earn revenue by focusing its business operations on adapting Glider for other programs and developing software outside of Glider. MDY is also looking to sell advertising on its Glider forum. As required by the Court's Order, MDY would report this information to Blizzard and deposit any profits into escrow.

Finally, the Court should be aware that Donnelly placed all of the profit distributions that Donnelly had received from MDY totaling over $400,000 into a

---

[8] Docket #116, at 10.
[9] *Id.*
[10] Donnelly Affidavit at 7.
[11] *Id* at 8.

7

personal investment account. As of March 10, 2009, Donnelly's account had lost over half its value on paper due to the drop in the markets. Blizzard forced MDY to liquidate the investment account and place the funds in escrow, rather than allowing Donnelly to assign the title to the investment account to escrow. By liquidating the account, Blizzard may have cost Donnelly an opportunity to earn back his losses in the market.[12] In either case, Donnelly has already deposited a quarter of a million dollars in escrow.[13] Currently MDY has no profit and has nothing more to deposit to escrow.[14] MDY should be allowed to maintain its remaining funds to continue funding its business operations, which would be consistent with the language in the Court's Order. Therefore, the remaining cash reserves in MDY's operating account should be excluded from escrow.

## IV. Conclusion

MDY and Donnelly are complying with the Court's March 10, 2009 order. Any assets that Donnelly has acquired with his reasonable salary, which is definitely not profit from MDY's revenues, should remain in Donnelly's possession. Furthermore, the remaining funds in MDY's operating account should not be placed in escrow. The operating account funds are not profit as stated in the Court's Order, and are necessary to continue operating MDY, which the Court's Order clearly acknowledged MDY is allowed to do while MDY's appeal is pending. Therefore, based upon the plain language of the Court's March 10, 2009 Order, the Court should deny Blizzard's Motion to Compel as moot.

---

[12] *Id* at 9. Considering that the market has already gained almost 20% of its losses back since March 10th, the value in escrow would have been worth an additional $50,000.00 had Blizzard not required Donnelly to liquidate his investment account.
[13] *Id* at 10.
[14] *Id* at 11.

Respectfully submitted on June 1, 2009,

**Venable, Campillo, Logan & Meaney, P.C.**

By /s/Lance C. Venable
Lance C. Venable SBN 017074
Joseph R. Meaney SBN 017371
1938 East Osborn Road
Phoenix, Arizona 85016
Tel: 602-631-9100
Fax: 602-631-9796
E-Mail docketing@vclmlaw.com

*Attorneys for Plaintiff MDY Industries, LLC and Third-Party Defendant Donnelly*

## CERTIFICATE OF SERVICE

☒ I hereby certify that on June 1, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| Name | Email Address |
| --- | --- |
| Christian Genetski, Esq. | cgenetski@sonnenschein.com |
| Scott Jeremy Stein, Esq. | sstein@sonnenschein.com <br> wanderson@sonnenschein.com |
| Shane McGee, Esq. | smcgee@sonnenschein.com |
|  |  |

☐ I hereby certify that on _____, I served the attached document by FIRST CLASS MAIL on the following, who are not registered participants of the CM/ECF System:

| Name | Physical or Email Address |
| --- | --- |
|  |  |

s/ Lance C. Venable