**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MDY Industries, LLC,
    *Plaintiff-counter-defendant-*
                *Appellant,*

        v.

Blizzard Entertainment, Inc. and
Vivendi Games, Inc.,
    *Defendants-third-party-plaintiffs-*
                *Appellees,*

        v.

Michael Donnelly,
    *Third-party-defendant-Appellant.*

> No. 09-15932
>
> D.C. No.
> 2:06-CV-02555-
> DGC

MDY Industries, LLC,
    *Plaintiff-counter-defendant-*
                *Appellee,*

        v.

Blizzard Entertainment, Inc. and
Vivendi Games, Inc.,
    *Defendants-third-party-plaintiffs-*
                *Appellants,*

        v.

Michael Donnelly,
    *Third-party-defendant-Appellee.*

> No. 09-16044
>
> D.C. No.
> 2:06-CV-02555-
> DGC
>
> ORDER AND
> AMENDED
> OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

2657

Argued and Submitted
June 7, 2010—Seattle, Washington

Filed December 14, 2010
Amended February 17, 2011

Before: William C. Canby, Jr., Consuelo M. Callahan and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Callahan

## COUNSEL

Lance C. Venable (argued) and Joseph R. Meaney of Venable, Campillo, Logan & Meaney, P.C., for plaintiff-appellant/cross-appellee MDY Industries LLC and plaintiff-appellant/third-party-defendant-appellee Michael Donnelly.

Christian S. Genetski (argued), Shane M. McGee, and Jacob A. Sommer of Sonnenschein Nath & Rosenthal LLP, for defendants-appellees/cross-appellants Blizzard Entertainment, Inc. and Vivendi Games, Inc.

George A. Riley, David R. Eberhart, and David S. Almeling of O'Melveny & Myers LLP, for amicus curiae Business Software Alliance.

Scott E. Bain, Keith Kupferschmid, and Mark Bohannon, for amicus curiae Software & Information Industry Association.

Brian W. Carver of the University of California, Berkeley, School of Information, and Sherwin Siy and Jef Pearlman, for amicus curiae Public Knowledge.

Robert H. Rotstein, Steven J. Metalitz, and J. Matthew Williams of Mitchell Silberberg & Knupp LLP, for amicus curiae Motion Picture Association of America, Inc.

## ORDER

Our opinion filed on December 14, 2010, is amended to include the following footnote at the end of Section V(E)(2):

> For the first time in its petition for rehearing, MDY raises the applicability of Section 1201(f) and the question whether Glider is an "independently created computer program" under that subsection and thus exempt from the coverage of Section 1201(a). Because this argument was not raised to the district court or presented in the parties' briefs on appeal, we decline to reach it.

With this amendment, the plaintiffs-appellants' petition for panel rehearing is DENIED. No further petition for rehearing will be entertained.

---

## OPINION

CALLAHAN, Circuit Judge:

Blizzard Entertainment, Inc. ("Blizzard") is the creator of World of Warcraft ("WoW"), a popular multiplayer online role-playing game in which players interact in a virtual world while advancing through the game's 70 levels. MDY Industries, LLC and its sole member Michael Donnelly ("Donnelly") (sometimes referred to collectively as "MDY") developed and sold Glider, a software program that automatically plays the early levels of WoW for players.

MDY brought this action for a declaratory judgment to establish that its Glider sales do not infringe Blizzard's copyright or other rights, and Blizzard asserted counterclaims under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et seq.*, and for tortious interference with con-

tract under Arizona law. The district court found MDY and Donnelly liable for secondary copyright infringement, violations of DMCA §§ 1201(a)(2) and (b)(1), and tortious interference with contract. We reverse the district court except as to MDY's liability for violation of DMCA § 1201(a)(2) and remand for trial on Blizzard's claim for tortious interference with contract.

## I.

### A.   World of Warcraft

In November 2004, Blizzard created WoW, a "massively multiplayer online role-playing game" in which players interact in a virtual world. WoW has ten million subscribers, of which two and a half million are in North America. The WoW software has two components: (1) the game client software that a player installs on the computer; and (2) the game server software, which the player accesses on a subscription basis by connecting to WoW's online servers. WoW does not have single-player or offline modes.

WoW players roleplay different characters, such as humans, elves, and dwarves. A player's central objective is to advance the character through the game's 70 levels by participating in quests and engaging in battles with monsters. As a player advances, the character collects rewards such as ingame currency, weapons, and armor. WoW's virtual world has its own economy, in which characters use their virtual currency to buy and sell items directly from each other, through vendors, or using auction houses. Some players also utilize WoW's chat capabilities to interact with others.

### B.   Blizzard's use agreements

Each WoW player must read and accept Blizzard's End User License Agreement ("EULA") and Terms of Use ("ToU") on multiple occasions. The EULA pertains to the

game client, so a player agrees to it both before installing the game client and upon first running it. The ToU pertains to the online service, so a player agrees to it both when creating an account and upon first connecting to the online service. Players who do not accept both the EULA and the ToU may return the game client for a refund.

## C.   Development of Glider and Warden

Donnelly is a WoW player and software programmer. In March 2005, he developed Glider, a software "bot" (short for robot) that automates play of WoW's early levels, for his personal use. A user need not be at the computer while Glider is running. As explained in the Frequently Asked Questions ("FAQ") on MDY's website for Glider:

> Glider . . . moves the mouse around and pushes keys on the keyboard. You tell it about your character, where you want to kill things, and when you want to kill. Then it kills for you, automatically. You can do something else, like eat dinner or go to a movie, and when you return, you'll have a lot more experience and loot.

Glider does not alter or copy WoW's game client software, does not allow a player to avoid paying monthly subscription dues to Blizzard, and has no commercial use independent of WoW. Glider was not initially designed to avoid detection by Blizzard.

The parties dispute Glider's impact on the WoW experience. Blizzard contends that Glider disrupts WoW's environment for non-Glider players by enabling Glider users to advance quickly and unfairly through the game and to amass additional game assets. MDY contends that Glider has a minimal effect on non-Glider players, enhances the WoW experience for Glider users, and facilitates disabled players' access to WoW by auto-playing the game for them.

In summer 2005, Donnelly began selling Glider through MDY's website for fifteen to twenty-five dollars per license. Prior to marketing Glider, Donnelly reviewed Blizzard's EULA and client-server manipulation policy. He reached the conclusion that Blizzard had not prohibited bots in those documents.

In September 2005, Blizzard launched Warden, a technology that it developed to prevent its players who use unauthorized third-party software, including bots, from connecting to WoW's servers. Warden was able to detect Glider, and Blizzard immediately used Warden to ban most Glider users. MDY responded by modifying Glider to avoid detection and promoting its new anti-detection features on its website's FAQ. It added a subscription service, Glider Elite, which offered "additional protection from game detection software" for five dollars a month.

Thus, by late 2005, MDY was aware that Blizzard was prohibiting bots. MDY modified its website to indicate that using Glider violated Blizzard's ToU. In November 2005, Donnelly wrote in an email interview, "Avoiding detection is rather exciting, to be sure. Since Blizzard does not want bots running at all, it's a violation to use them." Following MDY's anti-detection modifications, Warden only occasionally detected Glider. As of September 2008, MDY had gross revenues of $3.5 million based on 120,000 Glider license sales.

### D.   Financial and practical impact of Glider

Blizzard claims that from December 2004 to March 2008, it received 465,000 complaints about WoW bots, several thousand of which named Glider. Blizzard spends $940,000 annually to respond to these complaints, and the parties have stipulated that Glider is the principal bot used by WoW players. Blizzard introduced evidence that it may have lost monthly subscription fees from Glider users, who were able to reach WoW's highest levels in fewer weeks than players

playing manually. Donnelly acknowledged in a November 2005 email that MDY's business strategy was to make Blizzard's anti-bot detection attempts financially prohibitive:

> The trick here is that Blizzard has a finite amount of development and test resources, so we want to make it bad business to spend that much time altering their detection code to find Glider, since Glider's negative effect on the game is debatable . . . . [W]e attack th[is] weakness and try to make it a bad idea or make their changes very risky, since they don't want to risk banning or crashing innocent customers.

### E.   Pre-litigation contact between MDY and Blizzard

In August 2006, Blizzard sent MDY a cease-and-desist letter alleging that MDY's website hosted WoW screenshots and a Glider install file, all of which infringed Blizzard's copyrights. Donnelly removed the screenshots and requested Blizzard to clarify why the install file was infringing, but Blizzard did not respond. In October 2006, Blizzard's counsel visited Donnelly's home, threatening suit unless MDY immediately ceased selling Glider and remitted all profits to Blizzard. MDY immediately commenced this action.

## II.

On December 1, 2006, MDY filed an amended complaint seeking a declaration that Glider does not infringe Blizzard's copyright or other rights. In February 2007, Blizzard filed counterclaims and third-party claims against MDY and Donnelly for, *inter alia*, contributory and vicarious copyright infringement, violation of DMCA §§ 1201(a)(2) and (b)(1), and tortious interference with contract.

In July 2008, the district court granted Blizzard partial summary judgment, finding that MDY's Glider sales contributorily and vicariously infringed Blizzard's copyrights and

tortiously interfered with Blizzard's contracts. The district court also granted MDY partial summary judgment, finding that MDY did not violate DMCA § 1201(a)(2) with respect to accessing the game software's source code.

In September 2008, the parties stipulated to entry of a $6 million judgment against MDY for the copyright infringement and tortious interference with contract claims. They further stipulated that Donnelly would be personally liable for the same amount if found personally liable at trial. After a January 2009 bench trial, the district court held MDY liable under DMCA §§ 1201(a)(2) and (b)(1). It also held Donnelly personally liable for MDY's copyright infringement, DMCA violations, and tortious interference with contract.

On April 1, 2009, the district court entered judgment against MDY and Donnelly for $6.5 million, an adjusted figure to which the parties stipulated based on MDY's DMCA liability and post-summary judgment Glider sales. The district court permanently enjoined MDY from distributing Glider. MDY's efforts to stay injunctive relief pending appeal were unsuccessful. On April 29, 2009, MDY timely filed this appeal. On May 12, 2009, Blizzard timely cross-appealed the district court's holding that MDY did not violate DMCA §§ 1201(a)(2) and (b)(1) as to the game software's source code.

## III.

We review de novo the district court's (1) orders granting or denying summary judgment; (2) conclusions of law after a bench trial; and (3) interpretations of state law. *Padfield v. AIG Life Ins.*, 290 F.3d 1121, 1124 (9th Cir. 2002); *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 879 (9th Cir. 2005); *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). We review the district court's findings of fact for clear error. *Twentieth Century Fox*, 429 F.3d at 879.

## IV.

**[1]** We first consider whether MDY committed contributory or vicarious infringement (collectively, "secondary infringement") of Blizzard's copyright by selling Glider to WoW players.[1] *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996) ("A copyright is a right against the world. Contracts, by contrast, generally affect only their parties."). To establish secondary infringement, Blizzard must first demonstrate direct infringement. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019, 1022 (9th Cir. 2001). To establish direct infringement, Blizzard must demonstrate copyright ownership and violation of one of its exclusive rights by Glider users. *Id*. at 1013. MDY is liable for contributory infringement if it has "intentionally induc[ed] or encourag[ed] direct infringement" by Glider users. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). MDY is liable for vicarious infringement if it (1) has the right and ability to control Glider users' putatively infringing activity and (2) derives a direct financial benefit from their activity. *Id*. If Glider users directly infringe, MDY does not dispute that it satisfies the other elements of contributory and vicarious infringement.

**[2]** As a copyright owner, Blizzard possesses the exclusive right to reproduce its work. 17 U.S.C. § 106(1). The parties agree that when playing WoW, a player's computer creates a copy of the game's software in the computer's random access memory ("RAM"), a form of temporary memory used by computers to run software programs. This copy potentially infringes unless the player (1) is a licensee whose use of the software is within the scope of the license or (2) owns the copy of the software. *See Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121 (9th Cir. 1999) ("*Sun I*"); 17

---

[1]Alternatively, MDY asks that we determine whether there are any genuine issues of material fact that warrant a remand for trial on Blizzard's secondary copyright infringement claims. We find none.

U.S.C. § 117(a). As to the scope of the license, ToU § 4(B), "Limitations on Your Use of the Service," provides:

> You agree that you will not . . . (ii) create or use cheats, bots, "mods," and/or hacks, or any other third-party software designed to modify the World of Warcraft experience; or (iii) use any third-party software that intercepts, "mines," or otherwise collects information from or through the Program or Service.

By contrast, if the player owns the copy of the software, the "essential step" defense provides that the player does not infringe by making a copy of the computer program where the copy is created and used solely "as an essential step in the utilization of the computer program in conjunction with a machine." 17 U.S.C. § 117(a)(1).

## A.   Essential step defense

We consider whether WoW players, including Glider users, are owners or licensees of their copies of WoW software. If WoW players own their copies, as MDY contends, then Glider users do not infringe by reproducing WoW software in RAM while playing, and MDY is not secondarily liable for copyright infringement.

[3] In *Vernor v. Autodesk, Inc.*, we recently distinguished between "owners" and "licensees" of copies for purposes of the essential step defense. *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1108-09 (9th Cir. 2010; *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 519 n.5 (9th Cir. 1993); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1333, 1335-36 (9th Cir. 1995); *Wall Data, Inc. v. Los Angeles County Sheriff's Dep't*, 447 F.3d 769, 784-85 (9th Cir. 2006). In *Vernor*, we held "that a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes

notable use" restrictions. 621 F.3d at 1111 (internal footnote omitted).

**[4]** Applying *Vernor*, we hold that WoW players are licensees of WoW's game client software. Blizzard reserves title in the software and grants players a non-exclusive, limited license. Blizzard also imposes transfer restrictions if a player seeks to transfer the license: the player must (1) transfer all original packaging and documentation; (2) permanently delete all of the copies and installation of the game client; and (3) transfer only to a recipient who accepts the EULA. A player may not sell or give away the account.

**[5]** Blizzard also imposes a variety of use restrictions. The game must be used only for non-commercial entertainment purposes and may not be used in cyber cafes and computer gaming centers without Blizzard's permission. Players may not concurrently use unauthorized third-party programs. Also, Blizzard may alter the game client itself remotely without a player's knowledge or permission, and may terminate the EULA and ToU if players violate their terms. Termination ends a player's license to access and play WoW. Following termination, players must immediately destroy their copies of the game and uninstall the game client from their computers, but need not return the software to Blizzard.

**[6]** Since WoW players, including Glider users, do not own their copies of the software, Glider users may not claim the essential step defense. 17 U.S.C. § 117(a)(1). Thus, when their computers copy WoW software into RAM, the players may infringe unless their usage is within the scope of Blizzard's limited license.

## B. Contractual covenants vs. license conditions

**[7]** "A copyright owner who grants a nonexclusive, limited license ordinarily waives the right to sue licensees for copyright infringement, and it may sue only for breach of con-

tract." *Sun I*, 188 F.3d at 1121 (internal quotations omitted). However, if the licensee acts outside the scope of the license, the licensor may sue for copyright infringement. *Id.* (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989)). Enforcing a copyright license "raises issues that lie at the intersection of copyright and contract law." *Id.* at 1122.

**[8]** We refer to contractual terms that limit a license's scope as "conditions," the breach of which constitute copyright infringement. *Id.* at 1120. We refer to all other license terms as "covenants," the breach of which is actionable only under contract law. *Id.* We distinguish between conditions and covenants according to state contract law, to the extent consistent with federal copyright law and policy. *Foad Consulting Group v. Musil Govan Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001).

**[9]** A Glider user commits copyright infringement by playing WoW while violating a ToU term that is a license condition. To establish copyright infringement, then, Blizzard must demonstrate that the violated term — ToU § 4(B) — is a condition rather than a covenant. *Sun I*, 188 F.3d at 1122. Blizzard's EULAs and ToUs provide that they are to be interpreted according to Delaware law. Accordingly, we first construe them under Delaware law, and then evaluate whether that construction is consistent with federal copyright law and policy.

A covenant is a contractual promise, i.e., a manifestation of intention to act or refrain from acting in a particular way, such that the promisee is justified in understanding that the promisor has made a commitment. *See Travel Centers of Am. LLC v. Brog*, No. 3751-CC, 2008 Del. Ch. LEXIS 183, *9 (Del. Ch. Dec. 5, 2008); *see also* Restatement (Second) of Contracts § 2 (1981). A condition precedent is an act or event that must occur before a duty to perform a promise arises. *AES P.R., L.P. v. Alstom Power, Inc.*, 429 F. Supp. 2d 713, 717 (D. Del. 2006) (citing Delaware state law); *see also* Restatement

(Second) of Contracts § 224. Conditions precedent are disfavored because they tend to work forfeitures. *AES*, 429 F. Supp. 2d at 717 (internal citations omitted). Wherever possible, equity construes ambiguous contract provisions as covenants rather than conditions. *See Wilmington Tr. Co. v. Clark*, 325 A.2d 383, 386 (Del. Ch. 1974). However, if the contract is unambiguous, the court construes it according to its terms. *AES*, 429 F. Supp. 2d at 717 (citing 17 Am. Jur. 2d Contracts § 460 (2006)).

**[10]**  Applying these principles, ToU § 4(B)(ii) and (iii)'s prohibitions against bots and unauthorized third-party software are covenants rather than copyright-enforceable conditions. *See Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1212, (9th Cir. 2010) ("[H]eadings and titles are not meant to take the place of the detailed provisions of the text," and . . . "the heading of a section cannot limit the plain meaning of the text." (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528—29 (1947))). Although ToU § 4 is titled, "Limitations on Your Use of the Service," nothing in that section conditions Blizzard's grant of a limited license on players' compliance with ToU § 4's restrictions. To the extent that the title introduces any ambiguity, under Delaware law, ToU § 4(B) is not a condition, but is a contractual covenant. *Cf. Sun Microsystems, Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1031-32 (N.D. Cal. 2000) ("*Sun II*") (where Sun licensed Microsoft to create only derivative works compatible with other Sun software, Microsoft's "compatibility obligations" were covenants because the license was not specifically conditioned on their fulfillment).

To recover for copyright infringement based on breach of a license agreement, (1) the copying must exceed the scope of the defendant's license and (2) the copyright owner's complaint must be grounded in an exclusive right of copyright (e.g., unlawful reproduction or distribution). *See Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc.*,

421 F.3d 1307, 1315-16 (Fed. Cir. 2005). Contractual rights, however, can be much broader:

> [C]onsider a license in which the copyright owner grants a person the right to make one and only one copy of a book with the caveat that the licensee may not read the last ten pages. Obviously, a licensee who made a hundred copies of the book would be liable for copyright infringement because the copying would violate the Copyright Act's prohibition on reproduction and would exceed the scope of the license. Alternatively, if the licensee made a single copy of the book, but read the last ten pages, the only cause of action would be for breach of contract, because reading a book does not violate any right protected by copyright law.

*Id*. at 1316. Consistent with this approach, we have held that the potential for infringement exists only where the licensee's action (1) exceeds the license's scope (2) in a manner that implicates one of the licensor's exclusive statutory rights. *See, e.g.*, *Sun I*, 118 F.3d at 1121-22 (remanding for infringement determination where defendant allegedly violated a license term regulating the creation of derivative works).[2]

[11] Here, ToU § 4 contains certain restrictions that are

---

[2]*See also S.O.S.*, 886 F.2d at 1089 (remanding for infringement determination where licensee exceeded the license's scope by preparing a modified version of software programs without licensor's authorization); *LGS Architects, Inc. v. Concordia Homes, Inc.*, 434 F.3d 1150, 1154-57 (9th Cir. 2006) (licensor likely to prove infringement where licensee used architectural plans for project outside the license's scope, where licensee's use may have included unauthorized reproduction, distribution, and public display of the plans); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 511 (9th Cir. 1985) (hotel infringed copyright by publicly performing copyrighted music with representations of movie scenes, where its public performance license expressly prohibited the use of accompanying visual representations).

grounded in Blizzard's exclusive rights of copyright and other restrictions that are not. For instance, ToU § 4(D) forbids creation of derivative works based on WoW without Blizzard's consent. A player who violates this prohibition would exceed the scope of her license and violate one of Blizzard's exclusive rights under the Copyright Act. In contrast, ToU § 4(C)(ii) prohibits a player's disruption of another player's game experience. *Id.* A player might violate this prohibition while playing the game by harassing another player with unsolicited instant messages. Although this conduct may violate the contractual covenants with Blizzard, it would not violate any of Blizzard's exclusive rights of copyright. The anti-bot provisions at issue in this case, ToU § 4(B)(ii) and (iii), are similarly covenants rather than conditions. A Glider user violates the covenants with Blizzard, but does not thereby commit copyright infringement because Glider does not infringe any of Blizzard's exclusive rights. For instance, the use does not alter or copy WoW software.

Were we to hold otherwise, Blizzard — or any software copyright holder — could designate any disfavored conduct during software use as copyright infringement, by purporting to condition the license on the player's abstention from the disfavored conduct. The rationale would be that because the conduct occurs while the player's computer is copying the software code into RAM in order for it to run, the violation is copyright infringement. This would allow software copyright owners far greater rights than Congress has generally conferred on copyright owners.[3]

---

[3]A copyright holder may wish to enforce violations of license agreements as copyright infringements for several reasons. First, breach of contract damages are generally limited to the value of the actual loss caused by the breach. *See* 24 Richard A. Lord, *Williston on Contracts* § 65:1 (4th ed. 2007). In contrast, copyright damages include the copyright owner's actual damages and the infringer's actual profits, or statutory damages of up to $150,000 per work. 17 U.S.C. § 504; *see Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 512 n.5 (9th Cir. 1985). Second, copyright law

**[12]** We conclude that for a licensee's violation of a contract to constitute copyright infringement, there must be a nexus between the condition and the licensor's exclusive rights of copyright.[4] Here, WoW players do not commit copyright infringement by using Glider in violation of the ToU. MDY is thus not liable for secondary copyright infringement, which requires the existence of direct copyright infringement. *Grokster*, 545 U.S. at 930.

It follows that because MDY does not infringe Blizzard's copyrights, we need not resolve MDY's contention that Blizzard commits copyright misuse. Copyright misuse is an equitable defense to copyright infringement, the contours of which are still being defined. *See Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997). The remedy for copyright misuse is to deny the copyright holder the right to enforce its copyright during the period of misuse. Since MDY does not infringe, we do not consider whether Blizzard committed copyright misuse.

We thus reverse the district court's grant of summary judgment to Blizzard on its secondary copyright infringement claims. Accordingly, we must also vacate the portion of the district court's permanent injunction that barred MDY and Donnelly from "infringing, or contributing to the infringement of, Blizzard's copyrights in WoW software."

---

offers injunctive relief, seizure of infringing articles, and awards of costs and attorneys' fees. 17 U.S.C. §§ 502-03, 505. Third, as amicus Software & Information Industry Association highlights, copyright law allows copyright owners a remedy against "downstream" infringers with whom they are not in privity of contract. *See ProCD, Inc.*, 86 F.3d at 1454.

[4]A licensee arguably may commit copyright infringement by continuing to use the licensed work while failing to make required payments, even though a failure to make payments otherwise lacks a nexus to the licensor's exclusive statutory rights. We view payment as *sui generis*, however, because of the distinct nexus between payment and all commercial copyright licenses, not just those concerning software.

# V.

After MDY began selling Glider, Blizzard launched Warden, its technology designed to prevent players who used bots from connecting to the WoW servers. Blizzard used Warden to ban most Glider users in September 2005. Blizzard claims that MDY is liable under DMCA §§ 1201(a)(2) and (b)(1) because it thereafter programmed Glider to avoid detection by Warden.

## A.   The Warden technology

Warden has two components. The first is a software module called "scan.dll," which scans a computer's RAM prior to allowing the player to connect to WoW's servers. If scan.dll detects that a bot is running, such as Glider, it will not allow the player to connect and play. After Blizzard launched Warden, MDY reconfigured Glider to circumvent scan.dll by not loading itself until after scan.dll completed its check. Warden's second component is a "resident" component that runs periodically in the background on a player's computer when it is connected to WoW's servers. It asks the computer to report portions of the WoW code running in RAM, and it looks for patterns of code associated with known bots or cheats. If it detects a bot or cheat, it boots the player from the game, which halts the computer's copying of copyrighted code into RAM.

## B.   The Digital Millennium Copyright Act

Congress enacted the DMCA in 1998 to conform United States copyright law to its obligations under two World Intellectual Property Organization ("WIPO") treaties, which require contracting parties to provide effective legal remedies against the circumvention of protective technological measures used by copyright owners. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001). In enacting the DMCA, Congress sought to mitigate the problems pre-

sented by copyright enforcement in the digital age. *Id.* The DMCA contains three provisions directed at the circumvention of copyright owners' technological measures. The Supreme Court has yet to construe these provisions, and they raise questions of first impression in this circuit.

The first provision, 17 U.S.C. § 1201(a)(1)(A), is a general prohibition against "circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]." The second prohibits trafficking in technology that circumvents a technological measure that "effectively controls access" to a copyrighted work. 17 U.S.C. § 1201(a)(2). The third prohibits trafficking in technology that circumvents a technological measure that "effectively protects" a copyright owner's right. 17 U.S.C. § 1201(b)(1).

## C.   The district court's decision

The district court assessed whether MDY violated DMCA §§ 1201(a)(2) and (b)(1) with respect to three WoW components. First, the district court considered the game client software's **literal elements**: the source code stored on players' hard drives. Second, the district court considered the game client software's **individual non-literal elements**: the 400,000+ discrete visual and audible components of the game, such as a visual image of a monster or its audible roar. Finally, it considered the game's **dynamic non-literal elements**: that is, the "real-time experience of traveling through different worlds, hearing their sounds, viewing their structures, encountering their inhabitants and monsters, and encountering other players."

The district court granted MDY partial summary judgment as to Blizzard's § 1201(a)(2) claim with respect to WoW's literal elements. The district court reasoned that Warden does not effectively control access to the literal elements because WoW players can access the literal elements without connecting to a game server and encountering Warden; they need

only install the game client software on their computers. The district court also ruled for MDY following trial as to Blizzard's § 1201(a)(2) claim with respect to WoW's individual non-literal elements, reasoning that these elements could also be accessed on a player's hard drive without encountering Warden.

The district court, however, ruled for Blizzard following trial as to its §§ 1201(a)(2) and (b)(1) claims with respect to WoW's dynamic non-literal elements, or the "real-time experience" of playing WoW. It reasoned that Warden effectively controlled access to these elements, which could not be accessed without connecting to Blizzard's servers. It also found that Glider allowed its users to circumvent Warden by avoiding or bypassing its detection features, and that MDY marketed Glider for use in circumventing Warden.

We turn to consider whether Glider violates DMCA §§ 1201(a)(2) and (b)(1) by allowing users to circumvent Warden to access WoW's various elements. MDY contends that Warden's scan.dll and resident components are separate, and only scan.dll should be considered as a potential access control measure under § 1201(a)(2). However, in our view, an access control measure can both (1) attempt to block initial access and (2) revoke access if a secondary check determines that access was unauthorized. Our analysis considers Warden's scan.dll and resident components together because the two components have the same purpose: to prevent players using detectable bots from continuing to access WoW software.

## D.   Construction of § 1201

One of the issues raised by this appeal is whether certain provisions of § 1201 prohibit circumvention of access controls when access does not constitute copyright infringement. To answer this question and others presented by this appeal,

we address the nature and interrelationship of the various provisions of § 1201 in the overall context of the Copyright Act.

We begin by considering the scope of DMCA § 1201's three operative provisions, §§ 1201(a)(1), 1201(a)(2), and 1201(b)(1). We consider them side-by-side, because "[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole. Thus, the [term to be construed] must be read in light of the immediately following phrase . . . ." *United States v. Morton*, 467 U.S. 822, 828 (1984); *see also Padash v. I.N.S.*, 358 F.3d 1161, 1170 (9th Cir. 2004) (we analyze the statutory provision to be construed "in the context of the governing statute as a whole, presuming congressional intent to create a coherent regulatory scheme").

### 1. *Text of the operative provisions*

"We begin, as always, with the text of the statute." *Hawaii v. Office of Hawaiian Affairs*, 129 S. Ct. 1436, 1443 (2009) (quoting *Permanent Mission of India to United Nations v. City of New York*, 551 U.S. 193, 197 (2007)). Section 1201(a)(1)(A) prohibits "circumvent[ing] a technological measure that effectively controls access to a work protected under this title." Sections 1201(a)(2) and (b)(1) provide that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that —

| §1201(a)(2) | § 1201(b)(1) |
|---|---|
| (A) | (A) |
| is primarily designed or produced | is primarily designed or produced |
| for the purpose of | for the purpose of |
| **circumventing a technological measure** | **circumventing protection afforded** |
| | **by a technological measure** |
| that effectively controls access | that effectively protects |
| to **a work protected under this title;** | **a right of a copyright owner;** |
| (B) | (B) |
| has only limited commercially significant | has only limited commercially significant |
| purpose or use other than | purpose of use other than |
| to circumvent a technological measure | to circumvent protection afforded by a |
| | technological measure |
| that effectively controls access | that effectively protects a |
| to a work protected under this title; | right of a copyright owner under this title |
| | in a work or portion thereof; |
| (C) | (C) |
| is marketed by a person or another acting | is marketed by that person or another acting |
| in concert with that person | in concert with that person |
| with that person's knowledge for use | with that person's knowledge for use |
| in circumventing | in circumventing protection afforded by |
| a technological measure that | a technological measure that |
| effectively controls access to | effectively protects a |
| a work protected under this title. | right of a copyright owner under this title in |
| a | portion or work thereof." |

(emphasis added).

## 2.   *Our harmonization of the DMCA's operative provisions*

**[13]** For the reasons set forth below, we believe that § 1201 is best understood to create two distinct types of claims. First, § 1201(a) prohibits the circumvention of any technological measure that effectively controls access to a protected work and grants copyright owners the right to enforce that prohibition. *Cf. Corley,* 273 F.3d at 441 ("[T]he focus of subsection 1201(a)(2) is circumvention of technologies designed to prevent access to a work"). Second, and in contrast to § 1201(a), § 1201(b)(1) prohibits trafficking in technologies that circumvent technological measures that effectively protect "a right of a copyright owner." Section 1201(b)(1)'s prohibition is thus aimed at circumventions of

measures that protect the copyright itself: it entitles copyright owners to protect their existing exclusive rights under the Copyright Act. Those exclusive rights are reproduction, distribution, public performance, public display, and creation of derivative works. 17 U.S.C. § 106. Historically speaking, preventing "access" to a protected work in itself has not been a right of a copyright owner arising from the Copyright Act.[5]

**[14]** Our construction of § 1201 is compelled by the four significant textual differences between §§ 1201(a) and (b). First, § 1201(a)(2) prohibits the circumvention of a measure that "effectively controls access to *a work protected under this title*," whereas § 1201(b)(1) concerns a measure that "effectively protects *a right of a copyright owner under this title in a work or portion thereof*." (emphasis added). We read § 1201(b)(1)'s language — "right of a copyright owner under this title" — to reinforce copyright owners' traditional exclusive rights under § 106 by granting them an additional cause of action against those who traffic in circumventing devices that facilitate infringement. Sections 1201(a)(1) and (a)(2), however, use the term "work protected under this title." Neither of these two subsections explicitly refers to traditional copyright infringement under § 106. Accordingly, we read this term as extending a new form of protection, i.e., the right to prevent circumvention of access controls, broadly to works protected under Title 17, i.e., copyrighted works.

Second, as used in § 1201(a), to "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C.

---

[5]17 U.S.C. § 106; *see also* Jay Dratler, *Cyberlaw: Intellectual Prop. in the Digital Millennium*, § 1.02 (2009) (stating that the DMCA's "protection is also quite different from the traditional exclusive rights of the copyright holder . . . [where the] exclusive rights never implicated access to the work, as such").

§ 1201(a)(3)(A). These two specific examples of unlawful circumvention under § 1201(a) — descrambling a scrambled work and decrypting an encrypted work — are acts that do not necessarily infringe or facilitate infringement of a copyright.[6] Descrambling or decrypting only enables someone to watch or listen to a work without authorization, which is not necessarily an infringement of a copyright owner's traditional exclusive rights under § 106. Put differently, descrambling and decrypting do not necessarily result in someone's reproducing, distributing, publicly performing, or publicly displaying the copyrighted work, or creating derivative works based on the copyrighted work.

The third significant difference between the subsections is that § 1201(a)(1)(A) prohibits circumventing an effective access control measure, whereas § 1201(b) prohibits trafficking in circumventing devices, but does not prohibit circumvention itself because such conduct was already outlawed as copyright infringement. The Senate Judiciary Committee explained:

> This . . . is the reason there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1). The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation on 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary.

S. Rep. No. 105-90, at 11 (1998). This difference reinforces our reading of § 1201(b) as strengthening copyright owners' traditional rights against copyright infringement and of

---

[6]Perhaps for this reason, Congress did not list descrambling and decrypting as circumventing acts that would violate § 1201(b)(1). *See* 17 U.S.C. § 1201(b)(2)(A).

§ 1201(a) as granting copyright owners a new anti-circumvention right.

Fourth, in § 1201(a)(1)(B)-(D), Congress directs the Library of Congress ("Library") to identify classes of copyrighted works for which "noninfringing uses by persons who are users of a copyrighted work are, or are likely to be, adversely affected, and the [anti-circumvention] prohibition contained in [§ 1201(a)(1)(A)] shall not apply to such users with respect to such classes of works for the ensuing 3-year period." There is no analogous provision in § 1201(b). We impute this lack of symmetry to Congress' need to balance copyright owners' new anti-circumvention right with the public's right to access the work. *Cf.* H.R. Rep. No. 105-551, pt. 2, at 26 (1998) (specifying that the House Commerce Committee "endeavored to specify, with as much clarity as possible, how the right against anti-circumvention (sic) would be qualified to maintain balance between the interests of content creators and information users."). Sections 1201(a)(1)(B)-(D) thus promote the public's right to access by allowing the Library to exempt circumvention of effective access control measures in particular situations where it concludes that the public's right to access outweighs the owner's interest in restricting access.[7] In limiting the owner's right to control access, the Library does not, and is not permitted to, authorize infringement of a copyright owner's traditional exclusive rights under the copyright. Rather, the Library is only entitled to moderate the new anti-circumvention right created by, and hence subject to the limitations in, DMCA § 1201(a)(1).[8]

---

[7]For instance, pursuant to § 1201(a), the Library of Congress recently approved circumvention of the technological measures contained on the iPhone and similar wireless phone handsets known as "smartphones," in order to allow users to install and run third-party software applications on these phones. *See http://www.copyright.gov/fedreg/2010/75fr43825.pdf.*

[8]In addition to these four textual differences, we note that § 1201(a)(2) prohibits the circumvention of "a technological measure," and § 1201(b)(1) prohibits the circumvention "of protection afforded by a

Our reading of §§ 1201(a) and (b) ensures that neither section is rendered superfluous. A violation of § 1201(a)(1)(A), which prohibits circumvention itself, will not be a violation of § 1201(b), which does not contain an analogous prohibition on circumvention. A violation of § 1201(a)(2), which prohibits trafficking in devices that facilitate circumvention of *access* control measures, will not always be a violation of § 1201(b)(1), which prohibits trafficking in devices that facilitate circumvention of measures that protect against *copyright infringement*. Of course, if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement, a defendant who traffics in a device that circumvents that measure could be liable under both §§ 1201(a) and (b). Nonetheless, we read the differences in structure between §§ 1201(a) and (b) as reflecting Congress's intent to address distinct concerns by creating different rights with different elements.

3. *Our construction of the DMCA is consistent with the legislative history*

Although the text suffices to resolve the issues before us, we also consider the legislative history in order to address the parties' arguments concerning it. Our review of that history supports the view that Congress created a new anti-circumvention right in § 1201(a)(2) independent of traditional copyright infringement and granted copyright owners a new weapon against copyright infringement in § 1201(b)(1). For instance, the Senate Judiciary Committee report explains that §§ 1201(a)(2) and (b)(1) are "not interchangeable": they were "designed to protect two distinct rights and to target two dis-

---

technological measure." In our view, these terms have the same meaning, given the presumption that a "legislative body generally uses a particular word with a consistent meaning in a given context." *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, (2010) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)) (internal quotation marks omitted).

tinct classes of devices," and "many devices will be subject to challenge only under one of the subsections." S. Rep. No. 105-190, at 12 (1998). That is, § 1201(a)(2) "is designed to protect access to a copyrighted work," while § 1201(b)(1) "is designed to protect the traditional copyright rights of the copyright owner." *Id*. Thus, the Senate Judiciary Committee understood § 1201 to create the following regime:

> [I]f an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under § 1201(b)(1), but not under § 1201(a)(2). Conversely, if an effective technological protection measure limits access to the plain text of a work only to those with authorized access, but provides no additional protection against copying, displaying, performing or distributing the work, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under § 1201(a)(2), but not under § 1201(b).

*Id*. The Senate Judiciary Committee proffered an example of § 1201(a) liability with no nexus to infringement, stating that if an owner effectively protected access to a copyrighted work by use of a password, it would violate § 1201(a)(2)(A)

> [T]o defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act. This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

*Id*. at 12. The House Judiciary Committee similarly states of § 1201(a)(2), "The act of circumventing a technological protection measure put in place by a copyright owner to control

access to a copyrighted work is the electronic equivalent of breaking into a locked room in order to obtain a copy of a book." *See* H.R. Rep. No. 105-551, pt. 1, at 17 (1998). We note that bypassing a password and breaking into a locked room in order to read or view a copyrighted work would not infringe on any of the copyright owner's exclusive rights under § 106.

We read this legislative history as confirming Congress's intent, in light of the current digital age, to grant copyright owners an independent right to enforce the prohibition against circumvention of effective technological access controls.[9] In § 1201(a), Congress was particularly concerned with encouraging copyright owners to make their works available in digital formats such as "on-demand" or "pay-per-view," which allow consumers effectively to "borrow" a copy of the work for a limited time or a limited number of uses. As the House Commerce Committee explained:

> [A]n increasing number of intellectual property works are being distributed using a "client-server" model, where the work is effectively "borrowed" by the user (e.g., infrequent users of expensive software purchase a certain number of uses, or viewers watch a movie on a pay-per-view basis). To operate in this environment, content providers will need both the technology to make new uses possible and the legal framework to ensure they can protect their work from piracy.

---

[9]Indeed, the House Commerce Committee proposed, albeit unsuccessfully, to move § 1201 out of Title 17 altogether "because these regulatory provisions have little, if anything, to do with copyright law. The anti-circumvention provisions (and the accompanying penalty provisions for violations of them) would be separate from, and cumulative to, the existing claims available to copyright owners." H.R. Rep. No. 105-551 (1998), pt. 2, at 23-24.

*See* H.R. Rep. No. 105-551 pt. 2, at 23 (1998).

**[15]** Our review of the legislative history supports our reading of § 1201: that section (a) creates a new anti-circumvention right distinct from copyright infringement, while section (b) strengthens the traditional prohibition against copyright infringement.[10] We now review the decisions of the Federal Circuit that have interpreted § 1201 differently.

### 4.   *The Federal Circuit's decisions*

The Federal Circuit has adopted a different approach to the DMCA. In essence, it requires § 1201(a) plaintiffs to demonstrate that the circumventing technology infringes or facilitates infringement of the plaintiff's copyright (an "infringement nexus requirement"). *See Chamberlain Group, Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1203 (Fed. Cir. 2004); *Storage Tech. Corp. v. Custom Hardware Eng'g Consulting, Inc.*, 421 F.3d 1307 (Fed. Cir. 2005).[11]

The seminal decision is *Chamberlain*, 381 F.3d 1178 (Fed. Cir. 2004). In *Chamberlain*, the plaintiff sold garage door

---

[10]The Copyright Office has also suggested that § 1201(a) creates a new access control right independent from copyright infringement, by expressing its view that the fair use defense to traditional copyright infringement does not apply to violations of § 1201(a)(1). U.S. Copyright Office, The Digital Millennium Copyright Act of 1998: U.S. Copyright Office Summary 4 (1998), *available at http://www.copyright.gov/legislation/dmca.pdf* ("Since the fair use doctrine is not a defense to the act of gaining unauthorized access to a work, the act of circumventing a technological measure in order to gain access is prohibited.").

[11]The Fifth Circuit in its subsequently withdrawn opinion in *MGE UPS Systems, Inc. v. GE Consumer and Industrial, Inc.*, 95 U.S.P.Q.2d 1632, 1635 (5th Cir. 2010), embraced the Federal Circuit's approach in *Chamberlain*. However, its revised opinion, 622 F.3d (5th Cir. Sept. 20, 2010), avoids the issue by determining that MGE had not shown circumvention of its software protections. Notably, the revised opinion does not cite *Chamberlain*.

openers ("GDOs") with a "rolling code" security system that purportedly reduced the risk of crime by constantly changing the transmitter signal necessary to open the door. *Id*. at 1183. Customers used the GDOs' transmitters to send the changing signal, which in turn opened or closed their garage doors. *Id*.

Plaintiff sued the defendant, who sold "universal" GDO transmitters for use with plaintiff's GDOs, under § 1201(a)(2). *Id*. at 1185. The plaintiff alleged that its GDOs and transmitters both contained copyrighted computer programs and that its rolling code security system was a technological measure that controlled access to those programs. *Id*. at 1183. Accordingly, plaintiff alleged that the defendant — by selling GDO transmitters that were compatible with plaintiff's GDOs — had trafficked in a technology that was primarily used for the circumvention of a technological measure (the rolling code security system) that effectively controlled access to plaintiff's copyrighted works. *Id*.

The Federal Circuit rejected the plaintiff's claim, holding that the defendant did not violate § 1201(a)(2) because, *inter alia*, the defendant's universal GDO transmitters did not infringe or facilitate infringement of the plaintiff's copyrighted computer programs. *Id*. at 1202-03. The linchpin of the *Chamberlain* court's analysis is its conclusion that DMCA coverage is limited to a copyright owner's rights under the Copyright Act as set forth in § 106 of the Copyright Act. *Id*. at 1192-93. Thus, it held that § 1201(a) did not grant copyright owners a new anti-circumvention right, but instead, established new causes of action for a defendant's unauthorized access of copyrighted material when it infringes upon a copyright owner's rights under § 106. *Id*. at 1192, 1194. Accordingly, a § 1201(a)(2) plaintiff was required to demonstrate a nexus to infringement — i.e., that the defendant's trafficking in circumventing technology had a "reasonable relationship" to the protections that the Copyright Act affords copyright owners. *Id*. at 1202-03. The Federal Circuit explained:

> Defendants who traffic in devices that circumvent access controls in ways that facilitate infringement may be subject to liability under § 1201(a)(2). Defendants who use such devices may be subject to liability under § 1201(a)(1) whether they infringe or not. Because all defendants who traffic in devices that circumvent rights controls necessarily facilitate infringement, they may be subject to liability under § 1201(b). Defendants who use such devices may be subject to liability for copyright infringement. *And finally, defendants whose circumvention devices do not facilitate infringement are not subject to § 1201 liability.*

*Id*. at 1195 (emphasis added). *Chamberlain* concluded that § 1201(a) created a new cause of action linked to copyright infringement, rather than a new anti-circumvention right separate from copyright infringement, for six reasons.

First, *Chamberlain* reasoned that Congress enacted the DMCA to balance the interests of copyright owners and information users, and an infringement nexus requirement was necessary to create an anti-circumvention right that truly achieved that balance. *Id*. at 1196 (citing H.R. Rep. No. 105-551, at 26 (1998)). Second, *Chamberlain* feared that copyright owners could use an access control right to prohibit exclusively fair uses of their material even absent feared foul use. *Id*. at 1201. Third, *Chamberlain* feared that § 1201(a) would allow companies to leverage their sales into aftermarket monopolies, in potential violation of antitrust law and the doctrine of copyright misuse. *Id*. (citing *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 455 (1992) (antitrust); *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003) (copyright misuse)). Fourth, *Chamberlain* viewed an infringement nexus requirement as necessary to prevent "absurd and disastrous results," such as the existence of DMCA liability for disabling a burglary alarm to gain access to a home containing copyrighted materials. *Id*.

Fifth, *Chamberlain* stated that an infringement nexus requirement might be necessary to render Congress's exercise of its Copyright Clause authority rational. *Id.* at 1200. The Copyright Clause gives Congress "the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product." *Id.* (citing *Eldred v. Ashcroft*, 537 U.S. 186, 204-05 (2003) (internal citation omitted)). Without an infringement nexus requirement, Congress arguably would have allowed copyright owners in § 1201(a) to deny all access to the public by putting an effective access control measure in place that the public was not allowed to circumvent.

Finally, the *Chamberlain* court viewed an infringement nexus requirement as necessary for the Copyright Act to be internally consistent. It reasoned that § 1201(c)(1), enacted simultaneously, provides that "nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title." The *Chamberlain* court opined that if § 1201(a) creates liability for access without regard to the remainder of the Copyright Act, it "would clearly affect rights and limitations, if not remedies and defenses." *Id.*

Accordingly, the Federal Circuit held that a DMCA § 1201(a)(2) action was foreclosed to the extent that the defendant trafficked in a device that did not facilitate copyright infringement. *Id.*; *see also Storage Tech.*, 421 F.3d 1307 (same).

### 5.   *We decline to adopt an infringement nexus requirement*

**[16]** While we appreciate the policy considerations expressed by the Federal Circuit in *Chamberlain*, we are unable to follow its approach because it is contrary to the plain language of the statute. In addition, the Federal Circuit failed to recognize the rationale for the statutory construction that we have proffered. Also, its approach is based on policy

concerns that are best directed to Congress in the first instance, or for which there appear to be other reasons that do not require such a convoluted construction of the statute's language.

### i.   Statutory inconsistencies

Were we to follow *Chamberlain* in imposing an infringement nexus requirement, we would have to disregard the plain language of the statute. Moreover, there is significant textual evidence showing Congress's intent to create a new anti-circumvention right in § 1201(a) distinct from infringement. As set forth *supra*, this evidence includes: (1) Congress's choice to link only § 1201(b)(1) explicitly to infringement; (2) Congress's provision in § 1201(a)(3)(A) that descrambling and decrypting devices can lead to § 1201(a) liability, even though descrambling and decrypting devices may only enable non-infringing access to a copyrighted work; and (3) Congress's creation of a mechanism in § 1201(a)(1)(B)-(D) to exempt certain non-infringing behavior from § 1201(a)(1) liability, a mechanism that would be unnecessary if an infringement nexus requirement existed.

Though unnecessary to our conclusion because of the clarity of the statute's text, *see United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010), we also note that the legislative history supports the conclusion that Congress intended to prohibit even non-infringing circumvention and trafficking in circumventing devices. Moreover, in mandating a § 1201(a) nexus to infringement, we would deprive copyright owners of the important enforcement tool that Congress granted them to make sure that they are compensated for valuable non-infringing access — for instance, copyright owners who make movies or music available online, protected by an access control measure, in exchange for direct or indirect payment.

The *Chamberlain* court reasoned that if § 1201(a) creates liability for access without regard to the remainder of the

Copyright Act, it "would clearly affect rights and limitations, if not remedies and defenses." 381 F.3d at 1200. This perceived tension is relieved by our recognition that § 1201(a) creates a new anti-circumvention right distinct from the traditional exclusive rights of a copyright owner. It follows that § 1201(a) does not limit the traditional framework of exclusive rights created by § 106, or defenses to those rights such as fair use.[12] We are thus unpersuaded by *Chamberlain*'s reading of the DMCA's text and structure.

### ii.   Additional interpretive considerations

Though we need no further evidence of Congress's intent, the parties, citing *Chamberlain*, proffer several other arguments, which we review briefly in order to address the parties' contentions. *Chamberlain* relied heavily on policy considerations to support its reading of § 1201(a). As a threshold matter, we stress that such considerations cannot trump the statute's plain text and structure. *Gallegos*, 613 F.3d at 1214. Even were they permissible considerations in this case, however, they would not persuade us to adopt an infringement nexus requirement. *Chamberlain* feared that § 1201(a) would allow companies to leverage their sales into aftermarket monopolies, in tension with antitrust law and the doctrine of copyright misuse.[13] *Id.* (citing *Eastman*, 504 U.S. at 455 (antitrust); *Assessment Techs.*, 350 F.3d at 647 (copy-

---

[12]Like the *Chamberlain* court, we need not and do not reach the relationship between fair use under § 107 of the Copyright Act and violations of § 1201. *Chamberlain*, 381 F.3d at 1199 n.14. MDY has not claimed that Glider use is a "fair use" of WoW's dynamic non-literal elements. Accordingly, we too leave open the question whether fair use might serve as an affirmative defense to a prima facie violation of § 1201. *Id.*

[13]Copyright misuse is an equitable defense to copyright infringement that denies the copyright holder the right to enforce its copyright during the period of misuse. *Practice Mgmt. Info. Corp v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997). Since we have held that § 1201(a) creates a right distinct from copyright infringement, we conclude that we need not address copyright misuse in this case.

right misuse)). Concerning antitrust law, we note that there is no clear issue of anti-competitive behavior in this case because Blizzard does not seek to put a direct competitor who offers a competing role-playing game out of business and the parties have not argued this issue. If a § 1201(a)(2) defendant in a future case claims that a plaintiff is attempting to enforce its DMCA anti-circumvention right in a manner that violates antitrust law, we will then consider the interplay between this new anti-circumvention right and antitrust law.

*Chamberlain* also viewed an infringement nexus requirement as necessary to prevent "absurd and disastrous results," such as the existence of DMCA liability for disabling a burglary alarm to gain access to a home containing copyrighted materials. 381 F.3d at 1201. In addition, the Federal Circuit was concerned that, without an infringement nexus requirement, § 1201(a) would allow copyright owners to deny all access to the public by putting an effective access control measure in place that the public is not allowed to circumvent. 381 F.3d at 1200. Both concerns appear to be overstated,[14] but even accepting them, *arguendo*, as legitimate concerns, they do not permit reading the statute as requiring the imposition of an infringement nexus. As § 1201(a) creates a distinct right, it does not disturb the balance between public rights and the traditional rights of owners of copyright under the Copyright Act. Moreover, § 1201(a)(1)(B)-(D) allows the Library of Congress to create exceptions to the § 1201(a) anti-circumvention right in the public's interest. If greater protec-

---

[14]The *Chamberlain* court's assertion that the public has a constitutional right to appropriately access copyright works during the copyright term, 381 F.3d at 1200, cited *Eldred v. Ashcroft*, 537 U.S. 186, 204-05 (2003). The *Eldred* decision, however, was quoting the Supreme Court's previous decision in *Sony Corp. of America v. Universal City Studios, Inc.*, which discussed the public's right of access *after the copyright term*. 464 U.S. 417, 429 (1984) ("[T]he limited grant [of copyright] . . . is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.").

tion of the public's ability to access copyrighted works is required, Congress can provide such protection by amending the statute.

In sum, we conclude that a fair reading of the statute (supported by legislative history) indicates that Congress created a distinct anti-circumvention right under § 1201(a) without an infringement nexus requirement. Thus, even accepting the validity of the concerns expressed in *Chamberlain*, those concerns do not authorize us to override congressional intent and add a non-textual element to the statute. *See In Re Dumont*, 581 F.3d 1104, 1111 (9th Cir. 2009) ("[W]here the language of an enactment is clear or, in modern parlance, plain, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended."). Accordingly, we reject the imposition of an infringement nexus requirement. We now consider whether MDY has violated §§ 1201(a)(2) and (b)(1).

### E.  Blizzard's § 1201(a)(2) claim

#### 1.  *WoW's literal elements and individual non-literal elements*

**[17]** We agree with the district court that MDY's Glider does not violate DMCA § 1201(a)(2) with respect to WoW's literal elements[15] and individual non-literal elements, because Warden does not effectively control access to these WoW elements. First, Warden does not control access to WoW's literal elements because these elements — the game client's software code — are available on a player's hard drive once the game client software is installed. Second, as the district court found:

---

[15]We also agree with the district court that there are no genuine issues of material fact on Blizzard's § 1201(a)(2) claim regarding WoW's literal elements.

> [WoW's] individual nonliteral components may be accessed by a user without signing on to the server. As was demonstrated during trial, an owner of the game client software may use independently purchased computer programs to call up the visual images or the recorded sounds within the game client software. For instance, a user may call up and listen to the roar a particular monster makes within the game. Or the user may call up a virtual image of that monster.

Since a player need not encounter Warden to access WoW's individual non-literal elements, Warden does not effectively control access to those elements.

Our conclusion is in accord with the Sixth Circuit's decision in *Lexmark International v. Static Control Components*, 387 F.3d 522 (6th Cir. 2004). In *Lexmark*, the plaintiff sold laser printers equipped with an authentication sequence, verified by the printer's copyrighted software, that ensured that only plaintiff's own toner cartridges could be inserted into the printers. *Id.* at 530. The defendant sold microchips capable of generating an authentication sequence that rendered other manufacturers' cartridges compatible with plaintiff's printers. *Id.*

The Sixth Circuit held that plaintiff's § 1201(a)(2) claim failed because its authentication sequence did not effectively control access to its copyrighted computer program. *Id.* at 546. Rather, the mere purchase of one of plaintiff's printers allowed "access" to the copyrighted program. Any purchaser could read the program code directly from the printer memory without encountering the authentication sequence. *Id.* The authentication sequence thus blocked only one form of access: the ability to make use of the printer. However, it left intact another form of access: the review and use of the computer program's literal code. *Id.* The Sixth Circuit explained:

> Just as one would not say that a lock on the back door of a house "controls access" to a house whose front door does not contain a lock and just as one would not say that a lock on any door of a house "controls access" to the house after its purchaser receives the key to the lock, it does not make sense to say that this provision of the DMCA applies to otherwise-readily-accessible copyrighted works. Add to this the fact that the DMCA not only requires the technological measure to "control access" but requires the measure to control that access "effectively," 17 U.S.C. § 1201(a)(2), and it seems clear that this provision does not naturally extend to a technological measure that restricts one form of access but leaves another route wide open.

*Id.* at 547.

[18] Here, a player's purchase of the WoW game client allows access to the game's literal elements and individual non-literal elements. Warden blocks one form of access to these elements: the ability to access them while connected to a WoW server. However, analogously to the situation in *Lexmark*, Warden leaves open the ability to access these elements directly via the user's computer. We conclude that Warden is not an effective access control measure with respect to WoW's literal elements and individual non-literal elements, and therefore, that MDY does not violate § 1201(a)(2) with respect to these elements.

2.  *WoW's dynamic non-literal elements*

[19] We conclude that MDY meets each of the six textual elements for violating § 1201(a)(2) with respect to WoW's dynamic non-literal elements. That is, MDY (1) traffics in (2) a technology or part thereof (3) that is primarily designed, produced, or marketed for, or has limited commercially significant use other than (4) circumventing a technological mea-

sure (5) that effectively controls access (6) to a copyrighted work. *See* 17 US.C. § 1201(a)(2).

The first two elements are met because MDY "traffics in a technology or part thereof" — that is, it sells Glider. The third and fourth elements are met because Blizzard has established that MDY *markets* Glider for use in circumventing Warden, thus satisfying the requirement of § 1201(a)(2)(C).[16] Indeed, Glider has no function other than to facilitate the playing of WoW. The sixth element is met because, as the district court held, WoW's dynamic non-literal elements constitute a copyrighted work. *See, e.g.*, *Atari Games Corp. v. Oman*, 888 F.2d 878, 884-85 (D.C. Cir. 1989) (the audiovisual display of a computer game is copyrightable independently from the software program code, even though the audiovisual display generated is partially dependent on user input).

---

[16]To "circumvent a technological measure" under § 1201(a) means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, *without the authority of the copyright owner.*" 17 U.S.C. § 1201(a)(3)(A) (emphasis added). A circuit split exists with respect to the meaning of the phrase "without the authority of the copyright owner." The Federal Circuit has concluded that this definition imposes an additional requirement on a § 1201(a)(2) plaintiff: to show that the defendant's circumventing device enables third parties to access the copyrighted work without the copyright owner's authorization. *See Chamberlain*, 381 F.3d at 1193.The Second Circuit has adopted a different view, explaining that § 1201(a)(3)(A) plainly exempts from § 1201(a) liability those whom a copyright owner authorizes to circumvent an access control measure, not those whom a copyright owner authorizes to access the work. *Corley*, 273 F.3d at 444 & n.15; *see also 321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1096 (N.D. Cal. 2004) (same).

We find the Second Circuit's view to be the sounder construction of the statute's language, and conclude that § 1201(a)(2) does not require a plaintiff to show that the accused device enables third parties to access the work without the copyright owner's authorization. Thus, Blizzard has satisfied the "circumvention" element of a § 1201(a)(2) claim, because Blizzard has demonstrated that it did not authorize MDY to circumvent Warden.

**[20]** The fifth element is met because Warden is an effective access control measure. To "effectively control access to a work," a technological measure must "in the ordinary course of its operation, require[ ] the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). Both of Warden's two components "require[ ] the application of information, or a process or a treatment . . . to gain access to the work." For a player to connect to Blizzard's servers which provide access to WoW's dynamic non-literal elements, scan.dll must scan the player's computer RAM and confirm the absence of any bots or cheats. The resident component also requires a "process" in order for the user to continue accessing the work: the user's computer must report portions of WoW code running in RAM to the server. Moreover, Warden's provisions were put into place by Blizzard, and thus, function "with the authority of the copyright owner." Accordingly, Warden effectively controls access to WoW's dynamic non-literal elements.[17] We hold that MDY is liable under § 1201(a)(2) with respect to WoW's dynamic non-literal elements.[18] Accordingly, we

---

[17]The statutory definition of the phrase "effectively control access to a work" does not require that an access control measure be strong or circumvention-proof. Rather, it requires an access control measure to provide some degree of control over access to a copyrighted work. As one district court has observed, if the word "effectively" were read to mean that the statute protects "only successful or efficacious technological means of controlling access," it would "gut" DMCA § 1201(a)(2), because it would "limit the application of the statute to access control measures that thwart circumvention, but withhold protection for those measures that can be circumvented." *See Universal City Studios v. Reimerdes*, 111 F. Supp. 2d 294, 318 (S.D.N.Y. 2000) ("Defendants would have the Court construe the statute to offer protection where none is needed but to withhold protection precisely where protection is essential.").

[18]We note that the DMCA allows innocent violators to seek reduction or remittance of damages. *See* 17 U.S.C. § 1203(c)(5).

affirm the district court's entry of a permanent injunction against MDY to prevent future § 1201(a)(2) violations.[19]

## F.  Blizzard's § 1201(b)(1) claim

[21]  Blizzard may prevail under § 1201(b)(1) only if Warden "effectively protect[s] a right" of Blizzard under the Copyright Act. Blizzard contends that Warden protects its reproduction right against unauthorized copying. We disagree.

First, although WoW players copy the software code into RAM while playing the game, Blizzard's EULA and ToU authorize all licensed WoW players to do so. We have explained that ToU § 4(B)'s bot prohibition is a license covenant rather than a condition. Thus, a Glider user who violates this covenant does not infringe by continuing to copy code into RAM. Accordingly, MDY does not violate § 1201(b)(1) by enabling Glider users to avoid Warden's interruption of their *authorized* copying into RAM.

[22]  Second, although WoW players can theoretically record game play by taking screen shots, there is no evidence that Warden detects or prevents such allegedly infringing copying.[20] This is logical, because Warden was designed to reduce the presence of cheats and bots, not to protect WoW's dynamic non-literal elements against copying. We conclude that Warden does not effectively protect any of Blizzard's

---

[19]For the first time in its petition for rehearing, MDY raises the applicability of Section 1201(f) and the question whether Glider is an "independently created computer program" under that subsection and thus exempt from the coverage of Section 1201(a). Because this argument was not raised to the district court or presented in the parties' briefs on appeal, we decline to reach it.

[20]No evidence establishes that Glider users engage in this practice, and Glider itself does not provide a software mechanism for taking screenshots or otherwise reproducing copyrighted WoW material.

rights under the Copyright Act, and MDY is not liable under § 1201(b)(1) for Glider's circumvention of Warden.[21]

## VI.

The district court granted Blizzard summary judgment on its claim against MDY for tortious interference with contract ("tortious interference") under Arizona law and held that Donnelly was personally liable for MDY's tortious interference. We review the district court's grant of summary judgment de novo. *See Canyon Ferry Rd. Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1027 (9th Cir. 2009). We view the evidence in the light most favorable to non-movant MDY in determining whether there are any genuine issues of material fact. *Id*. Because we conclude that there are triable issues of material fact, we vacate and remand for trial.

### A.   Elements of Blizzard's tortious interference claim

To recover for tortious interference under Arizona law, Blizzard must prove: (1) the existence of a valid contractual relationship; (2) MDY's knowledge of the relationship; (3) MDY's intentional interference in inducing or causing the breach; (4) the impropriety of MDY's interference; and (5) resulting damages. *See Safeway Ins. Co. v. Guerrero*, 106 P.3d 102, 1025 (Ariz. 2005); *see also Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bur. of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981).

Blizzard satisfies four of these five elements based on

---

[21]The district court permanently enjoined "MDY and Michael Donnelly from engaging in contributory or vicarious copyright infringement and from violating the DMCA with respect to Blizzard's copyrights in and rights to" WoW. Because we conclude that MDY is not liable under § 1201(b)(1), we vacate the aspect of the permanent injunction dealing with MDY's and Donnelly's § 1201(b)(1) liability.

undisputed facts. First, a valid contractual relationship exists between Blizzard and its customers based on the operative EULA and ToU. Second, MDY was aware of this relationship: it does not contend that it was unaware of the operative EULA and ToU, or unaware that using Glider breached their terms. In fact, after Blizzard first attempted to ban Glider users, MDY modified its website to notify customers that using Glider violated the ToU. Third, MDY intentionally interfered with Blizzard's contracts. After Blizzard used Warden to ban a majority of Glider users in September 2005, MDY programmed Glider to be undetectable by Warden. Finally, Blizzard has proffered evidence that it was damaged by MDY's conduct.

Thus, Blizzard is entitled to summary judgment if there are no triable issues of material fact as to the fourth element of its tortious interference claim: whether MDY's actions were improper. To determine whether a defendant's conduct was improper, Arizona employs the seven-factor test of Restatement (Second) of Torts § 767. *See Safeway*, 106 P.3d at 1027; *see also Wagonseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1042-43 (Ariz. 1985), *superseded in other respects* by A.R.S. § 23-1501. The seven factors are (1) the nature of MDY's conduct, (2) MDY's motive, (3) Blizzard's interests with which MDY interfered, (4) the interests MDY sought to advance, (5) the social interests in protecting MDY's freedom of action and Blizzard's contractual interests, (6) the proximity or remoteness of MDY's conduct to the interference, and (7) the relations between MDY and Blizzard. *Id.* A court should give greatest weight to the first two factors. *Id.* We conclude that summary judgment was inappropriate here, because on the current record, taking the facts in the light most favorable to MDY, the first five factors do not clearly weigh in either side's favor, thus creating a genuine issue of material fact.

## 1. *Nature of MDY's conduct and MDY's motive*

The parties have presented conflicting evidence with respect to these two most important factors. Blizzard's evi-

dence tends to demonstrate that MDY helped Glider users gain an advantage over other WoW players by advancing automatically to a higher level of the game. Thus, MDY knowingly assisted Glider users to breach their contracts, and then helped to conceal those breaches from Blizzard. Blizzard's evidence also supports the conclusion that Blizzard was negatively affected by MDY's Glider sales, because Glider use: (1) distorts WoW's virtual economy by flooding it with excess resources; (2) interferes with WoW players' ability to interact with other human players in the virtual world; and (3) strains Blizzard's servers because bots spend more continuous time in-game than do human players. Finally, Blizzard introduced evidence that MDY's motive was its three and a half to four million dollar profit.

On the other hand, MDY proffered evidence that it created Glider in 2005, when Blizzard's ToU did not explicitly prohibit bots.[22] Glider initially had no anti-detection features. MDY added these features only after Blizzard added Warden to WoW. Blizzard did not change the EULA or ToU to proscribe bots such as Glider explicitly until after MDY began selling Glider. Finally, MDY has introduced evidence that Glider enhances some players' experience of the game, including players who might otherwise not play WoW at all. Taking this evidence in the light most favorable to MDY, there is a genuine issue of material fact as to these factors.

---

[22] When MDY created Glider in 2005, Blizzard's ToU prohibited the use of "cheats" and "unauthorized third-party software" in connection with WoW. The meaning of these contractual terms, including whether they prohibit bots such as Glider, is ambiguous. In Arizona, the construction of ambiguous contract provisions is a jury question. *See Clark v. Compania Ganadera de Cananea, S.A.*, 385 P.2d 691, 697-98 (Ariz. 1963).

2.  *Blizzard's interests with which MDY interferes; the interest that MDY seeks to advance; the social interest in protecting MDY's and Blizzard's respective interests*

Blizzard argues that it seeks to provide its millions of WoW players with a particular role-playing game experience that excludes bots. It contends, as the district court determined, that MDY's interest depends on inducing Blizzard's customers to breach their contracts. In contrast, MDY argues that Glider is an innovative, profitable software program that has positively affected its users' lives by advancing them to WoW's more interesting levels. MDY has introduced evidence that Glider allows players with limited motor skills to continue to play WoW, improves some users' romantic relationships by reducing the time that they spend playing WoW, and allows users who work long hours to play WoW. We further note that, if the fact-finder decides that Blizzard did not ban bots at the time that MDY created Glider, the fact-finder might conclude that MDY had a legitimate interest in continuing to sell Glider. Again, the parties' differing evidence creates a genuine issue of material fact that precludes an award of summary judgment.

3.  *Proximity of MDY's conduct to the interference; relationship between MDY and Blizzard*

[23] MDY's Glider sales are the but-for cause of Glider users' breach of the operative ToU. Moreover, Blizzard and MDY are not competitors in the online role-playing game market; rather, MDY's profits appear to depend on the continued popularity of WoW. Blizzard, however, chose not to authorize MDY to sell Glider to its users. Even accepting that these factors favor Blizzard, we do not think that they independently warrant a grant of summary judgment to Blizzard. As noted, we cannot hold that five of the seven "impropriety" factors compel a finding in Blizzard's favor at this stage, including the two (nature of MDY's conduct and MDY's motive) that the Arizona courts deem most important.

Accordingly, we vacate the district court's grant of summary judgment to Blizzard.[23]

## B.  Copyright Act preemption

MDY contends that Blizzard's tortious interference claim is preempted by the Copyright Act. The Copyright Act preempts state laws that confer rights equivalent to the exclusive rights of copyright under 17 U.S.C. § 106 (i.e., reproduction, distribution, public display, public performance, and creation of derivative works). 17 U.S.C. § 301(a). However, the Copyright Act does not preempt state law remedies with respect to "activities violating legal or equitable rights that are not equivalent to any of the exclusive rights [of copyright]." 17 U.S.C. § 301(b)(3).

[24] Whether, in these circumstances, tortious interference with contract is preempted by the Copyright Act is a question of first impression in this circuit. However, we have previously addressed a similar tortious interference cause of action under California law and found it not preempted. *See Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089-90 (9th Cir. 2005). In so holding, we relied on the Seventh Circuit's analysis in *ProCD*, 86 F.3d 1447, which explained that because contractual rights are not equivalent to the exclusive rights of copyright, the Copyright Act's preemption clause usually does not affect private contracts. *Altera*, 424 F.3d at 1089; *see ProCD*, 86 F.3d at 1454 ("A copyright is a right against the world. Contracts, by contrast, generally affect only their parties; strangers may do as they please, so contracts do not create 'exclusive rights.' "). The Fourth, Fifth, and Eighth Circuits have also held that the Copyright Act does not preempt a party's enforcement of its contractual rights. *See Nat'l Car Rental Sys., Inc. v. Comp. Assoc. Int'l, Inc.*, 991 F.2d 426,

---

[23]Because the district court entered a permanent injunction based on MDY's liability for tortious interference, we also vacate that permanent injunction.

433 (8th Cir. 1993); *Taquino v. Teledyne Monarch Rubber*, 893 F.2d 1488, 1501 (5th Cir. 1990); *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir. 1988).

**[25]** This action concerns the anti-bot provisions of ToU § 4(b)(ii) and (iii), which we have held are contract-enforceable covenants rather than copyright-enforceable conditions. We conclude that since Blizzard seeks to enforce contractual rights that are not equivalent to any of its exclusive rights of copyright, the Copyright Act does not preempt its tortious interference claim. *Cf. Altera*, 424 F0.3d at 1089-90. Accordingly, we hold that Blizzard's tortious interference claim under Arizona law is not preempted by the Copyright Act, but we vacate the grant of summary judgment because there are outstanding issues of material fact.[24]

## VII.

The district court found that Donnelly was personally liable for MDY's tortious interference with contract, secondary copyright infringement, and DMCA violations. We vacate the district court's decision because we determine that MDY is not liable for secondary copyright infringement and is liable under the DMCA only for violation of § 1201(a)(2) with respect to WoW's dynamic non-literal elements. In addition, we conclude that summary judgment is inappropriate as to Blizzard's claim for tortious interference with contract under Arizona law. Accordingly, on remand, the district court shall

---

[24]Because we determine that there are triable issues of fact, we need not, and do not, address MDY's further contentions: that (1) Blizzard has unclean hands because it changed the ToU to ban bots after this litigation began; and (2) MDY is not liable for tortious interference because it only "honestly persuaded" people to buy Glider.

reconsider the issue of Donnelly's personal liability.[25] The district court's decision is **VACATED** and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.

Each side shall bear its own costs.

---

[25]If MDY is found liable at trial for tortious interference with contract, the district court may consider Donnelly's personal liability for that tortious interference. Moreover, the district court may determine whether Donnelly is personally liable for MDY's violation of DMCA § 1201(a)(2). In light of the foregoing disposition regarding Donnelly's personal liability, we also vacate *in toto* the district court's permanent injunction against Donnelly, though the district court may consider the propriety of an injunction against Donnelly if it finds him liable for MDY's § 1201(a)(2) violations or for tortious interference with contract.